BARROWAY TOPAZ KESSLER
   MELTZER & CHECK, LLP
RAMZI ABADOU   (Bar No. 222567)
NICHOLE BROWNING   (Bar No. 251937)
STACEY KAPLAN  (Bar No. 241989)
ERIK D. PETERSON   (Bar No. 257098)
580 California Street, Suite 1750
San Francisco, CA 94104
Tel:     (415) 400-3000
Fax:     (415) 400-3001
rabadou@btkmc.com
nbrowning@btkmc.com
skaplan@btkmc.com
epeterson@btkmc.com

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
DAVID R. STICKNEY (Bar No. 188574)
BENJAMIN GALDSTON (Bar No.
211114)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:     (858) 793-0070
Fax:     (858) 793-0323
davids@blbglaw.com
beng@blbglaw.com

KAPLAN FOX & KILSHEIMER LLP
FREDERIC S. FOX (*pro hac vice*)
JOEL B. STRAUSS (*pro hac vice*)
DONALD R. HALL (*pro hac vice*)
850 Third Avenue, 14th Floor
New York, NY 10022
Tel:     (212) 687-1980
Fax:     (212) 687-7714
ffox@kaplanfox.com
jstrauss@kaplanfox.com
dhall@kaplanfox.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| HARRY W. PLICHTA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SUNPOWER CORPORATION, THOMAS H. WERNER, DENNIS V. ARRIOLA, EMMANUEL T. HERNANDEZ, DEUTSCHE BANK SECURITIES INC., CREDIT SUISSE SECURITIES (USA) LLC, LAZARD CAPITAL MARKETS LLC, BARCLAYS CAPITAL INC, PIPER JAFFRAY & CO., WACHOVIA CAPITAL MARKETS, LLC n/k/a WELLS FARGO SECURITIES, LLC, SL HARE CAPITAL, INC., T.J. RODGERS, W. STEVE ALBRECHT, BETSY S. ATKINS, PATRICK WOOD, III & UWE-ERNST BUFE<br><br>Defendants. | Case No. CV 09-5473-RS<br>**(Consolidated)**<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

1

## I.   INTRODUCTION

1.      Arkansas Teacher Retirement System, Första-AP Fonden and Danske Invest Management A/S (collectively, "Lead Plaintiffs") allege the following based upon personal knowledge with respect to themselves and, with respect to all other matters, the investigation of Lead Counsel.  Lead Counsel's investigation included, *inter alia*, review and analysis of SunPower Corporation ("SunPower" or the "Company") filings with the U.S. Securities and Exchange Commission ("SEC"), press releases and other Company public statements, securities analyst reports and media reports, as well as interviews with former SunPower employees.  Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      This is a class action for violation of the federal securities laws.  Lead Plaintiffs bring this action on behalf of all persons who purchased or otherwise acquired the publicly-traded securities of SunPower between April 17, 2008 and November 16, 2009, inclusive (the "Class Period"), and were damaged by the conduct asserted herein (the "Class").[1] Lead Plaintiffs assert claims against SunPower and the Insider Defendants (*see* n.2, *infra*) for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

3.      Separately, Lead Plaintiffs assert claims pursuant to §§11(a) and 15 of the Securities Act of 1933 (the "Securities Act"), for materially untrue statements and omissions in the Registration Statement on Form S-3 filed with the SEC on or about September 10, 2008 (the "September 2008 Registration Statement"), and Prospectuses on Form 424B5 filed with the SEC on or about April 29, 2009 (the "April 2009

---

[1]      The Company's equity is traded as Class A and B shares on the NASDAQ under the tickers "SPWRA" and "SPWRB," respectively.  Class B shares were issued to investors in September 2008 in connection with Cypress Semiconductor Corporation ("Cypress") spinning-off its shares of SunPower (the "Class B Shares Offering").  For purposes of this analysis, all references to SunPower's "securities" or "stock" will be to the Class A shares unless otherwise noted.  The reaction of the two classes of SunPower's securities is generally (but not perfectly) correlated.

Prospectuses").[2] The Securities Act claims are not based on any allegation of deliberate or intentional misconduct and Lead Plaintiffs specifically disclaim any reference to or reliance upon fraud allegations for such claims. The defendants for the Securities Act claims are SunPower, certain of the Company's present and former executives and directors and the underwriters for the April 2009 Offerings.[3]

4. SunPower designs, manufactures and sells what it describes as "the planet's most powerful solar" technology. SunPower operates two business segments: components and systems. SunPower's components segment builds and sells solar power products, including solar cells, solar panels and inverters, which convert sunlight to electricity for utility networks for use in residential and commercial applications. SunPower also sells products for use in multi-megawatt solar power plant applications. SunPower's systems segment offers power systems and system technologies, which include development, engineering and procurement of permits and equipment, as well as construction management, access to financing, monitoring and maintenance services.

5. Founded in 1985, SunPower experienced dramatic growth through the development of innovative and highly-efficient solar products. By the start of the Class Period, however, the market that SunPower had once led through technological innovation and engineering savvy had become an oversupplied commodities market dominated by a host of new solar power companies hoping to profit from the alternative energy boom. No

---

[2] Pursuant to the April 2009 Prospectuses, which related to the January 29, 2007 Shelf Registration Statement ("January 2007 Registration Statement"), the Company offered: (1) up to $230 million in 4.75% Senior Convertible Debentures due 2014; and (2) up to 10.35 million shares of Class A stock at $22 per share (the "April 2009 Offerings").

[3] The Underwriter Defendants (defined in ¶¶39-45, *infra*) and Director Defendants (defined in ¶¶33-7, *infra*) are not alleged to have engaged in any fraudulent conduct and are liable exclusively under the non-fraud provisions of §11 of the Securities Act. As used herein, the term "Insider Defendants" refers exclusively to SunPower and those individuals alleged herein to be liable under the fraud provisions of §10(b) of the Exchange Act: (i) Chief Executive Officer ("CEO") Thomas H. Werner ("Werner"); (ii) Chief Financial Officer ("CFO") Dennis V. Arriola ("Arriola"); and (iii) former CFO Emmanuel T. Hernandez ("Hernandez"). The term "defendants" refers exclusively to the Insider Defendants and SunPower, also alleged herein to be liable under the fraud provisions of §10(b) of the Exchange Act.

1    longer able to grow through product innovation alone, between April 2008 and November

2    2009, SunPower resorted to fraudulent accounting in its financial statements and publicly-

3    reported results in order to artificially maintain its stock price.

4            6.      SunPower and the Insider Defendants' fraudulent accounting scheme was

5    simple – they **intentionally** made improper adjustments to the Company's accounting

6    records to remove current operating expenses that had been properly recorded in the

7    Company's cost of goods sold, thereby inflating SunPower's earnings and sales margins

8    and enabling SunPower to publicly report "record" financial results during the Class

9    Period.  SunPower issued numerous false statements about its performance and future

10   prospects, and filed six quarterly reports and an annual report with the SEC which grossly

11   misrepresented the Company's financial results and the adequacy of SunPower's internal

12   controls over financial reporting and disclosure controls and procedures.  SunPower's

13   accounting misstatements not only overstated income and earnings per share ("EPS") in

14   quarters that analysts and the broader market viewed as critical to the Company's success,

15   but it also drastically distorted the Company's publicly-reported gross margins and

16   inflated the Company's inventory balance.

17           7.      As a direct result of the fraudulent accounting scheme, SunPower was

18   forced to formally restate its financial statements for fiscal year ended December 28, 2008,

19   each quarterly period in 2008 and the first three quarters in fiscal year ended January 3,

20   2010 (the "Restatement").[4]   When the truth about SunPower's misstatements was

21   revealed, the market price for SunPower's Class A common stock plunged by

22   approximately 19% on November 17, 2009 and 14% on March 19, 2010 on heavy trading

23   volume.

24           8.      By restating, SunPower has admitted that its financial statements were

25   issued in violation of Generally Accepted Accounting Principles ("GAAP") and due to

26   _____

27   [4]      The restated results were announced on March 18, 2010.  On May 3, 2010,
     SunPower filed three amended Forms 10-Q/A admitting, for the first time, that it had also
     materially misrepresented its inventory component balances during the Class Period.

28   CONSOLIDATED COMPLAINT                                                          -3-
     Case No. 09-5473-RS

"**unsubstantiated accounting entries**…[which] generally resulted in an understatement of the Company's cost of goods sold (referred to as 'cost of revenue' in the [Condensed Consolidated] Statement of Operations)." The Restatement also explained the intentional nature of defendants' scheme: "certain expenses were understated by (a) not sufficiently accruing expenses or (b) **reversing** previously recorded expenses through manual journal entries **that were not based on actual transactions** or reasonable estimates of expenses."[5]

9.     The Company's "unsubstantiated accounting" entries were neither accidental nor isolated – they constituted tens of millions of dollars and represented the difference between meeting or missing Wall Street consensus EPS in key periods for the Company:



Comparison of Analysts' 2Q09 Consensus EPS Expectation to SunPower's 2Q09 Reported EPS, Before and After Restatement (non-GAAP basis)

10.     SunPower's Class Period misstatements readily identifiable by defendants given their acknowledged responsibility for the Company's internal control over financial reporting and disclosure controls and procedures, their high-level positions and the material impact that the unsubstantiated entries had on SunPower's operating results. The Company's accounting misstatements grossly misrepresented the Company's profitability

[5]     Unless otherwise noted, all emphasis is added.

CONSOLIDATED COMPLAINT                                                                        -4-
Case No. 09-5473-RS

in clear violation of GAAP and known accounting rules, none of which hinged on new or complex rules or a simple oversight during a single quarter or even a single year that was later corrected on a good faith basis.  In fact, on an earnings call after the Restatement was announced, the Company's CFO confirmed that SunPower had, throughout the Class Period, "***intentionally*** proposed or approved journal entries that were not substantiated by actual transactions or costs."  As a result of the Company's misstatements, SunPower was forced to correct financial statements covering almost two years to address the accounting improprieties defendants could no longer conceal given their increasingly material effect on the Company's books and publicly-reported results.

11.     In its 2009 Annual Report on Form 10-K filed with the SEC on March 19, 2010 (the "2009 Form 10-K") (and signed by all the Director Defendants, Werner and Arriola), SunPower also sought to explain why the misstatements occurred, namely, "in order to report results for manufacturing operations that would be consistent with internal expense projections."  In other words, the Company's expenses were initially recorded correctly but were then intentionally altered (*i.e.*, "reversed") to subsequently exclude certain expenses and instead record significantly lower expense "projections."  This understated SunPower's reported cost of revenue and overstated income, inventory, assets and shareholders' equity in the Company's public financial reports.

12.     The Company's accounting irregularities were highly material to the Company's financial results for each quarter during the Class Period, and, but for the drastic distortion of the Company's cost of goods sold, the Company would have badly missed its 2008 and 2Q09 analysts' consensus EPS estimates.  With respect to the effect of defendants' accounting misstatements on 2Q09 alone, for instance, Citigroup Markets Inc. ("Citigroup") analyst Timothy M. Arcuri explained that SunPower "would have actually missed consensus EPS by ~$0.03-0.04 versus a beat of nearly $0.10 as reported….However, on the margin and EPS beat, the stock proceeded to rally ~25% the

-5-

next day – adding $700 [million] in market capitalization to the A shares alone. ***This would appear to be undone by this new disclosure***."

13.      Prior to SunPower's fraud revelations, analysts had consistently marveled at SunPower's publicly-reported financial results, especially in light of the macroeconomic challenges and peer-pricing pressures the Company was facing during the Class Period. Defendants' accounting misstatements also enabled them to create a façade that SunPower sold "exceptional" and "differentiated" solar products justifying the 20-30% price premium the Company sought from buyers of its products.  Defendants knew that investors had grave concerns about the Company's ability to compete against its larger government-subsidized European rivals and a stampede of new, smaller solar companies from Asia that sold comparable Tier-1 solar modules at lower prices.  For instance, on July 22, 2009, Ardour Capital Investments publicly raised its concern that "[a]s ASPs [average selling prices] continue their rapid decline, we see the Company facing more margin pressure compared to its Chinese peers.  As pricing declines, we believe [SunPower's] higher than average nonpolysilicon costs will continue to hurt margins."  Defendants' accounting fraud was specifically designed to (and did) dispel such concerns during the Class Period.

14.      While investors were kept in the dark about SunPower's accounting misstatements, Company insiders sold substantial blocks of their personally held shares and stock options and SunPower undertook the April 2009 Offerings in an effort to capitalize on the Company's inflated stock price. SunPower completed the April 2009 Offerings on May 4, 2009 and received net proceeds of $218.9 million for its Class A common stock while the Company's shares were trading at artificially-inflated prices and issued $230 million in principal amount of its 4.75% debentures.

15.      Throughout the Class Period, defendants Werner (CEO), Hernandez (CFO) and Arriola (CFO) also signed numerous sworn certifications publicly attesting to the adequacy of SunPower's internal controls.  SunPower has now admitted that its internal

---

CONSOLIDATED COMPLAINT
Case No. 09-5473-RS

-6-

1924164.1

controls suffered from multiple "material weaknesses" throughout the Class Period.  In a March 18, 2010 press release on Form 8-K (signed by Arriola), SunPower was forced to acknowledge that "[m]anagement has concluded that these control deficiencies constituted *material weaknesses* in the Company's internal control over financial reporting [and] *the company did not maintain an effective internal control over financial reporting or effective disclosure controls and procedures as of January 3, 2010*."

16.    Critically, defendants were on notice that the strength of SunPower's controls was particularly important to investors as the Company's November 16, 2009 revelation was the *second time* during the Class Period that management had surprised investors with a view into the Company's weak internal control over financial reporting and disclosure controls and procedures.  On November 4, 2008, the Company was forced to reduce guidance it had provided to investors only three weeks earlier, causing Wedbush Morgan Securities analyst Al Kaschalk to note "reduced confidence by the Street in the management team as it lowers outlook three weeks after earnings report….Management will need to work to regain some of its tarnished image after lowering guidance a mere three weeks after reporting its Q3:08 earnings."   Other drew a direct link between the Company's November 4, 2008 and November 16, 2009 announcements, bluntly accusing SunPower's management of using "*accounting chicanery to smooth out results in tough times*."

17.    Ultimately, throughout the Class Period, defendants' accounting violations enabled SunPower to accomplish what it could not achieve legitimately: (i) report quarter after quarter of success during a time of unprecedented strain on the Company's share price; (ii) complete the approximately $450 million April 2009 Offerings while the Company's stock was trading at grossly artificially-inflated prices; (iii) create an uneven playing field in an oversupplied solar market; (iv) mask the structural disadvantages the Company faced relative to its new competitors; (v) respond to aggressive pricing pressure from new, lower-cost entrants in the solar market; and (vi) enable the Insider Defendants

to personally profit from their fraud by selling approximately *$13.4 million* worth of their SunPower securities throughout the Class Period.

## II.    JURISDICTION AND VENUE

18.    The claims asserted herein arise under and pursuant to §§11(a) and 15 of the Securities Act, 15 U.S.C. §§77k(a) and 77o; §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by and venue is proper pursuant to §22(a) of the Securities Act and §27 of the Exchange Act.

19.    Venue is proper in this District pursuant to §27 of the Exchange Act.  Many of the false and misleading statements were made in or issued from this District, and SunPower's principal executive offices are located in this District.

## III.   THE PARTIES

### A.    Lead Plaintiffs

20.    Lead Plaintiff Arkansas Teacher Retirement System ("ATRS"), as set forth in the certification filed previously on January 19, 2010 and as incorporated by reference herein, purchased SunPower securities during the Class Period and has been damaged thereby.  ATRS was established in 1937 to provide retirement benefits for the employees of Arkansas' education community and manages over $10 billion in assets.  ATRS lost over $2 million from its purchases of SunPower securities during the Class Period.

21.    Lead Plaintiff Första-AP Fonden ("AP1"), as set forth in the certification filed previously on January 19, 2010 and as incorporated by reference herein, purchased SunPower securities during the Class Period and has been damaged thereby.  AP1 is a pension fund with global orientation, whose management contributes to ensuring a high and predictable retirement pension for every person employed in Sweden.  With net assets of over $25 billion, AP1 is one of Sweden's largest pension funds.  AP1 lost approximately $1.75 million from its purchases of SunPower securities during the Class Period.

22.     Lead Plaintiff Danske Invest Management A/S ("Danske"), as set forth in the certification filed previously on January 19, 2010 and as incorporated by reference herein, purchased SunPower securities during the Class Period and has been damaged thereby.  Danske is based in Copenhagen, Denmark, and with approximately $45 billion in assets under management, is one of Denmark's largest institutional investors.  Danske lost approximately $1.65 million from its purchases of SunPower securities during the Class Period.

**B.      Additional Named Plaintiff**

23.     Plaintiff Bobby J. Reynolds, as set forth in the certification and chart attached hereto as Exhibit A, purchased SunPower securities during the Class Period and has been damaged thereby.

**C.      Corporate Defendant**

24.     SunPower is a Delaware corporation with its principal place of business at 3939 North First Street, San Jose, CA 95134.  According to the Company's profile, SunPower engages in the design, manufacture and marketing of solar electric power technologies, including: solar cells, solar panels and inverters, which convert sunlight to electricity for the utility networks serving installers and resellers for use in residential and commercial applications; power systems and system technologies, which include development, engineering and procurement of permits and equipment; and construction management, access to financing, monitoring and maintenance services.

**D.      Insider Defendants**

25.     Thomas H. Werner is, and during the Class Period was, CEO of the Company. During the Class Period, Werner made statements in Company press releases and conference calls, as alleged herein, and signed and/or certified the Company's SEC filings, including but not limited to SunPower's Form(s) 10-Q and its 2008 Annual Report on Form 10-K filed with the SEC on February 26, 2009 (the "2008 Form 10-K") and/or

CONSOLIDATED COMPLAINT                                                   -9-
Case No. 09-5473-RS

1924164.1

the materially false and misleading Registration Statements and Prospectuses issued in connection with the registration and sale of Company securities.

26.     Dennis V. Arriola is, and during the Class Period became, CFO, Principal Accounting Officer and Senior Vice President of the Company.  During the Class Period, Arriola made statements in Company press releases and conference calls, as alleged herein, and signed and/or certified the Company's SEC filings, including, but not limited to, SunPower's Form(s) 10-Q and 2008 Form 10-K and/or the materially false and misleading Registration Statements and Prospectuses issued in connection with the registration and sale of Company securities.  Arriola earned a bachelor's degree in economics from Stanford University and a master's degree in business administration from Harvard University.  He joined SunPower with over twenty years of financial experience, including serving as Senior Vice President and CFO of both San Diego Gas & Electric and Southern California Gas Company, where he helped build the finance and treasury teams, including accounting, planning and budgeting, strategic development, risk management, information technology and procurement.

27.     Emmanuel T. Hernandez was, during the Class Period until the time of his unscheduled departure from the Company on or about October 2008, CFO and Principal Accounting Officer of the Company.  During the Class Period, Hernandez made statements in Company press releases and conference calls, as alleged herein, and signed and/or certified the Company's SEC filings, including, but not limited to, SunPower's Form(s) 10-Q and/or the materially false and misleading Registration Statements and Prospectuses issued in connection with the registration and sale of Company securities.  A graduate of the University of Nueva Caceres in the Philippines, Mr. Hernandez has a bachelor's degree in accounting, a master's degree in finance from Golden Gate University in San Francisco and he received his CPA license from the Philippine Institute of Certified Public Accountants.

28.     The defendants referenced above in ¶¶25-27 are referred to herein as the "Insider Defendants."

29.     Because of the Insider Defendants' positions within the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

30.     The Company's press releases and SEC filings were group-published documents, representing the collective actions of Company management. The Insider Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements and financial condition, as alleged herein. The Insider Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or deliberately disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

31.     The Insider Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Insider Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

1   Accordingly, each Insider Defendant is responsible for the accuracy of the public reports

2   and releases detailed herein, and is therefore primarily liable for the representations

3   contained therein.

4         32.     SunPower and the Insider Defendants are liable as participants in a

5   fraudulent scheme and course of business that operated as a fraud or deceit on purchasers

6   of SunPower securities by disseminating materially false and misleading statements and/or

7   concealing material adverse facts. The scheme: (i) deceived the investing public regarding

8   SunPower's business, operations and management and the intrinsic value of SunPower

9   securities; (ii) enabled the Company to register for sale and sell hundreds of millions of

10   dollars in SunPower securities in the April 2009 Offerings; (iii) enabled SunPower

11   insiders to sell $13.4 million worth of their privately held SunPower securities while in

12   possession of material adverse non-public information about the Company; and (iv)

13   caused Lead Plaintiffs and other members of the Class to purchase SunPower securities at

14   artificially inflated prices.

15         **E.**    **SunPower Director Defendants**

16         33.     T.J. Rodgers ("Rodgers") is, and was throughout the Class Period,

17   Chairman of SunPower's Board of Directors.   Rodgers signed the January 2007

18   Registration Statement and the September 2008 Registration Statement for the April 2009

19   Offerings and the Class B Shares Offering, respectively.   None of the claims against

20   Rodgers include allegations of fraud or scienter.

21         34.     W. Steve Albrecht ("Albrecht") is, and was throughout the Class Period, a

22   Director of SunPower.  Albrecht signed the January 2007 Registration Statement and the

23   September 2008 Registration Statement for the April 2009 Offerings and the Class B

24   Shares Offering, respectively.   None of the claims against Albrecht include allegations of

25   fraud or scienter.

26         35.     Betsy S. Atkins ("Atkins") is, and was throughout the Class Period, a

27   Director of SunPower.  Atkins signed the January 2007 Registration Statement and the

28    

CONSOLIDATED COMPLAINT                  -12-
Case No. 09-5473-RS

September 2008 Registration Statement for the April 2009 Offerings and the Class B Shares Offering, respectively. None of the claims against Atkins include any allegations of fraud or scienter.

36.     Patrick Wood, III ("Wood") is, and was throughout the Class Period, a Director of SunPower. Wood signed the January 2007 Registration Statement and the September 2008 Registration Statement for the April 2009 Offerings and the Class B Shares Offering, respectively. None of the claims against Wood include any allegations of fraud or scienter.

37.     Uwe-Ernst Bufe ("Bufe") has been a Director of SunPower since on or about August 12, 2008. Bufe signed the September 2008 Registration Statement for the Class B Shares Offering. None of the claims against Bufe include allegations of fraud or scienter.

38.     Rodgers, Albrecht, Atkins, Wood and Bufe are referred to as the "Director Defendants."

**F.     Underwriter Defendants**

39.     Deutsche Bank Securities Inc. ("Deutsche Bank") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies. Deutsche Bank acted as a joint book-running manager for SunPower's April 2009 Offerings. As an underwriter for the April 2009 Offerings, Deutsche Bank is liable under §11 of the Securities Act.

40.     Credit Suisse Securities (USA) LLC ("Credit Suisse") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies. Credit Suisse acted as a joint book-running manager for SunPower's April 2009 Offerings. As an underwriter for the April 2009 Offerings, Credit Suisse is liable under §11 of the Securities Act.

41.     Lazard Capital Markets LLC ("Lazard") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies.  As an underwriter for the April 2009 Offerings, Lazard is liable under §11 of the Securities Act.

42.     Barclays Capital Inc ("Barclays") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies.  As an underwriter for the April 2009 Offerings, Barclays is liable under §11 of the Securities Act.

43.     Piper Jaffray & Co. ("Piper Jaffray") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies.  As an underwriter for the April 2009 Offerings, Piper Jaffray is liable under §11 of the Securities Act.

44.     Wachovia Capital Markets, LLC (n/k/a Wells Fargo Securities, LLC) ("Wachovia") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies.  Wachovia acted as an underwriter in SunPower's April 2009 Offerings and received SunPower securities for its work in the offerings.  As an underwriter, Wachovia is liable under §11 of the Securities Act.

45.     SL Hare Capital, Inc. ("SL Hare") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies.  As an underwriter for the April 2009 Offerings, SL Hare is liable under §11 of the Securities Act.

46.     The defendants referenced above in ¶¶39-45 are referred to as the "Underwriter Defendants."

## IV.     VIOLATIONS OF THE SECURITIES ACT

47.     Lead Plaintiffs' Securities Act claims are based on strict liability and negligence  and are brought on behalf of investors who purchased or otherwise acquired SunPower securities pursuant to or traceable to the Offering Materials issued in connection with the Class B Shares Offering and the April 2009 Offerings.

### A.     The Class B Shares Offering Materials Contained Materially False and Misleading Statements

48.     On September 10, 2008, SunPower filed a Shelf Registration Statement on Form S-3 registering all 42,033,287 shares of its Class B common stock to be distributed to Cypress shareholders.  The September 2008 Registration Statement was signed by (i) Werner; (ii) Hernandez; (iii) Rodgers; (iv) Albrecht; (v) Atkins; (vi) Wood; and (vii) Bufe. After the close of trading on September 29, 2008, Cypress completed the spin-off of all of its shares of the Company's Class B common stock in the form of a *pro rata* dividend to the holders of Cypress common stock.  As a result of the spin-off, the Company's Class B common stock began trading publicly and is listed on the NASDAQ Global Select Market along with the Company's Class A common stock.  As of the close of the spin-off on September 29, 2008, Cypress fully divested itself of SunPower.

49.     By its Restatement, SunPower has admitted that the September 2008 Registration Statement for the Class B Shares Offering incorporated by reference the following materially false and misleading financial statements: (i) SunPower's 1Q08 Form 10-Q; and (ii) SunPower's 2Q08 Form 10-Q.

50.     SunPower has admitted that its financial results and statements for 1Q08, ended March 30, 2008, included the following misstatements:

**Q1 2008 SunPower Financial Information as Reported and as Corrected by SunPower**

| $ in millions, rounded, except per share amounts | Three Months Ended Mar 30, 2008 | | | |
| --- | --- | --- | --- | --- |
| | Reported amount | Corrected amount | Amount overstated | Percent overstated |
| Gross margin ($) | $ 53.2 | $ 51.5 | $   1.7 | 3% |
| Pre-tax income | $ 13.3 | $ 11.8 | $   1.4 | 12% |
| Earnings per share | $0.14 | $0.13 | $0.01 | 8% |
| Components gross margin rate (%) | 19% | 17% | 1.7% | 10% |

51.     SunPower has admitted that its financial results and statements for 2Q08, ended June 29, 2008, included the following misstatements:

**Q2 2008 SunPower Financial Information as Reported and as Corrected by SunPower**

| $ in millions, rounded, except per share amounts | Three Months Ended June 29, 2008 | | | |
| --- | --- | --- | --- | --- |
| | Reported amount | Corrected amount | Amount overstated | Percent overstated |
| Gross margin ($) | $ 92.8 | $ 84.2 | $   8.7 | 10% |
| Pre-tax income | $ 37.4 | $ 29.1 | $   8.4 | 29% |
| Earnings per share | $0.37 | $0.32 | $0.05 | 16% |
| Components gross margin rate (%) | 28% | 24% | 4.3% | 18% |

**B.     The April 2009 Offerings Materials Contained Materially False and Misleading Statements**

52.     On April 29, 2009, the Company filed the April 2009 Prospectuses, offering: (1) up to $230 million in 4.75% Senior Convertible Debentures due 2014; and (2) up to 10.35 million shares of Class A stock at $22 per share.  The Company completed the April 2009 Offerings on May 4, 2009 and received net proceeds of $218.9 million for its Class A common stock and net proceeds of $225 million from issuing all $230 million in principal amount of its 4.75% convertible debt.  The April 2009 Prospectuses were filed pursuant to the January 2007 Registration Statement, which was signed by: (i) Werner; (ii) Hernandez; (iii) Rodgers; (iv) Albrecht; (v) Atkins; and (vi) Wood.

53.     The Company agreed to sell the Underwriter Defendants, for whom Credit Suisse and Deutsche Bank acted as joint book-running managers and representatives, and

CONSOLIDATED COMPLAINT
Case No. 09-5473-RS

-16-

1924164.1

the underwriters severally agreed to purchase the following respective number of shares of the Company's Class A common stock:

| Underwriter | Number of Shares |
|---|---|
| Credit Suisse | 3,420,000 |
| Deutsche Bank | 3,420,000 |
| Lazard | 630,000 |
| Barclays | 540,000 |
| Piper Jaffray | 450,000 |
| Wachovia | 360,000 |
| SL Hare | 180,000 |
| Total | 9,000,000 |

54.     By its Restatement, SunPower has admitted that the April 2009 Prospectuses contained and/or incorporated by reference the materially false and misleading 2008 Form 10-K. SunPower has admitted that its financial results and statement for its fiscal year 2008, ended December 28, 2008 included the following misstatements:

**Fiscal 2008 SunPower Financial Information**
**As Reported and as Corrected by SunPower**

| $ in millions, rounded, except per share amounts | Reported amount | Corrected amount | Amount overstated | Percent overstated |
|---|---|---|---|---|
| | Twelve Months Ended December 28, 2008 | | | |
| Gross margin ($) | $362.7 | $349.6 | $ 13.1 | 4% |
| Pre-tax income | $129.1 | $116.1 | $ 13.1 | 11% |
| Earnings per share | $1.16 | $1.05 | $0.11 | 11% |
| Inventory – Work-in-process | $ 15.5 | $ 25.8 | ($ 10.3) | (40%) |
| Components gross margin rate (%) | 32% | 30% | 1.7% | 5% |

## V.      VIOLATIONS OF THE EXCHANGE ACT

55.     SunPower and the Insider Defendants are liable for making false statements or failing to disclose adverse facts known to them about SunPower.  Their fraudulent scheme and course of business operated as a fraud or deceit on purchasers of SunPower publicly traded securities, as it: (i) deceived the investing public regarding SunPower's earnings, income from operations, net income, gross profit and net income per share; (ii)

deceived the investing public regarding SunPower's accounting practices and internal controls; (iii) artificially inflated the price of SunPower's securities; (iv) enabled defendants to collectively sell hundreds of thousand of their personally held SunPower securities at artificially inflated prices for proceeds of approximately $13.4 million during the Class Period; (v) consummate the approximately $450 million April 2009 Offerings at artificially inflated prices; and (vi) caused Lead Plaintiffs and other members of the Class to purchase SunPower publicly traded securities at inflated prices and be damaged thereby.

A. **Substantive Allegations**

1. **Company Background**

56.     Founded by former Stanford University electrical engineering professor Dr. Richard Swanson in 1985, SunPower was incorporated to commercialize high efficiency photovoltaic cell technology for use in solar concentrators.  In 2002, Cypress, led by its CEO T.J. Rodgers, announced plans to invest $8.8 million for a 44% stake in SunPower. In November 2005, Cypress, took SunPower public in a wildly successful initial public offering ("IPO") of 7.7 million shares.  Between SunPower's November 2005 IPO and December 2007, the Company's stock price experienced significant growth.

57.     While SunPower's founder, Dr. Swanson, is still widely viewed as an early visionary in the alternative energy movement, T.J. Rodgers has long been an outspoken and fierce critic of the environmental benefits Dr. Swanson first created SunPower to provide.  In an article appearing in *Fortune Magazine* in October 2007 titled "For Solar Power, the Future Looks Bright," Rodgers was quoted as saying that "[t]he group that is most vehement about global warming represent to me *some of the worst people in the world*....*I dislike them so much, it's difficult to listen to what they have to say objectively*."  Even if Dr. Swanson's and Rodgers' philosophies on the benefits of solar energy may diverge somewhat, the ties between Cypress and SunPower run deep.

58.     To this day, Rodgers remains SunPower's Chairman of the Board of Directors and Dr. Swanson serves as the Company's Chief Technology Officer and President Emeritus.  Hernandez, SunPower's former CFO, was formerly Vice President of Finance and Administration and CFO for Cypress, including Cypress' Philippine headquarters from 1994 to 2005.  In 2005, Hernandez, who obtained his CPA license from the Philippine Institute of Certified Public Accountants, left Cypress to become SunPower's CFO.

59.     Announcing Hernandez's new role as SunPower's CFO, on April 22, 2005, Rodgers claimed that Hernandez's "addition to the SunPower team enables our most important subsidiary to leverage the skills of one of the most experienced CFOs in the semiconductor industry as it prepares for its next phase of development.  As a native of the Philippines, Manny [Hernandez] also understands the nuances of doing business there."  Hernandez's Filipino background and his participation at the executive management level at both Cypress and SunPower exemplify SunPower's senior management's deep ties to the Philippines where, to this day, the vast majority of SunPower's manufacturing takes place and where the Company has most of its personnel and physical assets:[6]

| SunPower's Global Operations | | | | |
|---|---|---|---|---|
| | **Philippines** | U.S. | Other | Total |
| Total number of employees | **4,710**<br>**87%** | 540<br>10% | 150<br>3% | 5,400<br>100% |
| Total value of property | **$583M**<br>**94%** | $38M<br>6% | $1M<br>0% | $622M<br>100% |

60.     On October 20, 2008, just weeks before the Company's November 4, 2008 withdrawal of 4Q08 guidance, Hernandez "resigned" as SunPower's CFO and was replaced by the Company's current CFO, Arriola.  From the beginning of the Class Period until his departure in October 2008, Hernandez had sufficient experience, knowledge and

---

[6]     Manufacturing solar products in the Philippines purportedly offers SunPower lower costs and tax advantages.

CONSOLIDATED COMPLAINT                                                                          -19-
Case No. 09-5473-RS

1924164.1

1    involvement in the Company's financial operations to ensure that proper financial

2    reporting structures were implemented at the Company and to immediately recognize the

3    $15+ million expense variances that were on the Company's balance sheet rather than its

4    income statement.

5         61.    Prior to and throughout the Class Period, SunPower emphasized its

6    purported competitive advantage of higher margins through lower manufacturing costs.  In

7    November 2006, SunPower announced its acquisition of Powerlight Corporation

8    ("Powerlight") – a solar system integrator – which was completed in January 2007 for

9    $334 million.  Commenting on the acquisition, Werner said the aim of the combined

10   companies was to "accelerate the reduction of solar power costs."  SunPower repeatedly

11   touted the Powerlight acquisition as part of the Company's "vertical integration" strategy

12   that would reduce costs and improve margins by giving the Company "visibility" into all

13   aspects of its operations and purportedly making it more insulated from oversupply than

14   its competitors.

15        62.    A Cowen & Company analyst commented on November 12, 2008 that

16   "[t]he acquisition of Powerlight brought value added products for systems integration,

17   project design and services capability….Margins should also expand, thanks to lower

18   costs for silicon…" Macquarie Research Equities also noted that "SunPower's vertical

19   integration affords the company control over more steps along the value chain, enabling it

20   an opportunity to better control costs while also being able to deliver customers a higher-

21   quality, more integrated solution."  On January 11, 2009, analysts at Merriman Curhan

22   Ford wrote that "[v]ertical integration supports cost out strategy.  SunPower's acquisition

23   of PowerLight [] was a strategic positive…increasing visibility on SunPower's cost out

24   strategy.  ***In the near-term we believe cost reductions will be essential to preserve***

25   ***profitability and defend market share***…."

26        63.    As alleged below, however, SunPower achieved the appearance of cost

27   reduction and higher margins only through the accounting fraud.  The inflated figures

28

CONSOLIDATED COMPLAINT                                                        -20-
Case No. 09-5473-RS

1924164.1

made the Company's gross margins appear superior to its competitors, thus artificially inflating the price of SunPower's securities throughout the Class Period.

### 2. SunPower Encounters Unprecedented Challenges

64.     By the start of the Class Period, the emerging industry that Dr. Swanson once had led through technological innovations had become an oversupplied commodities market dominated by new solar companies with manufacturing facilities in China.  While the market value of the world's publicly-traded solar companies stood at approximately $1 billion in 2004, by the end of 2007, that number had ballooned to approximately $71 billion.  Widespread concerns over global warming, high energy costs and dependence on foreign sources of oil, combined with large solar subsidies in Europe and China drove a "green-tech" IPO boom from 2006 through 2009.   As one analyst described these circumstances, "[t]he list of companies looking to cash in on the solar buzz seems to grow each day.  It seems anyone and everyone, particularly in China, who can get access to funding is either planning to make polysilicon or solar panels."  In fact, between 2007 and 2009, approximately thirty-five solar companies filed IPOs on U.S. exchanges and for the first time in its history, SunPower was being forced to compete directly against rivals who sold comparable products, but for far less.

65.     In addition, in the first half of 2008, the price for solar-grade polysilicon soared when demand exceeded available supplies.  Polysilicon is the main ingredient used by SunPower and its competitors in manufacturing solar cells, and accounts for approximately 80% of the cost of producing solar wafers.  Polysilicon became scarce between 2005 and 2008 due, in part, to the fact that silicon manufacturers declined to add capacity following the 2001 collapse of the semiconductor industry.  As the chart below demonstrates, in the second half of 2008, however, the price of polysilicon dropped from $125-$150/kg in 4Q08 to $80-$100/kg in 1Q09 to below $65-$75/kg in 2Q09 due to increased investment, additional suppliers entering the marketplace and better availability of raw materials:

1

2

3

4

5

6

7

8

9

10

11

12

13



14    66.    Unlike some of its newer competitors, the price SunPower paid for

15  polysilicon during the Class Period was fixed by long-term supply agreements the

16  Company had entered into between January 2006 and January 2008, a time when the price

17  of polysilicon was at all-time highs:

18

| Polysilicon Supplier | Signed | Term | Expires | Cost |
|---|---|---|---|---|
| M. Setek Co., Ltd. | 5/06 | 2 years | 1/13 | $500 million |
| DC Chemical Co., Ltd. | 7/06 | 6 years | 7/12 | $250 million |
| ErSol Energy AG | 8/06 | 5 years | 8/11 | $125 million |
| Woojin Conway | 9/06 | 5 years | 9/11 | $250 million |
| REC SiTech AS | 10/06 | 1 year | 10/07 | $20 million |
| Q-Cells SE | 10/06 | 5 years | 10/11 | $150 million |
| Hemlock Semiconductor Corporation | 7/07 | 10 years | 7/17 | n/a |

19

20

21

22

23

24    67.    As polysilicon prices plummeted, SunPower was nevertheless forced to

25  meet its long-term contractual obligations and, for instance, utilize approximately $291

26  million in prepayments made to polysilicon suppliers like Hemlock Semiconductor

27  Corporation at higher-than-market prices over several years.  At the same time, SunPower

28

was under intense pressure during the Class Period to lower the price of its modules to remain competitive, and some of SunPower's larger customers were beginning to complain that SunPower's solar modules were "not attractive" given their vastly higher prices and, in some cases, tendency to operate poorly.  SunPower's use of higher-grade (and more expensive) monocrystalline polysilicon – rather than the lower quality multicrystalline polysilicon used by many of its competitors – also made it difficult for SunPower to quickly adjust its products and pricing from high-quality to low-cost in a rapidly-shifting solar marketplace.  During roughly the same period that polysilicon prices were falling, Chinese solar companies, in particular, began aggressively pushing down the price of solar panels by almost half between 2008 and 2009.

68.     While increased competition was a positive development for consumers and the broader solar market, it proved disastrous for SunPower which had sought to differentiate itself as a company that sold "higher-quality" products worthy of significant price premiums.  In reality, while SunPower's cells were modestly more efficient than those of its competitors, its manufacturing costs were approximately 40-45% higher than some of its Asian peers, whose non-polysilicon costs were approximately $0.90-$0.95/watt compared to SunPower's non-polysilicon costs of approximately $1.32/watt.  Summing up market sentiment at the time, one analyst noted that SunPower was "under intense pressure to lower the prices of its modules from many end-use customers."  Rather than lower its prices to compete against less expensive brands, SunPower's management reported fictitious lower costs and higher margins by violating GAAP.

69.     An article appearing in *Forbes* following the Class Period succinctly explained the challenges the Company had faced during the Class Period:  "[a] big boom in manufacturing capacity in Asia, the economic slowdown [and] cheaper raw materials…have combined to push panel prices down sharply over the past 18 months.  New Chinese entrants like Trina and Yingli have burst on the California scene…going from almost nowhere to third and fifth highest market share [] this year….***Almost all of***

1    *this growth is coming out of the hide of U.S.-based SunPower, historically California's*

2    *biggest player*.   SunPower makes the world's most efficient solar panels and the

3    company's designs are sleek.   SunPower hoped that these features would allow it to

4    continue to charge higher prices and hold on to market share."   Unable to protect its

5    market share (and maintain its lofty stock price) through product innovation and the

6    quality and reputation of its "brand," defendants resorted to the fraudulent accounting

7    scheme alleged herein.

8                    **3.    Defendants' Fraudulent Class Period Scheme**

9            70.    Throughout the Class Period, SunPower and the Insider Defendants

10   repeatedly promoted SunPower's purported key competitive advantages as: (i) cost (*i.e.*,

11   "[d]irect control of costs across the value chain"); (ii) technology (*i.e.*, "[h]ighest

12   efficiency solar cells, panels and systems"); (iii) brand (*i.e.*, "brand preference" and

13   "aesthetics"); and (iv) people (*i.e.*, "[r]ecruit, hire and retain the best people").

14   Defendants' now-admitted accounting violations became a necessary component of the

15   Company's ability to report strong gross margins and demonstrate that SunPower was

16   controlling costs.   SunPower and the Insider Defendants manipulated ***these*** metrics, in

17   particular, because they knew that investors were deeply concerned about the Company's

18   margins and costs.   As one analyst commented during the Class Period, "we continue to

19   see management's ability to drive costs as the greatest intermediate term factor to

20   determine the success of [SunPower's] model."

21           71.    The Class Period commences on April 17, 2008, with the Company release

22   of its false 1Q08 results.   Cognizant that analysts had begun to focus on the Company's

23   margins,  the Company reported a 92% increase in revenue (year-on-year), overall gross

24   margin of 19.5% and total operating income of $14.8 million in 1Q08.   In truth, as the

25   Company has now admitted, its: (i) publicly-reported gross margin for that period was

26   overstated by $1.7 million; (ii) pre-tax net income was overstated by 12%; (iii) EPS was

27

28

overstated by 8%; and (iv) component segment gross margin was overstated by 10%.[7] Relying on the Company's misrepresentations, a Wedbush Morgan Securities report maintained its "$132 price target" and "reiterate[d] **STRONG BUY** rating."

72.     On April 22, 2008, just four days after reporting 1Q08 results that analysts at Merriman Curhan Ford described as "stellar," the Company's CEO, Werner, exercised 50,000 stock options at prices ranging from $92.35-$95.02 a share, pocketing **$4.66 million**.   Just three days after Werner's insider sales, on April 25, 2008, Hernandez followed suit and sold 25,000 shares at prices ranging from $87.30-$88.68, for proceeds of **$2.19 million**.

73.     On July 17, 2008, the Company publicly reported 2Q08 combined gross margin of 24.3%, total operating income of $45 million and diluted net income per share of $0.34.   Again, the market was stunned by SunPower's seemingly gravity-defying results.  Thomas Wiesel Partners wrote that "SunPower reported 2Q08 results that handily beat our and Street estimates.…"   Morgan Stanley Research was pleased that the Company's "[m]argins continue to improve as lower priced silicon and greater than expected savings are realized."  Macquarie Research Equities wrote that SunPower was "[s]taying ahead of the curve" and that the Company "stands out amidst the crowded solar landscape.…"    Jefferies & Company, Inc. praised SunPower's "improving margin outlook."  Cowen and Company characterized these as "blowout Q2 results" for the Company.  In response to SunPower's 2Q08 results, investors drove the Company's stock price from $75.32 on July 17, 2008 to $76.70 on July 18, 2008.

74.     Unbeknownst to investors, the Company's 2Q08 reported results were materially false and misleading as: (i) gross margin was overstated by 10%; (ii) pre-tax income was overstated by 29%; (iii) EPS was overstated by 16%; (iv) components gross margin rate was overstated by 18%; and (v) systems gross margin rate was overstated by 7%.  In addition, the Company's cost of revenue was $3.8 million and $4.8 million higher

---

[7]     Overstatement amounts and percentages are based on SunPower's retrospectively adjusted financial results.

than reported in systems and components, respectively, and the Company's publicly-reported net income was off by $4.3 million.   Only a few days after reporting 2Q08 results, on July 22, 2008, Werner unloaded another 50,000 shares of his SunPower holdings at artificially inflated prices pocketing *another $4 million*.

75.     On October 16, 2008, the Company announced its financial results for 3Q08 and provided strong guidance for 4Q08.   As the Company has now admitted, SunPower again reported overstated gross margins, pre-tax income, EPS and components segment gross margin – this time by 3%, 6%, 7% and 6%, respectively.   On October 20, 2008, SunPower's CFO, Hernandez, "resigned" and was replaced by the Company's current CFO, Arriola.

76.     Three weeks later, on November 4, 2008, SunPower suddenly withdrew its 4Q08 guidance, citing "foreign exchange rate volatility."   Investors were "spooked" by the Company's announcement.   Indeed, during the earnings conference call discussing the Company's reported 3Q08 results, management was asked specifically whether its 4Q08 guidance accounted for fluctuations in the foreign currency exchange rate, and Hernandez replied that the Company had been "conservative."   Analyst Michael Carboy wrote that the announcement "rattles our confidence" in SunPower's financial and risk management practices.   Wedbush Morgan Securities analyst Al Kaschalk wrote that the "reduced confidence by the Street in the management team as it lowers outlook three weeks after earnings report….Management will need to work to regain some of its tarnished image after lowering guidance a mere three weeks after reporting Q3:08 earnings."

77.     On November 11, 2008, at an investor conference hosted by SunPower in Las Vegas, Nevada, defendants reassured investors that the Company had "identified and corrected" the issues leading to its bungled 4Q08 guidance.   While analysts aptly noted that "finance department staff will receive *close scrutiny* for the error," defendants allowed the deficiencies in SunPower's internal controls to go unabated for another year.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

78.     As the Class Period progressed, the market had begun to express rising concern with SunPower's margins and cost controls.  For instance, Kaufman Bros. Equity Research stated that "we believe margins will be adversely affected whether or not SunPower decides to provide credit to its customers who are no longer able to access capital markets."  On November 12, 2008, William & Blair Company confirmed broader market concern with the Company's ability to deliver strong margins, noting "we continue to see management's ability to drive costs down as the greatest intermediate term factor to the success of the model."   On November 13, 2008, relying on defendants' false statements, J.P. Morgan noted that "[d]emand [at SunPower] remains strong, no signs of slowdown…which is counter to commentary coming out of China [and] [w]e are concerned about increased pricing pressure on solar system components, including modules, ***but believe SunPower will be able to outperform its peers due to its product differentiation and cost reduction roadmap***."

79.     On January 29, 2009, the Company issued a press release again announcing "record" results for 4Q08 and full year 2008.  For the 4Q08, SunPower reported gross margin of 27.9%, total operating income of $55 million and net income per diluted share of $0.35.  Unbeknownst to investors, however, these results were false.  EPS, for example, was overstated by 10%.  The chart below demonstrates the EPS effect of defendants' fraud for all of 2008:

CONSOLIDATED COMPLAINT                                                           -27-
Case No. 09-5473-RS

1924164.1

Comparison of Analysts' 2008 Consensus EPS Expectation to
SunPower's Reported 2008 EPS, Before and After Restatement (non-GAAP basis)

80.     Just days after reporting 4Q08 results, on February 2, 2009, Werner sold 7,320 shares, pocketing $233,361.

81.     On April 23, 2009, the Company issued a press release announcing 1Q09 results and reporting, among other items, gross margin of 22.3%.  In connection with the Company's 1Q09 results, Werner claimed that:

> [o]ur quarterly performance was impacted by seasonality, the continuing effects of the credit crisis and difficult economic conditions. ***Despite these headwinds, we were able to deliver strong gross margins in our Components business and positive non-GAAP net income***. We have responded to current market conditions by moving to a demand-driven manufacturing model and reducing our planned operating expenses to align with our adjusted revenue outlook.

82.     In truth, the only reason SunPower managed to "deliver strong gross margins" and "positive non-GAAP net income" was because the Company had understated its cost of goods sold for 1Q09.  In the Restatement, SunPower's 1Q09 non-GAAP EPS was reduced by $0.14, from $0.05 to a ***loss*** of $0.09 per share.  For 1Q09, on a GAAP basis, SunPower overstated its gross margin and understated its pre-tax loss by $15.5 million each (48% and 52%, respectively), and reported a loss per share of $0.06 instead of the $0.12 per share it actually lost.[8]

---

[8]     2008 and 2009 amounts and percentages based on SunPower's March 19, 2010 restated financial statements.

CONSOLIDATED COMPLAINT                                                    -28-
Case No. 09-5473-RS

1924164.1

83.    In April 2009, the Company unexpectedly announced the April 2009 Offerings, including: (1) up to $230 million in 4.75% Senior Convertible Debentures due 2014; and (2) up to 10.35 million shares of Class A stock at $22 per share.  The Company completed the April 2009 Offerings on May 4, 2009 and received net proceeds of $218.9 million for all 10.35 million shares of its Class A common stock and net proceeds of $225 million from issuing all $230 million in principal amount of its 4.75% convertible debt.

84.    Notably, prior to the April 2009 Offerings, the Company had repeatedly assured investors that the Company was "free cash flow positive" and would not need to tap the markets for additional capital.  In November 2008, a Deutsche Bank analyst noted that "[t]he company also indicated that its business model is fully funded; the company should be *free cash flow positive in 2009, and should not have a need to tap the public markets anytime soon*."  After the Class Period, analysts took a dimmer view, noting that the April 2009 Offerings were "priced *on the assumption that its financial statements were fairly represented* [and] [t]he accounting errors [revealed by the Company's Restatement] bring into question the fairness of the valuation."  Hapoalim Securities ("Hapoalim") went one step further, advising its clients that defendants knew "how challenging things could become this [2009] year, and thus [motivating] its desire to 'cash in' on its share price at these levels."

85.    On July 23, 2009, SunPower issued a press release reporting its results for 2Q09.  For 2Q09, SunPower overstated its gross margin and pre-tax income by $17.8 million (44%) and $18.9 million (305%), respectively, and reported EPS of $0.25 instead of the $0.16 per share it actually made.  Responding to investor focus on margins and costs, Werner stated that "[o]ur manufacturing costs are competitive today and we are ahead of plan to achieve or cost reduction goals."  Again, analysts were impressed by the Company's strong reported results.  Analysts at Gabelli & Co. noted that they were "changing [their] recommendation on SunPower Corporation from Sell to Buy following the company's strong performance in 2Q09...."  Canaccord Adams wrote that "SunPower

thoroughly beat expectations on all sides." On July 24, 2009, Brigantine Advisors noted that "[w]ith a backdrop of multiple negative pre-announcements recently from German solar companies, SunPower's strong Q2 *was a surprise to many*." Excluding one-time charges, *Forbes* described the Company's EPS as "handily" beating estimates. In fact, the Company's 2Q09 results were false and, but for the Company's accounting fraud, SunPower would have badly missed, rather than handily beat, 2Q09 consensus EPS.

86.     Following the Company's 2Q09 announcement of "continued success" due to "reducing inventory levels and [] controlling variable expenses," the price of SunPower common stock rose from $24.85 on July 23, 2009 to $32.04 on July 24, 2009 – a one day increase of nearly 30%. The next day, on July 24, 2009, Werner exercised 25,000 stock options for proceeds of over $781,000. At the time the 2Q09 results were issued, however, investors remained in the dark about defendants' scheme.

87.     On October 22, 2009, SunPower issued a press release reporting its results for 3Q09. Werner commented on the Company's performance: "[w]ith strong market demand continuing, all of our manufacturing facilities are now fully operational, resulting in unit cost reductions in line with our plan." As alleged herein, the Company's "cost reductions" had been due, in large measure to, in the Company's own words, SunPower's "unsubstantiated accounting entries." In the same press release, the Company falsely reported gross margins of 19.1%, operating income of $34.6 million and net income per diluted share of $0.13. As admitted in the Restatement, for the nine months ended September 27, 2009 (3Q09), SunPower overstated its gross margin and pre-tax income by $22.8 million (13% and 174%, respectively), and reported EPS of $0.35 instead of the $0.27 per share it actually made.

88.     Immediately following SunPower's announcement of its 3Q09 results, defendants Werner and Arriola sold their personally-held shares and exercised stock options. On October 23, 2009, Werner exercised 25,000 options pocketing over $718,000, and on November 12, 2009 – just four days before the Company stunned investors with the

1   November 16, 2009 disclosure – Arriola sold nearly 8,000 shares of Company stock for

2   proceeds of approximately $200,000.

3   **4.    The Truth is Revealed**

4       89.     After the markets closed on November 16, 2009, the Company issued a

5   press release disclosing "unsubstantiated accounting entries" in its previous financial

6   reports.  The press release admitted that the Company's Class Period financial statements

7   included materially false and misleading statements.  The Company also advised investors

8   they should no longer rely upon information contained in SunPower's 2009 quarterly

9   reports or 2008 Form 10-K.  On November 17, 2009, the Company's stock closed 19%

10   lower than the previous day.

11       90.     The press release stated, in relevant part:

12       based upon an internal review of its Philippine manufacturing operations,
       ***the company believes there may have been unsubstantiated accounting***
13       ***entries made in the first three quarters of 2009, some of which relate to the***
       ***company's fiscal year ended December 28, 2008***.  Management informed
14       the Audit Committee of the Board of Directors of these entries and the Audit
       Committee immediately commenced an investigation of the matter, which is
15       ongoing. The company's Audit Committee and management have discussed
       these issues with the company's independent auditors.
16

17       Based upon the preliminary findings of the ongoing investigation, the Audit
       Committee to date has identified accounting entries in the Philippines that
18       may have overstated expenses in its cost of goods sold of approximately $1
       million in the first quarter ending March 29, 2009, and understated expenses
19       in its cost of goods sold of approximately $14 million in the second quarter
       ending June 28, 2009 and approximately $2 million in the third quarter
20       ending September 27, 2009. The company previously reported 2009
       quarterly revenues and operating income under Generally Accepted
21       Accounting Principles (GAAP) of $213.8 million and a loss of $2.5 million,
       respectively, in the first quarter, $297.6 million and $9.9 million,
22       respectively, in the second quarter and $466.3 million and $34.6 million,
       respectively, in the third quarter. Full-year 2008 revenues were reported of
23       $1,434.9 million and GAAP operating income of $167.5 million.

24       If the preliminary investigation findings prove to be final, they could impact
       the company's previously reported interim 2009 financial results. The
25       company is also in the process of evaluating the financial impact of these
       adjustments on its previously reported results for the fiscal year and interim
26       periods ended December 28, 2008. The company currently estimates that
       approximately $9 million of the identified accounting entries should have
27       been recorded in 2008.

28   CONSOLIDATED COMPLAINT                                                      -31-
     Case No. 09-5473-RS

     1924164.1

The company is working with the Audit Committee, the Committee's outside experts, and with the company's independent auditors to determine if any restatements of the 2009 interim financial reports and the 2008 annual report will be necessary. Until the investigation is complete and such a determination is made, there can be no assurance that broader issues do not exist. Therefore, the company's previously issued interim financial statements for each of the 2009 quarterly periods, the previously reported financial results for the fiscal year ending December 28, 2008, the financial information in its quarterly reports on Form 10-Q for the 2009 quarters, the financial information in the 2008 annual report on Form 10-K, and the guidance provided by the company for the 2009 fiscal year, ***should no longer be relied upon***. The company anticipates providing an update on the investigation within the next 30 days.

91.     Notably, the Company's November 16, 2009 announcement indicated that the accounting violations in 1Q09 – a critical quarter for the Company as it immediately preceded the April 2009 Offerings that raised nearly $450 million – ***overstated*** cost of goods sold by $1 million.  However, as the Company later admitted in its Restatement, the cost of goods sold for 1Q09 was actually ***understated*** by $15.5 million.  Citigroup analyst Timothy Arcuri noted that while SunPower's accounting errors allowed the Company to beat the street's 2Q09 consensus EPS estimate of $0.14 (non-GAAP basis) by nearly $0.10, without the errors "it would have actually missed consensus by [approximately] $0.03-0.04."  Thus, but for the accounting fraud, SunPower would have badly missed 2Q09 EPS estimates.

92.     Following the November 16, 2009 announcement, at least one analyst noted the fortuitous timing of the most significant understatement of costs and was bluntly dismissive of the Company's effort to blame its operations in the Philippines for its accounting problems: "what's most troubling to us is the benefit SunPower's stock experienced following its stellar C2Q09 results, allowing the company to circumvent the share price pressure many of its peers were experiencing at the time. ***This effectively created an unlevel playing field with which SunPower used to tap the capital markets to boost its liquidity positioning***. Our conclusions here are predicated on our view that two substantial accounting errors in a matter of less than one year are indicative of a

CONSOLIDATED COMPLAINT                                                                      -32-
Case No. 09-5473-RS

1924164.1

management team that may be using ***accounting chicanery to smooth out results in tough times***."

93.     Deutsche Bank analyst Steve O'Rourke also questioned management's integrity and drew a direct link between the November 4, 2008 disclosure (*see* ¶75) and the November 16, 2009 disclosure:   "We believe ***the accounting errors call the company's credibility more into question*** than the business model.  Although the nuances are different, we note the announcement of accounting errors is reminiscent of inadequate hedging disclosed by the company soon after it announced 3Q08 results. . . ."  A report from Collins Stewart LLC noted that "[t]he indicated [preliminary figures] suggest that the maximum impact would have occurred in 2Q09 when the reported GAAP gross margin of 19.6% would have overstated the actual gross margin by 470 bps. ***That was in our view a critical quarter for the company following its April 28 9 million share secondary offering***.  The 2Q09 results drove a 29% surge in the shares the day following the report (7/24/09)."  Other analysts immediately cut their ratings on SunPower and advised investors to remain cautious until more information about the Company's accounting issues surfaced.  The comments by Citigroup, Hapoalim and Deutsche Bank were all tempered by the fact that they were still in the dark about the still undisclosed full impact on SunPower's 1Q09 results.

### 5.     Post-Class Period Events

94.     On December 15, 2009, the Company issued a press release announcing "significant progress in its internal investigation."  According to the Company, "[t]he investigation is being conducted under the direction of the SunPower board of director's audit committee, with the assistance of outside legal and accounting experts. The investigation to date is consistent with the preliminary findings announced on November 16, 2009.  The audit committee is working with its experts and appropriate SunPower personnel to promptly complete a thorough investigation."  As it turned out, the nature and

---

1    extent of the accounting misconduct were **much worse** than defendants had led investors

2    to expect.

3        95.    On March 19, 2010, SunPower filed its delinquent 2009 Form 10-K with

4    the SEC and issued its Restatement.  SunPower restated its financial results for its fiscal

5    year ended December 28, 2008 and for each of the quarters in 2008, as well as for the first

6    three quarters of 2009.   The extent of the accounting mistatements turned out to be far

7    more dramatic than the Company had predicted earlier as it reduced previously reported

8    operating income by $36 million ($13 million in 2008 and $23 million during the first

9    three quarters of 2009), versus the Company's November 16, 2009 estimate of the error of

10   just $15 million.

11       96.    Under GAAP, financial statements can **only** be restated to correct material

12   errors.  SFAS No. 154, *Accounting Changes and Error Corrections* ("SFAS 154"), defines

13   "Restatement" as "the process of revising previously issued financial statements to reflect

14   the correction of an error in those financial statements.[9]  SFAS 154, ¶2.  SFAS 154 provides

15   that "[a]ny error in the financial statements of a prior period discovered subsequent to their

16   issuance shall be reported as a prior-period adjustment by restating the prior period

17   financial statements.   SFAS 154, ¶25.[10]   By restating, defendants admitted that the

18   Company's prior financial statements were materially false and misleading, that they

19   contained material misstatements and omissions when they were originally issued and that

20   SunPower had contemporaneous access to information that demonstrated the falsity of

21   those statements.

22       97.    Specifically, the Company admitted that:

23            the Audit Committee's investigation found that unsubstantiated entries (a)
             were made at the direction of the Philippines-based finance personnel in

24   _____

25   [9]    SFAS 154 amended APB No. 20, *Accounting Changes,* for fiscal years ending after
     2005. In the 3rd quarter of 2009, SFAS 154 was replaced by ASC §250.10.XX, *Accounting
26   Changes and Error Corrections*.

27   [10]   SFAS 154 defines "[e]rrors in previously issued financial statements" as "resulting
     from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse
28   of facts that existed at the time the financial statements were prepared."

order to report results for manufacturing operations that would be consistent with internal expense projections, (b) generally resulted in an **understatement of the Company's cost of goods sold**, and (c) were not directed or encouraged by, or done with the knowledge of, executive management. During the course of the investigation, various accounting errors which required adjustments were also identified. Adjustments for these unsubstantiated entries and errors affected cost of goods sold and the following balance sheet accounts:

- Accounts payable and accrued liabilities: The investigation found that certain expenses were understated by (a) not sufficiently accruing expenses or (b) **reversing previously recorded expenses through manual journal entries that were not based on actual transactions or reasonable estimates of expenses**. The accounts primarily affected were accruals for manufacturing expenses such as subcontracted wafering costs, electricity, and freight and other accrued expenses. Unsubstantiated entries were also recorded to reduce uninvoiced receipts liability accounts, with an offsetting reduction to cost of goods sold.

- Inventories: The investigation found that **unsubstantiated entries were made to increase inventory and decrease cost of goods sold by adjusting variance capitalization amounts**. In addition, inventory obsolescence was understated for materials used in-house by wafering services of silicon ingots.

98.     The most significant impact of the Company's accounting fraud was for 1Q09 and 2Q09, which overstated SunPower's gross margin (GAAP) by $15.5 million (48%) and $17.8 million (44%), respectively.   The importance of 1Q09 is further heightened by the fact that the Company's results were made public on April 23, 2009, less than a week before it accessed the capital markets and raised nearly $450 million through debt and equity offerings on April 29, 2009.

99.     Despite defendant's admission that it was the Company's practice to "**intentionally propose[] and/or approve[] journal entries that were not substantiated by actual transactions or costs**" in clear violation of GAAP and contrary to their public statements in SEC filings, the Audit Committee sought to absolve current members of its executive management.  The Company's Audit Committee also self-servingly sought to throw blame on unnamed employees in the Philippines, suggesting that the "unsubstantiated accounting entries were made at the direction of the Philippines-based finance personnel," who "violated the Company's code of business conduct and ethics."

                                                                                    -35-

1    The Audit Committee's findings, however, failed to mention the identity or even the job

2    titles of any of the Philippines personnel they sought to blame.  Nor did the Audit

3    Committee's findings concede the obvious fact that, as the Company's Principal

4    Accounting Officers, Hernandez and Arriola supervised and controlled the work of the

5    accounting personnel in the Philippines; nor did it attempt to explain how any finance

6    personnel could engage in admittedly intentional and material accounting misstatements

7    for nearly two years without defendants' approval, knowledge or detection.

8          100.    Analysts were highly skeptical of the Audit Committee's purported finding

9    that executive management was "unaware" of the widespread accounting fraud alleged

10   herein.  As noted by Hapoalim analyst Gordon Johnson, defendants' attempt "to shift the

11   blame [] on its team in the Philippines" was "misleading" when considering that "(1) the

12   bulk of SunPower's manufacturing operations have been located in the Philippines since

13   2006, and (2) *the company's accounting responsibilities, globally, fall solely on senior*

14   *management* (*i.e.*, CEO and CFO). . . ."  Johnson also bluntly dismissed the Company's

15   effort to "dissuade the blame for this lapse in judgment from that of the U.S. management

16   team to that of the team in the Philippines" and noted that its effort to do so "*further taints*

17   *management's credibility* as it potentially 'shades' the truth (despite SunPower

18   benefitting, considerably, for the accounting 'oversight')."  Other analysts noted that the

19   accounting issues "cast some doubt on management's credibility."

20         101.    Former SunPower employees have also confirmed that the Company's

21   accounting decisions were the responsibility of the CFO in SunPower's San Jose,

22   California headquarters (*i.e.*, Hernandez and Arriola).  For instance, Confidential Witness

23   1 ("CW 1") began working at SunPower in connection with the PowerLight acquisition in

24   January 2007 and was part of SunPower's Logistics Department for the Systems Division

25   until January 2009.  CW1 stated that the financial controller in the Philippines, Estela

26   Valenzuela, reported directly to the Company's Class Period CFOs, Hernandez and

27   Arriola.  CW1 also stated that members of the Philippines internal audit group came to

28

San Jose every quarter and that the controller for the Philippines "ultimately had to run everything through [Hernandez or Arriola]."

102. Confidential Witness 2 ("CW2"), a former Director of Supply Chain and Global Sourcing Management who worked at SunPower from January 2007 through January 2009, also confirmed strong links between the Company's Philippines operations and Hernandez and Arriola. CW2 stated that Hernandez "had a lot of responsibility for what was going on in the Philippines, certainly finance-wise." Hernandez's strong ties to the Philippines and educational background as a Philippines-trained CPA further corroborate CW2's statements and undermine the Company's effort to cast blame on a single unidentified employee in the Company's Philippine operations. CW2 also confirmed that SunPower "had accountants and analysts [in the Philippines] but the Philippines was not a decision-making or policy body. They did, for the most part, what the corporate office [in San Jose] instructed them to do. . . [F]rom an accounting perspective, most of the policy activities came out of [the corporate office in San Jose]….[I]t was the San Jose office which handled finances from a policy and procedure perspective."

103. Similarly, Confidential Witness 3 ("CW3"), a former regional sales manager for SunPower's Components Division from June 2008 through January 2009 stated that "100% of SunPower's finances were managed out of San Jose." CW3 confirmed that there was no separate CEO or CFO for the Company's Philippines operations and that SunPower's San Jose accounting team frequently made "trips to the Philippines to review the books and [accounting] processes."

104. On May 3, 2010, SunPower filed amended Form 10-Qs admitting, *for the first time*, that the Company had also materially misrepresented the Company's inventory component balances during the Class Period. The Company's delinquent May 3, 2010 filings included the restated component inventory balances that had been omitted from the Restatement. Prior to May 3, 2010, defendants had not disclosed these errors in

CONSOLIDATED COMPLAINT                                                                                     -37-
Case No. 09-5473-RS

1924164.1

SunPower's 2009 Form 10-K, and instead, claimed that "[t]he restatement ha[d] no material impact on net assets for any period affected, excluding the Audit Committee's investigation expenses of $3.6 million incurred during the fourth quarter 2009."

105.    On December 14, 2009, the Company quietly filed a trademark application for a low-cost line of solar products called "Serengeti."  SunPower neither issued a press release nor did it make any special public announcement of this new business line. Instead, the closest SunPower has come to publicly acknowledging its foray into the low-cost solar power market was an ambiguous statement by Werner on a 4Q09 earnings call that the Company would "leverage [its] third-party panel strategy."  With the secretive launch of Serengeti, perhaps SunPower is now finally willing to acknowledge with acts what it was unwilling to concede with true statements during the Class Period – namely, that its highly-touted "brand" and "differentiated" business model were unsustainable in a commodities-driven market.  As an analyst described the Serengeti launch:

> SunPower [] *has silently* launched a product line of low-efficiency multicrystalline modules…We believe this is a measured reaction to the loss of market share due to increased competition from both Chinese and Japanese module manufacturers. In addition, *we believe the use of multi-crystalline modules weakens SunPower's competitive argument that the company's high-efficiency mono-crystalline modules can compete effectively versus the lower-priced Asian modules*. We continue to rate the shares of SPWRA with a Sell rating and find the stock is meaningfully over-valued given the use of non-GAAP results.
>
> * * *
>
> In our view, this new offering *tells us that SunPower management has capitulated on its belief that its high-performance mono-crystalline module can effectively compete for every solar application*.

106.    As of the date of this filing, SunPower's stock trades at approximately $10.50 per share, an amount notably less than the $18 per share SunPower demanded when it first became a publicly-traded company in 2005 and the $97.55 per share the Company's stock commanded at the height of the Class Period.

## VI.   DEFENDANTS' MATERIALLY FALSE AND MILSEADING CLASS PERIOD STATEMENTS

### A.   First Quarter 2008

107.   The Class Period begins on April 17, 2008, with the announcement of SunPower's results for 1Q08 and raising guidance for the remainder of 2008. On that date, SunPower issued a press release titled *SunPower Reports First-Quarter 2008 Results; Company Raises FY 2008 Guidance*, and stated, in part, as follows:

> Revenue for the 2008 first quarter was $273.7 million, up 22% from prior-quarter revenue of $224.3 million and up 92% from year-ago first-quarter revenue of $142.3 million. The Components and Systems segments accounted for 35% and 65% of first-quarter revenue, respectively.
>
> * * *
>
> On a GAAP basis, SunPower reported **gross margin of 19.5%, total operating income of $14.8 million and diluted net income per share of $0.15**.

108.   The press release also reported pre-tax income of $17.8 million and gross margin of $53.3 million.

109.   In addition to the foregoing, the press release also quoted Werner, in relevant part, as follows:

> Our first quarter performance reflects the value our customers attribute to SunPower's high-performance solar solutions…SunPower's market leadership will continue to be driven through our focus on brand, technology, cost and people. **We are building a strong brand based on sound fundamentals**….
>
> * * *
>
> SunPower is positioned to meet the needs of the market with industry-leading solar technology across the entire customer spectrum -- from large-scale systems designed for utilities and large commercial clients to homeowners. Our proprietary technology delivers the highest output per unit area of any commercially available solar system and we intend to leverage this technology by aggressively expanding our solar cell production by more than 150% in 2008 compared to 2007. **This scale, combined with lower silicon costs, higher efficiencies, thinner wafers and on-going quality and cost improvements in our factories, will drive unit cost reduction. During the first quarter of 2008, we continued to meet or exceed our manufacturing targets across both of our fabs and our panel manufacturing facility.**

* * *

We expect SunPower's silicon supply costs to decline by approximately 10% during 2008 compared to 2007….This cost improvement will amplify our silicon utilization benefits achieved through higher cell efficiency and thinner wafers. *We are on track to achieve our planned improvements in our cost structure, and therefore we expect to reach our target financial model of 30% gross margin, 10% operating expenses and 20% operating margin, on a non-GAAP basis, no later than the first quarter of 2009*. We are also on track to realize our mission of reducing installed systems cost by 50% by 2012.

110.    On April 17, 2008, the Company hosted a conference call with analysts following their earnings announcements for 1Q08, where defendants trumpeted the Company's reduced costs and improved gross margins.  Specifically, Werner stated:

Within manufacturing, we are implementing a wide range of initiatives to improve installed systems costs….With the outbound channel of a solar system accounting for approximately 30 to 50% of the overall installed cost, we have a significant opportunity to leverage our *vertical integration to drive down costs*.

* * *

In our systems business, we are moving labor out of the field by developing factory assembled designs, scaling our supply chain and logistics, and reducing our building materials through design improvements in our T20 Tracker.  *We have accomplished these cost reductions* while delivering systems that have superior energy collection characteristics….

111.    On the same conference call, Hernandez stated:

The company's overall GAAP gross margin for the first quarter was 19.5% whereas our non-GAAP gross margin was 24%, which was within our guidance...In the first quarter, our systems segment posted non-GAAP gross margin of 23.3.% which was within our guidance of 23 to 24%, while our component segment posted gross margin of 25.4%, a 200-basis point sequential improvement from the prior quarter but lower than our guidance. Our component segment gross margin benefited from higher volume and modestly higher average selling prices in the quarter.  The increase in component gross margin, however, was tempered by stable silicon costs rather than our expected slightly declining silicon costs as we secured incremental silicon supply to improve our factory linearity in the first and second quarters of the year….[L]ooking forward to the second quarter[,] *we expect our first meaningful reduction in average silicon costs which will contribute our estimated 510 to 610 basis point improvement in our component segments gross margin*.

* * *

Just a couple of notes here on the systems segment, *we've demonstrated improving margins in the segment* and we expect continued improvements in 2009….

CONSOLIDATED COMPLAINT
Case No. 09-5473-RS

-40-

112.   On May 9, 2008, defendants filed with the SEC the Company's 1Q08 Form 10-Q, signed by Hernandez and certified by Werner and Hernandez.  The 1Q08 Form 10-Q repeated the false and misleading financial results previously issued in the April 17, 2008 press release.

113.   The Company's 1Q08 Form 10-Q also contained false statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part, the following:

> Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, ***our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective***.

114.   In connection with the Company's 1Q08 Form 10-Q, both Werner and Hernandez executed and filed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") that attested to the purported accuracy and completeness of the Company's financial and operational reports as well as statements concerning the Company's controls and procedures, as follows:

> 1.   I have reviewed this Quarterly Report on Form 10-Q of SunPower Corporation;
>
> 2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.   ***The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a)   ***Designed such disclosure controls and procedures***, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the registrant***, including its

consolidated subsidiaries, *is made known to us by others within those entities*, particularly during the period in which this report is being prepared;

(b)   **Designed such internal control over financial reporting**, or caused such internal control over financial reporting to be designed under our supervision, **to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements** for external purposes in accordance with generally accepted accounting principles;

(c)   **Evaluated the effectiveness of the registrant's disclosure controls and procedures** and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   **Any fraud, whether or not material, that involves management or other employees** who have a significant role in the registrant's internal control over financial reporting.

Date:  May 9, 2008

/ S / THOMAS H. WERNER
Thomas H. Werner
Chief Executive Officer
(Principal Executive Officer)

* * *

Date:  May 9, 2008

/ S / EMMANUEL T. HERNANDEZ
Emmanuel T. Hernandez

Chief Financial Officer
(Principal Financial and Accounting
Officer)

* * *

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND
CHIEF FINANCIAL OFFICER PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the quarterly report of SunPower Corporation (the "Company") on Form 10-Q for the period ended March 30, 2008 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of Thomas H. Werner, Chief Executive Officer, and Emmanuel T. Hernandez, Chief Financial Officer, of the Company, certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of his knowledge and belief:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     *The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company*.

Dated: May 9, 2008

/ S / THOMAS H. WERNER
Thomas H. Werner
Chief Executive Officer
(Principal Executive Officer)

/ S / EMMANUEL T. HERNANDEZ
Emmanuel T. Hernandez
Chief Financial Officer
(Principal Financial and Accounting
Officer)

115.    The statements contained in SunPower's April 17, 2008 release, the statements made on the April 17, 2008 conference call and the statements contained in the Company's 1Q08 Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

(a)     By its Restatement, SunPower has admitted that its financial results and statements for 1Q08 (¶¶107-114, *supra*), included the following misstatements:

CONSOLIDATED COMPLAINT                                             -43-
Case No. 09-5473-RS

1924164.1

**1Q08 SunPower Financial Information**
**As Reported and as Corrected by SunPower**

| $ in millions, rounded, except per share amounts | Three Months Ended Mar 30, 2008[11] | | | |
| --- | --- | --- | --- | --- |
| | Reported amount | Corrected amount | Amount overstated | Percent overstated |
| Gross margin ($) | $ 53.2 | $ 51.5 | $ 1.7 | 3% |
| Pre-tax income | $ 13.3 | $ 11.8 | $ 1.4 | 12% |
| Earnings per share | $0.14 | $0.13 | $0.01 | 8% |
| Components gross margin rate (%) | 19% | 17% | 1.7% | 10% |

(b)    Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold, by failing to make proper, timely adjustments to the Company's stated reports. As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made…in order to report results for manufacturing operations that would be consistent with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c)    Contrary to Werner's and Hernandez's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

(d)    The statements in ¶¶107-14 were materially false and misleading because they created a false impression that the Company's gross margin in 1Q08 was based on higher solar cell conversion efficiency and better silicon utilization, cost reductions and increased volume when in fact it was in substantial part the direct result of SunPower and the Insider Defendants' intentional scheme to improperly understate cost of revenue, overstate inventory and distort gross margins in both the Company's systems and

---

[11]    Overstatement amounts and percentages are based on SunPower's retrospectively adjusted financial results.

components segments in order to meet Wall Street expectations, prop up the Company's stock price and enable insiders to sell SunPower securities at artificially inflated levels.

### B.   Second Quarter 2008

116.   On July 17, 2008, SunPower published a release announcing results for 2Q08 and again raised guidance for the remainder of the year. The press release was titled *SunPower Reports Second-Quarter 2008 Results; Company Raises FY 2008 and FY 2009 Guidance* and stated that SunPower "[g]enerated second quarter 2008 revenue of $382.8 million, up 120% year-on-year" and "[a]chieved $0.34 GAAP net income per share, $0.61 non-GAAP." The Company also reported gross margin of 24.3%, total operating income of $45.0 million and diluted net income per share of $0.34.

117.   In addition to the foregoing, the Company's July 17, 2008 press release quoted Werner, in part, as follows:

> The overall global business environment remains very favorable as we **continue to execute on our long-term strategy focused on brand, technology, cost and people. We are well-positioned for success entering the second half of the year**.
>
> \* \* \*
>
> SunPower continued to extend its technology lead during the quarter as we announced our world-record, 23.4 percent efficiency, prototype Generation 3 solar cell. This technology, expected to be in production in approximately two years, is **a key element in our roadmap to reduce total systems costs to compete with wholesale and retail electric rates by 2012. Also, in order to meet expected future demand and scale economies to reach our cost reduction goals**, SunPower announced plans to build its third solar cell manufacturing facility in Malaysia which, when completed, will have a nameplate capacity in excess of 1 gigawatt.
>
> **Our cost reduction plans are on target for silicon procurement as well. We saw our silicon unit costs materially decline in the second quarter as we started to realize the benefit of our portfolio approach to silicon supply**....With all of our silicon suppliers delivering according to contract, **we expect our silicon supply costs to continue to decline and remain fully contracted for our silicon needs through 2010.**

118.   The Company also raised guidance for fiscal years 2008 and 2009, as well as 3Q08:

> Based on the strong demand trends in both existing and emerging markets and continued progress on our 50 percent reduction in installed system

---

CONSOLIDATED COMPLAINT
Case No. 09-5473-RS

-45-

costs, we are raising our guidance for the fiscal year 2008 and expect the following non-GAAP results: Total revenue of $1.39 billion to $1.44 billion and diluted net income per share of $2.26 to $2.36. We also expect our 2009 total revenue to be in of the range of $2.0 billion to $2.1 billion, production capacity of 450+ megawatts and non-GAAP diluted net income per share of at least $3.50. Consistent with our practice of offering guidance for the current quarter, we expect third quarter 2008 non-GAAP total revenue of $340 million to $355 million, company non-GAAP gross margin of 26.5% to 27.5% and non-GAAP diluted net income per share of $0.53 to $0.57.

119.   That same day, the Company hosted a conference call with analysts following their earnings announcements for 2Q08.   During the call, Werner and Hernandez again falsely promoted the Company's improved margins and reduced costs. Specifically, Werner stated "[o]ur record second quarter once again exceeded our top and bottom line guidance and *we increased margins consistent with better than expected execution of our cost reduction road map*."  Werner further stated:

> *On the manufacturing side we continue to make material progress on our cost initiatives…we continue to reduce our balance assistance cost through our vertical integration strategy* by further scaling our services we offer through our dealer network, standardizing systems technology products that are factory assembled which reduces installed costs in the field for commercial systems and utility power plants, driving adoption of our T20 Tracking product which collects up to 30% more energy, and further ramp of our industry leading Generation Two cell technology which not only improves conversion efficiency but *significantly reduces field costs* as higher efficiency means less modules, less racking, less wires, less inverters, less labor and less land.

> * * *

> [A]s we more fully utilize our second fab, *our costs come down as well, so our costs decrease and compounded with the higher vertical integration, so it improves our [] cost position rather significantly*.

120.   Contributing to the Company's false statements about its margins and costs during the call, Hernandez added that:

> In the second quarter, our systems segment posted a non-GAAP gross margin of 24.2%, an improvement over last quarter[']s margin of 23.3[%], benefiting from higher percentage of SunPower panels used in its project as well as cost savings we realized in the field implementation of our trackers. *Our components segment posted gross margin of 31.7%, a 630 basis point improvement over last quarter[']s margin of 25.4, benefiting from lower silicon costs,* sequential growth in volume, and also modestly higher average selling prices during the quarter.

CONSOLIDATED COMPLAINT
Case No. 09-5473-RS

-46-

1924164.1

1       121.    On August 8, 2008, SunPower filed with the SEC the Company's 2Q08

2   Form 10-Q, signed by Hernandez and certified by Werner and Hernandez.   The 2Q08

3   Form 10-Q repeated the financial results previously issued in the July 17, 2008 press

4   release.

5       122.    The 2Q08 Form 10-Q also reported the Company's purported Cost of

6   Revenue (as a percentage of revenue and the year-over-year change) as follows:

> During the three and six months ended June 29, 2008, our total cost of revenue was approximately $289.7 million and $510.1 million, respectively, which represented increases of 101% compared to total cost of revenue reported in the comparable period of 2007. The increase in total cost of revenue resulted from increased costs in all cost of revenue spending categories and corresponds with an increase of 120% and 108% in total revenue during the three and six months ended June 29, 2008, respectively, from total revenue reported in the comparable period of 2007.

> As a percentage of total revenue, **our total cost of revenue decreased to 76% and 78% in the three and six months ended June 29, 2008, respectively, compared to 83% and 80% for the three and six months ended July 1, 2007, respectively. This decrease in total cost of revenue as a percentage of total revenue is reflective of decreased costs of polysilicon beginning in the second quarter of fiscal 2008 and improved manufacturing economies of scale associated with markedly higher production volume.** This decrease in total cost of revenue as a percentage of total revenue was partially offset by (i) one-time asset impairment charges of $5.5 million in the six months ended June 29, 2008 relating to the wind-down of our imaging detector product line and for the write-down of certain solar product manufacturing equipment which became obsolete due to new processes; (ii) a more favorable mix of business in our systems segment that benefited gross margin by approximately four percentage points during the six months ended July 1, 2007; and (iii) the $2.7 million settlement received from one of our suppliers in the components segment during the six months ended July 1, 2007 in connection with defective materials sold to us during 2006 that was reflected as a reduction to total cost of revenue.

> **Systems Segment**: …For the three and six months ended June 29, 2008, gross margin for the systems segment was $61.5 million and $97.1 million, respectively, or 23% and 22% of systems segment revenue, respectively. Gross margin for the systems segment was $12.5 million and $28.5 million for the three and six months ended July 1, 2007, respectively, or 12% and 16% of systems segment revenue, respectively. Gross margin in our systems segment increased eleven percentile points in the three months ended June 29, 2008 as compared to the three months ended July, 2007 and six percentile points in the six months ended June 29, 2008 as compared to the six months ended July, 2007 due to higher percentage of SunPower solar panels used in its projects as well as cost savings we realized from more efficient field implementation of our systems trackers.

**Component Segment**: …Gross margin for the components segment was $31.6 million and $49.3 million for the three and six months ended June 29, 2008, respectively, or 28% and 24% of components segment revenue, respectively. Gross margin for the components segment was $17.3 million and $33.7 million for the three and six months ended July 1, 2007, respectively, or 25% of components segment revenue for each of the three and six months ended July 1, 2007, respectively. ***Gross margin in our components segment increased three percentile points in the three months ended June 29, 2008*** as compared to the three months ended July, 2007 due to lower polysilicon costs, sequential growth in volume and modestly higher average selling prices. Gross margin in our components segment decreased one percentile point in the six months ended June 29, 2008 as compared to the six months ended July, 2007 due to increasing costs of raw materials through the first quarter ended March 30, 2008 and one-time asset impairment charges of $5.5 million incurred in the first quarter ended March 30, 2008.

123. The Company's 2Q08 Form 10-Q also contained false statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part the following:

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, ***our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective***.

124. In connection with the 2Q08 Form 10-Q, both Werner and Hernandez executed and filed SOX Certifications where defendants certified the accuracy of the Company's financial results and internal controls, using language identical to ¶114, *supra*.

125. The statements contained in SunPower's July 17, 2008 press release and made during the July 17, 2008 conference call and the statements contained in the Company's 2Q08 Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

(a) By its Restatement, SunPower has admitted that its financial results and statements for 2Q08, ended June 29, 2008 (¶¶116-24, *supra*), included the following misstatements:

1
2

### 2Q08 SunPower Financial Information
### As Reported and as Corrected by SunPower

3

|                                           | Three Months Ended June 29, 2008 | | | |
|-------------------------------------------|--------------------|--------------------|----------------------|-----------------------|
| $ in millions, rounded, except per share amounts | Reported amount | Corrected amount | Amount overstated | Percent overstated |
| Gross margin ($)                          | $ 92.8             | $ 84.2             | $   8.7              | 10%                   |
| Pre-tax income                            | $ 37.4             | $ 29.1             | $   8.4              | 29%                   |
| Earnings per share                        | $0.37              | $0.32              | $0.05                | 16%                   |
| Components gross margin rate (%)          | 28%                | 24%                | 4.3%                 | 18%                   |

(b)     Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold, by failing to make proper, timely adjustments to the Company's stated reports. As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made…in order to report results for manufacturing operations that would be consistent with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c)     Contrary to Werner's and Hernandez's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

(d)     The statements in ¶¶116-24 were materially false and misleading because they created a false impression that the Company's gross margin in 2Q08 was based on higher solar cell conversion efficiency and better silicon utilization, cost reductions and increased volume when in fact it was in substantial part the direct result of SunPower and the Insider Defendants' intentional scheme to improperly understate cost of revenue, overstate inventory and distort gross margins in both the Company's systems and

components segments in order to meet Wall Street expectations, prop up the Company's

stock price and enable insiders to sell SunPower securities at artificially inflated levels.

## C.   Third Quarter 2008

126.   On October 16, 2008, SunPower published a press release announcing

results for 3Q08 and reiterated guidance for the remainder of 2008. The press release was

titled *SunPower Reports Third Quarter 2008 Results*, and stated that SunPower generated

3Q08 revenue of $377.5 million, "up 61% year-on-[]year" and "achieved $0.26 GAAP net

income per share, $0.60 non-GAAP."

127.   The Company's October 16, 2008 release quoted Werner, in part, as

follows:

> Overall, global industry fundamentals remain strong and demand is
> increasing across multiple geographies. ***Our cost reduction roadmap is
> paying dividends as we are now selling at a levelized cost of energy which
> is cost-[]effective for our customers*** as evidenced by our recent utility-scale
> announcements with Pacific Gas and Electric Co. (PG&E), and Florida
> Power & Light Co. With the recent extension of the U.S. Investment Tax
> Credit, we now have a national solar market in the U.S. with long-term
> visibility and significant additional demand potential in all three market
> segments - residential, commercial and utility. We also saw uncertainty
> removed from the Spanish market in the third quarter. ***These developments
> make us even more confident in our planned performance as we look into
> next year***.
>
>                    * * *
>
> ***Our cost reduction programs remain on track***, enabling us to open up new
> markets such as the U.S. utility market where the combination of our
> tracking and industry leading cell technologies offer utilities a very
> competitive levelized cost of energy.
>
>                    * * *
>
> ***Due to strong industry fundamentals, continued execution of our vertical
> integration strategy, expected gross margin expansion, and our progress
> on our cost reduction programs, we will materially meet our target
> operating model in the fourth quarter.*** We are strategically well positioned
> for 2009 and remain on track to realize our mission of reducing installed
> systems cost by 50% from 2006 to 2012.

128.   On October 16, 2008, defendants participated in a conference call with analysts following its earnings announcements for 3Q08, where Werner stated "[in] next year['s] cost reduction[s,] we can hold 30% gross margins."  Further, Werner added:

> We delivered very strong operational and financial performance as we beat our revenue guidance, *significantly improved our gross margin* and beat our EPS guidance.  Our model continues to work.
>
> * * *
>
> Our non-GAAP EPS of $0.60 per share exceeded our guidance *as we further reduced manufacturing costs and managed operating expense growth*.
>
> * * *
>
> Our components segment accounted for 49% of revenue, delivered *very strong gross margins of 39%, up to 750 basis points sequentially*.  This strong performance was achieved through higher conversion efficiencies, improved silicon utilization, lower polysilicon cost, scale efficiencies at higher production volumes and modestly higher average selling prices.
>
> * * *
>
> Due to strong industry fundamentals, continued execution on our vertical integration strategy, expected gross margin expansion and our progress on *our cost reduction programs*, we expect to materially meet our target operating model in the fourth quarter.
>
> [W]e are increasing conversion efficiencies rather dramatically, as well as we're improving scale efficiencies in our second fab that are very significant.  And we realized that our average utilization in our second fab was probably on the [order] of several lines whereas next year it's going to be in the order of ten, probably closer to 13.  So there's a significant scale advantage…We are comfortable with 30% guidance of gross margin…

129.   On the same call, Hernandez stated that:

> [T]he total Company overall gross margin for the third quarter was 27.1%, whereas our non-GAAP gross margin reached 29.2%.  *This represents a 280 basis points improvement from last quarter's non-GAAP margin of 26.4%*.  In the third quarter, our systems segment posted a non-GAAP gross margin of 19.7%, a decrease over last quarter's margin of 24.2% largely due to regional mix of projects, specifically a higher North America project mix during the quarter.  Our component segment on the other hand posted gross margin of 39.2%, *a 750-basis point improvement over last quarter's 31.7, once again benefiting from lower silicon costs, higher volume, more efficient use of silicon and slightly higher average selling prices*.

130. On or about November 7, 2008, SunPower filed with the SEC the Company's 3Q08 Form 10-Q, signed by Hernandez and certified by Werner and Hernandez. The 3Q08 Form 10-Q repeated the financial results previously issued in the October 16, 2009 press release.

131. The 3Q08 Form 10-Q also reported the Company's purported cost of revenue (as a percentage of revenue and the year-over-year change) as follows:

**Systems Segment Cost of Revenue**: For the three and nine months ended September 28, 2008, gross margin for the systems segment was $34.6 million and $131.7 million, respectively, or 18% and 20% of systems segment revenue, respectively. Gross margin for the systems segment was $22.6 million and $51.2 million for the three and nine months ended September 30, 2007, respectively, or 14% and 15% of systems segment revenue, respectively. ***Gross margin in our systems segment increased four percentage points in the three months ended September 28, 2008 as compared to the three months ended September 30, 2007 and five percentage points in the nine months ended September 28, 2008 as compared to the nine months ended September 30, 2007 due to higher percentage of SunPower solar panels used in its projects as well as cost savings we realized from more efficient field implementation of our systems trackers***.

\* \* \*

**Components Segment Cost of Revenue**: Gross margin for the components segment was $71.0 million and $120.3 million for the three and nine months ended September 28, 2008, respectively, or 39% and 31% of components segment revenue, respectively. Gross margin for the components segment was $15.8 million and $49.5 million for the three and nine months ended September 30, 2007, respectively, or 21% and 24% of components segment revenue, respectively. ***Gross margin in our components segment increased eighteen percentage points in the three months ended September 28, 2008 as compared to the three months ended September 30, 2007 and seven percentage points in the nine months ended September 28, 2008 as compared to the nine months ended September 30, 2007 benefiting from higher average solar cell conversion efficiency and better silicon utilization, continued reduction in silicon costs, higher volume, and slightly higher average selling prices***.

\* \* \*

During the three and nine months ended September 28, 2008, our total cost of revenue was approximately $271.9 million and $782.0 million, respectively, which represented increases of 39% and 74%, respectively, compared to total cost of revenue reported in the comparable periods of 2007. The increase in total cost of revenue resulted from increased costs in all cost of revenue spending categories and corresponds with an increase of 61% and 88% in total revenue during the three and nine months ended

September 28, 2008, respectively, from total revenue reported in the comparable periods of 2007. As a percentage of total revenue, our total cost of revenue decreased to 72% and 76% in the three and nine months ended September 28, 2008, respectively, compared to 84% and 82% for the three and nine months ended September 30, 2007, respectively. ***This decrease in total cost of revenue as a percentage of total revenue is reflective of decreased costs of polysilicon beginning in the second quarter of fiscal 2008 and improved manufacturing economies of scale associated with markedly higher production volume***. This decrease in total cost of revenue as a percentage of total revenue in the nine months ended September 28, 2008 as compared to the nine months ended September 30, 2007 was partially offset by (i) a one-time asset impairment charge of $2.2 million in the nine months ended September 28, 2008 relating to the wind-down of our imaging detector product line (the $3.3 million write-down of certain solar product manufacturing equipment taken in the first quarter was reversed in the third quarter of fiscal 2008); (ii) a more favorable mix of business in our systems segment that benefited gross margin by approximately four percentage points during the nine months ended September 30, 2007; and (iii) the $2.7 million settlement received from one of our suppliers in the components segment during the nine months ended September 30, 2007 in connection with defective materials sold to us during 2006 that was reflected as a reduction to total cost of revenue.

132.     The Company's 3Q08 Form 10-Q also contained false and misleading statements regarding the sufficiency and adequacy of the Company's internal controls stating that the Company was:

implement[ing] and improve[ing] additional and existing administrative, financial and operations systems, procedures and controls, including the need to update and integrate our financial internal control systems in SP Systems ***and in our Philippines facility with those of our San Jose, California headquarters***.

133.     The 3Q08 Form 10-Q also stated:

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, ***our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective***.

134.     Additionally, in connection with the 3Q08 Form 10-Q, both Werner and Hernandez executed and filed SOX Certifications where they certified the financial results and the Company's internal controls, using language identical to ¶114, *supra*.

135.     The statements contained in SunPower's October 16, 2008 press release and made during the October 16, 2008 conference call, and the statements contained in the

Company's 3Q08 Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

(a)     SunPower has admitted that its financial results and statements for 3Q08 (¶¶126-34, *supra*), included the following misstatements:

### 3Q08 SunPower Financial Information
### as Reported and as Corrected by SunPower

| $ in millions, rounded, except per share amounts | Three Months Ended September 28, 2008 | | | |
| --- | --- | --- | --- | --- |
| | Reported amount | Corrected amount | Amount overstated | Percent overstated |
| Gross margin ($) | $105.3 | $102.2 | $   3.1 | 3% |
| Pre-tax income | $ 44.4 | $ 41.7 | $   2.7 | 6% |
| Earnings per share | $0.29 | $0.27 | $0.02 | 7% |
| Components gross margin rate (%) | 38% | 36% | 2.1% | 6% |

(b)     Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold by failing to make proper, timely adjustments to the Company's stated reports. As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made…in order to report results for manufacturing operations that would be consistent with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c)     Contrary to Werner's and Hernandez's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

(d)     The statements in ¶¶126-34 were materially false and misleading because they created a false impression that the Company's gross margin in 3Q08 was based on higher solar cell conversion efficiency and better silicon utilization, cost reductions and increased volume when in fact it was in substantial part the direct result of

---

CONSOLIDATED COMPLAINT
Case No. 09-5473-RS

-54-

1   SunPower and the Insider Defendants' intentional scheme to improperly understate cost of

2   revenue, overstate inventory and distort gross margins in both the Company's systems and

3   components segments in order to meet Wall Street expectations, prop up the Company's

4   stock price and enable insiders to sell SunPower securities at artificially inflated levels.

5   **D.      Fourth Quarter 2008 and Fiscal Year 2008**

6          136.   On January 29, 2009, SunPower issued a press release again announcing

7   purported "record" results for 4Q08 and fiscal year 2008, and raising guidance for the

8   remainder of 2008 and for 2009.  The press release was titled *SunPower Reports Record*

9   *Fourth-Quarter and Fiscal Year 2008 Results* and stated, in part:

10         Revenue for the 2008 fourth quarter was $401 million and compares to $378
           million in the third-quarter of 2008 [up 79% year-on-year] and $224 million
11         in the fourth-quarter of last year. The Components and Systems segments
           accounted for 56% and 44% of fourth-quarter revenue, respectively.
12
13                                        * * *

14         On a GAAP basis for the 2008 fourth quarter, SunPower reported gross
           margin of 27.9%, total operating income of $55 million and net income per
15         diluted share of $0.35.

16         On a non-GAAP basis, adjusted to exclude non-cash charges for
           amortization of intangible assets of $4.2 million and stock-based
17         compensation of $18.2 million, *SunPower reported total gross margin of*
           *29.9%, operating income of $77.5 million and net income per diluted share*
18         *of $0.70*. This compares with prior-quarter non-GAAP gross margin of
           29.2%, total operating income of $73 million and $0.58 net income per
19         diluted share. *For the 2008 fourth quarter, Components segment gross*
           *margin was 35.6% and Systems segment gross margin was 22.7%*. The
20         company's GAAP and Non-GAAP fourth-quarter results include a $6.3
           million, or $0.07 net income per diluted share, foreign currency gain related
21         to its Korean joint venture.

22         137.   On January 29, 2009, after the close of the market, Werner and Arriola
23
24   participated in a conference call with analysts following their "record" earnings

25   announcements for 4Q08 and fiscal year 2008.  During the call, defendants bragged that

26   despite challenging market conditions, SunPower "*exceeded [] guidance*" and claimed

27   that lower sales of solar systems were offset by the Company's "cost reduction" strategy.

28

CONSOLIDATED COMPLAINT                                                          -55-
Case No. 09-5473-RS

1924164.1

Werner claimed that "our components segment performed extremely well and accounted for 56% of revenue, up 22% sequentially, and delivered *a gross margin of 35% capitalizing on our cost reduction programs.*"  Werner also allayed analyst concerns about ASP declines, noting that "we have tested our model and *can sustain module ASP reductions in excess of 20% by accelerating our cost reduction programs* and limiting our operating expense growth."  Werner further stated that "[t]he combination of 50% lower module costs, 50% lower balance of system costs and improved energy delivery allow us to compete favorably on a levelized cost of energy basis in all markets."

138.   On the same call, Arriola stated that "[w]e're continuing to make significant progress in our systems cost reduction program" and promoted the benefits of the Company's cost reduction strategy, claiming that:

> ASP [average selling price] declines in the fourth quarter were *significantly offset by continued cost reductions.*  In 2008 we benefitted from lower silicon costs and lower conversion costs through higher production volumes. As expected, in the fourth quarter we saw blended ASPs decline less than 5% although overall ASPs were down about 10% when you include the impact of foreign exchange.

139.   On February 26, 2009, SunPower filed with the SEC the Company's 2008 Form 10-K for the fiscal year end December 28, 2008, signed and certified by Werner and Arriola.  The 2008 Form 10-K repeated the financial results previously issued in the January 29, 2009 press release, and also stated that "…our solar systems provide the following benefits compared with competitors' systems: []superior systems design to meet customer needs and *reduce cost*, including non-penetrating, fast roof installation technologies…."

140.   The Company's 2008 Form 10-K reported the Company's purported cost of revenue (as a percentage of revenue and the year-over-year change) as follows:

> **Total Cost of Revenue**: During fiscal 2008 and 2007, our total cost of revenue was $1,071.2 million and $627.0 million, respectively, which represents an increase of 71%. Our fiscal 2007 cost of revenue increased 237% compared to our total cost of revenue in 2006 of $186.0 million. The increase in total cost of revenue resulted from increased volume in all cost of revenue spending categories and corresponds with an increase of 85% in total revenue from fiscal 2007 to 2008 and 228% from fiscal 2006 to 2007.

As a percentage of total revenue, our total cost of revenue decreased from 81% in fiscal 2007 to 75% in fiscal 2008. ***This decrease in total cost of revenue as a percentage of total revenue is reflective of decreased costs of polysilicon beginning in the second quarter of fiscal 2008 and improved manufacturing economies of scale associated with markedly higher production volume***, partially offset by (i) a one-time asset impairment charge of $2.2 million in fiscal 2008 relating to the wind-down of our imaging detector product line; (ii) a more favorable mix of business in our Systems Segment that benefited gross margin by approximately five percentage points during fiscal 2007; and (iii) the $2.7 million settlement received from one of our suppliers in the Components Segment during fiscal 2007 in connection with defective materials sold to us during 2006 that was reflected as a reduction to total cost of revenue.

\* \* \*

**Systems Segment Gross Margin**:  Gross margin was $167.1 million and $77.7 million for fiscal 2008 and 2007, respectively, or 20% and 17% of systems revenue, respectively. Gross margin increased due to a higher percentage of SunPower solar panels used in its projects as well as cost savings we realized from more efficient field implementation of our systems trackers.

\* \* \*

**Components Segment Gross Margin**: Gross margin was $196.6 million, $70.1 million and $50.5 million for fiscal 2008, 2007 and 2006, respectively, or 32%, 23% and 21%, respectively, of components revenue. ***Gross margin increased due to higher average solar cell conversion efficiency and better silicon utilization, continued reduction in silicon costs, higher volume, and slightly higher average selling prices.***

\* \* \*

**Other Cost of Revenue Factors**:  Additionally, within our own solar panel assembly facility in the Philippines we incur personnel-related costs, depreciation, utilities and other occupancy costs. To date, ***demand for our solar power products has been robust and our production output has increased allowing us to spread a significant amount of our fixed costs over relatively high production volume, thereby reducing our per unit fixed cost***….

141.    The Company's 2008 Form 10-K also contained false and misleading statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part, the following:

Based on their evaluation as of the end of the period covered by this Annual Report on Form 10-K and subject to the foregoing, ***our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective***.

142.    The 2008 Form 10-K also stated that the Company had implemented a new system to enhance its internal controls over financial reporting, which "improve[d] and enhance[d the Company's] system of internal controls over financial reporting":

> In the third quarter of fiscal 2008, we implemented a new enterprise resource planning ("ERP") system in our subsidiaries around the world, which resulted in a material update to our system of internal control over financial reporting. Issues encountered subsequent to implementation caused us to further revise our internal control process and procedures in order to correct and supplement our processing capabilities within the new system in that quarter. Throughout the ERP system stabilization period *we will continue to improve and enhance our system of internal control over financial reporting.*

143.    Additionally, in connection with the 2008 Form 10-K, both Werner and Arriola executed and filed SOX Certifications where they certified the financial results and the Company's internal controls, using language identical to that above in ¶114, *supra*.

144.    The statements contained in SunPower's January 29, 2009 press release and made during the January 29, 2009 conference call, and the statements contained in the Company's 2008 Form 10-K, referenced above, were each materially false and misleading when made for the following reasons:

(a)    SunPower has admitted that its financial results and statements for 4Q08 and fiscal year 2008, ended December 28, 2008 (¶¶136-43, *supra*), included the following misstatements:

**4Q08 SunPower Financial Information**
**as Reported and as Corrected by SunPower**

| $ in millions, rounded, except per share amounts | Reported amount | Corrected amount | Amount overstated | Percent overstated |
|---|---|---|---|---|
| | Three Months Ended December 28, 2008 | | | |
| Gross margin ($) | $111.3 | $111.7 | ($  0.4) | 0% |
| Pre-tax income | $ 34.0 | $ 33.4 | $  0.6 | 2% |
| Earnings per share | $0.37 | $0.33 | $0.03 | 10% |
| Inventory – Work-in-process | $ 15.5 | $ 25.8 | ($ 10.3) | (40%) |
| Components gross margin rate (%) | 34% | 34% | (0%) | (1%) |

**Fiscal 2008 SunPower Financial Information**
**as Reported and as Corrected by SunPower**

| $ in millions, rounded, except per share amounts | Reported amount | Corrected amount | Amount overstated | Percent overstated |
|---|---|---|---|---|
| | Twelve Months Ended December 28, 2008 | | | |
| Gross margin ($) | $362.7 | $349.6 | $ 13.1 | 4% |
| Pre-tax income | $129.1 | $116.1 | $ 13.0 | 11% |
| Earnings per share | $1.16 | $1.05 | $0.11 | 11% |
| Inventory – Work-in-process | $ 15.5 | $ 25.8 | ($ 10.3) | (40%) |
| Components gross margin rate (%) | 32% | 30% | 1.7% | 5% |

(b)     Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold, by failing to make proper, timely adjustments to the Company's stated reports. As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made…in order to report results for manufacturing operations that would be consistent with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c)     Contrary to Werner's and Hernandez's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

1        (d)    The statements in ¶¶136-43 were materially false and misleading

2  because they created a false impression that the Company's gross margin in 4Q08 and fiscal

3  year 2008 was based on higher solar cell conversion efficiency and better silicon utilization,

4  cost reductions and increased volume when in fact it was in substantial part the direct result

5  of SunPower and the Insider Defendants' intentional scheme to improperly understate cost

6  of revenue, overstate inventory and distort gross margins in both the Company's systems

7  and components segments in order to meet Wall Street expectations, prop up the

8  Company's stock price and enable insiders to sell SunPower securities at artificially inflated

9  levels.

### E.     First Quarter 2009

145.   On April 23, 2009, SunPower published a press release announcing results

for 1Q09 and reiterating guidance for the remainder of 2009. The press release was titled

*SunPower Reports First-Quarter 2009 Results* and stated, in part, the following:

> Revenue for the 2009 first quarter was $214 million and compares to
> revenues of $401 million in the fourth quarter of 2008 and $274 million in
> the first quarter of last year. The Components and Systems segments each
> accounted for 50% of first-quarter 2009 revenue.
>
>            * * *
>
> On a GAAP basis for the 2009 first quarter, SunPower reported gross
> margin of 22.3%, an operating loss of $2.5 million and a net loss per share
> of ($0.06)....
>
> On a non-GAAP basis, adjusted to exclude non-cash charges for
> amortization of intangible assets of $4.1 million, stock-based compensation
> of $9.5 million and non-cash interest expense of $5.0 million, SunPower
> reported total gross margin of 24.3%, operating income of $11.5 million and
> net income per diluted share of $0.05. This compares with fourth-quarter
> 2008 non-GAAP gross margin of 29.9%, operating income of $77.5 million
> and $0.69 net income per diluted share. For the 2009 first quarter,
> Components segment gross margin was 29.5% and Systems segment gross
> margin was 19.0%.

146.   In addition to the foregoing, the Company's April 23, 2009 release quoted

Werner, in part, as follows:

> [o]ur quarterly performance was impacted by seasonality, the continuing
> effects of the credit crisis and difficult economic conditions. ***Despite these***

CONSOLIDATED COMPLAINT                         -60-
Case No. 09-5473-RS

*headwinds we were able to deliver strong gross margins in our Components business and positive non-GAAP net income.* We have responded to current market conditions by moving to a demand-driven manufacturing model and reducing our planned operating expenses to align with our adjusted revenue outlook. Looking forward, we see positive trends emerging in a number of market segments, including the rooftop, distributed power plant and utility markets that give us confidence that we are well positioned for growth in the second half of 2009, 2010 and beyond.

147.   That same day, the Company participated in a conference call with analysts following their earnings announcements for 1Q09.  While acknowledging that 1Q09 was "challenging," SunPower still reported strong gross margins and positive net income and that SunPower "*responded to a challenging Q1 by taking the steps necessary to control our costs given current market conditions*…." SunPower also claimed on the call that the Company remained competitive in the challenging market due to its reduced costs and that "our cost structure on the components segment, which specifically is modules is quite good."  Specifically, Werner repeated:

> [O]ur first quarter was impacted by seasonality, and continuing effects of the credit crisis, and difficult economic conditions.  *Despite these headwinds, we were able to deliver strong gross margins, and positive non-GAAP net income*….

148.   Arriola further stated:

> In regards to our operating expenses, we took a systematic approach to *reducing costs* throughout the Company.  We analyzed which of our expenses could be shifted from a fixed nature to variable based and reprioritized costs that could be eliminated or delayed until the business climate and overall demand improves.  As a result, *we have identified and reduced more than $50 million in costs from our internal 2009 operating expense line*….

149.   On the same call, Werner answered a question about inventory and falsely assured the public that the Company would not have to write down any inventory during the next two quarters:

> **Timothy Arcuri** - Citigroup – Analyst:
> …looking at the inventory number and looking at the premium that your components are getting out there relative to the peers. It is at its highest level that it has ever been. *As you look at that big inventory number, how do you assess the risk of having to write that down over the next two quarters,* as pricing has to come down to close that gap?

---

CONSOLIDATED COMPLAINT
Case No. 09-5473-RS

-61-

1924164.1

**Tom Werner** – SunPower Corporation – CEO:

[] So in terms of the inventory and risk of write-down, we mentioned that we have implemented a demand-driven supply chain. And what that means is that we will regulate or size the amount of manufacturing that we do based on the amount of inventory that we have between us and installation. So by definition, ***we are able to manage that inventory level down by managing how much we produce. And so we fully expect to absorb that inventory pretty rapidly in the first part of Q2.*** The other thing that I said that is really relevant to this is that the first part of Q2 has started out substantially better than the first part of Q1. And so the rate of installation is substantially higher than the rate of installation in Q1. So you can't use the Q1 usage rates to calculate when that inventory will go away. So very good question. ***I can assure you we are on top of this.*** And we are moderating production build, based on the amount of inventory as we install it. In terms of the specific numbers of production, I think our guys are ready.

150.    Later in the call, Werner was again pressed about SunPower's inventory position:

**Al Kaschalk** – Wedbush Morgan – Analyst:

Tom, I am trying to balance the outlook, the guidance, and the manufacturing production starting in Q2 here. And maybe you could just shed a little bit of color? I am not necessarily asking you to call a bottom. But are you comfortable as you roll out Q2 that you can remain pretty steady state on the manufacturing side, and not necessarily building inventory further? ***Or do you need a few more things to open up in the visibility channel to make that statement?***

**Tom Werner** – SunPower Corporation – CEO:
***No, we are comfortable that we can lower inventory consistent with our manufacturing plan, yes.***

**Al Kaschalk** – Wedbush Morgan – Analyst:
Does that mean production could be at least 20% above what you produced in Q1 of 93 to 94 megawatts?

**Tom Werner** – SunPower Corporation – CEO:
Yes, ***let me be clear.   We have already adjusted our manufacturing to lower the amount of inventory that we carried from Q1, and satisfy what we expect our business to be in Q2.*** And what we will do is moderate the amount of manufacturing we do based on inventory levels, which is driven by demand. So hopefully that is helpful. ***The answer is yes, we will lower inventory levels consistent with our expected build plan.***

151.    On or about May 8, 2009, SunPower filed with the SEC the Company's 1Q09 Form 10-Q, signed by Arriola and certified by Werner and Arriola. The 1Q09 Form 10-Q repeated the financial results previously issued in the April 23, 2009 press release. The 1Q09 Form 10-Q reported the Company's purported cost of revenue (as a percentage of revenue and the year-over-year change) for its two segments, as follows:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Total Cost of Revenue**: During the three months ended March 29, 2009 and March 30, 2008, our total cost of revenue was $166.0 million and $220.5 million, respectively, which represents a decrease of 25%. The decrease in total cost of revenue corresponds with the decrease of 22% in total revenue during the three months ended March 29, 2009 compared to the same period in 2008. As a percentage of total revenue, our total cost of revenue decreased to 78% in the three months ended March 29, 2009 compared to 81% in the three months ended March 30, 2008. ***This decrease in total cost of revenue as a percentage of total revenue*** is reflective of (i) decreased costs of polysilicon beginning in the second quarter of fiscal 2008; (ii) improved manufacturing economies of scale associated with markedly higher production volume; (iii) reduced expenses associated with the amortization of intangible assets and stock-based compensation; and (iv) one-time asset impairment charges of $5.5 million in the first quarter of fiscal 2008 relating to the wind down of our imaging detector product line and for the write-down of certain solar product manufacturing equipment which became obsolete due to new processes (the costs associated with the $3.3 million write-down of certain solar product manufacturing equipment was recovered from the vendor in the third quarter of fiscal 2008).

\* \* \*

**Systems Segment Gross Margin**: Gross margin was $17.7 million and $35.6 million for the three months ended March 29, 2009 and March 30, 2008, respectively, or 17% and 20%, respectively, of systems revenue. Gross margin decreased due to lower average selling prices for our solar power systems and system group department overhead costs incurred that are fixed in nature when systems revenue decreased 41% in the three months ended March 29, 2009 as compared to the same period in 2008.

\* \* \*

**Components Segment Gross Margin**: Gross margin was $30.0 million and $17.6 million for the three months ended March 29, 2009 and March 30, 2008, respectively, or 28% and 19%, respectively, of components revenue. ***Gross margin increased due to higher average solar cell conversion efficiency and better silicon utilization, continued reduction in silicon costs and higher volume, partially offset by lower average selling prices for our solar power products.***

152.    The Company's 1Q09 Form 10-Q also contained statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part, the following:

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, ***our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective***.

CONSOLIDATED COMPLAINT                                                      -63-
Case No. 09-5473-RS

1924164.1

153.   In connection with the 1Q09 Form 10-Q, both Werner and Arriola executed and filed SOX Certifications where they certified the financial results and the Company's internal controls, using language identical to ¶114, *supra*.

154.   The statements contained in SunPower's April 23, 2009 press release and made during the April 23, 2009 conference call, and the statements contained in the Company's 1Q09 Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

(a)   SunPower has admitted that its financial results and statements for 1Q09, ended March 29, 2009 (¶¶145-53), included the following misstatements:

**1Q09 SunPower Financial Information
as Reported and as Corrected by SunPower**

|  | Three Months Ended March 29, 2009 | | | |
| --- | --- | --- | --- | --- |
| $ in millions, rounded, except per share amounts | Reported amount | Corrected amount | Amount overstated | Percent overstated |
| Gross margin ($) | $ 47.7 | $ 32.2 | $ 15.5 | 48% |
| Pre-tax loss | ($ 14.6) | ($ 30.1) | ($ 15.5) | (52%) |
| Loss per share | ($0.06) | ($0.12) | ($0.06) | (51%) |
| Inventory – Work-in-process | $ 12.9 | $ 47.2 | ($ 34.3) | (73%) |
| Systems gross margin rate (%) | 16.7% | 8.3% | 8.4% | 101% |
| Components gross margin rate (%) | 28% | 22% | 6% | 27% |
| Combined gross margin rate (%) | 22% | 15% | 7% | 47% |

(b)   Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold, by failing to make proper, timely adjustments to the Company's stated reports. As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made…in order to report results for manufacturing operations that would be consistent

CONSOLIDATED COMPLAINT                                                    -64-
Case No. 09-5473-RS

1924164.1

with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c)    Contrary to Werner's and Arriola's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

(d)    The statements in ¶¶145-53 were materially false and misleading because they created a false impression that the Company's increase in gross margin in 1Q09 was based on higher solar cell conversion efficiency and better silicon utilization, cost reductions and increased volume when in fact it was in substantial part the direct result of SunPower and the Insider Defendants' intentional scheme to: (i) improperly understate cost of revenue (ii) overstate inventory and distort gross margins in both the Company's systems and components segments in order to meet Wall Street expectations; (iii) prop up the Company's stock price; (iv) enable insiders to sell SunPower securities at artificially inflated levels; and (v) complete the April 2009 Offerings while SunPower's securities were trading at artificially-inflated prices.

## F.    Second Quarter 2009

155.    On July 23, 2009, SunPower issued a press release announcing results for 2Q09 and reiterated guidance for the remainder of 2009.  The press release was titled *SunPower Reports Second-Quarter 2009 Results* and stated, in part, the following:

> Revenue for the 2009 second quarter was $298 million which compares to revenues of $214 million in the first quarter of 2009 and $383 million in the second quarter of 2008. The company's Components and Systems segments accounted for 63% and 37% of second-quarter 2009 revenue, respectively.
>
> * * *
>
> On a [GAAP basis…], SunPower reported gross margin of 19.6%, operating income of $9.9 million and net income per share of $0.26. GAAP net income per diluted share for the second quarter of 2009 includes a $21.2 million, or $0.21 per diluted share, non-taxable gain related to the company's recent securities offering and a $5.9 million, or $0.04 per diluted

share for noncash interest charges associated with the adoption of the new FSP APB 14-1 accounting rule, which impacts how companies account for interest expense on convertible bonds.

On a non-GAAP basis, adjusted to exclude non-cash charges for amortization of intangible assets of $4.1 million, stock-based compensation of $11.6 million and non-cash interest expense of $5.9 million, SunPower reported total gross margin of 22.6%. Gross margin for the second quarter was negatively impacted by approximately $12 million from lower factory utilization due to the company's planned transition to a demand driven manufacturing strategy, which successfully focused on reducing inventory levels. Operating income for the quarter was $26.8 million and net income per diluted share was $0.24. This compares with first quarter 2009 non-GAAP gross margin of 24.3%, operating income of $11.5 million and $0.05 net income per diluted share. For the 2009 second quarter, the Components segment non-GAAP gross margin was 24.6% and Systems segment gross margin was 18.9%.

156.    The Company's July 23, 2009 release quoted Werner, in relevant part, as follows:

Our second-quarter results reflect the continued success of our diversified segment and market strategy as we benefited from the further growth in our dealer network and executed on our large scale project commitments. [] *Additionally, our operational focus during the quarter enabled us to show progress in reducing inventory levels and in controlling variable expenses*. Our long-term strategy to build our brand based on superior experience, technology and return is paying off. As a result, we have successfully adjusted pricing to maintain market share and our price premium.

Overall, we recorded solid second-quarter results in a demand driven market, consistent with our operating plan. In all of our markets, we are encouraged by the improving industry trends we are seeing in both end demand and financing and we are well positioned for further growth in the second half of the year and 2010. *Our manufacturing costs are competitive today and we are ahead of plan to achieve our cost reduction goals*. Customers continue to choose SunPower due to our superior roof top and power plant experience, industry leading performance of our solar panels and tracking technology, and our ability to drive attractive project returns for our customers.

157.    On July 23, 2009, defendants participated in a conference call with analysts following their earnings announcements for the 2Q09. Defendants reported that the 2Q09 was "characterized by strong execution as we [] *beat our stated goals for the quarter*." Defendants claimed that revenue in the 2Q09 was $298 million, a *39% increase* from 1Q09. Arriola stated:

CONSOLIDATED COMPLAINT                                                                    -66-
Case No. 09-5473-RS

1924164.1

*As we expected, we experienced a strong turnaround in the second quarter* revenue from our components business….Revenue in this category was $189 million in the second quarter, up over 75% compared to the first quarter of 2009, and up over 68% compared to the second quarter of 2008.

158.    On the July 23, 2009 call, Werner emphasized the "value of SunPower's vertical integration and diversified market and channel strategy," noting that SunPower "beat our goals" in 2Q09 by being a "*cost leader*."  Werner claimed that SunPower has been "aggressive[] on cost reductions" and has "reduced costs by more than 50% since 2007."  Werner further stated that:

Our product continues to command a premium average selling price.  This is a result of our experience, technology, and return on investment we offer our customers.   Our channel strategy was designed for a demand-driven environment, and gives us the ability to manage our pricing as a result of market conditions and long-term strategy.

* * *

As far as ASPs, our revenue range is modeled to incorporate decreases of up to 15% in the second half of the year.  *We expect to maintain or potentially improve our gross margins in the second half of the year*, as we increase the capacity utilization in our fabs…

159.    On or about August 3, 2009, SunPower filed with the SEC the Company's 2Q09 Form 10-Q, signed by Arriola and certified by Werner and Arriola.  The Company's 2Q09 Form 10-Q repeated the financial results previously issued in the July 23, 2009 press release and also stated, in part, the following:

In the three months ended June 28, 2009, the Company identified certain adjustments related to fiscal 2008, *primarily due to systems costs and inventory* that resulted in recording additional out of period costs of approximately $2.1 million. *The effect of these items is not material to estimated pre-tax or net income for the current year.*

In the opinion of management, the accompanying condensed consolidated interim financial statements contain all adjustments, consisting only of normal recurring adjustments, which the Company believes are necessary for a fair statement of the Company's financial position as of June 28, 2009 and its results of operations for the three and six months ended June 28, 2009 and June 29, 2008 and its cash flows for the six months ended June 28, 2009 and June 29, 2008. These condensed consolidated interim financial statements are not necessarily indicative of the results to be expected for the entire year.

160.   The 2Q09 Form 10-Q also reported the Company's purported Cost of Revenue (as a percentage of revenue and the year-over-year change) for its two segments, as follows:

**Total Cost of Revenue**: During the three and six months ended June 28, 2009, our two solar cell manufacturing facilities operated at approximately 49% and 61% capacity, respectively, producing only 63.6 megawatts and 157.3 megawatts, respectively, as compared to the three and six months ended June 29, 2008 when our facilities operated at approximately 74% and 71% capacity, respectively, producing 49.8 megawatts and 88.3 megawatts, respectively. ***During the three and six months ended June 28, 2009, our total cost of revenue was $239.2 million and $405.2 million, respectively, which represented decreases of 17% and 21%, respectively, compared to the total cost of revenue reported in the comparable periods of 2008***. As a percentage of total revenue, our total cost of revenue increased to 80% and 79% in the three and six months ended June 28, 2009, respectively, compared to 76% and 78% in the three and six months ended June 29, 2008, respectively. This increase in total cost of revenue as a percentage of total revenue is reflective of: (i) lower factory utilization due to our planned transition to a demand driven manufacturing strategy to reduce inventory levels and (ii) higher amortization of capitalized non-cash interest expense associated with the adoption of Financial Accounting Standards Board, or FASB, Staff Position, or FSP, Accounting Principles Board, or APB, 14-1, "Accounting for Convertible Debt Instruments That May Be Settled in Cash upon Conversion (Including Partial Cash Settlement)," or FSP APB 14-1. This increase in total cost of revenue as a percentage of total revenue was partially offset by: (i) decreased costs of polysilicon beginning in the second quarter of fiscal 2008; (ii) reduced expenses associated with the amortization of other intangible assets and stock-based compensation; and (iii) one-time asset impairment charges of $5.5 million in the first quarter of fiscal 2008 relating to the wind down of our imaging detector product line and for the write-down of certain solar product manufacturing equipment which became obsolete due to new processes (the costs associated with the $3.3 million write-down of certain solar product manufacturing equipment was recovered from the vendor in the third quarter of fiscal 2008).

**Systems Segment Cost of Revenue**: Our cost of systems revenue consists primarily of solar panels, mounting systems, inverters and subcontractor costs. The cost of solar panels is the single largest cost element in our cost of systems revenue. Our Systems Segment sourced virtually all of its solar panel installations with SunPower solar panels in the three and six months ended June 28, 2009, as compared to 61% and 52% for the three and six months ended June 29, 2008, respectively. Our Systems Segment generally experiences ***higher gross margin*** on construction projects that utilize SunPower solar panels compared to construction projects that utilize solar panels purchased from third-parties.

**Systems Segment Gross Margin**: ***Gross margin was $16.9 million and $34.7 million for the three and six months ended June 28, 2009, respectively, or 16% of systems revenue. Gross margin was $61.4 million and $97.0 million for the three and six months ended June 29, 2008, respectively, or 23% and 22%, respectively***, of systems revenue. Gross margin decreased due to lower average selling prices for our solar

power systems and system group department overhead costs incurred that are fixed in nature when systems revenue decreased 60% and 52% in the three and six months ended June 28, 2009, respectively, as compared to the same periods in 2008.

161.   The Company's 2Q09 Form 10-Q also contained statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part, the following:

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, *our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective.*

162.   In connection with the 2Q09 Form 10-Q, both Werner and Arriola executed and filed SOX Certifications where they certified the financial results and the Company's internal controls, employing language identical to ¶114, *supra*.

163.   The statements contained in SunPower's July 23, 2009 press release and made during the July 23, 2009 conference call, and the statements contained in the Company's 2Q09 Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

(a)   SunPower has admitted that its financial results and statements for 2Q09 (¶¶155-62, *supra*), included the following misstatements:

**2Q09 SunPower Financial Information
as Reported and as Corrected by SunPower**

| $ in millions, rounded, except per share amounts | Three Months Ended June 28, 2009 | | | |
| --- | --- | --- | --- | --- |
| | Reported amount | Corrected amount | Amount overstated | Percent overstated |
| Gross margin | $ 58.5 | $ 40.7 | $ 17.8 | 44% |
| Pre-tax income | $ 25.1 | $  6.2 | $ 18.9 | 305% |
| Earnings per share | $0.25 | $0.16 | $0.09 | 56% |
| Inventory – Work-in-process | $  5.9 | $ 36.1 | $ 30.2 | 84% |
| Systems gross margin rate (%) | 16% | 13% | 2.5% | 20% |
| Components gross margin rate (%) | 28% | 22% | 8.1% | 58% |
| Combined gross margin rate (%) | 20% | 14% | 6% | 45% |

CONSOLIDATED COMPLAINT                                                                  -69-
Case No. 09-5473-RS

1924164.1

(b)    Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold, by failing to make proper, timely adjustments to the Company's stated reports. As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made … in order to report results for manufacturing operations that would be consistent with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c)    Contrary to Werner's and Arriola's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

(d)    The statements in ¶¶155-62 materially false and misleading because they created a false impression that the Company's gross margin in 2Q09 was based on higher solar cell conversion efficiency and better silicon utilization, cost reductions and increased volume when in fact it was in substantial part the direct result of SunPower and the Insider Defendants' intentional scheme to improperly understate cost of revenue, overstate inventory and distort gross margins in both the Company's systems and components segments in order to meet Wall Street expectations, prop up the Company's stock price and enable insiders to sell SunPower securities at artificially inflated levels.

## G.    **Third Quarter 2009**

164.    On October 22, 2009, SunPower issued a press release announcing results for 3Q09, and reiterating guidance for the remainder of 2009. The press release was titled *SunPower Reports Third-Quarter 2009 Results* and stated, in part, the following:

> Revenue for the 2009 third quarter was $466 million which compares to $298 million in the second quarter of 2009 and $378 million in the third quarter of 2008. The company's Components and Systems segments accounted for 64% and 36% of third-quarter 2009 revenue, respectively.

CONSOLIDATED COMPLAINT                                                                    -70-
Case No. 09-5473-RS

1924164.1

165.    That same day, defendants participated in a conference call with analysts following their earnings announcements for 3Q09.  Werner claimed that their "vertically integrated strategy" provided for "another strong quarter with record revenue and production."  Arriola stated that "the consolidated gross margins was 20.7% versus 22.6% in the second quarter."

166.    During the October 22, 2009 conference call, in response to an analyst's question about margin improvement, Arriola stated:

> **But we're continuing to bring costs down.**   Capacity utilization is continuing to improve.  Which means we're having (inaudible) unabsorbed costs.  One time items will go away.  **So, look for on gross margins, similar to second quarter to slightly stronger.**

167.    On the 3Q09 conference call, Arriola also revealed that SunPower had recorded $8.5 million in charges to expense during 3Q09 for inventory losses, directly contradicting Werner's repeated assurances during SunPower's 1Q09 earnings conference call that there would be no inventory write-offs during the next two quarters:

> Gross margins were also impacted by our decision to sell and reposition some older third party inventory at competitive market prices.  As a result of these actions, **we incurred a one time expense of $8.5 million in the third quarter with $5.2 million of the expense allocated to our componented [sic] segment and $3.3 million allocated to our systems business.**

168.    On or about November 2, 2009, SunPower filed with the SEC the Company's 3Q09 Form 10-Q, signed by Arriola and certified by Werner and Arriola.  The Company's 3Q09 Form 10-Q repeated the financial results previously reported in the October 22, 2009 press release.

169.    The 3Q09 Form 10-Q also reported the Company's purported cost of revenue (as a percentage of revenue and the year-over-year change) for its two segments, as follows:

> **Total Cost of Revenue**:  During the three and nine months ended September 27, 2009, our total cost of revenue was $377.0 million and $782.2 million, respectively, which represented an increase of 39% and zero, respectively, compared to the total cost of revenue reported in the comparable periods of 2008.  As a percentage of total revenue, our total cost of revenue increased to 81% and 80% in the three and nine months ended September 27, 2009,

respectively, compared to 72% and 76% in the three and nine months ended September 28, 2008, respectively. This increase in total cost of revenue as a percentage of total revenue is reflective of: (i) the sale and write-down of inventory to its estimated market value in the third quarter of fiscal 2009 based upon our assumptions about future demand and market conditions; and (ii) higher amortization of capitalized non-cash interest expense in the three and nine months ended September 27, 2009 as compared to the same periods in 2008. This increase in total cost of revenue as a percentage of total revenue was partially offset by: (i) decreased costs of polysilicon; (ii) reduced expenses associated with the amortization of other intangible assets and stock-based compensation; and (iii) an asset impairment charge of $2.2 million in the nine months ended September 28, 2008 relating to the wind down of our imaging detector product line (the costs associated with the $3.3 million write-down of certain solar product manufacturing equipment taken in the first quarter of fiscal 2008 was recovered from the vendor in the third quarter of fiscal 2008).

* * *

**Systems Segment Gross Margin**: Gross margin was $23.6 million and $58.2 million for the three and nine months ended September 27, 2009, respectively, or 14% and 15%, respectively, of systems revenue. Gross margin was $34.5 million and $131.5 million for the three and nine months ended September 28, 2008, respectively, or 18% and 20%, respectively, of systems revenue. Gross margin decreased due to: (i) lower average selling prices for our solar power systems; (ii) the sale and write-down of aged third-party solar panels to its estimated market value in the third quarter of fiscal 2009 based upon our assumptions about future demand and market conditions; and (iii) our inability to reduce system group department overhead costs incurred that are fixed in nature when systems revenue decreased 13% and 40% in the three and nine months ended September 27, 2009, respectively, as compared to the same periods in 2008.

* * *

**Components Segment Gross Margin**: Gross margin was $65.7 million and $137.3 million for the three and nine months ended September 27, 2009, respectively, or 22% and 23%, respectively, of components revenue. Gross margin was $70.8 million and $119.9 million for the three and nine months ended September 28, 2008, respectively, or 38% and 31%, respectively, of components revenue. Gross margin decreased due to: (i) lower average selling prices for our solar power products; and (ii) the sale and write-down of inventory to its estimated market value in the third quarter of fiscal 2009 based upon our assumptions about future demand and market conditions. This decrease in gross margin was partially offset by continued reduction in silicon costs. Over the next several years, we expect average selling prices for our solar power products to decline as the market becomes more competitive, as financial incentives for solar power decline as typically planned by local, state, and national policy programs designed to accelerate solar power adoption, as certain products mature and as manufacturers are able to lower their manufacturing costs and pass on some of the savings to their customers.

CONSOLIDATED COMPLAINT
Case No. 09-5473-RS

-72-

1924164.1

170.   The Company's 3Q09 Form 10-Q also contained statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part, the following:

> Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, ***our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective.***

171.   In connection with the 3Q09 Form 10-Q, both Werner and Arriola executed and filed SOX Certifications where they certified the financial results and the Company's internal controls, employing language identical to ¶114 *supra*.

172.   The statements contained in SunPower's October 22, 2009 press release and made during the October 22, 2009 conference call, and the statements contained in the Company's 3Q09 Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

(a)   SunPower has admitted that its financial results and statements for its first three quarters of 2009, ended September 27, 2009 (¶¶164-71, *supra*), included the following misstatements:

**3Q09 - YTD - SunPower Financial Information
as Reported and as Corrected by SunPower**

| $ in millions, rounded, except per share amounts | Nine Months Ended September 27, 2009 | | | |
|---|---|---|---|---|
| | Reported amount | Corrected amount | Amount overstated | Percent overstated |
| Gross margin ($) | $195.5 | $172.7 | $ 22.8 | 13% |
| Pre-tax income | $ 35.8 | $ 13.0 | $ 22.8 | 174% |
| Earnings per share | $0.35 | $0.27 | $0.08 | 31% |
| Inventory – Work-in-process | $ 38.8 | $ 37.2 | ($ 1.6) | (4%) |
| Systems gross margin rate (%) | 15% | 13% | 2.5% | 20% |
| Components gross margin rate (%) | 23% | 21% | 2.2% | 10% |
| Combined gross margin rate (%) | 20% | 18% | 2.3% | 13% |

(b)   Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of

CONSOLIDATED COMPLAINT
Case No. 09-5473-RS

-73-

1  goods sold, by failing to make proper, timely adjustments to the Company's stated reports.

2  As admitted by the Company in the Restatement, these "unsubstantiated accounting entries

3  were made … in order to report results for manufacturing operations that would be

4  consistent with internal expense projections" and resulted in an understatement of the

5  Company's cost of goods sold throughout the Class Period;

6         (c)     Contrary to Werner's and Arriola's SOX Certifications and other

7  representations that internal controls were in place, at all times during the Class Period, the

8  Company's internal controls and procedures suffered from material weaknesses and that, as

9  a result, statements concerning SunPower's financial results were inaccurate, unreliable

10  and/or subject to manipulation; and

11         (d)     The statements in ¶¶164-71 were materially false and misleading

12  because they created a false impression that the Company's gross margin in 3Q09 and first

13  nine months of 2009 was based on higher solar cell conversion efficiency and better silicon

14  utilization, cost reductions and increased volume when in fact it was in substantial part the

15  direct result of SunPower and the Insider Defendants' intentional scheme to improperly

16  understate cost of revenue, overstate inventory and distort gross margins in both the

17  Company's systems and components segments in order to meet Wall Street expectations,

18  prop up the Company's stock price and enable insiders to sell SunPower securities at

19  artificially inflated levels.

20  **VII.    VIOLATIONS OF GAAP AND SEC REPORTING RULES**

21         173.    During the Class Period, SunPower and the Insider Defendants materially

22  misled the investing public, thereby inflating the price of the Company's securities, by

23  publicly issuing false and misleading statements and omitting to disclose material facts

24  necessary to make the Insider Defendants' statements, as set forth herein, not false and

25  misleading.  *See e.g.,* SEC Accounting and Auditing Enforcement Release No. 197, July 20,

26  1988.  The statements and omissions were materially false and misleading because they

27  failed to disclose material adverse information and misrepresented the truth about the

28

Company, its financial performance, accounting, reporting, and financial condition, in violation of the federal securities laws and GAAP.

## A.   **Management's GAAP Responsibilities**

174.    GAAP are the authoritative standards, interpretations, rules and underlying concepts that govern proper financial accounting and reporting practices in the United States.   Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, regardless of accompanying disclosures.   *See* 17 CFR §210.4-01(a)(1) and §210.10-01(a).   The SEC recognizes the financial accounting and reporting standards of the Financial Accounting Standards Board ("FASB") as GAAP.   SEC Release Nos. 33-8221; IC-26028; 34-47743; FR-70.[12]   SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

175.    Management is ***solely*** responsible for preparing financial statements that comply with GAAP.   PCAOB Auditing Standard No. 1, AU §110.03, *Distinction between Responsibilities of Auditor and Management*; *see also Sarbanes-Oxley Act of 2002,* Title III §302 and Title IV §404.   Werner, Hernandez and Arriola signed and filed with the SEC SOX Certifications acknowledging these responsibilities and representing that, in all material respects, SunPower's financial information and financial statements, *inter alia*: (i) did not contain any untrue statements; (ii) did not omit any statements that would cause statements made to be misleading; and (iii) were presented in a fair manner (*i.e.*, in accordance with GAAP).   *Id.*

176.    The Insider Defendants' Class Period SOX Certifications were false when filed with the SEC.   SunPower's financial information and financial statements were not

---

[12]    Effective in 3Q09, FASB codified existing GAAP as Accounting Standards Codification ("ASC").   Accordingly, the SEC now recognizes ASC as GAAP.   17 C.F.R. 211, 231 and 241; Release Nos. 33-9062A; 34-60519A; FR-80A.

CONSOLIDATED COMPLAINT                                                         -75-
Case No. 09-5473-RS

1924164.1

presented in a fair manner, violated GAAP and SEC rules and contained numerous material

misstatements and omissions.  In fact, as a result of the conduct detailed *infra*, SunPower

was forced to restate **all** of the financial statements that the Insider Defendants caused it to

file during the Class Period.  Contrary to their signed Certifications, Werner, Hernandez

and Arriola either: (i) failed to evaluate, in good faith, SunPower's disclosure controls and

procedures as claimed; or (ii) knowingly provided false public assurances regarding

SunPower's disclosure controls and procedures.

177. Months after the Class Period ended, SunPower announced that:

> …we are restating (a) our consolidated financial statements as of and for the year ended December 28, 2008 and consolidated financial data for each of the quarterly periods for the year then ended as well as for the first three quarterly periods in the year ended January 3, 2010 (the "Restated Periods"), and (b) the *Selected Financial Data* in Item 6 as of and for the year ended December 28, 2008. ***These restatements correct misstatements identified through an independent investigation into certain unsubstantiated accounting entries on the books of our Company's Philippines operations, as well as other errors identified by the Audit Committee's investigation and by management and out-of-period adjustments.***

178. By restating, SunPower and the Insider Defendants have admitted that the

Company's prior financial statements were materially false and misleading, that they

contained material misstatements and omissions when they were originally issued and that

SunPower had contemporaneous access to information that demonstrated the falsity of

those statements.  SunPower and the Insider Defendants have further admitted that they

improperly accounted for the Company's operating income, pre-tax income, net income,

EPS, cost of revenue, inventory and the gross margins of systems and components

segments, among many other errors and omissions.  Had SunPower complied with GAAP,

its reported Class Period financial results would have been materially worse than

represented during the Class Period.

**B.    SunPower's False Financial Information**

179. During and after the Class Period, SunPower reported and then corrected its

reports as follows:

---

CONSOLIDATED COMPLAINT                                                   -76-
Case No. 09-5473-RS

1924164.1

| 2009 SunPower Financial Information – as Reported and as Corrected by SunPower | | | | |
|---|---|---|---|---|
| $ in millions, rounded | Three Months Ended | | 6 Mos Ended | 9 Mos Ended |
| | Mar 29, 2009 | June 28, 2009 | June 28, 2009 | Sept 27, 2009 |
| <u>Gross margin</u> | | | | |
| Gross margin, reported | $ 47.7 | $ 58.5 | $106.2 | $195.5 |
|   Less: Amount overstated | <u>15.5</u> | <u>17.8</u> | <u>33.3</u> | <u>22.8</u> |
|     Gross margin, actual | $ 32.2 | $ 40.7 | $ 72.9 | $172.7 |
|     Gross Margin: % overstated | 48% | 44% | 46% | 13% |
| <u>Pre-tax income (loss)</u> | | | | |
| Pre-tax income (loss), reported | ($ 14.6) | $ 25.1 | $ 10.5 | $ 35.8 |
|   Less: Amount overstated | <u>15.5</u> | <u>18.9</u> | <u>34.4</u> | <u>22.8</u> |
|     Pre-tax income (loss), actual | ($ 30.1) | $ 6.2 | ($ 23.9) | $ 13.0 |
|     Pre-tax income: % overstated or Pre-tax loss: % understated | 52% | 305% | n/m | 174% |
| <u>Earnings (Loss) Per Share</u> | | | | |
| EPS (loss per share), reported | ($0.06) | $0.25 | $0.22 | $0.35 |
|   Less: Amount overstated | <u>0.06</u> | <u>0.09</u> | <u>0.16</u> | <u>0.08</u> |
|     EPS (loss per share), actual | ($0.12) | $0.16 | $0.05 | $0.27 |
|     EPS: % overstated or Loss Per Share: % understated | 50% | 56% | 299% | 31% |
| <u>Gross margin rate – Systems %</u> | | | | |
| Systems gross margin rate, reported | 17% | 16% | 16% | 15% |
|   Less: Gross margin rate overstated | <u>8%</u> | <u>3%</u> | <u>5.4%</u> | <u>2.5%</u> |
|     Systems gross margin rate, actual | 8% | 13% | 11% | 13% |
|     Systems GM rate: % overstated | 101% | 20% | 50% | 20% |
| <u>Gross margin rate – Components %</u> | | | | |
| Components gross margin rate, reported | 28% | 22% | 24% | 23% |
|   Less: gross margin rate overstated | <u>6%</u> | <u>8%</u> | <u>7%</u> | <u>2%</u> |
|     Components gross margin rate, actual | 22% | 14% | 17% | 21% |
|     Components GM rate: % overstated | 27% | 58% | 43% | 10% |

| 2008 SunPower Financial Information – As Reported and As Corrected by SunPower[13] | | | | | |
|---|---|---|---|---|---|
| | Three Months Ended | | | | 12 Months Ended |
| $ in millions, rounded | March 30, 2008 | June 29, 2008 | Sept 28, 2008 | Dec 28, 2008 | Dec 28, 2008 |
| **Gross margin** Gross margin, reported Less: Amount overstated Gross margin, actual | $ 53.2 1.7 $ 51.5 | $ 92.8 8.6 $ 84.2 | $105.3 3.1 $102.2 | $111.3 ( 0.4) $111.7 | $362.7 13.1 $349.6 |
| Gross Margin: % overstated | 3% | 10% | 3% | 0% | 4% |
| **Pre-tax income** Pre-tax income, reported Less: Amount overstated Pre-tax income, actual | $ 13.2 1.4 $ 11.8 | $ 37.4 8.3 $ 29.1 | $ 44.4 2.7 $ 41.7 | $ 34.0 0.6 $ 33.4 | $129.1 13.0 $116.1 |
| Pre-tax income: % overstated | 12% | 29% | 6% | 2% | 11% |
| **Earnings Per Share** EPS, reported Less: Amount overstated EPS, actual | $0.14 0.01 $0.13 | $0.37 0.05 $0.32 | $0.29 0.02 $0.28 | $0.37 0.03 $0.33 | $1.16 0.11 $1.05 |
| EPS: % overstated | 8% | 16% | 7% | 10% | 11% |

## C.    SunPower's Accounting Fraud

180.    SunPower and the Insider Defendants' GAAP violations were: (i) extensive in duration, misstating almost two years of financial results; (ii) significant in the financial impact, causing SunPower's quarterly reported earnings to be overstated more than 10% on average; (iii) crucial to the Company's ability to meet Wall Street expectations in each quarter during the Class Period; and (iv) the second time, in one year, that the Company admitted to inadequate internal controls over financial reporting, despite previously assuring investors that SunPower had "identified and corrected" previous problems.

181.    In substance, the Restatement restored the accounts to their balances before the entries – the recorded amounts for inventory and cost of sales were substantially ***correct*** until the unsubstantiated entries were made.  The failure to correct the financial information

---

[13]    Overstatement amounts and percentages are based on SunPower's retrospectively adjusted financial results.

1    prior to publicly disseminating the information was either severely reckless or knowing

2    when made.

3        182.    The "internal expense projections" manipulated during the Class Period –

4    also called budgets – are not readily confused with actual results.  Projections and budgets

5    are prepared for and approved by management, and by definition, are prepared before actual

6    results are known.  Because the *variances* from these budgets were so large – more than

7    $15 million in 1Q09 and 2Q09 – they could not have been created at or near the end of the

8    periods, or for financial reporting purposes.  The size of the variances strongly suggests that

9    these budgets were created before the reporting periods began.

10       183.    Budgets are a component of internal control.  The largest budgets are

11   approved by senior management and access is restricted.  The size of the variances that led

12   to the unsubstantiated accounting entries suggests that these were extremely large budgets.

13   This creates a strong inference that senior management approved and monitored

14   SunPower's "internal expense projections" throughout the reporting periods in question.

15       184.    SunPower's executives either saw and ignored the changes in the variances

16   and/or the suspiciously low final variances, or recklessly failed to perform their executive

17   duties.  The SEC says that manipulating inventory to inflate income is "***a perversion of the***

18   ***reporting process***."  SEC ASR 293, Codified as FRR.T.205.02.

19       **D.      Accounting for Inventory and Cost of Sales**

20       185.    Under Accounting Research Bulletin No. 43, Chapter 4, *Inventory*

21   *Pricing*[14] ("ARB 43") and Statement of Financial Accounting Standards No. 151, *Inventory*

22   *Costs*[15] ("SFAS 151"), inventories are stated at the lower of cost or market (SunPower's

23   manufacturing cost was lower than market):

> Inventories are presumed to be stated at cost....For example, variable
> production overheads are allocated to each unit of production on the basis of
> the actual use of the production facilities. However, the allocation of fixed

---

[14]    In 3Q09, ARB 43 was replaced by ASC §330.10.XX, *Inventory*.

[15]    In 3Q09, SFAS 151 was replaced by ASC §330.10.XX, *Inventory*.

production overheads to the costs of conversion is based on the normal capacity of the production facilities….The amount of fixed overhead allocated to each unit of production is not increased as a consequence of abnormally low production or idle plant.   Unallocated overheads are recognized as an expense in the period in which they are incurred.…

SFAS 151, ¶¶5-5A.

186.     In manufacturing environments, cost is based on the standard production cost *per unit* ("standard cost") of each product manufactured at each facility, under normal conditions.   Under SFAS 151 ¶¶5-5A, standard cost acts as a ceiling for manufactured inventory.  If actual costs are higher than standard costs, these excess or "abnormal" costs are included in cost of goods sold, and not added to inventory.

187.     Improperly accounting for the value of inventory distorts income by failing to properly match costs to related revenues.  ARB 43 states:

A major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues.

ARB 43, Chapter 4, ¶3, Statement 2

*See also* FASB Current Text, Section I78, *Inventory.*

188.     Based on ARB 43, improperly accounting for the value of inventory distorts income by failing to properly match costs to related revenues.  SunPower violated ARB 43 by overstating its inventory, which artificially reduced its cost of revenue and inflated its profit.

189.     During the Class Period, SunPower repeatedly violated SFAS No. 151 and ARB 43 by using so-called "unsubstantiated accounting entries" to remove excess manufacturing costs from its income statement, where it was properly reflected as cost of revenue, and improperly add these costs to inventory.  This caused cost of sales to be understated and inventory to be overstated by the same or nearly the same amount.

190.     These inventory accounting rules are based on an underlying GAAP concept often called the "matching principle."  GAAP and accrual accounting require that costs of sales, *inter alia*, be recorded in the same period as the associated revenues.

Otherwise, profits are misstated.   According to FASB Concepts Statement No. 6 ("Concepts 6"), *Elements of Financial Statements*:

> *Recognition, Matching and Allocation*
>
> \*       \*       \*
>
> …recognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities—including matching of costs and revenues, allocation, and amortization—is the essence of using accrual accounting to measure performance of entities.
>
> \*       \*       \*
>
> Matching of costs and revenues is simultaneous or combined recognition of the revenues and expenses that result directly and jointly from the same transactions or other events. In most entities, some transactions or events result simultaneously in both a revenue and one or more expenses. The revenue and expense(s) are directly related to each other and require recognition at the same time. In present practice, for example, a sale of product or merchandise involves both revenue (sales revenue) for receipt of cash or a receivable and expense (cost of goods sold) for sacrifice of the product or merchandise sold to customers.

Concepts 6, ¶145 and ¶146, respectively.

*See also* Statement of Financial Accounting Standards No. 16, *Prior Period Adjustments* and FASB Current Text, Section I78, *Inventory*.

**E.      SunPower's False and Misleading Disclosures Under SEC Regulations**

191.      To help conceal their financial statement fraud, defendants violated numerous SEC and GAAP requirements by making false and misleading disclosures, and omitting to make required disclosures in its financial statements.[16]  According to SEC rules and GAAP, such disclosures are necessary to prevent SunPower's financial statements from being misleading.[17]

192.      Regulation S-K, Item 303, *Management's Discussion and Analysis of Financial Condition and Results of Operations,* required SunPower to disclose any unusual or infrequent transactions that materially affected its income from continuing operations.

---

[16]      "The term 'financial statements' as used in this regulation shall be deemed to include all notes to the statements and all related schedules."  SEC Regulation S-X, Article 1, Rule 1-01(b), *Application of Regulation S-X.*

[17]      *See, e.g.,* SEC Regulation S-K, Item 303 and Accounting Principles Bulletin Opinion No. 22, *Disclosure of Accounting Policies.*

Accordingly, unless they were ordinary and frequent transactions, SunPower was required to disclose each of the "unsubstantiated accounting entries" and their impact on SunPower's financial statements.

193.    SunPower and the Insider Defendants failed to properly account for SunPower's cost of revenue, inventory, sales margins, operating income, pre-tax income, net income and EPS.  SunPower and the Insider Defendants (i) failed to design and adhere to appropriate procedures to account for manufacturing variances, which is an inherent element of production; and (ii) failed to implement proper (or any) controls over approving, entering and reviewing multi-million dollar journal entries, general ledger access, record-keeping and segregation of duties.  SunPower and the Insider Defendants also failed to comply with SEC or GAAP requirements for financial reporting and disclosure and their record-keeping failures were not isolated or unique instances – records were improperly maintained for at least seven consecutive reporting periods, from at least 1Q08 through at least 3Q09.

194.    In addition, SunPower and the Insider Defendants failed to implement procedures reasonably designed to prevent accounting errors or irregularities.  Defendants failed to ensure that review and checks were in place to ensure that it was properly recording, accounting for and reporting its cost of revenue, sales margins, inventory balances and expense variances.

195.    SunPower and the Insider Defendants also failed to disclose in the Company's financial statements the existence of the material facts described herein and to appropriately recognize and report assets, liabilities, revenues, and expenses in conformity with GAAP.  SunPower failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP.  The Insider Defendants knew, or were deliberately reckless in not knowing, the facts which indicated that all of the Company's interim financial statements, press releases, public statements, and financial filings with the SEC, which were disseminated to the investing public during the Class Period, were

materially false and misleading for the reasons set forth herein.  Had the true financial position and results of operations of the Company been disclosed during the Class Period, the Company's securities would have traded at prices well below what they did during the Class Period.

196.    In addition to SunPower's failure to make the required disclosures in its financial statements and in its SEC filings, defendants also shirked their duty to make such disclosures in its conference calls, its press releases and its annual reports.  As a result of these improprieties, many of defendants' key statements throughout the Class Period about SunPower's financial results were materially false and misleading because all of SunPower's Class Period financial statements and the results therein violated the basic fundamental principles and concepts underlying the fairness of GAAP, including:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)    The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are based partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1).

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders. To the extent that management offers public securities, it voluntarily accepts

wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1);

(e)     The principle that financial reporting should be reliable, relevant and timely to be useful.  Reliable means that the information represents what it purports to represent (FASB Statement of Concepts No. 2);

(f)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2);

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2);

(h)     The principle of comparability, that an enterprise's financial information gains greatly in usefulness if it can be compared with similar information about other enterprises and with similar information about the same enterprise for some other period (FASB Statement of Concepts No. 2).

## VIII.     ADDITIONAL SCIENTER ALLEGATIONS

197.     During the Class Period, SunPower intentionally issued financial statements with misstatements that were determined to be material.  SunPower also made undisclosed, purportedly "immaterial" errors in its financial statements, which SunPower failed to correct until after the Class Period.  The total amount of such errors was $4.8 million in 2008 and $2.9 million in the first three quarters of 2009.  These errors, which SunPower had identified at the time but failed to make any necessary corrections, were material because SunPower corrected them in the Restatement, which is not permitted for immaterial items.  After the Class Period, defendants made the admission that SunPower had knowingly issued financial statements with uncorrected errors during the Class Period:

***Out-Of-Period Adjustments:***

As noted above, the Company also recorded out-of-period adjustments during the restatement periods that were previously considered to be immaterial.  These adjustments related to Systems revenue, inventories, accounts payable and accruals and stock-based compensation.

198.   As the top executive officers at SunPower, the Insider Defendants were knowledgeable about the Company's core operations.  As the Company explained in its April 2009 Prospectus: "We rely heavily on the services of our key executive officers," including Werner, Hernandez and Arriola. The Company advised prospective shareholders that "the success of our business depends on the continuing contributions of our key personnel" and the loss of Werner or Hernandez, in particular, could adversely impact its operations.  Werner – as CEO and a Director – was responsible for the overall operations of the Company.   Werner had unrestricted access to all information pertinent to SunPower's operations.  Werner was knowledgeable about the same accounting rules that defendants circumvented with "unsubstantiated accounting entries."

199.   For example, Werner stated in response to an analyst's question about reduced factory utilization and the potential negative impact on margins:

***In terms of under absorption bookings, I am not a big fan of taking [such] cost hits***….[So we have really, Marty's team has really managed absorption very effectively.] ***So the fact that we are producing less volume than planned, of course, makes it difficult to absorb the fixed costs.***

***All of the numbers we report will absorb the fixed costs in our reporting***…[We don't expect to have a separate under absorption number. Although, if it is beneficial at the end of the quarter, we could compare what it would have been had it been 100% loaded.] ***But the way we report, we will absorb everything.***

200.   Hernandez and Arriola – SunPower's CFOs – were responsible for the accuracy of SunPower's reported financial results.  Both Hernandez and Arriola are experienced CFOs and have substantial GAAP experience and SEC reporting experience. As trained CPAs, both were thoroughly familiar with the nature of the accounting violations since before the Class Period.

CONSOLIDATED COMPLAINT                                                                    -85-
Case No. 09-5473-RS

1924164.1

201.   As SunPower's top officers, the Insider Defendants were informed about important developments in SunPower's core business; specifically, inventory, raw materials and manufacturing costs, margins, and cost of goods sold.

202.   SunPower's margins and cost of goods sold were key performance metrics for both management and investors throughout the Class Period.   As SunPower's top officers, Werner, Hernandez and Arriola were also aware of important developments at the Company and monitored its quarterly performance regarding these metrics.   Indeed, throughout the Class Period, the Insider Defendants made numerous statements and responded to inquiries from securities analysts regarding SunPower's manufacturing costs, product costs, cost of goods sold, margins and revenues – the same financial data that they later admitted was misstated.   *See supra*, ¶¶107-14, 116-24, 126-34, 136-43, 145-53, 155-62, 164-71.

203.   The Insider Defendants' scienter also can be inferred from the fact that SunPower's Philippines facilities represented the Company's single most important components manufacturing operation and its largest source of revenue.   SunPower's components are principally manufactured at SunPower's Philippines facilities.   Moreover, the vast majority of SunPower's personnel (approximately 85%) and physical assets (approximately 88%) are located in the Philippines.

    **A.**    **Following the November 2008 "Blunder," the Insider Defendants Claimed They Were Focused on Investigating and Correcting Any Internal Control Issues**

204.   On November 4, 2008, SunPower suddenly withdrew its 4Q08 guidance, citing "foreign exchange rate volatility."   The announcement came just three weeks after announcing earnings and updating its guidance on October 16, 2008.   Analyst Paul Clegg of Jeffries & Co. called the news a "surprising gaffe" and "blunder" for the Company. Other analysts were even more suspicious.   Analyst Michael Carboy wrote that the announcement "rattles our confidence" in SunPower's financial and risk management

CONSOLIDATED COMPLAINT
Case No. 09-5473-RS

-86-

1924164.1

1    practices.   Another  analyst  noted  that  the  impact  "is  weighted  significantly  to  the

2    Components business."

3          205.   Indeed,  during  the  earnings  conference  call  discussing  the  Company's

4    reported  3Q08  results,  management  had  been  asked  specifically  whether  its  4Q08

5    guidance accounted for fluctuations in the foreign currency exchange rate, and Hernandez

6    replied that the Company was "conservative."  Wedbush Morgan Securities analyst Al

7    Kaschalk wrote that the "reduced confidence by the Street in the management team as it

8    lowers  outlook  three  weeks  after  earnings  report.…Management  will  have  to  work  to

9    regain  some  of  its  tarnished  image  after  lowering  guidance  a  mere  three  weeks  after

10   reporting Q3:08 earnings."

11         206.   At a subsequent investor conference hosted by SunPower in Las Vegas,

12   Nevada on November 11, 2008, defendants reassured investors that the Company had

13   "identified  and  corrected"  the  financial  control  issues  leading  to  its  bungled  4Q08

14   guidance.

       **B.    SunPower's  Restatement  Demonstrates  the  Insider  Defendants'
15            Intentional or Reckless Conduct**

16         207.   SunPower's  GAAP  violations  and  other  misstatements  further  establish

17   scienter  based  on  the  results  and  accounts  affected  and  their  specific  significance  to

18   SunPower's business.  The Restatement is an admission that: (i) the Company's Class

19   Period financial statements and the Insider Defendants' public statements regarding those

20   results were *materially* false and misleading; and (ii) the financial statements reported

21   during the Class Period were incorrect *based on information available to the defendants*

22   *at the time the results were originally reported*.  SunPower's Restatement contains at least

23   the following indicators of defendants' scienter:

24         (a)    **The type of restatement (misuse of the facts)** – The restated items

25   at issue were not due to any mathematical error, or honest misapplication of a complex

26   accounting standard.  Rather, as set forth in ¶¶94-98, the Restatement resulted primarily

27   from huge accounting adjustments which manually removed unfavorable operating expense

28
CONSOLIDATED COMPLAINT                                              -87-
Case No. 09-5473-RS

1924164.1

variances from cost of revenue and improperly inflated gross margins, operating income, pre-tax income, net income and EPS.

(b) **The duration over which the improper accounting was perpetrated** – As detailed herein, the Restatement does not hinge on an honest mistake or oversight during a single quarter or even a single year that was later corrected on a good faith basis.  Here, SunPower was forced to restate its financial statements covering fiscal 2008, each quarterly period during 2008, and the first three quarters of 2009 to correct its accounting improprieties that could no longer be concealed.

(c) **The types of accounting gimmicks employed** – As detailed herein, the improper accounting corrected by this Restatement did not occur as a result of good faith differences in accounting judgments, or interpretations of complicated, vague or arcane accounting rules, and the Company does not claim otherwise.  Rather, SunPower's accounting improprieties violated clear and well-established basic expense recognition and inventory valuation standards.

(d) **The income statement effect of the misstatements** – Most or all of the purported "errors" had the effect of improving, not worsening, operating results, including but not limited to gross margins, operating income, pre-tax income, net income and EPS.

208.   In addition to the Insider Defendants' knowledge of the Company's violations of basic accounting principals based on their accounting backgrounds, defendants' SOX Certifications attached to SunPower's Forms 10-Q and Forms 10-K also establish scienter.  As set forth in ¶¶113-14, 123-24, 133-34, 141, 143, 152-53, 161-62, 170-71, Werner, Hernandez and Arriola certified that they had personally reviewed SunPower's financial statements, designed and evaluated SunPower's disclosure controls and evaluated SunPower's internal controls over financial reporting.  Such reviews and evaluations, if performed as represented, would have alerted the Insider Defendants to

1     SunPower's glaring accounting misstatements and material weaknesses in internal and

2     disclosure controls that were subsequently admitted.

3           209.    These, defendants either knew of the material misstatements in the

4     financial statements, the ineffectiveness of the disclosure controls, and the material

5     weaknesses in internal controls, *or* defendants knowingly failed to perform the required

6     review of the financial statements, evaluation of internal controls and evaluation of

7     disclosure controls and falsely represented that they had.  In either case, defendants knew

8     or recklessly disregarded that the SOX Certifications Werner, Hernandez and Arriola

9     signed were false and misleading.

10          210.    The Insider Defendants were further motivated to engage in this course of

11    conduct in order to allow Werner and Hernandez to sell their personally held SunPower

12    common stock and exercise stock options for gross proceeds of approximately $13.4

13    million during the Class Period.  Werner and Hernandez sold significant amounts of their

14    personally held SunPower stock (or exercised stock options) during the Class Period while

15    in possession of material, non-public information about SunPower.   Werner's and

16    Hernandez's insider sales were suspicious in both timing and amount and provide

17    additional indicia of scienter.  Werner sold 182,320 shares and exercised 204,000 options

18    (89*%* of the shares he acquired during the Class Period) for proceeds of approximately

19    *$10.4 million* during the Class Period and Hernandez sold 25,572 shares and exercised

20    25,000 options (100% of the shares he acquired during the Class Period) for proceeds of

21    approximately *$2.1 million* during the Class Period all while SunPower's stock price was

22    artificially inflated as a result of defendants' false and misleading statements and material

23    omissions.[18]

24    **IX.     LOSS CAUSATION/ECONOMIC LOSS**

25          211.    On November 16, 2009, after the close of trading, SunPower issued a

26    release announcing that the Company had identified "unsubstantiated accounting entries,"

27    _____

[18]      Arriola sold 7,780 shares during the Class Period (47% of the shares he acquired
during the Class Period).

28    CONSOLIDATED COMPLAINT                                                          -89-
      Case No. 09-5473-RS

      1924164.1

1    and that, as a result, the Company may have to restate its financial results for 2008 and the

2    first three quarters of 2009.  The following day, on November 17, 2009, shares of the

3    Company immediately collapsed as trading in SunPower shares resumed, falling

4    approximately 20% during that single trading day and closing at just over $22 per share,

5    compared to the prior day's close of about $27.00.

6          212.    Over a period of approximately eighteen months, SunPower improperly

7    inflated the Company's financial results.  When SunPower and the Insider Defendants'

8    prior misrepresentations and fraudulent conduct were revealed and became apparent to

9    investors, the price of SunPower securities declined precipitously – as the prior artificial

10    inflation in the price of SunPower's securities was eliminated. As a result of their

11    purchases of SunPower securities, during the Class Period, Lead Plaintiffs and other

12    members of the Class suffered economic losses, *i.e.* damages under the federal securities

13    laws.

14          213.    By improperly characterizing the Company's financial results and

15    misrepresenting its prospects, SunPower presented a misleading image of its business and

16    future growth prospects. During the Class Period, defendants repeatedly emphasized the

17    ability of the Company to monitor and control its operations and expenses, and

18    consistently reported results within the range of guidance sponsored or endorsed by the

19    Company. These claims caused and maintained the artificial inflation in SunPower's

20    securities prices throughout the Class Period and until the truth about the Company was

21    ultimately revealed to investors.

22          214.    The decline in SunPower's securities prices following the November 16,

23    2009 disclosure was a direct result of defendants' fraud being revealed. The timing and

24    magnitude of SunPower's securities price decline negates any inference that the losses

25    suffered by Plaintiffs and the other members of the Class was caused by changed market

26    conditions, macroeconomic or industry factors, or even Company-specific facts unrelated

27

28

1   to defendants' fraudulent conduct. During the same period in which SunPower's securities

2   prices fell, the Standard & Poor's 500 securities index was relatively unchanged.

3       215.   On March 18, 2010, after the close of trading, SunPower issued a press

4   release announcing the results of its internal investigation and including restated financial

5   information.   The announcement revealed new, previously unknown details about the

6   extent and pervasiveness of the accounting misstatements at SunPower during the Class

7   Period.   For example, the Company revealed that, in addition to the unsubstantiated

8   accounting entries previously disclosed, the Company had engaged in unspecified

9   "various accounting errors" and that the Audit Committee had recommended "various

10  remedial measures to address certain [unidentified] personnel, organization and internal

11  control matters."

12      216.   Additionally, the Company revealed that the adjustments to SunPower's

13  prior financial results would be more significant than previously disclosed. *See supra* ¶94.

14  Immediately following the issuance of the press release, the market price for SunPower

15  Class A common stock fell from its opening price of $22.02 on March 18, 2010 to a low

16  of $18.62 on March 19, 2010 – a decline of approximately 14%.   SunPower Class B

17  shares fell from a March 18, 2010 opening price of $19.73 to a low of $16.61 on March

18  19, 2010 – a decline of almost 14%.   Class members who held SunPower securities

19  through the March 18, 2010 disclosure suffered damages as a direct result of new, material

20  information about the scope of defendants' accounting misstatements being revealed to the

21  market.

22      217.   The economic loss, *i.e.* damages suffered by Lead Plaintiffs and other

23  members of the Class, was a direct result of defendants' fraudulent scheme to artificially

24  inflate the price of SunPower's securities and the subsequent significant decline in the

25  value of the Company's securities when defendants' prior misstatements and other

26  fraudulent conduct was revealed.

27

28

218.   At all relevant times, the material misrepresentations and omissions alleged in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class.  As described herein, during the Class Period, the Insider Defendants made or caused to be made a series of materially false or misleading statements about SunPower's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of SunPower and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period caused Lead Plaintiffs and other members of the Class to purchase the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## X.      CLASS ACTION ALLEGATIONS

219.   Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired SunPower publicly traded securities during the Class Period or pursuant to or traceable to the Class B Shares Offering and/or the April 2009 Offerings, and were damaged by the conduct asserted herein.  Defendants are excluded from the Class.

220.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  SunPower has over 25 million shares of stock outstanding, owned by hundreds if not thousands of persons.

221.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)      whether defendants violated the federal securities laws;

(b)      whether defendants omitted and/or misrepresented material facts;

(c)       whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)       whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)       whether the prices of SunPower publicly traded securities were artificially inflated; and

(f)       the extent of damage sustained by Class members and the appropriate measure of damages.

222.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from defendants' wrongful conduct.

223.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

224.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

225.    At all relevant times, the market for SunPower's securities was an efficient market for the following reasons, among others:

(a)       SunPower common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated markets;

(b)       As a regulated issuer, SunPower filed periodic reports with the SEC and the NASDAQ;

(c)       SunPower regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other

CONSOLIDATED COMPLAINT                                                        -93-
Case No. 09-5473-RS

1924164.1

1   wide-ranging public disclosures, such as communications with the financial press and other

2   similar reporting services; and

3            (d)      SunPower was followed by numerous securities analysts employed

4   by major brokerage firms who wrote reports which were distributed to the sales force and

5   certain customers of their respective brokerage firms.  Each of these reports was publicly

6   available and entered the public marketplace.

7            226.    As a result of the foregoing, the market for SunPower's securities promptly

8   digested current information regarding SunPower from all publicly available sources and

9   reflected such information in the prices of the stock.  Under these circumstances, all

10  purchasers of SunPower's securities during the Class Period suffered similar injury

11  through their purchase of SunPower's securities at artificially inflated prices, and a

12  presumption of reliance applies.

13  **XII.    NO SAFE HARBOR**

14           227.    The statutory safe harbor provided for forward-looking statements under

15  certain circumstances does not apply to any of the allegedly false statements pleaded in

16  this Complaint.  Many of the specific statements pleaded herein were not identified as and

17  were not "forward-looking statements" when made.  To the extent there were any forward-

18  looking statements, there were no meaningful cautionary statements identifying important

19  factors that could cause actual results to differ materially from those in the purportedly

20  forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does

21  apply to any forward-looking statements pleaded herein, the Insider Defendants are liable

22  for those false forward-looking statements because at the time each of those forward-

23  looking statements was made, the particular speaker knew that the particular forward-

24  looking statement was false, and/or the forward-looking statement was authorized and/or

25  approved by an executive officer of SunPower who knew that those statements were false

26  when made.

27

28

CONSOLIDATED COMPLAINT                                                              -94-
Case No. 09-5473-RS

1924164.1

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule**
**10b-5 Against SunPower and the Insider Defendants**

228.    Lead Plaintiffs incorporate ¶¶1-227 by reference.

229.    During the Class Period, SunPower and the Insider Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

230.    SunPower and the Insider Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of SunPower publicly traded securities during the Class Period.

231.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SunPower publicly traded securities.  Lead Plaintiffs and the Class would not have purchased SunPower publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for SunPower's securities had been artificially inflated by SunPower and the Insider Defendants' materially false and misleading statements.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**Against the Insider Defendants**

232.    Lead Plaintiffs incorporate ¶¶1-227 by reference.

233.    During the Class Period, the Insider Defendants acted as controlling persons of SunPower within the meaning of §20(a) of the Exchange Act.  By reason of their high-level positions with the Company, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, the Insider Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the materially false and misleading statements alleged herein.

234.    By reason of such conduct, Insider Defendants are liable pursuant to §20(a) of the Exchange Act.

### COUNT III
**For Violation of §11 of the Securities Act in Connection
with the April 2009 Offerings
Against SunPower, Werner, Hernandez, Rodgers,
Albrecht, Atkins, Wood, and the Underwriter Defendants**

235.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons who received or otherwise acquired SunPower securities pursuant to or traceable to the April 2009 Offerings against SunPower, Werner, Hernandez, Rodgers, Albrecht, Atkins, Wood and the Underwriter Defendants.

236.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct or motive are specifically excluded from this Count.  Lead Plaintiffs do not allege for purposes of this Count that SunPower, Werner, Hernandez, Rodgers, Albrecht, Atkins, Wood and the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

237.    The April 2009 Prospectuses were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

238.    The April 2009 Prospectuses incorporated by reference SunPower's materially false and misleading 2008 Form 10-K.  As set forth above in ¶94, SunPower

has admitted that its financial results and statement for its fiscal year 2008 contained in the 2008 Form 10-K included misstatements.  SunPower, Werner, Hernandez, Rodgers, Albrecht, Atkins, Wood and the Underwriter Defendants were responsible for the contents and dissemination of the April 2009 Prospectuses.  SunPower was the registrant for the securities issued in the Class B Shares Offering and the April 2009 Offerings, and as the issuer is strictly liable to Lead Plaintiffs and the Class for the material misstatements and omissions.

239.    Werner, Hernandez, Rodgers, Albrecht, Atkins and Wood signed the April 2009 Prospectuses.  Each of them was either an executive officer or director for the Company at the time the April 2009 Prospectuses became effective.  These defendants are therefore liable pursuant to §§11(a)(1) and 11(a)(2), 15 U.S.C. §77k (a)(1) and (2).

240.    The Underwriter Defendants issued, caused to be issued, and participated in the issuance of the materially false and misleading April 2009 Prospectuses.  The Underwriter Defendants acted as "underwriters" for the April 2009 Offerings and are liable pursuant to 15 U.S.C. §77k(a)(5).  This claim against the Underwriter Defendants is based only on theories of strict liability and negligence.  It is not predicated on any allegation that they engaged in fraudulent conduct.

241.    None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the April 2009 Prospectuses were true and without omissions of any material facts and were not misleading.

242.    Plaintiffs and the Class acquired SunPower securities pursuant to or traceable to the false and misleading April 2009 Prospectuses.

243.    At the times they purchased or otherwise acquired SunPower securities pursuant or traceable to the April 2009 Offerings, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to November 16, 2009.  Less

1  than one year has elapsed from the time Plaintiffs discovered or reasonably could have

2  discovered the facts upon which this Complaint is based to the time that Plaintiffs filed

3  this Complaint.  Less than three years elapsed between the time that the securities upon

4  which this Count is brought were offered to the public and the time Plaintiffs filed *Plichta*

5  *v. SunPower Corp., et al.*, Case No. CV-09-5473-RS (N.D. Cal. Nov. 18, 2009).

**COUNT IV**
**For Violation of §15 of the Securities Act**
**Against the Insider Defendants**

8  244.    This Count is brought pursuant to §15 of the Securities Act against the

9  Insider Defendants. This Count does not sound in fraud.  All of the preceding allegations

10  of fraud or fraudulent conduct or motive are specifically excluded from this Count.

11  Plaintiffs do not allege for purposes of this Count that the Insider Defendants had scienter

12  or fraudulent intent, which are not elements of a §15 claim.

13  245.    At all relevant times, each of the Insider Defendants was a control person

14  of SunPower within the meaning of §15 of the Securities Act by virtue of their positions as

15  a director and/or senior officer of SunPower, and their power to control SunPower's

16  corporate actions and the transactions, and public statements alleged herein.

17  246.    The Insider Defendants, at all relevant times, participated in the operation

18  and management of the Company and conducted and participated, directly and indirectly,

19  in the conduct of SunPower's business affairs.  As officers and/or directors of a publicly-

20  owned company, the Insider Defendants had a duty to disseminate accurate and truthful

21  information with respect to SunPower's financial conduct and results of operations.

22  Because of their positions of control and authority as officers and/or directors of

23  SunPower, the Insider Defendants were able to, and did, control the contents of the

24  Registration Statements and April 2009 Prospectuses, which contained materially false

25  and misleading financial information.

26  247.    Each of the Insider Defendants named herein was a participant in the

27  violation of §11 of the Securities Act alleged in Count III above, based on having signed

28

the Registration Statements and having otherwise participated in the process which allowed the April 2009 Offerings to be successfully completed.

## COUNT V
### For Violation of §11 of the Securities Act
### in Connection with the Class B Shares Offering Against
### SunPower, Werner, Hernandez, and the Director
### Defendants

248.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons who received or otherwise acquired SunPower Class B common stock pursuant to or traceable to the Class B Shares Offering against SunPower, Werner, Hernandez, and the Director Defendants.

249.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct or motive are specifically excluded from this Count.  Lead Plaintiffs do not allege for purposes of this Count that SunPower, Werner, Hernandez, or the Director Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

250.    The September 2008 Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

251.    The September 2008 Registration Statement incorporated by reference SunPower's 1Q08 Form 10-Q and 2Q08 Form 10-Q.  As set forth above, in ¶115 and ¶125, SunPower has admitted that its financial results contained in the 1Q08 Form 10-Q and 2Q08 Form 10-Q included misstatements.

252.    SunPower's 1Q08 Form 10-Q and 2Q08 Form 10-Q also falsely reported that defendants "prepare [SunPower's] financial statements to conform with GAAP."  In fact, however these financial statements were not prepared in accordance with GAAP as reflected by SunPower's Restatement by material amounts of gross margin, pre-tax income, EPS and components gross margin rate reflected in ¶115 and ¶125.

253.   The defendants named in this Count were responsible for the contents and dissemination of the September 2008 Registration Statement.

254.   SunPower was the registrant for the securities issued pursuant to the September 2008 Registration Statement and as issuer of the SunPower shares issued pursuant to that registration statement, is strictly liable to Lead Plaintiffs and the Class for the material misstatements and omissions.

255.   Werner, Hernandez and the Director Defendants signed the September 2008 Registration Statement.  Each of them was either an executive officer or director for the Company at the time the September 2008 Registration Statement became effective. The individual defendants named herein are therefore liable pursuant to §§11(a)(1) and 11(a)(2), 15 U.S.C. §77k (a)(1) and (2).

256.   None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the September 2008 Registration Statement were true and without omissions of any material facts and were not misleading.  Plaintiffs and the Class acquired SunPower shares pursuant to or traceable to the materially false and misleading September 2008 Registration Statement.

257.   At the times they purchased or otherwise acquired shares of SunPower Class B common stock pursuant or traceable to the September 2008 Registration Statement, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to November 16, 2009.  Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs filed this Complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed *Plichta v. SunPower Corp.*, Case No. CV-09-5473 (N.D. Cal. Nov. 18, 2009).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding Plaintiffs and the members of the Class damages, including interest;

C.      Awarding Plaintiffs reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: May 28, 2010                     Respectfully submitted,

                                        BARROWAY TOPAZ KESSLER
                                            MELTZER & CHECK LLP


                                        _/s/ Ramzi Abadou_____
                                          RAMZI ABADOU

                                        RAMZI ABADOU
                                        NICHOLE BROWNING
                                        STACEY KAPLAN
                                        ERIK D. PETERSON
                                        580 California Street, Suite 1750
                                        San Francisco, CA 94104
                                        Tel:    (415) 400-3000
                                        Fax:    (415) 400-3001

                                        BERNSTEIN LITOWITZ BERGER
                                            & GROSSMANN LLP


                                        _/s/ David R. Stickney_____
                                          DAVID R. STICKNEY

                                        DAVID R. STICKNEY
                                        BENJAMIN GALDSTON
                                        12481 High Bluff Drive, Suite 300
                                        San Diego, CA 92130
                                        Tel:    (858) 793-0070
                                        Fax:    (858) 793-0323
                                        davids@blbglaw.com
                                        beng@blbglaw.com

CONSOLIDATED COMPLAINT                                          -101-
Case No. 09-5473-RS

1924164.1

1

2                                            */s/ Joel B. Strauss*
                                            JOEL B. STRAUSS
3
                                            FREDERIC S. FOX (*pro hac vice*)
4                                            JOEL B. STRAUSS (*pro hac vice*)
                                            DONALD R. HALL (*pro hac vice*)
5                                            850 Third Avenue, 14th Floor
                                            New York, NY 10022
6                                            Tel:    (212) 687-1980
                                            Fax:    (212) 687-7714
7                                            ffox@kaplanfox.com
                                            jstrauss@kaplanfox.com
8                                            dhall@kaplanfox.com

9                                            -and-

10                                           MARIO M. CHOI (Bar No. 243409)
                                            350 Sansome Street, Suite 400
11                                           San Francisco, CA 94104
                                            Tel:    (415) 772-4700
12                                           Fax:    (415) 772-4707

13                                           *Lead Counsel*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT                                                              -102-
Case No. 09-5473-RS

1924164.1

## ATTESTATION PURSUANT TO GENERAL ORDER 45

I, Ramzi Abadou, attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 28th day of May, 2010, at San Francisco, California.

*/s/ Ramzi Abadou*
RAMZI ABADOU

# EXHIBIT A

## CERTIFICATION

I, **Bobby Reynolds**, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint, and authorizes its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's purchase and sale transaction(s) in the **SunPower Corp. (Nasdaq: SPWRA or SPWRB)** security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| **SEE ATTACHED** |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below:_____.

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _2/_ day of _MAY_, 2010.

_____

**BOBBY REYNOLDS**

SCHEDULE A

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price Per share |
|---|---|---|---|---|---|
| Common Stock | 70 | (B) | | 5/1/09 | $27.12 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# CERTIFICATE OF SERVICE

I certify that on the 28th day of May 2010, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF Registrants:

## Electronic Mail Notice List

- **Ramzi Abadou**
  rabadou@btkmc.com,knguyen@btkmc.com

- **George Carlos Aguilar**
  GAguilar@robbinsumeda.com,Notice@robbinsumeda.com

- **Mario Man-Lung Choi**
  mchoi@kaplanfox.com,kweiland@kaplanfox.com,lbarry@kaplanfox.com

- **Jordan Eth**
  jeth@mofo.com,nurbina@mofo.com

- **Frederic S. Fox**
  ffox@kaplanfox.com

- **Benjamin Galdston**
  beng@blbglaw.com,kristid@blbglaw.com,samj@blbglaw.com

- **Michael M. Goldberg**
  info@glancylaw.com

- **Donald R Hall**
  dhall@kaplanfox.com

- **Dennis J. Herman**
  dennish@rgrdlaw.com,e_file_sd@rgrdlaw.com,jdecena@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Robert N. Kaplan**
  rkaplan@kaplanfox.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,pashad@hbsslaw.com,sf_filings@hbsslaw.com

- **Mark P. Kindall**
  firm@izardnobel.com,mkindall@izardnobel.com

- **Laurence D. King**
  lking@kaplanfox.com,kweiland@kaplanfox.com,lbarry@kaplanfox.com

- **Catherine J. Kowalewski**
  katek@rgrdlaw.com

- **Joy Ann Kruse**
  jakruse@lchb.com

- **Nicole Catherine Lavallee**
  nlavallee@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Judson Earle Lobdell**
  jlobdell@mofo.com,mblackmer@mofo.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Kim Elaine Miller**
  kimmiller225@yahoo.com,kim.miller@ksfcounsel.com,ecf.notices@ksfcounsel.com

- **Aviah Cohen Pierson**
  acohenpierson@kaplanfox.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **David Ronald Stickney**
  davids@blbglaw.com

- **Joel B. Strauss**
  jstrauss@kaplanfox.com

- **Joseph J. Tabacco , Jr**
  jtabacco@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,khuang@rgrdlaw.com,travisd@rgrdlaw.com,cwood@rgrdlaw.com,e_file_sd@rgrdlaw.com,jdecena@rgrdlaw.com,e_file_sf@rgrdlaw.com

1
2          I further certify that on the 28th day of May, 2010, I served the same document by
3     U.S. Postal service on the following, who are not registered participants of the ECF system
4     in this case:
5
6     **Reed R. Kathrein**                          **Steve W. Berman**
      **Peter E. Borkon**                           Hagens Berman Sobol Shapiro LLP
7     Hagens Berman Sobol Shapiro LLP               1918 8th Ave., Suite 3300
      715 Hearst Avenue, Suite 202                  Seattle, WA 98101
8     Berkeley, CA 94710

9     **Francis A. Bottini, Jr.**                   **Lewis S. Kahn**
      **Frank J. Johnson**                          Kahn Swick & Foti, LLC
10    **Brett Michael Weaver**                      650 Poydras Street
      Johnson Bottini, LLP                          Suite 2150
11    601 W. Broadway, Suite 1720                   New Orleans, LA 70130
      San Diego, CA 92101
12
13    **Matthew Rawlinson**                         **Michael M. Goldberg**
      Latham & Watkins LLP                          **Lionel Z. Glancy**
14    140 Scott Drive                               Glancy & Binkow LLP
      Menlo Park, CA 94025                          1801 Avenue of the Stars, Suite 311
15                                                  Los Angeles, CA 90067

16    **Marc M. Umeda**
      **Arshan Amiri**
17    **David Lance Martin**
      **George Carlos Aguilar**
18    Robbins Umeda LLP
      600 B Street, Suite 1900
19    San Diego, CA 92101

20                                                     _/s/ Ramzi Abadou_____
                                                        RAMZI ABADOU
21
22
23
24
25
26
27
28
      ─────────────────────────────────────────────────────────────
      CONSOLIDATED COMPLAINT                                      -106-
      Case No. 09-5473-RS

      1924164.1