**\*\*E-filed 3/1/11\*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

HARRY W. PLICHTA,

    Plaintiff,

v.

SUNPOWER CORPORATION, et al.,

    Defendants.

No. C 09-5473 RS

**ORDER GRANTING MOTION TO DISMISS**

## I. INTRODUCTION

This shareholders' putative class action arises from a public admission by defendant SunPower Corporation that its prior financial statements had been based in part on, "unsubstantiated accounting entries . . . [that] generally resulted in an understatement of the Company's cost of goods sold." More specifically, SunPower acknowledged that "certain expenses were understated by (a) not sufficiently accruing expenses or (b) reversing previously recorded expenses through manual journal entries that were not based on actual transactions or reasonable estimates of expenses." Plaintiffs contend that as a result of these accounting improprieties, not only were SunPower's filings with the Securities and Exchange Commission rendered false and misleading, but numerous other public statements made by the company during the relevant time period regarding its business and its prospects were likewise untrue.

The operative Consolidated Complaint contends that SunPower and three of its executives ("the Insider Defendants") are liable for fraud under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. Plaintiffs also seek to hold the Insider Defendants responsible under §20(a) of the Exchange Act, as "controlling persons," who have derivative liability for any underlying violations of §10(b) by SunPower.

In addition to the fraud-based claims, the Consolidated Complaint seeks to impose liability under §§11(a) and 15 of the Securities Act of 1933 (the "Securities Act") for untrue matter contained in (1) a registration statement and prospectus issued in connection with an offering of debentures and common stock and (2) the registration statement for a transaction in which Cyprus Semiconductor Corporation "spun-off" its holdings in SunPower to Cyprus shareholders. The Securities Act claims name as additional defendants certain members of SunPower's board of directors ("the Director Defendants"), and various financial institutions that served as underwriters in the debenture and stock offerings ("the Underwriter Defendants").

SunPower and the Insider Defendants move to dismiss the Exchange Act claims, arguing that the allegations are inadequate in numerous respects, but particularly focusing on their contention that plaintiffs have failed to plead facts giving rise to the requisite strong inference of scienter. While the Consolidated Complaint has alleged manual manipulation of accounting entries that could not be easily explained except as intentional misrepresentation on the part of the person or persons who engaged in the conduct, plaintiffs have not come forward with sufficient facts to support an inference of scienter on the part of SunPower and its management that is, "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Accordingly, the Exchange Act claims will be dismissed, with leave to amend. The Securities Act claims, which do not depend on there having been any intent to mislead, will be dismissed for plaintiffs' failure to plead facts supporting the existence of standing as to some claims, and damages as to others.

## II. BACKGROUND

SunPower was formed in 1985 to commercialize high efficiency photovoltaic cell technology for use in solar concentrators. It designs, manufactures, and markets various devices for use in converting sunlight into electricity, including solar cells, solar panels, and inverters, for use in residential and commercial applications. SunPower also offers engineering and development services for large solar power plant installations. While SunPower is a Delaware corporation headquartered in San Jose, California, its manufacturing operations and the bulk of its personnel and assets are located in the Philippines.

Plaintiffs contend that although SunPower experienced dramatic growth and became a market leader, by early 2008 it was experiencing severe competitive pressure, particularly from companies based in China. This pressure presented a particular problem for SunPower, which had sought to differentiate itself as a company that sold higher-quality products, justifying significant price premiums. SunPower allegedly was constrained in its ability to lower prices by its manufacturing costs, including long-term contractual commitments to some of its suppliers. As a result, plaintiffs allege, during the class period of April 17, 2008 through November 16, 2009, SunPower engaged in fraudulent accounting in its financial statements and publicly-reported results for the purpose of artificially maintaining its stock price.

On the last day of the class period, SunPower issued a press release announcing that its audit committee had commenced an investigation into unsubstantiated accounting entries made in the company's Philippines manufacturing operations during 2008 and the first three quarters of 2009. The company's stock price dropped by approximately 19% the following day, and by another 14% several months later when the results of the investigation were announced and SunPower issued a restatement of its earnings.

Plaintiffs assert that the November 2009 announcement of unsubstantiated accounting entries was not SunPower's first experience with releasing information to the market that proved inaccurate. In November of 2008, SunPower withdrew the optimistic "guidance" it had provided for the final quarter of that year, citing a failure to address sufficiently "foreign exchange rate volatility." SunPower assured investors that it had "identified and corrected" the issues leading to

3

its inaccurate forecasts. The withdrawal of the guidance in 2008, however, did not involve any misstatements of past results, such as those that form the basis of plaintiffs' claims here.

As noted above, in addition to asserting claims under the Exchange Act on behalf of all persons who acquired shares of SunPower stock generally during the class period, the Consolidated Complaint advances claims under the Securities Act arising from two specific circumstances in which SunPower issued securities. First, in September of 2008, SunPower filed a registration statement for a transaction in which shareholders of Cypress Semiconductor Corporation received pro-rata distributions of SunPower Class B common shares that had been owned by Cypress, to effect a "spin off" of SunPower. Second, in April of 2009, SunPower filed prospectuses offering (1) up to 10.25 million shares of its Class A common stock, and (2) up to $230 million in convertible debentures.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 US 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Claims grounded in fraud are also subject to Rule 9(b), which provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy that rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

4

When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 US at 570). "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 US at 555 ("threadbare recitals of the elements of the cause of action, supported by mere conclusory statements," are not taken as true). In actions governed by the Private Securities Litigation Reform Act ("PSLRA"), such as this one, these general standards are subject to further refinement, as discussed in more detail below.

## IV. DISCUSSION

### A. Count I—Section 10(b) of the Exchange Act

Section 10(b) of the Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Pursuant to Section 10(b), the Securities and Exchange Commission ("SEC") has promulgated Rule 10b-5, which provides, *inter alia*, "It shall be unlawful for any person ... [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c).

To establish a violation of Rule 10b-5, a plaintiff must demonstrate "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006, 1014 (9th Cir. 2005). To survive a motion to dismiss, a complaint asserting claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Rule 9(b) and the PSLRA. *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

*1. Falsity*

Under the PSLRA, to allege falsity a complaint must, "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." *Gompper v. VISX, Inc*., 298 F.3d 893, 895 (9th Cir. 2002), (quoting 15 U.S.C. § 78u-4(b)(1)) (quotation marks omitted). Although not their primary focus, defendants argue that at least some of the alleged misrepresentation are presented in the Consolidated Complaint as "puzzle pleading," in that plaintiffs have merely set out lengthy blocks of text quoting various SunPower SEC filings and conference calls, affixed with the label "false and misleading" in light of the restatement of earnings. Plaintiffs respond that each statement alleged to be false or misleading is plainly identified through the use of bold and italic fonts, and that the Consolidated Complaint otherwise includes the requisite specificity as to the circumstances surrounding each of those statements.

Even assuming that not every purported misrepresentation has been pleaded in adequate detail and/or that some of them may not be actionable for one or more reasons, this is not an instance where it is difficult to assess whether *any* misrepresentations have been alleged with the requisite level of detail. Defendants do not challenge the adequacy of the pleading that SunPower's financial statements contained misrepresentations, as demonstrated by the restatement of earnings. The falsity of other representations flowing directly from those misstatements has also been adequately identified in the Consolidated Complaint. The possibility that the complaint contains additional allegations that, standing alone, would not meet the requirements for pleading falsity, does not warrant dismissal under these circumstances.

*2. Scienter*

The PSLRA expressly provides that to plead scienter, a complaint must, "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). In *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308 (2007), the Supreme Court defined "strong inference," concluding that a securities

6

1 fraud complaint will survive a motion to dismiss "only if a reasonable person would deem the
2 inference of scienter *cogent and at least as compelling as* any opposing inference one could draw
3 from the facts alleged." 127 S.Ct. at 2510 (emphasis added).

4 Here, as noted above, the facts advanced would support a strong inference that the person or
5 persons who made the "unsubstantiated accounting entries" acted with knowledge and an intent to
6 deceive—indeed, absent any contrary explanation for the conduct, it is likely that the *only*
7 reasonable inference to be drawn from the present allegations is that such persons had scienter with
8 respect to the inaccurate information they put forth. SunPower has acknowledged that
9 "unsubstantiated accounting entries were made . . . in order to report results for manufacturing
10 operations that would be consistent with internal expense projections." The admitted manipulation
11 included, "reversing previously recorded expenses through manual journal entries that were not
12 based on actual transactions or reasonable estimates of expenses." It is difficult, if not impossible,
13 to imagine how the persons undertaking such actions could not have known they were providing
14 false information on which others would reasonably rely. *Cf. Zucco*, *supra*, 552 F.3d at 1001
15 (describing uncertainties inherent in complicated accounting rules as undercutting any inference of
16 scienter).

17 The question presented by this motion, however, is *not* whether one or more SunPower
18 accounting department employees intended to mislead someone when preparing journal entries, but
19 whether the corporation and management intended to mislead potential investors when they relied
20 on that information and incorporated it in the various SEC filings and other statements alleged to
21 have been fraudulent. To a large extent, plaintiffs conflate the two issues, arguing that SunPower
22 has "admitted fraud" and suggesting that the intentional nature of the "unsubstantiated" journal
23 entries in and of itself satisfies their burden to plead scienter, or nearly so. In so arguing, plaintiffs
24 have overstated the importance of the fact that SunPower has effectively admitted the journal entries
25 were deliberately falsified. It may be true that this is not a case where incorrect accounting data may
26 be explained away as reflecting nothing more an innocent or negligent failure to comply with

27
28

7

complex GAAP[1] rules. It does not follow, however, that the corporation and its management acted with scienter in using, or failing to detect, the falsified information.[2]

The issue, then, is whether the Consolidated Complaint alleges facts sufficient to support a compelling inference that SunPower and/or any of the Insider Defendants had knowledge that the journal entries had been falsified, or at least acted with deliberate recklessness, when they made the various statements in dispute that were based on that misinformation.[3] To answer that question, *Tellabs* instructs that the Court must determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 127 S.Ct. at 2509. The evaluation, however, requires the Court to take into account plausible opposing inferences." *Id.* Notably, this "inquiry is inherently comparative." *Id.* at 2510. As explained in *Zucco*, "[a] court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." 552 F.3d at 991.

Plaintiffs rely on four basic categories of allegations to support their contention that they have adequately pleaded scienter, albeit with some overlap in the categories and slightly different

---

[1] GAAP refers to a "generally accepted accounting principles" adopted as a standards by the Financial Accounting Standard Board.

[2] Plaintiffs argue that while it might be appropriate at trial for defendants to "blame others for their misconduct," at the pleading stage the "well-pled allegations" of the complaint must be accepted as true. This argument begs the question. If defendants lacked knowledge that the journal entries had been falsified, and did not act with deliberate recklessness, then it is not a matter of "blaming others" for their own misconduct, rather it is that they did not engage in any misconduct.

[3] To proceed on a theory of "deliberate recklessness," a "plaintiff must plead 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Zucco*, 552 F.3d at 991 (quoting *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 976 (9th Cir. 1999).

8

1  grouping by plaintiffs and defendants. Taking the categories in turn,[4] plaintiffs first lay heavy
2  emphasis on the alleged "magnitude, duration, manner, and simplicity" of the alleged fraud.
3  Plaintiffs' main point is that the allegations of the Consolidated Complaint, based on *admissions* by
4  SunPower, establish to a near-certainty that the underlying manipulation of financial data was
5  undertaken deliberately, and could not have been the result of mistake, negligence, or confusion as
6  to what GAAP requires. As discussed above, however, establishing intent to mislead on the part of
7  the person or persons that manipulated the underlying data is no substitute for showing that
8  SunPower and the Individual Defendants had scienter when they relied on that data in making the
9  various representations of which plaintiffs complain. Plaintiffs also group in this category
10 allegations that the wrongdoing occurred over several fiscal quarters and involved a significant
11 effect on SunPower's reported bottom line. Those allegations are discussed further below, in
12 connection with the concept of "core operations."

13 Second, Plaintiffs suggest their allegations that the Insider Defendants signed certifications
14 under the Sarbanes-Oxley Act ("SOX Certifications") support the inference of scienter because
15 those defendants thereby represented that the reported financial results were accurate and that
16 adequate internal disclosure and financial reporting controls had been designed, implemented and
17 monitored. The *Zucco* court observed that, "[b]oilerplate language in a corporation's 10-K form, or
18 required certifications under Sarbanes-Oxley section 302(a), however, add nothing substantial to the
19 scienter calculus." 552 F.3d at 1002-1003. As such, *Zucco*, concluded, "Sarbanes-Oxley
20 certifications are not sufficient, without more, to raise a strong inference of scienter." *Id*. at 1003.

21 Plaintiffs attempt to bolster the importance of the SOX Certifications in this particular case
22 by pointing to the fact that SunPower had previously acknowledged a lapse in internal control
23 mechanisms, and had represented that improvements had been and were being made. As defendants
24 point out, however, the prior incident, in the Fall of 2008, related to SunPower's ability to project
25 future results in light of volatility in foreign currency exchange rates. The improved controls to be

---

[4] *See Zucco*, 552 F.3d at 992 ("We address each of these allegations in turn, and then, as *Tellabs* instructs, consider the allegations collectively to determine whether the complaint as a whole raises a strong inference of scienter.").

9

implemented did not relate to accounting for costs of goods sold or other matters directly relevant to the issues that gave rise to plaintiffs' claims in this action. As such, the allegations regarding the SOX certifications, and SunPower's prior failure to address exchange rate volatility adequately, do not give rise to a strong showing of scienter in and of themselves, and add very little, if anything, to the overall calculus.

Third, plaintiffs point to allegations of stock sales by the Insider Defendants, and by SunPower itself in the April 2009 offering, to support an inference of scienter. As *Zucco* held, "[f]or individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." 552 F.3d at 1005. The Consolidated Complaint provides no such information. As to SunPower's offering, plaintiffs' contention that the company sought to "cash in" on its artificially inflated stock price may be consistent with scienter, but it falls far short of constituting the requisite strong showing.

Finally, plaintiffs point to a variety of allegations all directed at an attempt to show that a strong inference of scienter is warranted because the false journal entries related to SunPower's "core operations."[5] As explained in *Zucco*, ordinarily it is not sufficient for a plaintiff merely to allege that, "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers." 552 F.3d at 1000 (quoting *In re Read-Rite Corp. Sec. Litig.,* 335 F.3d 843, 848 (9th Cir. 2003). Two exceptions to this general rule exist, however. First, general allegations about "management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements" may be sufficient to create a strong inference of scienter "when these allegations are buttressed with detailed and specific allegations about management's exposure to factual information within the company." *Zucco*, 552 F.3d at 1000 (quoting *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). Examples of such pleading include, "specific admissions from top executives that they are involved in every detail of the company and that they

---

[5] This category in particular substantially overlaps with the arguments plaintiffs make regarding the "magnitude, duration, manner, and simplicity" of the alleged fraud.

monitored portions of the company's database, . . . a specific admission from a top executive that 'we know exactly how much we have sold in the last hour around the world,' . . . or other particular details about the defendants' access to information within the company." *Id.* (internal citations and quotations omitted).

Here, plaintiffs have offered numerous allegations, some more conclusory than others, that the insider defendants closely monitored the company's finances and its Philippine operations, including the accounting functions carried out there. None of those allegations, however, rise to the level of an admission that the Insider Defendants, or other management level individuals, had reason to, or did, monitor recordkeeping and accounting functions down to the level of detail where the falsification allegedly occurred. Nor are there other factual allegations to that effect.[6] All of the more general allegations about management's involvement in and supervision of the Philippines operations and accounting matters also fail to satisfy this exception. *See Zucco*, 552 F.3d at 1000-1001 ("Allegations that [corporate] management had access to the purportedly manipulated quarterly accounting numbers, or that the management analyzed the inventory numbers closely, do not support the inference that management was in a position to know that such data was being manipulated. Nothing in the complaint suggests that [the CFO] had access to the underlying information from which the accounting numbers were derived.")

The second exception permits an inference of scienter where senior management "must have known" the information they were providing to the public was untrue because the falsity was obvious from the operations of the company. *Zucco*, 552 F.3d at 1001. Scienter will only be presumed under this exception where, "the falsity is patently obvious—where the facts are

---

[6] Plaintiffs offer statements from three confidential witnesses to bolster their contention that management knew or should have known about the falsified journal entries. Often the use of confidential witnesses raises the issue of whether they have been "described with sufficient particularity to establish their reliability and personal knowledge." *Zucco*, 552 F.3d at 995. Here the problem is not uncertainty as to the witnesses' personal knowledge, but that their assertions are so vague and generalized that they do little to further the scienter inquiry. *See*, *e.g.*, Consolidated Complaint ¶101 (confidential witness stating that controller in Philippines "reported directly" to the CFO and "ultimately had to run everything through [them]"); ¶102 (confidential witness asserting that CFO, "had a lot of responsibility for what was going on in the Philippines, certainly finance-wise.").

11

1 prominent enough that it would be absurd to suggest that top management was unaware of them."
2 *Id.* (citations and internal quotations omitted).

While plaintiffs have argued that cost and accounting issues were of such importance to SunPower management that it must—or at least should—have known about the falsified journal entries, they point to nothing in the Consolidated Complaint that suggests the falsity of those entries would have been "patently obvious." To the contrary, plaintiffs have alleged that the entries were falsified for the very purpose of conforming the results to the company's projections and expectations. As nothing in the Consolidated Complaint otherwise tends to show that management "must have known" those projections and expectations were not being realized, it is hardly "absurd" to suggest that the falsifications likely were accepted without question. Accordingly, none of the particular categories of allegations on which plaintiffs rely are sufficient to give rise to a strong inference of scienter.

Viewed holistically, the balance comes out the same. While plaintiffs are correct to point out that this case differs from *Zucco* insofar as there appears to have been deliberate misrepresentation at some level within the company, that simply is not enough to give rise to a strong inference of scienter on the part of SunPower or the Insider Defendants.[7] As in *Zucco*, plaintiffs appear to "assume that compiling a large quantity of otherwise questionable allegations will create a strong inference of scienter through the complaint's emergent properties." 552 F.3d 1008. Even the comprehensive perspective of the complaint *Tellabs* directs, however, "cannot transform a series of inadequate allegations into a viable inference of scienter." *Id.*[8]

---

[7] Plaintiffs also attempt to distinguish *Zucco* on the basis of the dollar amount involved in the misrepresentations. Divorced from a comparison of the companies' respective sizes, that distinction is of little persuasive value.

[8] Plaintiffs suggest that even if they have failed to allege facts showing the Insider Defendants acted with scienter, there is at least enough to conclude that *someone* in the corporation with sufficient authority to render SunPower liable must have had knowledge of the falsified journal entries. While a "collective scienter" theory may be viable in some circumstances, *see Glazer Capital Mgmt., L.P. v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008), plaintiffs have identified nothing in the complaint that would make it reasonable to assume some unidentified insider was more likely to have become aware of the false entries than were the named individual defendants.

12

### 3. *Reliance*

The only other challenge to the Section 10(b) claim that defendants advance is the contention that plaintiffs have failed to plead facts showing any *reliance* on the alleged misrepresentations by those persons who purchased SunPower's debentures, which were not offered or traded on NASDAQ. "Reliance is an element of a Rule 10b-5 cause of action." *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). A plaintiff, however, may rely on a presumption of reliance through the so-called "fraud on the market" theory, which posits that, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246. Plaintiffs here have invoked the fraud on the market theory to satisfy their requirement of alleging reliance as to purchases of SunPower common stock, but have not alleged that the debentures were traded on any "well-developed market" supporting a presumption of reliance with respect to those purchases.

In opposition to this additional argument by defendants, plaintiffs insist that (1) the complaint alleges all of SunPower's "securities" were traded in an efficient market, and that debentures are included within the ordinary meaning of the term "securities," and (2) whether or not a particular market is well-developed and efficient so as to permit application of the presumption is a factual question, not to be decided on a motion to dismiss. The first argument overlooks the fact that the Consolidated Complaint expressly defines "securities" to refer *only* to SunPower's Class A common stock (Consolidated Complaint ¶2, n.1) and that the allegations regarding an efficient market refer only to NASDAQ and SunPower's common stock traded thereon (Consolidated Complaint ¶ 225). The second argument does not address the issue that even if application of the presumption ultimately requires factual determinations, under *Iqbal* and *Twombly* plaintiffs must allege a sufficient factual basis for any contention that the debentures were traded on a well-developed and efficient market. Accordingly, to the extent that the section 10(b) claim is based on purchases of SunPower debentures, it is dismissed on this additional ground, with leave to amend if plaintiffs can in good faith allege either actual reliance or a factual basis for application of the fraud on the market theory.

13

B. Count II—Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act makes certain "controlling" individuals also liable for violations of Section 10(b) and its underlying regulations. Specifically, section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

There is no dispute that any liability under Section 20(a) in this action is dependent on the existence of an underlying violation of Section 10(b). In view of the dismissal of the 10(b) claims, this count must also be dismissed, with leave to amend.

C. Count III—Section 11 of the Securities Act—Class A Stock and debentures offering

Plaintiffs bring Count III against SunPower and those specific executives and directors who signed the April 2009 prospectuses issued in connection with SunPower's offering of Class A stock and debentures. It is also the only claim for relief advanced against the Underwriter defendants.

Defendants argue that this count must be dismissed under Rule 12(b)(6) for failure to state a claim as well as under Rule 12(b)(1) for lack of standing. Defendants contend that plaintiffs have not alleged facts showing that the common stock they purchased is traceable to the offering in dispute, and that the sole plaintiff that purchased debentures has not alleged any resulting damages, and cannot do so given the circumstances.

To have standing to bring suit under Section 11, a plaintiff must have purchased stock in the offering at issue, or trace later-purchased stock back to that offering. See *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 n.4 (9th Cir. 1999). Plaintiffs concede that they did not acquire their stock directly in the public offering. They argue, however, that their conclusory allegation of an ability to trace those shares to the offering is sufficient for pleading purposes. They emphasize that one named plaintiff purchased shares in close temporal proximity to the offering, which they

14

1 contend supports an inference that those shares may have originally been sold pursuant to the
2 challenged prospectuses.

3 Plaintiffs have not explained, however, how even with discovery, they hope to be able to
4 prove that any of their shares are traceable to the original offering, given that the shares are fungible
5 and that millions of shares were already being traded on the open market at the time of the offering.
6 *See*, *In re Century Aluminum Co. Securities Litigation*, __ F.Supp.2d __, 2010 WL 1729426
7 (N.D.Cal. 2010) ("Plaintiffs have neither alleged in the FAC, nor have they articulated in their
8 oppositions, how to trace any particular shares in the 75 million share pool that existed after the
9 secondary offering to show that those shares came from the secondary offering."). This is not a
10 matter, as plaintiffs argue, of imposing a requirement at the pleading stage that they *prove* their
11 shares were originally sold in the disputed offering. Rather, under *Iqbal* and *Twombly*, plaintiffs
12 must allege a factual basis plausibly reflecting that they eventually will be able to submit such
13 proof.[9] *See also Century Aluminum*, 2010 WL 1729426 at *12 ("If plaintiffs can never meet their
14 burden of tracing their shares to the secondary offering, there is no reason to defer this question to a
15 later stage.")

16 The sole plaintiff that purchased debentures has certified it sold those securities at a price in
17 excess of the offering price. Section 11(e) provides that a plaintiff's maximum recovery is limited
18 to "the difference between the amount paid for the security (not exceeding the price at which the
19 security was offered to the public)" and "the price at which such security shall have been disposed
20 of in the market before suit." 15 U.S.C. § 77k(e); *see also In re Initial Public Offering Sec. Litig.*,
21 241 F.Supp.2d 281, 351 (S.D.N.Y. 2003) ("[B]ased on the plain language of Section 11 and its
22 legislative history, a plaintiff who sells a security above its offering price has no cognizable
23 damages under Section 11 of the Securities Act, notwithstanding the fact that such plaintiff may
24 have actually suffered a loss."). Plaintiffs' arguments that damages are ordinarily presumed at the
25 pleading stage cannot survive the impact of the statutory definition of recoverable damages in this

---

[9] Additionally, because defendants also bring this motion as a challenge under Rule 12(b)(1) to jurisdiction, the pleadings are not dispositive, and plaintiffs bear the burden of establishing that they have standing. *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

15

1 context and the certification of the price at which the debentures were resold. *See id.* at 347 n.76
2 and accompanying text (rejecting similar arguments).

3     Accordingly, Count III must be dismissed against all named defendants. Although it is not
4 clear how the identified defects could be cured, plaintiffs will be given leave to attempt to do so
5 through amendment, to be exercised only in the event they have a good faith basis for asserting
6 additional or different facts and/or law to support the claims.

    D. <u>Count IV—Section 15 of the Securities Act—Control person liability</u>

    Count IV asserts a claim under Section 15 of the Securities Act against the Insider Defendants on a "control person" theory of liability. The claim is expressly premised on the Section 11 violation alleged in Count III. Accordingly, this count must also be dismissed, with leave to amend, to be exercised only if there is a good faith basis to replead Count IV.

    E. <u>Count V—Section 11 of the Securities Act—Class B Stock Cypress "spinoff"</u>

    Section 11(g) of the Securities Act provides: "In no case shall the amount recoverable under this section exceed the price at which the security was offered to the public." 15 U.S.C. 77k(g). This section provides a "cap on damages" at the "offering price." *In re Initial Pub. Offering Sec. Litig.*, *supra*, 241 F. Supp. 2d at 349. Here, the Cypress shareholders who received the SunPower Class B shares in the spinoff paid nothing for them—the registration statement on which the claim is based expressly stated:

> Cypress stockholders will not pay any consideration or surrender or exchange shares of their Cypress common stock for the shares of our Class B common stock they will receive in the spin-off. Accordingly, the registration fee has been calculated in accordance with Rule 457(o) under the Securities Act based on an offering price of $0.00.

Plaintiffs' attempt to characterize a subsequent decline in the value of *Cypress* shares as "consideration" that the Cypress shareholders exchanged for the SunPower shares while creative, is ultimately unpersuasive. Plaintiffs' alternative argument that Cypress assigned a dollar value to the share distribution, or that the shares were traded at a certain price after the distribution, goes only to

what the shares may have been *worth*, not the price at which they were offered to Cypress shareholders. Accordingly, Count V must also be dismissed. Again, leave to amend will be granted, but plaintiffs should avail themselves of that opportunity only if they have a good faith basis for asserting additional or different facts and/or law to support the claim.

## V. CONCLUSION

The motions to dismiss are granted. Any amended complaint shall be filed within 20 days of the date of this order.

IT IS SO ORDERED.

Dated: 3/1/11

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE