BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
DAVID R. STICKNEY   (Bar No. 188574)
BENJAMIN GALDSTON  (Bar No. 211114)
DAVID R. KAPLAN   (Bar No. 230144)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323
davids@blbglaw.com
beng@blbglaw.com
davidk@blbglaw.com

KAPLAN FOX & KILSHEIMER LLP
LAURENCE D. KING  (Bar No. 206423)
MARIO M. CHOI  (Bar No. 243409)
350 Sansome Street, Suite 400
San Francisco, CA 94104
Tel:   (415) 772-4700
Fax:   (415) 772-4707
lking@kaplanfox.com

BARROWAY TOPAZ KESSLER
   MELTZER & CHECK, LLP
RAMZI ABADOU   (Bar No. 222567)
STACEY KAPLAN   (Bar No. 241989)
ERIK D. PETERSON   (Bar No. 257098)
580 California Street, Suite 1750
San Francisco, CA 94104
Tel:   (415) 400-3000
Fax:   (415) 400-3001
rabadou@btkmc.com
skaplan@btkmc.com
epeterson@btkmc.com

*Attorneys for Lead Plaintiffs Arkansas Teacher Retirement System, Första-AP Fonden and Danske Invest Management A/S*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE SUNPOWER SECURITIES LITIGATION | Case No. CV 09-5473-RS<br>**(Consolidated)**<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................... 10

III.  THE PARTIES .............................................................................................. 10

    A.  Lead Plaintiffs ................................................................................... 10

    B.  Additional Named Plaintiff ............................................................... 11

    C.  Corporate Defendant ......................................................................... 11

    D.  Insider Defendants ............................................................................. 12

    E.  SunPower Director Defendants .......................................................... 16

    F.  Underwriter Defendants ..................................................................... 17

IV.  VIOLATIONS OF THE SECURITIES ACT .............................................. 19

    A.  The Class B Shares Offering Materials Contained Materially
       False And Misleading Statements ...................................................... 19

    B.  The April 2009 Offerings Materials Contained Materially False
       And Misleading Statements ................................................................ 20

V.  VIOLATIONS OF THE EXCHANGE ACT ................................................ 22

    A.  Substantive Allegations ..................................................................... 22

        1.  Company Background ............................................................. 22

        2.  SunPower Encounters Unprecedented Challenges ................. 25

        3.  Defendants' Fraudulent Class Period Scheme ........................ 28

            a)  The Insider Defendants Determined Expense
               Budgets, Closely Monitored Performance To
               Budget, And Knew Of Or Recklessly Disregarded
               The Accounting Manipulations Required To Meet
               Expense Budget Targets ............................................. 28

            b)  The Insider Defendants' Scheme Overstated
               SunPower's Reported Margins And Profitability ........................ 34

        4.  The Truth Is Revealed ............................................................ 40

        5.  Post-Class Period Events ........................................................ 42

B.    Defendants' Materially False And Misleading Class Period Statements ................................................................................................ 48

    1.    First Quarter 2008 .................................................................... 48

    2.    Second Quarter 2008 ................................................................ 54

    3.    Third Quarter 2008 .................................................................. 58

    4.    Fourth Quarter 2008 And Fiscal Year 2008 ........................... 63

    5.    First Quarter 2009 .................................................................... 68

    6.    Second Quarter 2009 ................................................................ 73

    7.    Third Quarter 2009 .................................................................. 78

C.    Violations Of GAAP And SEC Reporting Rules .............................. 82

    1.    Management's GAAP Responsibilities .................................... 82

    2.    SunPower's False Financial Information ................................. 84

    3.    Accounting For Inventory And Cost of Sales .......................... 86

    4.    SunPower's False And Misleading Disclosures Under SEC Regulations ...................................................................... 87

D.    Additional Scienter Allegations ....................................................... 90

    1.    Defendants' Pervasive, Extensive And Deliberate GAAP Violations .................................................................................. 91

    2.    Following The November 2008 "Blunder," SunPower Claimed It Was Focused On Investigating And Correcting Any Internal Control Issues ..................................................... 95

    3.    SunPower's Restatement Demonstrates The Insider Defendants' Intentional Or Reckless Conduct ......................... 97

E.    Loss Causation/Economic Loss ........................................................ 99

F.    Applicability Of Presumption Of Reliance: Fraud On The Market Doctrine ........................................................................................... 101

G.    No Safe Harbor ............................................................................... 103

VI.    CLASS ACTION ALLEGATIONS ............................................................ 104

VII.   CLAIMS FOR RELIEF .............................................................................. 105

COUNT I  For Violations Of § 10(b) Of The Exchange Act And Rule 10b-5(b) Against SunPower And The Insider Defendants ................................... 105

COUNT II For Violations Of § 10(b) Of The Exchange Act And Rule 10b-5(a)
   & (c) Against SunPower And The Insider Defendants ................................................ 106

COUNT III For Violations Of § 20(a) Of The Exchange Act Against The
   Insider Defendants ................................................................................................ 107

COUNT IV For Violation Of § 11 Of The Securities Act In Connection With
   The April 2009 Offerings Against SunPower, Werner, Hernandez,
   Rodgers, Albrecht, Atkins, Wood, And The Underwriter Defendants .......................... 108

COUNT V For Violation Of § 15 Of The Securities Act Against Werner,
   Hernandez, And Arriola ........................................................................................ 110

COUNT Vi For Violation Of § 11 Of The Securities Act In Connection With
   The Class B Shares Offering Against SunPower, Werner, Hernandez,
   And The Director Defendants ................................................................................ 111

PRAYER FOR RELIEF ................................................................................................ 112

JURY DEMAND ................................................................................................ 113

I. **INTRODUCTION**

1.       Arkansas Teacher Retirement System, Första-AP Fonden, and Danske Invest Management A/S (collectively, "Lead Plaintiffs") allege the following based upon personal knowledge with respect to themselves and, with respect to all other matters, the investigation of Lead Counsel.   Lead Counsel's investigation included, *inter alia,* review and analysis of SunPower Corporation ("SunPower" or the "Company") filings with the U.S. Securities and Exchange Commission ("SEC"), press releases and other Company public statements, securities analyst reports and media reports, as well as interviews with former SunPower employees.   Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.       This is a class action for violations of the federal securities laws.   Lead Plaintiffs bring this action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of SunPower between April 17, 2008, and November 16, 2009, inclusive (the "Class Period"), and were damaged by the conduct asserted herein (the "Class").[1]   Lead Plaintiffs assert claims against SunPower and the Insider Defendants (*see* ¶¶10, 29-33 *infra)* for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 (a)-(c) promulgated thereunder.   Lead Plaintiffs' Exchange Act claims arise out of a fraudulent scheme and course of business whereby SunPower and the Insider Defendants caused the Company to issue false financial statements in each quarter and for the year ended December 28, 2008, and the first three quarters in the year ended January 3, 2010.   Count I asserts claims arising under SEC Rule 10b-5(b), and Count II asserts claims arising under SEC Rule 10b-5(a) & (c).

---

[1] The Company's equity is traded as Class A and B shares on the NASDAQ under the tickers "SPWRA" and "SPWRB," respectively.   Class B shares were issued to investors in September 2008 in connection with Cypress Semiconductor Corporation ("Cypress") spinning-off its shares of SunPower (the "Class B Shares Offering").   Changes in the market price of the two classes of SunPower's common stock is generally (but not perfectly) correlated.    All references to SunPower's "securities" or "stock" refer to SunPower's Class A and Class B common stock and 4.75% Senior Convertible Debentures unless otherwise noted.

3.     Separately, Lead Plaintiffs assert claims pursuant to §§ 11(a) and 15 of the Securities Act of 1933 (the "Securities Act"), for materially untrue statements and omissions in the Registration Statement on Form S-3 filed with the SEC on or about September 10, 2008 (the "September 2008 Registration Statement"), and Prospectuses on Form 424B5 filed with the SEC on or about April 29, 2009 (the "April 2009 Prospectuses").[2]  The Securities Act claims are not based on any allegation of deliberate or intentional misconduct and Lead Plaintiffs specifically disclaim any reference to or reliance upon fraud allegations for such claims.  The defendants for the Securities Act claims are SunPower, certain of the Company's present and former executives and directors and the underwriters for the April 2009 Offerings.

4.     SunPower designs, manufactures and sells what it describes as "the planet's most powerful solar" technology.   SunPower operates two business segments: components and systems.  SunPower's components segment builds and sells solar power products, including solar cells, solar panels and inverters, which convert sunlight to electricity for utility networks for use in residential and commercial applications.  SunPower's components division makes products for use in multi-megawatt solar power plant applications for its systems division and for other solar power companies.  SunPower's systems segment offers power systems, system technologies and installation services, which include development, engineering and procurement of permits and equipment, as well as construction management, access to financing, monitoring and maintenance services.

5.     Founded in 1985, SunPower experienced dramatic growth through the development of innovative and highly-efficient solar products.  By the start of the Class Period, however, several factors adversely impacted SunPower's ability to continue reporting strong profit margins.  The market that SunPower had once led through technological innovation and

---

[2]  In its March 1, 2011 Order Granting Motion To Dismiss [ECF No. 149], the Court dismissed Lead Plaintiffs' claims pursuant to §§ 11 and 15 of the Securities Act.  Lead Plaintiffs have not amended those claims but have included them here solely and exclusively to preserve their appellate rights. *See*, *e.g.*, *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997) ("It's the law of this Circuit that a plaintiff waives all claims alleged in a dismissed complaint which are not realleged in an amended complaint.") (citations omitted).

engineering savvy had become an oversupplied commodities market dominated by a host of new solar power companies hoping to profit from the alternative energy boom. Moreover, during the Class Period, SunPower was locked into high-cost supply contracts for polysilicon – the principle raw material for its products – from fixed, non-cancelable purchase commitments signed earlier, when market demand for polysilicon exceeded available supplies. SunPower competitors, meanwhile, enjoyed drastically lower market prices for polysilicon beginning in the second half of 2008. In addition, by the start of 2009, SunPower was forced to slow down production at its Philippines facilities for the first two quarters of 2009, which SunPower and the Insider Defendants knew would result in unbudgeted excess fixed production costs. Competition, high-price polysilicon, and the production slowdown adversely affected SunPower's ability to report strong profit margins, which the Company and the Insider Defendants hid from investors through their accounting fraud.

6.     No longer able to grow through product innovation alone, between April 2008 and November 2009, SunPower resorted to fraudulent accounting in its financial statements and publicly reported results in order to artificially inflate and maintain its stock price. SunPower and the Insider Defendants' fraudulent accounting scheme was simple – they ***intentionally*** made improper adjustments to the Company's accounting records to remove current operating expenses that had been properly recorded in the Company's cost of goods sold, thereby inflating SunPower's earnings and sales margins and enabling SunPower to publicly report "record" financial results during the Class Period. SunPower issued numerous false statements about its performance and future prospects, and filed six quarterly reports and an annual report with the SEC which grossly misrepresented the Company's financial results and the adequacy of SunPower's internal controls over financial reporting and disclosure controls and procedures, which included the Company's core manufacturing facilities and assembly lines in the Philippines.[3] SunPower's accounting misstatements not only overstated income and earnings per

---

[3]    According to SunPower's Annual Report on Form 10-K for 2008, of the Company's 5,400 employees worldwide, 4,710 are located in the Philippines. Of these employees, 4,460 are

1    share ("EPS") in quarters that analysts and the broader market viewed as critical to the

2    Company's success, but it also drastically distorted the Company's publicly reported gross

3    margins and inflated the Company's inventory balance.

4        7.    As a direct result of the fraudulent accounting scheme, SunPower was forced to

5    formally restate its financial statements for the fiscal year ended December 28, 2008, each

6    quarterly period in 2008 and the first three quarters in fiscal year ended January 3, 2010 (the

7    "Restatement").[4]   When the truth about SunPower's misstatements was revealed, the market

8    price for SunPower's Class A common stock plunged on heavy trading volume; first, by

9    approximately 19% on November 17, 2009, when SunPower announced its internal investigation

10   into "unsubstantiated accounting entries," and 14% on March 19, 2010, when SunPower filed

11   restated financial results that were far worse that SunPower had led investors to expect.

12       8.    By restating, SunPower has admitted that its financial statements were issued in

13   violation of Generally Accepted Accounting Principles ("GAAP") and due to "***unsubstantiated***

14   ***accounting entries*** . . . [which] generally resulted in an understatement of the Company's cost of

15   goods sold (referred to as 'cost of revenue' in the [Condensed Consolidated] Statement of

16   Operations)."   The Restatement also explained the intentional nature of defendants' scheme:

17   "certain expenses were understated by (a) not sufficiently accruing expenses or (b) ***reversing***

18   previously recorded expenses through manual journal entries ***that were not based on actual***

19   ***transactions*** or reasonable estimates of expenses."[5]

20

21

22

---

23   engaged in manufacturing. The Annual Report states that SunPower's solar cells are
24   manufactured at two facilities in the Philippines, assembled at a third facility located in the
     Philippines, and, by geography, almost 95% of SunPower's property, plant, and equipment is
25   located in the Philippines.

26   [4]   The restated results were announced on March 18, 2010. On May 3, 2010, SunPower filed
     three amended Forms 10-Q/A admitting, for the first time, that it had also materially
27   misrepresented its inventory component balances during the Class Period.

     [5]   Unless otherwise noted, all emphasis is added.
28

---

9.     The Company's "unsubstantiated accounting" entries were neither accidental nor isolated − they constituted tens of millions of dollars and represented the difference between meeting or missing Wall Street consensus EPS in key periods for the Company:



**Comparison of Analysts' 2Q09 Consensus EPS Expectation to SunPower's 2Q09 Reported EPS, Before and After Restatement (non-GAAP basis)**

10.     The Insider Defendants are the Company's Chief Executive Officer ("CEO") Thomas H. Werner ("Werner"), its Chief Financial Officer ("CFO") Dennis V. Arriola ("Arriola"), its former CFO Emmanuel T. Hernandez ("Hernandez), its Corporate Controller John B. Rodman ("Rodman"), and its Philippines Finance Director Mariano M. Trinidad ("Trinidad").  SunPower's Class Period misstatements were known or recklessly disregarded by the Insider Defendants given their acknowledged responsibility for the Company's internal control over financial reporting and disclosure controls and procedures, their high-level positions and the material impact that the unsubstantiated entries had on SunPower's operating results.  SunPower's CEO and CFO's – Werner, Arriola and Hernandez – were responsible for and directed the Company's business, determined or approved expense budgets, and monitored SunPower's performance to budget.  Rodman, SunPower's Corporate Controller, was responsible for overseeing all accounting and financial reporting functions at the Company.  Trinidad, known as the Company's "Philippines CFO," set SunPower's 5-year cost reduction program and was

responsible for ensuring that the aggressive cost cutting goals were met at SunPower's Philippines operations. Rodman and Trinidad both reported to SunPower's CEO and CFO's and were responsible for, and directly involved in, preparing SunPower's financial accounting information that they knew would be reported to SunPower's investors. In short, the Insider Defendants closely monitored the record keeping and accounting functions where the falsification occurred. As explained below, the accounting misstatements, including increasing variances from budget to plan and the multi-million dollar adjustments made at each quarter-end during the Class Period, were patently obvious to SunPower and the Insider Defendants.

11. Before and throughout the Class Period, the Insider Defendants were intensely focused on SunPower's expenses and cost of goods sold, particularly for SunPower's Philippines manufacturing facilities as the vast majority of the Company's revenues and expenses derived from its Philippines operations. The Insider Defendants closely monitored expenses and cost of goods sold because SunPower's margins were a critical metric for investors and analysts. The Insider Defendants also closely monitored inventory, because excess inventory wastes capital resources, increases overhead, and reduces future sales margins.

12. As explained below, the Insider Defendants had regular and frequent meetings, videoconferences and travel between the Philippines and SunPower's San Jose corporate headquarters to set budgets and track the Company's performance to those goals. Management insisted on meeting those targets, which could only be achieved through accounting manipulation.

13. The Company's accounting misstatements grossly misrepresented the Company's profitability in clear violation of GAAP and known accounting rules, none of which hinged on new or complex rules or a simple oversight during a single quarter or even a single year that was later corrected on a good faith basis. In fact, on an earnings call after the Restatement was announced, the Company's CFO confirmed that SunPower had, throughout the Class Period, "***intentionally*** proposed or approved journal entries that were not substantiated by actual transactions or costs." As a result of the Company's misstatements, SunPower was forced to

correct financial statements covering almost two years to address the accounting improprieties defendants could no longer conceal given their increasingly material effect on the Company's books and publicly reported results.  Rodman and Trinidad were subsequently terminated in April 2010 when the Company suspended or fired some of those who were "involved in unethical activities" that led to the Restatement.   According to former SunPower employees, both Rodman and Trinidad were fired for their involvement in the accounting fraud.

14.   In its 2009 Annual Report on Form 10-K filed with the SEC on March 19, 2010 (the "2009 Form 10-K") (and signed by all the Director Defendants, Werner and Arriola), SunPower also sought to explain why the misstatements occurred, namely, "in order to report results for manufacturing operations that would be consistent with internal expense projections." In other words, the Company's expenses were initially recorded correctly during each quarter but were then intentionally altered (*i.e.,* "reversed") at the end of the quarter to subsequently exclude certain expenses and instead record significantly lower expense "projections."  Accordingly, the Insider Defendants – who were intensely focused on reducing expenses and cost of goods sold and avoiding building excess inventory – were aware of the increasing variances between actual and budgeted numbers throughout the quarter.  At the end of each quarter, multi-million-dollar adjustments were required to reduce the actual recorded expenses to the budgeted numbers.  Such massive quarter-end adjustments were made with authorization at the highest level.  For example, according to former SunPower employees, access to the general ledger was limited to "Superusers," which included the top executives at SunPower.   Only "Superusers" were authorized to make high-dollar accounting entries or adjustments.

15.   The accounting misstatements overstated inventory and understated SunPower's reported cost of revenue by roughly equal amounts, which overstated income and shareholders' equity in the Company's public financial reports, and were highly material to SunPower's financial results for each quarter during the Class Period.  But for the drastic distortion of the Company's cost of goods sold, the Company would have badly missed its 2008 and 2Q09 analysts' consensus EPS estimates.   With respect to the effect of defendants' accounting

misstatements on 2Q09 alone, for instance, Citigroup Markets Inc. ("Citigroup") analyst Timothy M. Arcuri explained that SunPower "would have actually missed consensus EPS by ~$0.03-0.04 versus a beat of nearly $0.10 as reported . . . .  However, on the margin and EPS beat, the stock proceeded to rally ~25% the next day − adding $700 [million] in market capitalization to the A shares alone. ***This would appear to be undone by this new disclosure***."

16.    Prior to SunPower's fraud revelations, analysts had consistently marveled at SunPower's publicly reported financial results, especially in light of the macroeconomic challenges and peer-pricing pressures the Company was facing during the Class Period. Defendants' accounting misstatements also enabled them to create a façade that SunPower sold "exceptional" and "differentiated" solar products justifying the 20-30% price premium the Company sought from buyers of its products.  Defendants knew that investors had grave concerns about the Company's ability to compete against its larger government-subsidized European rivals and a stampede of new, smaller solar companies from Asia that sold comparable Tier-1 solar modules at lower prices.  For instance, on July 22, 2009, Ardour Capital Investments publicly raised its concern that "[a]s ASPs [average selling prices] continue their rapid decline, we see the Company facing more margin pressure compared to its Chinese peers.  As pricing declines, we believe [SunPower's] higher than average nonpolysilicon costs will continue to hurt margins."  Defendants' accounting fraud was specifically designed to (and did) dispel such concerns during the Class Period.

17.    While investors were kept in the dark about SunPower's accounting misstatements, SunPower undertook the April 2009 Offerings in an effort to capitalize on the Company's inflated stock price.  SunPower completed the April 2009 Offerings on May 4, 2009, and received net proceeds of $218.9 million for its Class A common stock while the Company's shares were trading at artificially-inflated prices and issued $230 million in principal amount of its 4.75% debentures – a borrowing rate lower than SunPower could have obtained absent the Company's false financial results.

18.     Throughout the Class Period, defendants Werner (CEO), Hernandez (CFO) and Arriola (CFO) also signed numerous sworn certifications publicly attesting to the adequacy of SunPower's internal controls.   SunPower has now admitted that its internal controls suffered from multiple "material weaknesses" throughout the Class Period.   In a March 18, 2010 press release on Form 8-K (signed by Arriola), SunPower was forced to acknowledge that "[m]anagement has concluded that these control deficiencies constituted *material weaknesses* in the Company's internal control over financial reporting [and] *the company did not maintain an effective internal control over financial reporting or effective disclosure controls and procedures as of January 3, 2010*."   In April 2010, Rodman and Trinidad were quietly terminated from SunPower at the same time the Company was firing the unidentified employees who were "involved in unethical activities" that led to the Restatement.   According to former SunPower employees, both Rodman and Trinidad were fired for their involvement in the accounting misstatements.

19.     Critically, defendants were on notice that the strength of SunPower's controls was particularly important to investors as the Company's November 16, 2009 revelation was the *second time* during the Class Period that management had surprised investors with a view into the Company's weak internal control over financial reporting and disclosure controls and procedures.   On November 4, 2008, the Company was forced to reduce guidance it had provided to investors only three weeks earlier, causing Wedbush Morgan Securities analyst Al Kaschalk to note "reduced confidence by the Street in the management team as it lowers outlook three weeks after earnings report . . . .   Management will need to work to regain some of its tarnished image after lowering guidance a mere three weeks after reporting its Q3:08 earnings."   Others drew a direct link between SunPower's November 16, 2009 announcement and its earlier November 4, 2008 admission of flawed internal controls, bluntly accusing SunPower's management of using "*accounting chicanery to smooth out results in tough times*."

20.     Ultimately, throughout the Class Period, defendants' accounting violations enabled SunPower to accomplish what it could not achieve legitimately: (i) report quarter after quarter of success during a time of unprecedented strain on the Company's share price; (ii)

---

complete the approximately $450 million April 2009 Offerings while the Company's stock was trading at grossly artificially-inflated prices; (iii) create an uneven playing field in an oversupplied solar market; (iv) mask the structural disadvantages the Company faced relative to its new competitors; and (v) respond to aggressive pricing pressure from new, lower-cost entrants in the solar market.

## II.   JURISDICTION AND VENUE

21.   The claims asserted herein arise under and pursuant to §§ 11(a) and 15 of the Securities Act, 15 U.S.C. §§ 77k(a) and 77o; §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. Jurisdiction is conferred by and venue is proper pursuant to § 22(a) of the Securities Act and § 27 of the Exchange Act.

22.   Venue is proper in this District pursuant to § 27 of the Exchange Act.  Many of the false and misleading statements were made in or issued from this District, and SunPower's principal executive offices are located in this District.

23.   In connection with the acts alleged in this First Amended Consolidated Class Action Complaint For Violations Of The Federal Securities Laws ("Complaint"), defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

## III.   THE PARTIES

### A.   Lead Plaintiffs

24.   Lead Plaintiff Arkansas Teacher Retirement System ("ATRS"), as set forth in the certification filed previously on January 19, 2010, and as incorporated by reference herein, purchased SunPower securities during the Class Period and has been damaged thereby.  ATRS was established in 1937 to provide retirement benefits for the employees of Arkansas' education community and manages over $10 billion in assets.  ATRS lost over $2 million from its purchases of SunPower securities during the Class Period.

25.     Lead Plaintiff Första-AP Fonden ("AP1"), as set forth in the certification filed previously on January 19, 2010, and as incorporated by reference herein, purchased SunPower securities during the Class Period and has been damaged thereby.  AP1 is a pension fund with global orientation, whose management contributes to ensuring a high and predictable retirement pension for every person employed in Sweden.  With net assets of over $25 billion, AP1 is one of Sweden's largest pension funds.  AP1 lost approximately $1.75 million from its purchases of SunPower securities during the Class Period.

26.     Lead Plaintiff Danske Invest Management A/S ("Danske"), as set forth in the certification filed previously on January 19, 2010, and as incorporated by reference herein, purchased SunPower securities during the Class Period and has been damaged thereby.  Danske is based in Copenhagen, Denmark, and with approximately $45 billion in assets under management, is one of Denmark's largest institutional investors.  Danske lost approximately $1.65 million from its purchases of SunPower securities during the Class Period.

## B.     Additional Named Plaintiff

27.     Plaintiff Bobby J. Reynolds, as set forth in the certification filed previously on May 28, 2010 with the Consolidated Complaint For Violation Of Federal Securities Laws [ECF 92] ("Consolidated Complaint"), and as incorporated by reference herein, purchased SunPower securities during the Class Period and has been damaged thereby.

## C.     Corporate Defendant

28.     SunPower is a Delaware corporation with its principal place of business at 3939 North First Street, San Jose, California 95134. According to the Company's profile, SunPower engages in the design, manufacture and marketing of solar electric power technologies, including: solar cells, solar panels and inverters, which convert sunlight to electricity for the utility networks serving installers and resellers for use in residential and commercial applications; power systems and system technologies, which include development, engineering and procurement of permits and equipment; and construction management, access to financing, installation, monitoring and maintenance services.

1

### D.    Insider Defendants

2      29.    Thomas H. Werner is, and during the Class Period was, CEO of the Company.

3  During the Class Period, Werner made statements in Company press releases and conference

4  calls, as alleged herein, and signed and/or certified the Company's SEC filings, including but not

5  limited to SunPower's Form(s) 10-Q and its 2008 Annual Report on Form 10-K filed with the

6  SEC on February 26, 2009 (the "2008 Form 10-K"), and/or the materially false and misleading

7  Registration Statements and Prospectuses issued in connection with the registration and sale of

8  Company securities.

9      30.    Dennis V. Arriola is, and during the Class Period became, CFO, Principal

10  Accounting Officer and Senior Vice President of the Company.  During the Class Period, Arriola

11  made statements in Company press releases and conference calls, as alleged herein, and signed

12  and/or certified the Company's SEC filings, including, but not limited to, SunPower's Form(s)

13  10-Q and 2008 Form 10-K and/or the materially false and misleading Registration Statements

14  and Prospectuses issued in connection with the registration and sale of Company securities.

15  Arriola earned a bachelor's degree in economics from Stanford University and a master's degree

16  in business administration from Harvard University.  Arriola joined SunPower with over twenty

17  years of financial experience, including serving as Senior Vice President and CFO of both San

18  Diego Gas & Electric and Southern California Gas Company, where he helped build the finance

19  and treasury teams, including accounting, planning and budgeting, strategic development, risk

20  management, information technology and procurement.

21      31.    Emmanuel T. Hernandez was, during the Class Period until the time of his

22  unscheduled departure from the Company on or about October 20, 2008, CFO and Principal

23  Accounting Officer of the Company.  During the Class Period, Hernandez made statements in

24  Company press releases and conference calls, as alleged herein, and signed and/or certified the

25  Company's SEC filings, including, but not limited to, SunPower's Form(s) 10-Q and/or the

26  materially false and misleading Registration Statements and Prospectuses issued in connection

27  with the registration and sale of Company securities.  A graduate of the University of Nueva

28

Caceres in the Philippines, Mr. Hernandez has a bachelor's degree in accounting, a master's degree in finance from Golden Gate University in San Francisco and he received his CPA license from the Philippine Institute of Certified Public Accountants.  Prior to serving as SunPower's CFO, Hernandez was CFO for Cypress Semiconductor, SunPower's former parent.

32.     John B. Rodman was, during the Class Period until he was terminated from the Company on or about April 2010, SunPower's Corporate Controller and a vice president. According to a Company press release dated January 17, 2006, Rodman joined SunPower in January 2006, reported directly to the CFO, and was responsible for "oversee[ing] all accounting and financial reporting for the company."  In the same press release, Werner described Rodman as an "integral member of the SunPower team."  Rodman has been a licensed Certified Public Accountant since 1991 and was a senior manager with the accounting firm KPMG Peat Marwick before joining SunPower.

33.     Mariano M. ("Miguel") Trinidad was SunPower's Finance Director for worldwide operations at SunPower from January 2009 until he was terminated on or about April 2010. Trinidad served as Finance Director for SunPower's core solar panel manufacturing facilities in the Philippines from January 2004 to December 2008, and was Finance Manager for Cypress Semiconductor from 1999 to December 2003.  Trinidad, a citizen of the Philippines, resided in the United States from approximately January 2009 through mid-2010, and traveled frequently between the Philippines and the United States throughout the Class Period in connection with the acts and practices alleged herein.  Trinidad was a high-level executive who was responsible for, for example: (1) formulating the Company's internal 5-year cost reduction plan; (2) driving Company cost reduction programs; and (3) SunPower's cost accounting, which included the accounting for SunPower's excess fixed production costs.  As Finance Director for SunPower's Philippines manufacturing operations, Trinidad effectively acted as the Company's Philippines CFO and was responsible for all areas of financial management and administration including treasury operations, controllership and cost accounting.  Trinidad prepared budgets, monthly rolling forecasts, tracking performance vs. budgets and targets, and reports to others on the

management team, including budget variance reports to Werner, Hernandez and Arriola.  During the Class Period, Trinidad reported directly to SunPower's CFOs Hernandez and Arriola and to SunPower's Chief Operating Officer ("COO"), Martin Neese, and to CEO Werner.  Trinidad is a licensed Certified Public Accountant and attorney in the Philippines, and was previously employed by the accounting firm Ernst & Young in Manila.

34.     The defendants referenced above in ¶¶29-33 are referred to herein as the "Insider Defendants."

35.     Because of the Insider Defendants' positions, they had access to the adverse undisclosed information about SunPower's financial results, business, operations and practices, *via* access to internal corporate documents, conversations and contact with other corporate officers and employees, attendance at meetings and *via* reports and other information provided to them.  Each of the Insider Defendants, by virtue of his high-level position, was directly involved in the day-to-day operations of SunPower at the highest levels and was privy to confidential information concerning the Company and its business, operations and practices, including the accounting misstatements alleged herein.  Their positions of control and authority as officers or directors enabled the Insider Defendants to control the content of the SEC filings, press releases, and other public statements of SunPower during the Class Period.  Accordingly, each of the Insider Defendants bears responsibility for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the misrepresentations and omissions contained therein.  Moreover, each of the Insider Defendants had continuous and systematic contacts with the United States and California through SunPower's conduct of its business and its San Jose corporate headquarters.

36.     During the Class Period, each of the Insider Defendants substantially participated in the preparation of SunPower's false financial records or engaged in conduct that made it necessary or inevitable that material misrepresentations would be made to investors on the basis of that conduct.

37.     The Insider Defendants were obligated to refrain from falsifying SunPower's books, records, and accounts and were prohibited from using the instrumentalities of interstate commerce or the mails to (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person.  Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of SunPower securities.

38.     Each of the Insider Defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of SunPower securities by disseminating materially false and misleading statements and/or concealing material adverse facts about SunPower's operations and financial condition. Defendants' scheme deceived the investing public regarding SunPower's operations, finances and financial statements, and the intrinsic value of SunPower's securities, enabled the Company to register for sale and sell hundreds of millions of dollars in SunPower securities in the April 2009 Offerings, and caused Lead Plaintiffs and other members of the Class to be damaged as a result of their purchases of SunPower securities at artificially inflated prices.

39.     The Company's press releases and SEC filings were group-published documents, representing the collective actions of Company management.  The Insider Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements and financial condition, as alleged herein.  The Insider Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or deliberately disregarded, that the false and misleading statements were being issued regarding

1  the Company, and approved or ratified these statements, in violation of the federal securities
2  laws.

3        40.    The Insider Defendants, because of their positions of control and authority as
4  officers and/or directors of the Company, were able to and did control the content of the various
5  SEC filings, press releases and other public statements pertaining to the Company during the
6  Class Period.  Each Insider Defendant was provided with copies of the documents alleged herein
7  to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity
8  to prevent their issuance or cause them to be corrected.  Accordingly, each Insider Defendant is
9  responsible for the accuracy of the public reports and releases detailed herein, and is therefore
10  primarily liable for the representations contained therein.

11        **E.**    **SunPower Director Defendants**

12        41.    T.J. Rodgers ("Rodgers") is, and was throughout the Class Period, Chairman of
13  SunPower's Board of Directors. Rodgers signed the January 2007 Registration Statement and the
14  September 2008 Registration Statement for the April 2009 Offerings and the Class B Shares
15  Offering, respectively.   None of the claims against Rodgers include allegations of fraud or
16  scienter.

17        42.    W. Steve Albrecht ("Albrecht") is, and was throughout the Class Period, a
18  Director of SunPower.  Albrecht signed the January 2007 Registration Statement and the
19  September 2008 Registration Statement for the April 2009 Offerings and the Class B Shares
20  Offering, respectively.   None of the claims against Albrecht include allegations of fraud or
21  scienter.

22        43.    Betsy S. Atkins ("Atkins") is, and was throughout the Class Period, a Director of
23  SunPower.  Atkins signed the January 2007 Registration Statement and the September 2008
24  Registration Statement for the April 2009 Offerings and the Class B Shares Offering,
25  respectively.  None of the claims against Atkins include any allegations of fraud or scienter.

26        44.    Patrick Wood, III ("Wood") is, and was throughout the Class Period, a Director of
27  SunPower.   Wood signed the January 2007 Registration Statement and the September 2008

28

Registration Statement for the April 2009 Offerings and the Class B Shares Offering, respectively.  None of the claims against Wood include any allegations of fraud or scienter.

45.     Uwe-Ernst Bufe ("Bufe") has been a Director of SunPower since on or about August 12, 2008.  Bufe signed the September 2008 Registration Statement for the Class B Shares Offering.  None of the claims against Bufe include allegations of fraud or scienter.

46.     Rodgers, Albrecht, Atkins, Wood and Bufe are referred to herein as the "Director Defendants."

**F.     Underwriter Defendants**

47.     Deutsche Bank Securities Inc. ("Deutsche Bank") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies.  Deutsche Bank acted as a joint book-running manager for SunPower's April 2009 Offerings.  As an underwriter for the April 2009 Offerings, Deutsche Bank is liable under § 11 of the Securities Act.

48.     Credit Suisse Securities (USA) LLC ("Credit Suisse") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies.  Credit Suisse acted as a joint book-running manager for SunPower's April 2009 Offerings.  As an underwriter for the April 2009 Offerings, Credit Suisse is liable under § 11 of the Securities Act.

49.     Lazard Capital Markets LLC ("Lazard") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies.  As an underwriter for the April 2009 Offerings, Lazard is liable under §11 of the Securities Act.

50.     Barclays Capital Inc. ("Barclays") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including

acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies. As an underwriter for the April 2009 Offerings, Barclays is liable under § 11 of the Securities Act.

51. Piper Jaffray & Co. ("Piper Jaffray") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies. As an underwriter for the April 2009 Offerings, Piper Jaffray is liable under § 11 of the Securities Act.

52. Wachovia Capital Markets, LLC (n/k/a Wells Fargo Securities, LLC) ("Wachovia") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies. Wachovia acted as an underwriter in SunPower's April 2009 Offerings and received SunPower securities for its work in the offerings. As an underwriter, Wachovia is liable under § 11 of the Securities Act.

53. SL Hare Capital, Inc. ("SL Hare") is an integrated financial services institution that provides commercial and investment banking services and advisory services, including acting as underwriter in the sale of corporate securities and providing investment analysis and opinions on public companies. As an underwriter for the April 2009 Offerings, SL Hare is liable under § 11 of the Securities Act.

54. The defendants referenced above in ¶¶47-53 are referred to herein as the "Underwriter Defendants."

55. The Underwriter Defendants and Director Defendants are not alleged to have engaged in any fraudulent conduct and are liable exclusively under the non-fraud provisions of § 11 of the Securities Act. As used herein, the term "Insider Defendants" refers exclusively to those individuals alleged herein to be liable under the fraud provisions of § 10(b) of the Exchange Act: (i) Werner; (ii) Arriola; (iii) Hernandez; (iv) Rodman; and (v) Trinidad.

1   IV.   **VIOLATIONS OF THE SECURITIES ACT**

2        56.    Lead Plaintiffs do not amend their Securities Act claims here.  The Securities Act

3   claims are realleged only to preserve appellate rights, if necessary.  *See* n.2 *supra*.

4        57.    Lead Plaintiffs' Securities Act claims are based on strict liability and negligence

5   and are brought on behalf of investors who purchased or otherwise acquired SunPower securities

6   pursuant to or traceable to the offering materials issued in connection with the Class B Shares

7   Offering and the April 2009 Offerings.

8        A.    **The Class B Shares Offering Materials Contained**
             **Materially False And Misleading Statements**
9

10       58.    On September 10, 2008, SunPower filed a Shelf Registration Statement on Form

11  S-3 registering all 42,033,287 shares of its Class B common stock to be distributed to Cypress

12  shareholders.   The September 2008 Registration Statement was signed by (i) Werner; (ii)

13  Hernandez; (iii) Rodgers; (iv) Albrecht; (v) Atkins; (vi) Wood; and (vii) Bufe.  After the close of

14  trading on September 29, 2008, Cypress completed the spin-off of all of its shares of the

15  Company's Class B common stock in the form of a *pro rata* dividend to the holders of Cypress

16  common stock.  As a result of the spin-off, the Company's Class B common stock began trading

17  publicly and is listed on the NASDAQ Global Select Market along with the Company's Class A

18  common stock.  As of the close of the spin-off on September 29, 2008, Cypress fully divested

19  itself of SunPower.

20       59.    By its Restatement, SunPower has admitted that the September 2008 Registration

21  Statement for the Class B Shares Offering incorporated by reference the following materially

22  false and misleading financial statements: (i) SunPower's 1Q08 Form 10-Q; and (ii) SunPower's

23  2Q08 Form 10-Q.

24

25

26

27

28

60.     SunPower has admitted that its financial results and statements for 1Q08, ended March 30, 2008, included the following misstatements:

| Q1 2008 SunPower Financial Information as Reported and as Corrected by SunPower | | | | |
|---|---|---|---|---|
| | Three Months Ended March 30, 2008 | | | |
| $ in millions, rounded, except per share amounts | Reported Amount | Corrected Amount | Amount Overstated | Percent Overstated |
| Gross margin ($) | $ 53.2 | $ 51.5 | $ 1.7 | 3% |
| Pre-tax income | $ 13.3 | $ 11.8 | $ 1.4 | 12% |
| Earnings per share | $0.14 | $0.13 | $0.01 | 8% |
| Components gross margin rate (%) | 19% | 17% | 1.7% | 10% |

61.     SunPower has admitted that its financial results and statements for 2Q08, ended June 29, 2008, included the following misstatements:

| Q2 2008 SunPower Financial Information as Reported and as Corrected by SunPower | | | | |
|---|---|---|---|---|
| | Three Months Ended June 29, 2008 | | | |
| $ in millions, rounded, except per share amounts | Reported Amount | Corrected Amount | Amount Overstated | Percent Overstated |
| Gross margin ($) | $ 92.8 | $ 84.2 | $ 8.7 | 10% |
| Pre-tax income | $ 37.4 | $ 29.1 | $ 8.4 | 29% |
| Earnings per share | $0.37 | $0.32 | $0.05 | 16% |
| Components gross margin rate (%) | 28% | 24% | 4.3% | 18% |

**B.     The April 2009 Offerings Materials Contained Materially False And Misleading Statements**

62.     On April 29, 2009, the Company filed the April 2009 Prospectuses, offering: (1) up to $230 million in 4.75% Senior Convertible Debentures due 2014; and (2) up to 10.35 million shares of Class A stock at $22 per share.  The Company completed the April 2009 Offerings on May 4, 2009, and received net proceeds of $218.9 million for its Class A common stock and net proceeds of $225 million from issuing all $230 million in principal amount of its

4.75% convertible debt. The April 2009 Prospectuses were filed pursuant to the January 2007 Registration Statement, which was signed by: (i) Werner; (ii) Hernandez; (iii) Rodgers; (iv) Albrecht; (v) Atkins; and (vi) Wood.

63.     The Company agreed to sell the Underwriter Defendants, for whom Credit Suisse and Deutsche Bank acted as joint book-running managers and representatives, and the underwriters severally agreed to purchase the following respective number of shares of the Company's Class A common stock:

| Underwriter | Number of Shares |
|---|---|
| Credit Suisse | 3,420,000 |
| Deutsche Bank | 3,420,000 |
| Lazard | 630,000 |
| Barclays | 540,000 |
| Piper Jaffray | 450,000 |
| Wachovia | 360,000 |
| SL Hare | 180,000 |
| Total | 9,000,000 |

64.     By its Restatement, SunPower has admitted that the April 2009 Prospectuses contained and/or incorporated by reference the materially false and misleading 2008 Form 10-K. SunPower has admitted that its financial results and statements for its fiscal year 2008, ended December 28, 2008, included the following misstatements:

| Fiscal 2008 SunPower Financial Information as Reported and as Corrected by SunPower | | | | |
|---|---|---|---|---|
| | Twelve Months Ended December 28, 2008 | | | |
| $ in millions, rounded, except per share amounts | Reported Amount | Corrected Amount | Amount Overstated | Percent Overstated |
| Gross margin ($) | $ 362.7 | $ 349.6 | $ 13.1 | 4% |
| Pre-tax income | $ 129.1 | $ 116.1 | $ 13.1 | 11% |
| Earnings per share | $1.16 | $1.05 | $0.11 | 11% |
| Inventory – Work-in-process | $ 15.5 | $ 25.8 | ($ 10.3) | (40%) |
| Components gross margin rate (%) | 32% | 30% | 1.7% | 5% |

1    **V.     VIOLATIONS OF THE EXCHANGE ACT**

2          65.    SunPower and the Insider Defendants are liable for making false statements or

3    failing to disclose adverse facts known to them about SunPower.  SunPower and the Insider

4    Defendants are further liable pursuant to SEC Rule 10b-5(a) & (c) for engaging in a scheme to

5    defraud and course of fraudulent business conduct.  Their fraudulent scheme and course of

6    business operated as a fraud or deceit on purchasers of SunPower publicly traded securities, as

7    it: (i) deceived the investing public regarding SunPower's earnings, income from operations, net

8    income, gross profit and net income per share; (ii) deceived the investing public regarding

9    SunPower's accounting practices and internal controls; (iii) artificially inflated the price of

10   SunPower's securities; (iv) enabled defendants to consummate the approximately $450 million

11   April 2009 Offerings at artificially inflated prices; and (v) caused Lead Plaintiffs and other

12   members of the Class to purchase SunPower publicly traded securities at inflated prices and be

13   damaged thereby.

14         **A.     Substantive Allegations**

15                **1.     Company Background**

16         66.    Founded by former Stanford University electrical engineering professor Dr.

17   Richard Swanson in 1985, SunPower was incorporated to commercialize high efficiency

18   photovoltaic cell technology for use in solar concentrators.  In 2002, Cypress, led by its CEO T.J.

19   Rodgers, announced plans to invest $8.8 million for a 44% stake in SunPower.  In November

20   2005, Cypress, took SunPower public in a wildly successful initial public offering ("IPO") of 7.7

21   million shares.  Between SunPower's November 2005 IPO and December 2007, the Company's

22   stock price experienced significant growth.

23         67.    While SunPower's founder, Dr. Swanson, is still widely viewed as an early

24   visionary in the alternative energy movement, T.J. Rodgers has long been an outspoken and

25   fierce critic of the environmental benefits Dr. Swanson first created SunPower to provide. In an

26   article appearing in *Fortune Magazine* in October 2007 titled "For Solar Power, the Future Looks

27   Bright," Rodgers was quoted as saying that "[t]he group that is most vehement about global

28

warming represent to me *some of the worst people in the world . . . I dislike them so much, it's difficult to listen to what they have to say objectively*." Even if Dr. Swanson's and Rodgers' philosophies on the benefits of solar energy may diverge somewhat, the ties between Cypress and SunPower run deep.

68.     To this day, Rodgers remains SunPower's Chairman of the Board of Directors and Dr. Swanson serves as the Company's Chief Technology Officer and President Emeritus. Hernandez, SunPower's former CFO, was formerly Vice President of Finance and Administration and CFO for Cypress, including Cypress' Philippine headquarters from 1994 to 2005.   In 2005, Hernandez, who obtained his CPA license from the Philippine Institute of Certified Public Accountants, left Cypress to become SunPower's CFO.

69.     Announcing Hernandez's new role as SunPower's CFO, on April 22, 2005, Rodgers claimed that Hernandez's "addition to the SunPower team enables our most important subsidiary to leverage the skills of one of the most experienced CFOs in the semiconductor industry as it prepares for its next phase of development.  As a native of the Philippines, Manny [Hernandez] also understands the nuances of doing business there."  Hernandez's Filipino background and his participation at the executive management level at both Cypress and SunPower exemplify SunPower's senior management's deep ties to the Philippines where, to this day, the vast majority of SunPower's manufacturing takes place and where the Company has most of its personnel and physical assets:[6]

| SunPower's Global Operations | | | | |
|---|---|---|---|---|
| | **Philippines** | U.S. | Other | Total |
| Total number of employees | **4,710** **87%** | 540 10% | 150 3% | 5,400 100% |
| Total value of property | **$583M** **94%** | $38M 6% | $1M 0% | $622M 100% |

---

[6] Manufacturing solar products in the Philippines purportedly offers SunPower lower costs and tax advantages.

70.   On October 20, 2008, just weeks before the Company's November 4, 2008, withdrawal of 4Q08 guidance, Hernandez "resigned" as SunPower's CFO and was replaced by the Company's current CFO, Arriola.  From the beginning of the Class Period until his departure in October 2008, Hernandez had sufficient experience, knowledge and involvement in the Company's financial operations to ensure that proper financial reporting structures were implemented at the Company and to immediately recognize the $15+ million expense variances that were inflating inventory on the Company's balance sheet rather than where the expenses belonged, in cost of sales on its income statement.

71.   Prior to and throughout the Class Period, SunPower emphasized its purported competitive advantage of higher margins through lower manufacturing costs.  In November 2006, SunPower announced its acquisition of Powerlight Corporation ("Powerlight") − a solar system integrator − which was completed in January 2007 for $334 million.  Commenting on the acquisition, Werner said the aim of the combined companies was to "accelerate the reduction of solar power costs."  SunPower repeatedly touted the Powerlight acquisition as part of the Company's "vertical integration" strategy that would reduce costs and improve margins by giving the Company "visibility" into all aspects of its operations and purportedly making it more insulated from oversupply than its competitors.

72.   A Cowen & Company analyst commented on November 12, 2008, that "[t]he acquisition of Powerlight brought value added products for systems integration, project design and services capability . . . .  Margins should also expand, thanks to lower costs for silicon . . ."  Macquarie Research Equities also noted that "SunPower's vertical integration affords the company control over more steps along the value chain, enabling it an opportunity to better control costs while also being able to deliver customers a higher-quality, more integrated solution."  On January 11, 2009, analysts at Merriman Curhan Ford wrote that "[v]ertical integration supports cost out strategy.  SunPower's acquisition of PowerLight [] was a strategic positive . . . increasing visibility on SunPower's cost out strategy.  *In the near-term we believe cost reductions will be essential to preserve profitability and defend market share* . . . ."

73.     As alleged below, however, SunPower achieved the appearance of cost reduction and higher margins only through the accounting fraud. The inflated figures made the Company's gross margins appear superior to its competitors, thus artificially inflating the price of SunPower's securities throughout the Class Period.

### 2.     SunPower Encounters Unprecedented Challenges

74.     By the start of the Class Period, the emerging industry that Dr. Swanson once had led through technological innovations had become an oversupplied commodities market dominated by new solar companies with manufacturing facilities in China.  While the market value of the world's publicly traded solar companies stood at approximately $1 billion in 2004, by the end of 2007, that number had ballooned to approximately $71 billion.  Widespread concerns over global warming, high energy costs and dependence on foreign sources of oil, combined with large solar subsidies in Europe and China drove a "green-tech" IPO boom from 2006 through 2009.  As one analyst described these circumstances, "[t]he list of companies looking to cash in on the solar buzz seems to grow each day.  It seems anyone and everyone, particularly in China, who can get access to funding is either planning to make polysilicon or solar panels."  In fact, between 2007 and 2009, approximately thirty-five solar companies filed IPOs on U.S. exchanges and for the first time in its history, SunPower was being forced to compete directly against rivals who sold comparable products, but for far less.

75.     In addition, in the first half of 2008, the price for solar-grade polysilicon soared when demand exceeded available supplies.  Polysilicon is the main ingredient used by SunPower and its competitors in manufacturing solar cells, and accounts for approximately 80% of the cost of producing solar wafers.  Polysilicon became scarce between 2005 and 2008 due, in part, to the fact that silicon manufacturers declined to add capacity following the 2001 collapse of the semiconductor industry.  As the chart below demonstrates, in the second half of 2008, however, the price of polysilicon dropped from $125-$150/kg in 4Q08 to $80-$100/kg in 1Q09 to below $65-$75/kg in 2Q09 due to increased investment, additional suppliers entering the marketplace and better availability of raw materials:



76.    Unlike some of its newer competitors, the price SunPower paid for polysilicon during the Class Period was fixed by long-term supply agreements the Company had entered into between January 2006 and January 2008, a time when the price of polysilicon was at all-time highs:

| Polysilicon Supplier | Signed | Term | Expires | Cost |
|---|---|---|---|---|
| M. Setek Co., Ltd. | 5/06 | 2 years | 1/13 | $500 million |
| DC Chemical Co., Ltd. | 7/06 | 6 years | 7/12 | $250 million |
| ErSol Energy AG | 8/06 | 5 years | 8/11 | $125 million |
| Woojin Conway | 9/06 | 5 years | 9/11 | $250 million |
| REC SiTech AS | 10/06 | 1 year | 10/07 | $20 million |
| Q-Cells SE | 10/06 | 5 years | 10/11 | $150 million |
| Hemlock Semiconductor Corporation | 7/07 | 10 years | 7/17 | n/a |

77.    As polysilicon prices plummeted, SunPower was nevertheless forced to meet its long-term contractual obligations and, for instance, utilize approximately $291 million in

---

prepayments made to polysilicon suppliers like Hemlock Semiconductor Corporation at higher-than-market prices over several years.  At the same time, SunPower was under intense pressure during the Class Period to lower the price of its modules to remain competitive, and some of SunPower's larger customers were beginning to complain that SunPower's solar modules were "not attractive" given their vastly higher prices and, in some cases, tendency to operate poorly. SunPower's use of higher-grade (and more expensive) monocrystalline polysilicon − rather than the lower quality multicrystalline polysilicon used by many of its competitors − also made it difficult for SunPower to quickly adjust its products and pricing from high-quality to low-cost in a rapidly-shifting solar marketplace.  During roughly the same period that polysilicon prices were falling, Chinese solar companies, in particular, began aggressively pushing down the price of solar panels by almost half between 2008 and 2009.

78.     While increased competition was a positive development for consumers and the broader solar market, it proved disastrous for SunPower which had sought to differentiate itself as a company that sold "higher-quality" products worthy of significant price premiums.   In reality, while SunPower's cells were modestly more efficient than those of its competitors, its manufacturing costs were approximately 40-45% higher than some of its Asian peers, whose non-polysilicon costs were approximately $0.90-$0.95/watt compared to SunPower's non-polysilicon costs of approximately $1.32/watt.  Summing up market sentiment at the time, one analyst noted that SunPower was "under intense pressure to lower the prices of its modules from many end-use customers."  Rather than lower its prices to compete against less expensive brands, SunPower's management reported fictitious lower costs and higher margins by violating GAAP.

79.     An article appearing in *Forbes* following the Class Period succinctly explained the challenges the Company had faced during the Class Period: "[a] big boom in manufacturing capacity in Asia, the economic slowdown [and] cheaper raw materials . . . have combined to push panel prices down sharply over the past 18 months.  New Chinese entrants like Trina and Yingli have burst on the California scene . . . going from almost nowhere to third and fifth highest market share [] this y e a r  .  .  .  .  ***Almost all of this growth is coming out of the hide of U.S.-based***

***SunPower, historically California's biggest player***.  SunPower makes the world's most efficient solar panels and the company's designs are sleek.  SunPower hoped that these features would allow it to continue to charge higher prices and hold on to market share."  Unable to protect its market share (and maintain its lofty stock price) through product innovation and the quality and reputation of its "brand," defendants resorted to the fraudulent accounting scheme alleged herein.

### 3. Defendants' Fraudulent Class Period Scheme

80.     Throughout the Class Period, SunPower and the Insider Defendants repeatedly promoted SunPower's purported key competitive advantages as: (i) cost (*i.e.,* "[d]irect control of costs across the value chain"); (ii) technology (*i.e.*, "[h]ighest efficiency solar cells, panels and systems"); (iii) brand (*i.e.,* "brand preference" and "aesthetics"); and (iv) people (*i.e.*, "[r]ecruit, hire and retain the best people").  Defendants' now-admitted accounting violations became a necessary component of the Company's ability to report strong gross margins and demonstrate that SunPower was controlling costs.  SunPower and the Insider Defendants manipulated ***these*** metrics, in particular, because they knew that investors were deeply concerned about the Company's margins and costs.  As one analyst commented during the Class Period, "we continue to see management's ability to drive costs as the greatest intermediate term factor to determine the success of [SunPower's] model."

> **a)     The Insider Defendants Determined Expense Budgets, Closely Monitored Performance To Budget, And Knew Of Or Recklessly Disregarded The Accounting Manipulations Required To Meet Expense Budget Targets**

81.     The Insider Defendants closely monitored the record keeping and accounting functions where the falsification occurred.  The Insider Defendants set expense budgets and closely monitored performance to budget.  Defendant Trinidad devised SunPower's 5-year cost reduction plan and was responsible for ensuring the Company – particularly the Philippines operations – met the aggressive cost-cutting goals.  As explained below, the Insider Defendants were responsible for determining operating budgets and closely monitored the Company's

1   performance against those budgets through frequent and regular meetings, videoconferences, and

2   travel between San Jose and the Philippines.

3         82.   High-level accounting personnel raised questionable accounting adjustments with

4   Rodman and Hernandez, who traveled to the Philippines to investigate. Confidential Witness

5   ("CW") 4 was the Controller for SunPower's Systems division from 2007 through July 2009.

6   CW 4 had worked for PowerLight since 2001 and joined SunPower when it acquired PowerLight

7   in 2007. As a cost-cutting measure, SunPower began moving certain functions to the Philippines

8   in 2007; shortly thereafter, nearly all of the Company's manufacturing and assembly took place

9   in the Philippines, and the vast majority of the Company's personnel and physical assets were

10  located in Philippines. CW 4 explained that Rodman was the one driving the relocation, first

11  with accounts payable and the inventory management. When SunPower adopted the Oracle

12  Enterprise Resource Planning ("ERP") software system by approximately 2008, the Philippines

13  had the same accounting system and processes as San Jose.

14        83.   By approximately 2009, all inventory accounting was controlled by SunPower

15  personnel in the Philippines. Trinidad, the Philippines Controller, reported to Rodman and

16  Rodman reported to Hernandez and then Arriola, following Hernandez's "retirement."

17  According to CW 4, Rodman paid close attention to expenses and the accounting team in the

18  Philippines furnished Rodman with monthly reports. Once every quarter, Rodman or Hernandez

19  would travel to the Philippines and spend an entire week reviewing financials and any issues.

20  CW 4 also attended weekly meetings with Hernandez and Rodman. CW 4 described executive

21  review meetings known as "balance sheet reviews," which were always attended by the CFOs,

22  Rodman, Trinidad, and others. The purpose of the "balance sheet review" meetings was to go

23  through the Company's operations. If there were any issues that were questioned, they were

24  always reported to Rodman and it was understood that he would escalate it. Hernandez also

25  attended the quarterly reviews where accounting personnel went through the books and details of

26  the accounts. CW 4 described receiving questionable cost adjustments for materials from the

27  Philippines every quarter, which were never explained. Those concerns were raised with

28

Rodman.  For example, CW 4 raised concerns with Rodman over the unexplained adjustments but Rodman would always respond that he was going to the Philippines and would look into it. Whenever Rodman could not go, Hernandez would take his place, but CW 4 never received an answer to any of the questionable adjustments that were challenged.

84.     Additional confidential witnesses corroborate that the Insider Defendants monitored expense accounting at a very detailed level and were in a position to know that the data was being manipulated.  CW 5 was SunPower's Director of Worldwide Sales Operations from October 2007 to February 2009.  CW 5's responsibilities included revenue planning and forecasting, and reporting and analysis.  According to CW 5, SunPower was very driven to meet revenue and expense forecasts, and monitoring the Company's progress against those targets. Because CW 5 was responsible for revenue planning and forecasting, he/she sat in on meetings with SunPower executives where revenue forecasts and plans were discussed.  According to CW 5, the company was very quarterly driven as there was definitely a "cadence" or rhythm that the Company followed each quarter that involved a set of conference calls or video conferences to discuss plans and projections.  It was a pretty formalized process that the Company would plan almost to an excess.

85.     According to CW 5, SunPower had four to five different planning sessions each year.  First, SunPower would begin every year by going through its multi-year plan, which was usually a five to seven year forecast.  A subset of the multi-year plan was the Annual Operating Plan ("AOP").  That was something done every year that was signed off on by the executive management team and became the operating "bible" for that calendar year.  According to CW 5, the AOP would be stamped January 1st of each year and would establish a four to eight quarter view or forecast of what sales and manufacturing thought they could build, sell, etc.  SunPower executives would go through the forecast meetings refreshing AOP's, meaning whatever number was set at the beginning of the quarter would be religiously measured until they got to it by the end of the quarter.  Each AOP was measured against or integrated into the larger, five or seven year plan.

86.     Second, SunPower had a quarterly review cycle at the beginning of the quarter. The "Beginning of Quarter" ("BOQ") projections would include revenue, expenses, and profit and loss ("P&L") based on forecasts rolled up from the various SunPower divisions.

87.     Third, as the quarter would progress, SunPower would start an end of quarter ("EOQ") forecast, which would be used to measure actual performance against budget.

88.     The executive operating team attended the meetings regarding the multi-year, AOP, BOQ, EOQ plans, including Werner, Hernandez/Arriola, and COO Marty Neese.  CW 5, as Director of Sales Operations, was responsible for providing a revenue forecast, whether it was on a multi-year, annual, or quarterly basis.  SunPower's finance department would then roll up the revenue forecast with the forecasts of other SunPower divisions into a master file, which was subject approval and sign-off on by Werner, Hernandez/Arriola, and Neese.

89.     CW 5 confirmed that SunPower was closely monitoring margins and operating expenses very carefully and particularly at the end of quarters.  During the last week or the last two weeks of a quarter, conference calls with SunPower personnel including Werner and Hernandez/Arriola, were set up two to three times a week, which usually lasted about thirty minutes.  CW 5 also reported that SunPower executives held video conferences during which they would be looking at the financial forecast and would scrutinize manufacturing operations as closely as sales.  The Philippines was a big cost center for the Company.  There was tremendous focus by the executives into what was happening in the Philippines from an absorption and operating expense perspective and a tremendous amount of focus into the financial performance of the country.  CW 5 described weekly or bi-weekly meetings where the Philippines operations would be discussed.  Tom [Werner] would have an executive staff meeting that was just the executives where they would go through sensitive topics.  Then there was another set of meetings or calls that Werner would have with Manny Hernandez or COO Marty Neese that specifically focused on the Philippines in which they would do a routine, regularly scheduled review session.  The calls that focused on the Philippines would be quarterly at a minimum, if not more frequently.

90.     CW 6, a group leader in SunPower's Systems R&D division from May 2007 through May 2009, also stated that Werner, Hernandez and Arriola kept track of everything.  CW 6 confirmed that in approximately mid-2008, Rodman began getting more involved in tracking costs.  Every expenditure at SunPower had to be approved by San Jose headquarters.  Even low-dollar expenses had to be approved in advance by her/his department head, Jack Peurach, and then by Rodman.  The approval process was taken very seriously.

91.     CW 6 stated that, during the Class Period, SunPower had a five year plan to cut costs in half.  Costs for projects at SunPower were tracked through "Stage Gates."  At each stage, the Company would compare the progress to the original plan and look at cost variances.  If they were not on target with the plan, it would come up as a "red flag" – literally a red-colored indication on the spreadsheets that were circulated to SunPower executives.  The "dashboard" reports would be red if the Company was not on target to plan.  During the Class Period, CW 6 routinely saw red dashboards.

92.     CW 6 also explained that SunPower closely tracked the "Levelized Cost of Energy" ("LCOE") for its products, which SunPower was always seeking to reduce.  The LCOE reflects SunPower's production costs measured against the solar energy output for SunPower's products.  LCOE includes the Company's manufacturing costs, raw materials, and fixed costs (*i.e.*, salaries, overhead, depreciation) – the constituents of SunPower's cost of goods sold.  SunPower's LCOE was a target that was tracked constantly by executive management.  According to CW 6, CEO Werner approved and signed off on the plans that set targets for the LCOE, which was a quarterly driven exercise and a Company priority.  Werner, the CFOs Hernandez and Arriola, Rodman and other executives then monitored the trend line for cost reduction performance during each quarter, including frequent video conferences to discuss performance to budget and how to reduce costs.  Video conferences were scheduled into the early evening so that they could include employees in the Philippines where it was early morning.  It was a Company-wide exercise; everything was driven by those plans.

93.     The quarter-end manual adjustments that forced cost of sales to be in line with SunPower's operating expense budget simply ***moved*** budget variances from cost of sales on the income statement to inventory on the balance sheet.  The resulting inventory variances were equally apparent because the variances were the same enormous amounts as when they were originally (and properly) recorded in cost of sales.

94.     As the Company's Restatement indicates, expenses were initially recorded correctly during each quarter of the Class Period.  However, at the end of each quarter, multi-million dollar adjustments were manually made to report cost of sales and sales margins that conformed to expense budgets.  According to several former SunPower employees, such adjustments could only be made to SunPower's computerized accounting system by a select group of SunPower executives with "Superuser" access, including the Insider Defendants.

95.     CW 7, a SunPower shift manager in the Shared Services Organization in the Philippines from January 2009 to June 11, 2009, who managed multiple business lines including finance, reported that SunPower held a Company-wide teleconference called "VAR" meetings every Wednesday between 3:00 a.m. and 4:00 a.m. Manila time.  The meetings were led by Cliff Kalinowski, SunPower's Director of Global Services.   Regarding SunPower's San Jose executives control over Philippines personnel, CW 7 explained that management set the pace and the tone.  They told SunPower personnel what to do.  CW 7 further explained that all SunPower overseas operations, including the Philippines, got all of their orders from North America.  North America dictated the way reports and documentation should be, down to the font.

96.     As part of his job responsibilities, CW 7 reviewed reports from the finance division.  CW 7 previously worked at an investment bank and is familiar with financial reporting requirements.  According to CW 7, the Company was implementing the new Company-wide Oracle ERP system, which is a computerized software tool used by large companies to tie together multiple business units and coordinate forecasting and financial reporting functions. CW 7, described a general practice among employees in the finance, planning, logistics, and business analytics departments at SunPower of exporting data from the Oracle ERP system to

Excel spreadsheets, where the data was manually adjusted. This practice occurred in both SunPower's U.S. and Philippines facilities.

97. The ability to *import* manually adjusted entries back into the Oracle system (and, therefore, the Company's general ledger), however, was strictly limited. The C-level executives and Directors (*i.e.*, SunPower executives one level below the CEO, CFO and COO) had "Superuser" access, which means they could make modifications to financial data. Managers (*i.e.*, a category below Directors) can export data but they cannot import data; meaning, only "Superusers" could replace original, correct accounting entries with manually-adjusted entries.

98. CW 8 also confirmed that there were limits of authority as to who could make large journal entries. CW 8 was the Regional Controller in SunPower's Shared Services Organization from September 2007 to September 2010 and reported to Rodman. Journal entries in the tens of thousands of dollars (or more) required Rodman's signature. Accordingly, only high-level executives could authorize large journal entries or adjustments.

**b)** **The Insider Defendants' Scheme Overstated**
**SunPower's Reported Margins And Profitability**

99. The Class Period commences on April 17, 2008, with the Company release of its false 1Q08 results. Cognizant that analysts had begun to focus on the Company's margins, the Company reported a 92% increase in revenue (year-on-year), overall gross margin of 19.5% and total operating income of $14.8 million in 1Q08. In truth, as the Company has now admitted, its: (i) publicly reported gross margin for that period was overstated by $1.7 million; (ii) pre-tax net income was overstated by 12%; (iii) EPS was overstated by 8%; and (iv) component segment gross margin was overstated by 10%.[7] Relying on the Company's misrepresentations, a Wedbush Morgan Securities report maintained its "$132 price target" and "reiterate[d] *STRONG BUY* rating."

---

[7] Overstatement amounts and percentages are based on SunPower's retrospectively adjusted financial results.

100.   On July 17, 2008, the Company publicly reported 2Q08 combined gross margin of 24.3%, total operating income of $45 million and diluted net income per share of $0.34. Again, the market was stunned by SunPower's seemingly gravity-defying results.   Thomas Wiesel Partners wrote that "SunPower reported 2Q08 results that handily beat our and Street estimates . . . ."  Morgan Stanley Research was pleased that the Company's "[m]argins continue to improve as lower priced silicon and greater than expected savings are realized."  Macquarie Research Equities wrote that SunPower was "[s]taying ahead of the curve" and that the Company "stands out amidst the crowded solar landscape . . . ." Jefferies & Company, Inc. praised SunPower's "improving margin outlook."  Cowen and Company characterized these as "blowout Q2 results" for the Company.   In response to SunPower's 2Q08 results, investors drove the Company's stock price from $75.32 on July 17, 2008, to $76.70 on July 18, 2008.

101.   Unbeknownst to investors, the Company's 2Q08 reported results were materially false and misleading as: (i) gross margin was overstated by 10%; (ii) pre-tax income was overstated by 29%; (iii) EPS was overstated by 16%; (iv) components gross margin rate was overstated by 18%; and (v) systems gross margin rate was overstated by 7%. In addition, the Company's cost of revenue was $3.8 million and $4.8 million higher than reported in systems and components, respectively, and the Company's publicly reported net income was off by $4.3 million.

102.   On October 16, 2008, the Company announced its financial results for 3Q08 and provided strong guidance for 4Q08.  As the Company has now admitted, SunPower again reported overstated gross margins, pre-tax income, EPS and components segment gross margin − this time by 3%, 6%, 7% and 6%, respectively.   On October 20, 2008, SunPower's CFO, Hernandez, "resigned" and was replaced by the Company's current CFO, Arriola.

103.   Three weeks later, on November 4, 2008, SunPower suddenly withdrew its 4Q08 guidance, citing "foreign exchange rate volatility."  Investors were "spooked" by the Company's announcement.  Indeed, during the earnings conference call discussing the Company's reported 3Q08 results, management was asked specifically whether its 4Q08 guidance accounted for

fluctuations in the foreign currency exchange rate, and Hernandez replied that the Company had been "conservative."   Analyst Michael Carboy wrote that the announcement "rattles our confidence" in SunPower's financial and risk management practices.   Wedbush Morgan Securities analyst Al Kaschalk wrote that the "reduced confidence by the Street in the management team as it lowers outlook three weeks after earnings report . . . .   Management will need to work to regain some of its tarnished image after lowering guidance a mere three weeks after reporting Q3:08 earnings."

104.    On November 11, 2008, at an investor conference hosted by SunPower in Las Vegas, Nevada, defendants reassured investors that the Company had "identified and corrected" the issues leading to its bungled 4Q08 guidance.   While analysts aptly noted that "finance department staff will receive *close scrutiny* for the error," defendants allowed the deficiencies in SunPower's internal controls to go unabated for another year.

105.    As the Class Period progressed, the market had begun to express rising concern with SunPower's margins and cost controls.   For instance, Kaufman Bros. Equity Research stated that "we believe margins will be adversely affected whether or not SunPower decides to provide credit to its customers who are no longer able to access capital markets."   On November 12, 2008, William & Blair Company confirmed broader market concern with the Company's ability to deliver strong margins, noting "we continue to see management's ability to drive costs down as the greatest intermediate term factor to the success of the model."   On November 13, 2008, relying on defendants' false statements, J.P. Morgan noted that "[d]emand [at SunPower] remains strong, no signs of slowdown . . . which is counter to commentary coming out of China [and] [w]e are concerned about increased pricing pressure on solar system components, including modules, *but believe SunPower will be able to outperform its peers due to its product differentiation and cost reduction roadmap*."

106.    On January 29, 2009, the Company issued a press release again announcing "record" results for 4Q08 and full year 2008. For the 4Q08, SunPower reported gross margin of 27.9%, total operating income of $55 million and net income per diluted share of $0.35.

Unbeknownst to investors, however, these results were false. EPS, for example, was overstated by 10%. The chart below demonstrates the EPS effect of defendants' fraud for all of 2008:



107. By the start of 2009, demand for SunPower products had waned. Meanwhile, the market price for polysilicon had dropped dramatically but SunPower was locked in to high-price polysilicon supply contracts. In response to these competitive pressures, SunPower reduced production at its core Philippines production facilities. In an analyst conference call in April 2009, defendant Werner downplayed the impact of market conditions and claimed that SunPower was "moderating" its manufacturing output to match reduced demand. In truth, the production slowdown at SunPower's Philippines manufacturing facilities further adversely affected SunPower's margins. The unplanned production slowdown only increased pressures on margins because the Company continued to incur fixed costs, such as salaries, insurance and depreciation. Such fixed costs are normally absorbed into the cost of manufactured inventory during a period. When factory utilization is reduced below a manufacturer's "normal" production capacity, the reduced amount of manufactured inventory serves to cap the amount of fixed cost of sales in the current period.

108. On April 23, 2009, the Company issued a press release announcing 1Q09 results and reporting, among other items, gross margin of 22.3%. In connection with the Company's 1Q09 results, Werner claimed that:

[o]ur quarterly performance was impacted by seasonality, the continuing effects of the credit crisis and difficult economic conditions. ***Despite these headwinds, we were able to deliver strong gross margins in our Components business and positive non-GAAP net income***. We have responded to current market conditions by moving to a demand-driven manufacturing model and reducing our planned operating expenses to align with our adjusted revenue outlook.

109.    In truth, the only reason SunPower managed to "deliver strong gross margins" and "positive non-GAAP net income" was because the Company had understated its cost of goods sold for 1Q09. In the Restatement, SunPower's 1Q09 non-GAAP EPS was reduced by $0.14, from $0.05 to a ***loss*** of $0.09 per share. For 1Q09, on a GAAP basis, SunPower overstated its gross margin and understated its pre-tax loss by $15.5 million each (48% and 52%, respectively), and reported a GAAP loss per share of $0.06 instead of the $0.12 per share it actually lost.[8]

110.    In April 2009, the Company unexpectedly announced the April 2009 Offerings, including: (1) up to $230 million in 4.75% Senior Convertible Debentures due 2014; and (2) up to 10.35 million shares of Class A stock at $22 per share. The Company completed the April 2009 Offerings on May 4, 2009, and received net proceeds of $218.9 million for all 10.35 million shares of its Class A common stock and net proceeds of $225 million from issuing all $230 million in principal amount of its 4.75% convertible debt.

111.    Notably, prior to the April 2009 Offerings, the Company had repeatedly assured investors that the Company was "free cash flow positive" and would not need to tap the markets for additional capital. In November 2008, a Deutsche Bank analyst noted that "[t]he company also indicated that its business model is fully funded; the company should be ***free cash flow positive in 2009, and should not have a need to tap the public markets anytime soon***." After the Class Period, analysts took a dimmer view, noting that the April 2009 Offerings were "priced ***on the assumption that its financial statements were fairly represented*** [and] [t]he accounting errors [revealed by the Company's Restatement] bring into question the fairness of the valuation."

---

[8]  2008 and 2009 amounts and percentages based on SunPower's March 19, 2010 restated financial statements.

Hapoalim Securities ("Hapoalim") went one step further, advising its clients that defendants knew "how challenging things could become this [2009] year, and thus [motivating] its desire to 'cash in' on its share price at these levels."

112.    On July 23, 2009, SunPower issued a press release reporting its results for 2Q09. For 2Q09, SunPower overstated its gross margin and pre-tax income by $17.8 million (44%) and $18.9 million (305%), respectively, and reported EPS of $0.25 instead of the $0.16 per share it actually made.  Responding to investor focus on margins and costs, Werner stated that "[o]ur manufacturing costs are competitive today and we are ahead of plan to achieve our cost reduction goals."  Again, analysts were impressed by the Company's strong reported results. Analysts at Gabelli & Co. noted that they were "changing [their] recommendation on SunPower Corporation from Sell to Buy following the company's strong performance in 2Q09 . . . ." Canaccord Adams wrote that "SunPower thoroughly beat expectations on all sides."  On July 24, 2009, Brigantine Advisors noted that "[w]ith a backdrop of multiple negative pre-announcements recently from German solar companies, SunPower's strong Q2 *was a surprise to many*." Excluding one-time charges, *Forbes* described the Company's EPS as "handily" beating estimates.  In fact, the Company's 2Q09 results were false and, but for the Company's accounting fraud, SunPower would have badly missed, rather than handily beat, 2Q09 consensus EPS.

113.    Following the Company's 2Q09 announcement of "continued success" due to "reducing inventory levels and [] controlling variable expenses," the price of SunPower common stock rose from $24.85 on July 23, 2009, to $32.04 on July 24, 2009 − a one day increase of nearly 30%.

114.    On October 22, 2009, SunPower issued a press release reporting its results for 3Q09.  Werner commented on the Company's performance: "[w]ith strong market demand continuing, all of our manufacturing facilities are now fully operational, resulting in unit cost reductions in line with our plan."  As alleged herein, the Company's "cost reductions" had been due, in large measure to, in the Company's own words, SunPower's "unsubstantiated accounting

1    entries."   In the same press release, the Company falsely reported gross margins of 19.1%,

2    operating income of $34.6 million and net income per diluted share of $0.13.  As admitted in the

3    Restatement, for the nine months ended September 27, 2009 (3Q09), SunPower overstated its

4    gross margin and pre-tax income by $22.8 million (13% and 174%, respectively), and reported

5    EPS of $0.35 instead of the $0.27 per share it actually made.

6                    **4.    The Truth Is Revealed**

7            115.    After the markets closed on November 16, 2009, the Company issued a press

8    release disclosing "unsubstantiated accounting entries" in its previous financial reports.  The

9    press release admitted that the Company's Class Period financial statements included materially

10   false and misleading statements.  The Company also advised investors they should no longer rely

11   upon information contained in SunPower's 2009 quarterly reports or 2008 Form 10-K.   On

12   November 17, 2009, the Company's stock closed 19% lower than the previous day.

13          116.    The press release stated, in relevant part:

14          based upon an internal review of its Philippine manufacturing operations, ***the
            company believes there may have been unsubstantiated accounting entries made in***
15          ***the first three quarters of 2009, some of which relate to the company's fiscal year***
            ***ended December 28, 2008***.   Management informed the Audit Committee of these
16          entries and the Audit Committee immediately commenced an investigation of the matter, which is ongoing.   The company's
17          Audit Committee and management have discussed these issues with the company's
            independent auditors.
18
            Based upon the preliminary findings of the ongoing investigation, the Audit
19          Committee to date has identified accounting entries in the Philippines that may
            have overstated expenses in its cost of goods sold of approximately $1 million in
20          the first quarter ending March 29, 2009, and understated expenses in its cost of
            goods sold of approximately $14 million in the second quarter ending June 28,
21          2009 and approximately $2 million in the third quarter ending September 27, 2009.
            The company previously reported 2009 quarterly revenues and operating income
22          under Generally Accepted Accounting Principles (GAAP) of $213.8 million and a
            loss of $2.5 million, respectively, in the first quarter, $297.6 million and $9.9
23          million, respectively, in the second quarter and $466.3 million and $34.6 million,
            respectively, in the third quarter.    Full-year 2008 revenues were reported of
24          $1,434.9 million and GAAP operating income of $167.5 million.

25          If the preliminary investigation findings prove to be final, they could impact the
            company's previously reported interim 2009 financial results.   The company is
26          also in the process of evaluating the financial impact of these adjustments on its
            previously reported results for the fiscal year and interim periods ended December
27          28, 2008.  The company currently estimates that approximately $9 million of the
            identified accounting entries should have been recorded in 2008.
28

---

The company is working with the Audit Committee, the Committee's outside experts, and with the company's independent auditors to determine if any restatements of the 2009 interim financial reports and the 2008 annual report will be necessary.  Until the investigation is complete and such a determination is made, there can be no assurance that broader issues do not exist.  Therefore, the company's previously issued interim financial statements for each of the 2009 quarterly periods, the previously reported financial results for the fiscal year ending December 28, 2008, the financial information in its quarterly reports on Form 10-Q for the 2009 quarters, the financial information in the 2008 annual report on Form 10-K, and the guidance provided by the company for the 2009 fiscal year, **should no longer be relied upon**.  The company anticipates providing an update on the investigation within the next 30 days.

117.   Notably, the Company's November 16, 2009 announcement indicated that the accounting violations in 1Q09 – a critical quarter for the Company as it immediately preceded the April 2009 Offerings that raised nearly $450 million − **overstated** cost of goods sold by $1 million.  However, as the Company later admitted in its Restatement, the cost of goods sold for 1Q09 was actually **understated** by $15.5 million.  Citigroup analyst Timothy Arcuri noted that while SunPower's accounting errors allowed the Company to beat the street's 2Q09 consensus EPS estimate of $0.14 (non-GAAP basis) by nearly $0.10, without the errors "it would have actually missed consensus by [approximately] $0.03-0.04."  Thus, but for the accounting fraud, SunPower would have badly missed 2Q09 EPS estimates.

118.   Following the November 16, 2009 announcement, at least one analyst noted the fortuitous timing of the most significant understatement of costs and was bluntly dismissive of the Company's effort to blame its operations in the Philippines for its accounting problems: "what's most troubling to us is the benefit SunPower's stock experienced following its stellar C2Q09 results, allowing the company to circumvent the share price pressure many of its peers were experiencing at the time.  ***This effectively created an unlevel playing field with which SunPower used to tap the capital markets to boost its liquidity positioning***.  Our conclusions here are predicated on our view that two substantial accounting errors in a matter of less than one year are indicative of a management team that may be using ***accounting chicanery to smooth out results in tough times***."

119.     Deutsche Bank analyst Steve O'Rourke also questioned management's integrity and drew a direct link between the November 16, 2009 disclosure and the prior November 4, 2008 disclosure of defective internal controls (*see* ¶¶103, 236): "We believe **the accounting errors call the company's credibility more into question** than the business model. Although the nuances are different, we note the announcement of accounting errors is reminiscent of inadequate hedging disclosed by the company soon after it announced 3Q08 results. . . ."  A report from Collins Stewart LLC noted that "[t]he indicated [preliminary figures] suggest that the maximum impact would have occurred in 2Q09 when the reported GAAP gross margin of 19.6% would have overstated the actual gross margin by 470 bps.  ***That was in our view a critical quarter for the company following its April 28 9 million share secondary offering***.  The 2Q09 results drove a 29% surge in the shares the day following the report (7/24/09)."  Other analysts immediately cut their ratings on SunPower and advised investors to remain cautious until more information about the Company's accounting issues surfaced.  One commentator, Toby Shute, was particularly skeptical:

> SunPower . . . easily had the worst week in the solar world, disclosing accounting irregularities that really socked its stock price. The most distorted figure appears to be the second quarter's operating expenses, understated by some $14 million. The company reported $9.9 million in operating income that quarter.  If you ascribe [sic] to the cockroach theory of accounting shenanigans, in which one visible cockroach is evidence of many more, then SunPower is a company to avoid.  Many analysts have advised clients to do just that.

120.     The comments by Citigroup, Hapoalim, Deutsche Bank, and Shute were all tempered by the fact that they were still in the dark about the still undisclosed full impact on SunPower's 1Q09 results.

### 5.     Post-Class Period Events

121.     On December 15, 2009, the Company issued a press release announcing "significant progress in its internal investigation."   According to the Company, "[t]he investigation is being conducted under the direction of the SunPower board of director's audit committee, with the assistance of outside legal and accounting experts.  The investigation to date is consistent with the preliminary findings announced on November 16, 2009.   The audit

committee is working with its experts and appropriate SunPower personnel to promptly complete a thorough investigation." As it turned out, the nature and extent of the accounting misconduct were *much worse* than defendants had led investors to expect.

122. On March 19, 2010, SunPower filed its delinquent 2009 Form 10-K with the SEC and issued its Restatement. SunPower restated its financial results for its fiscal year ended December 28, 2008, and for each of the quarters in 2008, as well as for the first three quarters of 2009. The extent of the accounting mistatements turned out to be far more dramatic than the Company had predicted earlier as it reduced previously reported operating income by $36 million ($13 million in 2008 and $23 million during the first three quarters of 2009), versus the Company's November 16, 2009 estimate of the error of just $15 million.

123. Under GAAP, financial statements can *only* be restated to correct material errors. SFAS No. 154, *Accounting Changes and Error Corrections* ("SFAS 154"), defines "Restatement" as "the process of revising previously issued financial statements to reflect the correction of an error in those financial statements.[9] SFAS 154, ¶2. SFAS 154 provides that "[a]ny error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior period financial statements. SFAS 154, ¶25.[10] By restating, defendants admitted that the Company's prior financial statements were materially false and misleading, that they contained material misstatements and omissions when they were originally issued and that SunPower had contemporaneous access to information that demonstrated the falsity of those statements.

124. Specifically, the Company admitted that:

the Audit Committee's investigation found that unsubstantiated entries (a) were made at the direction of the Philippines-based finance personnel in order to report

---

[9] SFAS 154 amended APB No. 20, *Accounting Changes,* for fiscal years ending after 2005. In the 3rd quarter of 2009, SFAS 154 was replaced by ASC § 250.10.XX, *Accounting Changes and Error Corrections.*

[10] SFAS 154 defines "[e]rrors in previously issued financial statements" as "resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of facts that existed at the time the financial statements were prepared."

---

results for manufacturing operations that would be consistent with internal expense projections, (b) generally resulted in an ***understatement of the Company's cost of goods sold***, and (c) were not directed or encouraged by, or done with the knowledge of, executive management.   During the course of the investigation, various accounting errors which required adjustments were also identified. Adjustments for these unsubstantiated entries and errors affected cost of goods sold and the following balance sheet accounts:

- Accounts payable and accrued liabilities: The investigation found that certain expenses were understated by (a) not sufficiently accruing expenses or (b) ***reversing previously recorded expenses through manual journal entries that were not based on actual transactions or reasonable estimates of expenses***.   The accounts primarily affected were accruals for manufacturing expenses such as subcontracted wafering costs, electricity, and freight and other accrued expenses. Unsubstantiated entries were also recorded to reduce uninvoiced receipts liability accounts, with an offsetting reduction to cost of goods sold.

- Inventories: The investigation found that ***unsubstantiated entries were made to increase inventory and decrease cost of goods sold by adjusting variance capitalization amounts***.   In addition, inventory obsolescence was understated for materials used in-house by wafering services of silicon ingots.

125.   The most significant impact of the Company's accounting fraud was for 1Q09 and 2Q09, which overstated SunPower's gross margin (GAAP) by $15.5 million (48%) and $17.8 million (44%), respectively.   The importance of 1Q09 is further heightened by the fact that the Company's results were made public on April 23, 2009, less than a week before it accessed the capital markets and raised nearly $450 million through debt and equity offerings on April 29, 2009.

126.   Despite defendant's admission that it was the Company's practice to ***"intentionally propose[] and/or approve[] journal entries that were not substantiated by actual transactions or costs"*** in clear violation of GAAP and contrary to their public statements in SEC filings, the Audit Committee sought to absolve current members of its executive management. The Company's Audit Committee also self-servingly sought to throw blame on unnamed employees in the Philippines, suggesting that the "unsubstantiated accounting entries were made at the direction of the Philippines-based finance personnel," who "violated the Company's code of business conduct and ethics."   The Audit Committee's findings, however, failed to mention the identity or even the job titles of any of the Philippines personnel they sought to blame.   Nor did

the Audit Committee's findings concede the obvious fact that, as the Company's Principal Accounting Officers, Hernandez and Arriola supervised and controlled the work of the accounting personnel in the Philippines; nor did it attempt to explain how any finance personnel could engage in admittedly intentional and material accounting misstatements concerning a core business unit for nearly two years without defendants' approval, knowledge or detection.

127.    Analysts were highly skeptical of the Audit Committee's purported finding that executive management was "unaware" of the widespread accounting fraud alleged herein.  As noted by Hapoalim analyst Gordon Johnson, defendants' attempt "to shift the blame [] on its team in the Philippines" was "misleading" when considering that "(1) the bulk of SunPower's manufacturing operations have been located in the Philippines since 2006, and (2) *the company's accounting responsibilities, globally, fall solely on senior management* (i.e., CEO and CFO). . . ." Johnson also bluntly dismissed the Company's effort to "dissuade the blame for this lapse in judgment from that of the U.S. management team to that of the team in the Philippines" and noted that its effort to do so "*further taints management's credibility* as it potentially 'shades' the truth (despite SunPower benefitting, considerably, for the accounting 'oversight')."  Other analysts noted that the accounting issues "cast some doubt on management's credibility."

128.    Former SunPower employees have also confirmed that the Company's accounting decisions were the responsibility of the CFO in SunPower's San Jose, California headquarters *(i.e.,* Hernandez and Arriola).  For instance, CW 1 began working at SunPower in connection with the PowerLight acquisition in January 2007 and was part of SunPower's Logistics Department for the Systems Division until January 2009.  CW 1 stated that members of the Philippines internal audit group came to San Jose every quarter and that the controller for the Philippines "ultimately had to run everything through [Hernandez or Arriola]."  According to CW 1, Rodman was the Company's "Deputy CFO" – the "second guy in line" to Hernandez.  "Everything had to go through [San Jose] because Manny [Hernandez] was there and the numbers had to be reported to Manny [Hernandez]."

129.    CW 2, a former Director of Supply Chain and Global Sourcing Management who worked at SunPower from January 2007 through January 2009, also confirmed strong links between the Company's essential Philippines operations and Hernandez and Arriola.   CW 2 stated that Hernandez "had a lot of responsibility for what was going on in the Philippines, certainly finance-wise."   Hernandez's strong ties to the Philippines and educational background as a Philippines-trained CPA further corroborate CW 2's statements and undermine the Company's effort to cast blame on a single unidentified employee in the Company's Philippine operations.   CW 2 also confirmed that SunPower "had accountants and analysts [in the Philippines] but the Philippines was not a decision-making or policy body.  They did, for the most part, what the corporate office [in San Jose] instructed them to do . . . . [F]rom an accounting perspective, most of the policy activities came out of [the corporate office in San Jose] . . . .  [I]t was the San Jose office which handled finances from a policy and procedure perspective."

130.    Similarly, CW 3, a former regional sales manager for SunPower's Components Division from June 2008 through January 2009 stated that "100% of SunPower's finances were managed out of San Jose."   CW 3 confirmed that there was no separate CEO or CFO for the Company's Philippines operations and that SunPower's San Jose accounting team frequently made "trips to the Philippines to review the books and [accounting] processes."

131.    On May 3, 2010, SunPower filed amended Form 10-Qs admitting, *for the first time*, that the Company had also materially misrepresented the Company's inventory component balances during the Class Period.   The Company's delinquent May 3, 2010 filings included the restated component inventory balances that had been omitted from the Restatement.   Prior to May 3, 2010, defendants had not disclosed these errors in SunPower's 2009 Form 10-K, and instead, claimed that "[t]he restatement ha[d] no material impact on net assets for any period affected, excluding the Audit Committee's investigation expenses of $3.6 million incurred during the fourth quarter 2009."

132.    SunPower had to inflate the inventory component balances so they would add up to the total inventory reported.  However, beginning in the third quarter of 2008 and accelerating in the first half of 2009, when SunPower reduced factory utilization, work-in-process had become particularly bloated.  The Insider Defendants knew about the high work-in-process balances because the top executives authorized the production slowdown in the first half of 2009 that caused it to surge.  Since work-in-process was already prompting questions from analysts, the Insider Defendants resorted to overstating other inventory components, raw materials and finished goods by tens of millions of dollars in order to concurrently understate the work-in-process by an equivalent amount.  Manipulation of the inventory balances required high-level coordination.

133.    On May 13, 2009, the Company filed its Form 10-Q for the quarter ended April 4, 2010.  In management's discussion of internal controls, SunPower listed the purported "remedial actions" it had undertaken to address the material weaknesses in internal controls that SunPower admitted led to its Restatement.  The Company claimed that, effective April 2010, it had suspended or terminated employees "involved in [the] unethical activities" that led to the Restatement.  Trinidad and Rodman were terminated from SunPower in April and May 2010, respectively.  Accounts of former SunPower employees confirm that both Rodman and Trinidad were fired because of their direct role in the accounting fraud.  For example, CW 9, a senior paralegal at SunPower's San Jose headquarters from June 2008 to August 2010, said that ***Rodman admitted during a conversation that he was fired because of the accounting issues***. CW 9 identified Trinidad's direct report, Cely Morana ("Morana"), as another SunPower Philippines employee fired because of her involvement in the accounting fraud.  CW 7 also understood that Morana was fired along with Trinidad because she made false accounting entries at Trinidad's direction.  According to CW 7, Trinidad was escorted out of the building.

134.    CW 8, the Regional Controller in SunPower's Shared Services Organization from September 2007 to September 2010 who reported to Rodman, also understood that Rodman and Trinidad were terminated for their involvement in the accounting fraud.  It was well-known by

SunPower employees that Rodman ran the manufacturing division in the Philippines and traveled between San Jose and the Philippines frequently.  According to CW 8, Trinidad was fired, along with others in the Philippines, and Rodman was also implicated in the unsubstantiated journal entries and may have been pushed out of the Company as a result.

135.    SunPower's May 13, 2009 Form 10-Q also conceded that the Company's failure to segregate budgeting and accounting functions – for example, by integrating the accounting and financial planning functions in the numerous and regular budget and performance reviews – constituted a material weakness that led to the Restatement.  In response, Sunpower identified "[s]egragation of duties between the financial planning and accounting functions" as a "remedial action" it was undertaking in the wake of the fraud.  Additionally, the Company claimed it was addressing its period-end closing processes in the Philippines to "reduce unnecessary manual journal entries."

**B.      Defendants' Materially False And Misleading Class Period Statements**

**1.      First Quarter 2008**

136.    The Class Period begins on April 17, 2008, with the announcement of SunPower's results for 1Q08 and raising guidance for the remainder of 2008. On that date, SunPower issued a press release titled *SunPower Reports First-Quarter 2008 Results; Company Raises FY 2008 Guidance,* and stated, in part, as follows:

> Revenue for the 2008 first quarter was $273.7 million, up 22% from prior- quarter revenue of $224.3 million and up 92% from year-ago first-quarter revenue of $142.3 million. The Components and Systems segments accounted for 35% and 65% of first-quarter revenue, respectively.
>
> *      *      *
>
> On a GAAP basis, SunPower reported **gross margin of 19.5%, total operating income of $14.8 million and diluted net income per share of $0.15**.

137.    The press release also reported pre-tax income of $17.8 million and gross margin of $53.3 million.

---

138.    In addition to the foregoing, the press release also quoted Werner, in relevant part, as follows:

Our first quarter performance reflects the value our customers attribute to SunPower's high-performance solar solutions. SunPower's market leadership will continue to be driven through our focus on brand, technology, cost and people. *We are building a strong brand based on sound fundamentals . . . .*

\*   \*   \*

SunPower is positioned to meet the needs of the market with industry-leading solar technology across the entire customer spectrum – from large-scale systems designed for utilities and large commercial clients to homeowners. Our proprietary technology delivers the highest output per unit area of any commercially available solar system and we intend to leverage this technology by aggressively expanding our solar cell production by more than 150% in 2008 compared to 2007. *This scale, combined with lower silicon costs, higher efficiencies, thinner wafers and on-going quality and cost improvements in our factories, will drive unit cost reduction. During the first quarter of 2008, we continued to meet or exceed our manufacturing targets across both of our fabs and our panel manufacturing facility.*

\*   \*   \*

We expect SunPower's silicon supply costs to decline by approximately 10% during 2008 compared to 2007 . . . .  This cost improvement will amplify our silicon utilization benefits achieved through higher cell efficiency and thinner wafers.  *We are on track to achieve our planned improvements in our cost structure, and therefore we expect to reach our target financial model of 30% gross margin, 10% operating expenses and 20% operating margin, on a non-GAAP basis, no later than the first quarter of 2009.*  We are also on track to realize our mission of reducing installed systems cost by 50% by 2012.

139.    On April 17, 2008, the Company hosted a conference call with analysts following their earnings announcements for 1Q08, where defendants trumpeted the Company's reduced costs and improved gross margins. Specifically, Werner stated:

Within manufacturing, we are implementing a wide range of initiatives to improve installed systems costs . . . .  With the outbound channel of a solar system accounting for approximately 30 to 50% of the overall installed cost, we have a significant opportunity to leverage our *vertical integration to drive down costs.*

\*   \*   \*

In our systems business, we are moving labor out of the field by developing factory assembled designs, scaling our supply chain and logistics, and reducing our building materials through design improvements in our T20 Tracker. *We have accomplished these cost reductions* while delivering systems that have superior energy collection characteristics . . . .

140.    On the same conference call, Hernandez stated:

The company's overall GAAP gross margin for the first quarter was 19.5% whereas our non-GAAP gross margin was 24%, which was within our guidance . . . . In the first quarter, our systems segment posted non-GAAP gross margin of 23.3.% which was within our guidance of 23 to 24%, while our component segment posted gross margin of 25.4%, a 200-basis point sequential improvement from the prior quarter but lower than our guidance. Our component segment gross margin benefited from higher volume and modestly higher average selling prices in the quarter. The increase in component gross margin, however, was tempered by stable silicon costs rather than our expected slightly declining silicon costs as we secured incremental silicon supply to improve our factory linearity in the first and second quarters of the year . . . . [L]ooking forward to the second quarter[,] **_we expect our first meaningful reduction in average silicon costs which will contribute our estimated 510 to 610 basis point improvement in our component segments gross margin._**

\*   \*   \*

Just a couple of notes here on the systems segment, **_we've demonstrated improving margins in the segment_** and we expect continued improvements in 2009 . . . .

141.    On May 9, 2008, defendants filed with the SEC the Company's 1Q08 Form 10-Q, signed by Hernandez and certified by Werner and Hernandez. The 1Q08 Form 10-Q repeated the false and misleading financial results previously issued in the April 17, 2008 press release.

142.    The Company's 1Q08 Form 10-Q also contained false statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part, the following:

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, **_our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective_**.

143.    In connection with the Company's 1Q08 Form 10-Q, both Werner and Hernandez executed and filed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") that attested to the purported accuracy and completeness of the Company's financial and operational reports as well as statements concerning the Company's controls and procedures, as follows:

1.    I have reviewed this Quarterly Report on Form 10-Q of SunPower Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  ***The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  ***Designed such disclosure controls and procedures,*** or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the registrant***, including its consolidated subsidiaries, ***is made known to us by others within those entities***, particularly during the period in which this report is being prepared;

    (b)  ***Designed such internal control over financial reporting***, or caused such internal control over financial reporting to be designed under our supervision, ***to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements*** for external purposes in accordance with generally accepted accounting principles;

    (c)  ***Evaluated the effectiveness of the registrant's disclosure controls and procedures*** and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  ***Any fraud, whether or not material, that involves management or other employees*** who have a significant role in the registrant's internal control over financial reporting.

Date: May 9, 2008

/ S / THOMAS H. WERNER

Thomas H. Werner
Chief Executive Officer
(Principal Executive Officer)

\*   \*   \*

Date: May 9, 2008

/ S / EMMANUEL T. HERNANDEZ

Emmanuel T. Hernandez
Chief Financial Officer
(Principal Financial and Accounting Officer)

\*   \*   \*

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND
CHIEF FINANCIAL OFFICER PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the quarterly report of SunPower Corporation (the "Company") on Form 10-Q for the period ended March 30, 2008 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of Thomas H. Werner, Chief Executive Officer, and Emmanuel T. Hernandez, Chief Financial Officer, of the Company, certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of his knowledge and belief:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     ***The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company***.

Dated: May 9, 2008

/ S / THOMAS H. WERNER

Thomas H. Werner
Chief Executive Officer
(Principal Executive Officer)

/ S / EMMANUEL T. HERNANDEZ

Emmanuel T. Hernandez
Chief Financial Officer
(Principal Financial and Accounting Officer)

144.     The statements contained in SunPower's April 17, 2008 release, the statements made on the April 17, 2008 conference call and the statements contained in the Company's 1Q08

Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

(a)     By its Restatement, SunPower has admitted that its financial results and statements for 1Q08 (¶¶136-143, *supra),* included the following misstatements:

| 1Q08 SunPower Financial Information as Reported and as Corrected by SunPower | | | | |
| --- | --- | --- | --- | --- |
| | Three Months Ended March 30, 2008[11] | | | |
| $ in millions, rounded, except per share amounts | Reported Amount | Corrected Amount | Amount Overstated | Percent Overstated |
| Gross margin ($) | $ 53.2 | $ 51.5 | $ 1.7 | 3% |
| Pre-tax income | $ 13.3 | $ 11.8 | $ 1.4 | 12% |
| Earnings per share | $0.14 | $0.13 | $0.01 | 8% |
| Components gross margin rate (%) | 19% | 17% | 1.7% | 10% |

(b)     Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold, by failing to make proper, timely adjustments to the Company's stated reports. As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made . . . in order to report results for manufacturing operations that would be consistent with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c)     Contrary to Werner's and Hernandez's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

(d)     The statements in ¶¶136-143 were materially false and misleading because they created a false impression that the Company's gross margin in 1Q08 was based on

---

[11] Overstatement amounts and percentages are based on SunPower's retrospectively adjusted financial results.

higher solar cell conversion efficiency and better silicon utilization, cost reductions and increased volume when in fact it was in substantial part the direct result of SunPower and the Insider Defendants' intentional scheme to improperly understate cost of revenue, overstate inventory and distort gross margins in both the Company's systems and components segments in order to meet Wall Street expectations, and inflate and maintain the Company's stock price.

## 2.  **Second Quarter 2008**

145.   On July 17, 2008, SunPower published a press release announcing results for 2Q08 and again raised guidance for the remainder of the year. The press release was titled *SunPower Reports Second-Quarter 2008 Results; Company Raises FY 2008 and FY 2009 Guidance* and stated that SunPower "[g]enerated second quarter 2008 revenue of $382.8 million, up 120% year-on-year" and "[a]chieved $0.34 GAAP net income per share, $0.61 non-GAAP." The Company also reported gross margin of 24.3%, total operating income of $45.0 million and diluted net income per share of $0.34.

146.   In addition to the foregoing, the Company's July 17, 2008 press release quoted Werner, in part, as follows:

> The overall global business environment remains very favorable as *we continue to execute on our long-term strategy focused on brand, technology, cost and people.  We are well-positioned for success entering the second half of the year.*
>
> \*   \*   \*
>
> SunPower continued to extend its technology lead during the quarter as we announced our world-record, 23.4 percent efficiency, prototype Generation 3 solar cell. This technology, expected to be in production in approximately two years, is *a key element in our roadmap to reduce total systems costs to compete with wholesale and retail electric rates by 2012. Also, in order to meet expected future demand and scale economies to reach our cost reduction goals,* SunPower announced plans to build its third solar cell manufacturing facility in Malaysia which, when completed, will have a nameplate capacity in excess of 1 gigawatt.
>
> *Our cost reduction plans are on target for silicon procurement as well.  We saw our silicon unit costs materially decline in the second quarter as we started to realize the benefit of our portfolio approach to silicon supply* . . . .  With all of our silicon suppliers delivering according to contract, *we expect our silicon supply costs to continue to decline and remain fully contracted for our silicon needs through 2010.*

147. The Company also raised guidance for fiscal years 2008 and 2009, as well as 3Q08:

> Based on the strong demand trends in both existing and emerging markets and continued progress on our 50 percent reduction in installed system costs, we are raising our guidance for the fiscal year 2008 and expect the following non-GAAP results: Total revenue of $1.39 billion to $1.44 billion and diluted net income per share of $2.26 to $2.36. We also expect our 2009 total revenue to be in of the range of $2.0 billion to $2.1 billion, production capacity of 450+ megawatts and non-GAAP diluted net income per share of at least $3.50. Consistent with our practice of offering guidance for the current quarter, we expect third quarter 2008 non-GAAP total revenue of $340 million to $355 million, company non-GAAP gross margin of 26.5% to 27.5% and non-GAAP diluted net income per share of $0.53 to $0.57.

148. That same day, the Company hosted a conference call with analysts following their earnings announcements for 2Q08. During the call, Werner and Hernandez again falsely promoted the Company's improved margins and reduced costs. Specifically, Werner stated "[o]ur record second quarter once again exceeded our top and bottom line guidance and *we increased margins consistent with better than expected execution of our cost reduction road map*." Werner further stated:

> *On the manufacturing side we continue to make material progress on our cost initiatives . . . we continue to reduce our balance assistance cost through our vertical integration strategy* by further scaling our services we offer through our dealer network, standardizing systems technology products that are factory assembled which reduces installed costs in the field for commercial systems and utility power plants, driving adoption of our T20 Tracking product which collects up to 30% more energy, and further ramp of our industry leading Generation Two cell technology which not only improves conversion efficiency but *significantly reduces field costs* as higher efficiency means less modules, less racking, less wires, less inverters, less labor and less land.

> \* \* \*

> [A]s we more fully utilize our second fab, *our costs come down as well, so our costs decrease and compounded with the higher vertical integration, so it improves our [] cost position rather significantly*.

149. Contributing to the Company's false statements about its margins and costs during the call, Hernandez added that:

> In the second quarter, our systems segment posted a non-GAAP gross margin of 24.2%, an improvement over last quarter[']s margin of 23.3[%], benefiting from higher percentage of SunPower panels used in its project as well as cost savings we realized in the field implementation of our trackers. *Our components segment*

---

*posted gross margin of 31.7%, a 630 basis point improvement over last quarter['']s margin of 25.4, benefiting from lower silicon costs,* sequential growth in volume, and also modestly higher average selling prices during the quarter.

150.    On August 8, 2008, SunPower filed with the SEC the Company's 2Q08 Form 10-Q, signed by Hernandez and certified by Werner and Hernandez.  The 2Q08 Form 10-Q repeated the financial results previously issued in the July 17, 2008 press release.

151.    The 2Q08 Form 10-Q also reported the Company's purported Cost of Revenue (as a percentage of revenue and the year-over-year change) as follows:

> During the three and six months ended June 29, 2008, our total cost of revenue was approximately $289.7 million and $510.1 million, respectively, which represented increases of 101% compared to total cost of revenue reported in the comparable period of 2007.  The increase in total cost of revenue resulted from increased costs in all cost of revenue spending categories and corresponds with an increase of 120% and 108% in total revenue during the three and six months ended June 29, 2008, respectively, from total revenue reported in the comparable period of 2007.

> As a percentage of total revenue, *our total cost of revenue decreased to 76% and 78% in the three and six months ended June 29, 2008, respectively, compared to 83% and 80% for the three and six months ended July 1, 2007, respectively. This decrease in total cost of revenue as a percentage of total revenue is reflective of decreased costs of polysilicon beginning in the second quarter of fiscal 2008 and improved manufacturing economies of scale associated with markedly higher production volume*.  This decrease in total cost of revenue as a percentage of total revenue was partially offset by (i) one-time asset impairment charges of $5.5 million in the six months ended June 29, 2008 relating to the wind-down of our imaging detector product line and for the write-down of certain solar product manufacturing equipment which became obsolete due to new processes; (ii) a more favorable mix of business in our systems segment that benefited gross margin by approximately four percentage points during the six months ended July 1, 2007; and (iii) the $2.7 million settlement received from one of our suppliers in the components segment during the six months ended July 1, 2007 in connection with defective materials sold to us during 2006 that was reflected as a reduction to total cost of revenue.

> **Systems Segment:**  For the three and six months ended June 29, 2008, gross margin for the systems segment was $61.5 million and $97.1 million, respectively, or 23% and 22% of systems segment revenue, respectively.  Gross margin for the systems segment was $12.5 million and $28.5 million for the three and six months ended July 1, 2007, respectively, or 12% and 16% of systems segment revenue, respectively.  Gross margin in our systems segment increased eleven percentile points in the three months ended June 29, 2008 as compared to the three months ended July, 2007 and six percentile points in the six months ended June 29, 2008 as compared to the six months ended July, 2007 due to higher percentage of SunPower solar panels used in its projects as well as cost savings we realized from more efficient field implementation of our systems trackers.

**Component Segment:**  Gross margin for the components segment was $31.6 million and $49.3 million for the three and six months ended June 29, 2008, respectively, or 28% and 24% of components segment revenue, respectively. Gross margin for the components segment was $17.3 million and $33.7 million for the three and six months ended July 1, 2007, respectively, or 25% of components segment revenue for each of the three and six months ended July 1, 2007, respectively. ***Gross margin in our components segment increased three percentile points in the three months ended June 29, 2008*** as compared to the three months ended July, 2007 due to lower polysilicon costs, sequential growth in volume and modestly higher average selling prices.  Gross margin in our components segment decreased one percentile point in the six months ended June 29, 2008 as compared to the six months ended July, 2007 due to increasing costs of raw materials through the first quarter ended March 30, 2008 and one-time asset impairment charges of $5.5 million incurred in the first quarter ended March 30, 2008.

152.    The Company's 2Q08 Form 10-Q also contained false statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part, the following:

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, ***our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective***.

153.    In connection with the 2Q08 Form 10-Q, both Werner and Hernandez executed and filed SOX Certifications where defendants certified the accuracy of the Company's financial results and internal controls, using language identical to ¶143, *supra.*

154.    The statements contained in SunPower's July 17, 2008 press release and made during the July 17, 2008 conference call and the statements contained in the Company's 2Q08 Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

(a)    By its Restatement, SunPower has admitted that its financial results and statements for 2Q08, ended June 29, 2008 (¶¶145-153, *supra),* included the following misstatements:

| 2Q08 SunPower Financial Information as Reported and as Corrected by SunPower | | | |
|---|---|---|---|
| | Three Months Ended June 29, 2008 | | |
| $ in millions, rounded, except per share amounts | Reported Amount | Corrected Amount | Amount Overstated | Percent Overstated |
| Gross margin ($) | $ 92.8 | $ 84.2 | $ 8.7 | 10% |

| Pre-tax income | $ 37.4 | $ 29.1 | $ 8.4 | 29% |
| Earnings per share | $0.37 | $0.32 | $0.05 | 16% |
| Components gross margin rate (%) | 28% | 24% | 4.3% | 18% |

(b)     Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold, by failing to make proper, timely adjustments to the Company's stated reports.  As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made . . . in order to report results for manufacturing operations that would be consistent with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c)     Contrary to Werner's and Hernandez's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

(d)     The statements in ¶¶145-153 were materially false and misleading because they created a false impression that the Company's gross margin in 2Q08 was based on higher solar cell conversion efficiency and better silicon utilization, cost reductions and increased volume when in fact it was in substantial part the direct result of SunPower and the Insider Defendants' intentional scheme to improperly understate cost of revenue, overstate inventory and distort gross margins in both the Company's systems and components segments in order to meet Wall Street expectations, and inflate and maintain the Company's stock price.

### 3.     <u>Third Quarter 2008</u>

155.     On October 16, 2008, SunPower published a press release announcing results for 3Q08 and reiterated guidance for the remainder of 2008.  The press release was titled *SunPower Reports Third Quarter 2008 Results,* and stated that SunPower generated 3Q08 revenue of $377.5

1 million, "up 61% year-on-[]year" and "achieved $0.26 GAAP net income per share, $0.60 non-

2 GAAP."

3      156.    The Company's October 16, 2008 release quoted Werner, in part, as follows:

4     Overall, global industry fundamentals remain strong and demand is increasing across multiple geographies. ***Our cost reduction roadmap is paying dividends as***

5 ***we are now selling at a levelized cost of energy which is cost-[]effective for our customers*** as evidenced by our recent utility-scale announcements with Pacific

6 Gas and Electric Co. (PG&E), and Florida Power & Light Co. With the recent extension of the U.S. Investment Tax Credit, we now have a national solar market

7 in the U.S. with long-term visibility and significant additional demand potential in all three market segments − residential, commercial and utility. We also saw

8 uncertainty removed from the Spanish market in the third quarter. ***These developments make us even more confident in our planned performance as we look***

9 ***into next year.***

10                         *   *   *

11 ***Our cost reduction programs remain on track,*** enabling us to open up new markets such as the U.S. utility market where the combination of our tracking and industry

12 leading cell technologies offer utilities a very competitive levelized cost of energy.

13                         *   *   *

14

15 ***Due to strong industry fundamentals, continued execution of our vertical integration strategy, expected gross margin expansion, and our progress on our***

16 ***cost reduction programs, we will materially meet our target operating model in the fourth quarter.*** We are strategically well positioned for 2009 and remain on

17 track to realize our mission of reducing installed systems cost by 50% from 2006 to 2012.

18      157.    On October 16, 2008, defendants participated in a conference call with analysts

19 following its earnings announcements for 3Q08, where Werner stated "[in] next year['s] cost

20 reduction[s,] we can hold 30% gross margins." Further, Werner added:

21     We delivered very strong operational and financial performance as we beat our revenue guidance, ***significantly improved our gross margin*** and beat our EPS

22 guidance. Our model continues to work.

23                         *   *   *

24     Our non-GAAP EPS of $0.60 per share exceeded our guidance ***as we further reduced manufacturing costs and managed operating expense growth.***

25

26                         *   *   *

27     Our components segment accounted for 49% of revenue, delivered ***very strong gross margins of 39%, up to 750 basis points sequentially.*** This strong performance

28 was achieved through higher conversion efficiencies, improved silicon utilization,

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT          -59-
Case No. CV 09-5473-RS

lower polysilicon cost, scale efficiencies at higher production volumes and modestly higher average selling prices.

\* \* \*

Due to strong industry fundamentals, continued execution on our vertical integration strategy, expected gross margin expansion and our progress on *our cost reduction programs,* we expect to materially meet our target operating model in the fourth quarter.

[W]e are increasing conversion efficiencies rather dramatically, as well as we're improving scale efficiencies in our second fab that are very significant. And we realized that our average utilization in our second fab was probably on the [order] of several lines whereas next year it's going to be in the order of ten, probably closer to 13. So there's a significant scale advantage . . . . We are comfortable with 30% guidance of gross margin . . .

158.    On the same call, Hernandez stated that:

[T]he total Company overall gross margin for the third quarter was 27.1%, whereas our non-GAAP gross margin reached 29.2%. ***This represents a 280 basis points improvement from last quarter's non-GAAP margin of 26.4%***. In the third quarter, our systems segment posted a non-GAAP gross margin of 19.7%, a decrease over last quarter's margin of 24.2% largely due to regional mix of projects, specifically a higher North America project mix during the quarter. Our component segment on the other hand posted gross margin of 39.2%, ***a 750-basis point improvement over last quarter's 31.7, once again benefiting from lower silicon costs, higher volume, more efficient use of silicon and slightly higher average selling prices***.

159.    On or about November 7, 2008, SunPower filed with the SEC the Company's 3Q08 Form 10-Q, signed by Hernandez and certified by Werner and Hernandez. The 3Q08 Form 10-Q repeated the financial results previously issued in the October 16, 2008 press release.

160.    The 3Q08 Form 10-Q also reported the Company's purported cost of revenue (as a percentage of revenue and the year-over-year change) as follows:

**Systems Segment Cost of Revenue:**    For the three and nine months ended September 28, 2008, gross margin for the systems segment was $34.6 million and $131.7 million, respectively, or 18% and 20% of systems segment revenue, respectively. Gross margin for the systems segment was $22.6 million and $51.2 million for the three and nine months ended September 30, 2007, respectively, or 14% and 15% of systems segment revenue, respectively. ***Gross margin in our systems segment increased four percentage points in the three months ended September 28, 2008 as compared to the three months ended September 30, 2007 and five percentage points in the nine months ended September 28, 2008 as compared to the nine months ended September 30, 2007 due to higher percentage of SunPower solar panels used in its projects as well as cost savings we realized from more efficient field implementation of our systems trackers***.

* * *

**Components Segment Cost of Revenue:**  Gross margin for the components segment was $71.0 million and $120.3 million for the three and nine months ended September 28, 2008, respectively, or 39% and 31% of components segment revenue, respectively.  Gross margin for the components segment was $15.8 million and $49.5 million for the three and nine months ended September 30, 2007, respectively, or 21% and 24% of components segment revenue, respectively.  ***Gross margin in our components segment increased eighteen percentage points in the three months ended September 28, 2008 as compared to the three months ended September 30, 2007 and seven percentage points in the nine months ended September 28, 2008 as compared to the nine months ended September 30, 2007 benefiting from higher average solar cell conversion efficiency and better silicon utilization, continued reduction in silicon costs, higher volume, and slightly higher average selling prices***.

* * *

During the three and nine months ended September 28, 2008, our total cost of revenue was approximately $271.9 million and $782.0 million, respectively, which represented increases of 39% and 74%, respectively, compared to total cost of revenue reported in the comparable periods of 2007.  The increase in total cost of revenue resulted from increased costs in all cost of revenue spending categories and corresponds with an increase of 61% and 88% in total revenue during the three and nine months ended September 28, 2008, respectively, from total revenue reported in the comparable periods of 2007.  As a percentage of total revenue, our total cost of revenue decreased to 72% and 76% in the three and nine months ended September 28, 2008, respectively, compared to 84% and 82% for the three and nine months ended September 30, 2007, respectively.  ***This decrease in total cost of revenue as a percentage of total revenue is reflective of decreased costs of polysilicon beginning in the second quarter of fiscal 2008 and improved manufacturing economies of scale associated with markedly higher production volume***.  This decrease in total cost of revenue as a percentage of total revenue in the nine months ended September 28, 2008 as compared to the nine months ended September 30, 2007 was partially offset by (i) a one-time asset impairment charge of $2.2 million in the nine months ended September 28, 2008 relating to the wind-down of our imaging detector product line (the $3.3 million write-down of certain solar product manufacturing equipment taken in the first quarter was reversed in the third quarter of fiscal 2008); (ii) a more favorable mix of business in our systems segment that benefited gross margin by approximately four percentage points during the nine months ended September 30, 2007; and (iii) the $2.7 million settlement received from one of our suppliers in the components segment during the nine months ended September 30, 2007 in connection with defective materials sold to us during 2006 that was reflected as a reduction to total cost of revenue.

161.    The Company's 3Q08 Form 10-Q also contained false and misleading statements regarding the sufficiency and adequacy of the Company's internal controls stating that the Company was:

implement[ing] and improve[ing] additional and existing administrative, financial and operations systems, procedures and controls, including the need to update and

---

integrate our financial internal control systems in SP Systems *and in our Philippines facility with those of our San Jose, California headquarters*.

162.   The 3Q08 Form 10-Q also stated:

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, *our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective*.

163.   Additionally, in connection with the 3Q08 Form 10-Q, both Werner and Hernandez executed and filed SOX Certifications where they certified the financial results and the Company's internal controls, using language identical to ¶143, *supra*.

164.   The statements contained in SunPower's October 16, 2008 press release and made during the October 16, 2008 conference call, and the statements contained in the Company's 3Q08 Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

(a)   SunPower has admitted that its financial results and statements for 3Q08 (¶¶155-163, *supra),* included the following misstatements:

| **1Q08 SunPower Financial Information as Reported and as Corrected by SunPower** | | | | |
|---|---|---|---|---|
| | Three Months Ended September 28, 2008 | | | |
| $ in millions, rounded, except per share amounts | Reported Amount | Corrected Amount | Amount Overstated | Percent Overstated |
| Gross margin ($) | $ 105.3 | $ 102.2 | $ 3.1 | 3% |
| Pre-tax income | $ 44.4 | $ 41.7 | $ 2.7 | 6% |
| Earnings per share | $0.29 | $0.27 | $0.02 | 7% |
| Components gross margin rate (%) | 38% | 36% | 2.1% | 6% |

(e)   Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold by failing to make proper, timely adjustments to the Company's stated reports.  As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made . . . in order to report results for manufacturing operations that would be consistent with internal

expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(f)     Contrary to Werner's and Hernandez's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

(g)     The statements in ¶¶155-163 were materially false and misleading because they created a false impression that the Company's gross margin in 3Q08 was based on higher solar cell conversion efficiency and better silicon utilization, cost reductions and increased volume when in fact it was in substantial part the direct result of SunPower and the Insider Defendants' intentional scheme to improperly understate cost of revenue, overstate inventory and distort gross margins in both the Company's systems and components segments in order to meet Wall Street expectations, and inflate and maintain the Company's stock price.

### 4.     Fourth Quarter 2008 And Fiscal Year 2008

165.    On January 29, 2009, SunPower issued a press release again announcing purported "record" results for 4Q08 and fiscal year 2008, and raising guidance for the remainder of 2008 and for 2009.  The press release was titled *SunPower Reports Record Fourth-Quarter and Fiscal Year 2008 Results* and stated, in part:

> Revenue for the 2008 fourth quarter was $401 million and compares to $378 million in the third-quarter of 2008 [up 79% year-on-year] and $224 million in the fourth-quarter of last year.  The Components and Systems segments accounted for 56% and 44% of fourth-quarter revenue, respectively.
>
> *      *      *
>
> On a GAAP basis for the 2008 fourth quarter, SunPower reported gross margin of 27.9%, total operating income of $55 million and net income per diluted share of $0.35.
>
> On a non-GAAP basis, adjusted to exclude non-cash charges for amortization of intangible assets of $4.2 million and stock-based compensation of $18.2 million, ***SunPower reported total gross margin of 29.9%, operating income of $77.5 million and net income per diluted share of $0.70.***  This compares with prior-quarter non-GAAP gross margin of 29.2%, total operating income of $73 million and $0.58

net income per diluted share. ***For the 2008 fourth quarter, Components segment gross margin was 35.6% and Systems segment gross margin was 22.7%***. The company's GAAP and Non-GAAP fourth-quarter results include a $6.3 million, or $0.07 net income per diluted share, foreign currency gain related to its Korean joint venture.

166.   On January 29, 2009, after the close of the market, Werner and Arriola participated in a conference call with analysts following their "record" earnings announcements for 4Q08 and fiscal year 2008.  During the call, defendants bragged that despite challenging market conditions, SunPower "***exceeded [] guidance***" and claimed that lower sales of solar systems were offset by the Company's "cost reduction" strategy.  Werner claimed that "our components segment performed extremely well and accounted for 56% of revenue, up 22% sequentially, and delivered ***a gross margin of 35% capitalizing on our cost reduction programs***."  Werner also allayed analyst concerns about ASP declines, noting that "we have tested our model and ***can sustain module ASP reductions in excess of 20% by accelerating our cost reduction programs*** and limiting our operating expense growth."  Werner further stated that "[t]he combination of 50% lower module costs, 50% lower balance of system costs and improved energy delivery allow us to compete favorably on a levelized cost of energy basis in all markets."

167.   On the same call, Arriola stated that "[w]e're continuing to make significant progress in our systems cost reduction program" and promoted the benefits of the Company's cost reduction strategy, claiming that:

> ASP [average selling price] declines in the fourth quarter were ***significantly offset by continued cost reductions***.  In 2008 we benefitted from lower silicon costs and lower conversion costs through higher production volumes.  As expected, in the fourth quarter we saw blended ASPs decline less than 5% although overall ASPs were down about 10% when you include the impact of foreign exchange.

168.   On February 26, 2009, SunPower filed with the SEC the Company's 2008 Form 10-K for the fiscal year end December 28, 2008, signed and certified by Werner and Arriola.  The 2008 Form 10-K repeated the financial results previously issued in the January 29, 2009 press release, and also stated that ". . . our solar systems provide the following benefits compared with competitors' systems: []superior systems design to meet customer needs and ***reduce cost***, including non-penetrating, fast roof installation technologies . . . ."

169.   The Company's 2008 Form 10-K reported the Company's purported cost of revenue (as a percentage of revenue and the year-over-year change) as follows:

**Total Cost of Revenue:** During fiscal 2008 and 2007, our total cost of revenue was $1,071.2 million and $627.0 million, respectively, which represents an increase of 71%. Our fiscal 2007 cost of revenue increased 237% compared to our total cost of revenue in 2006 of $186.0 million.  The increase in total cost of revenue resulted from increased volume in all cost of revenue spending categories and corresponds with an increase of 85% in total revenue from fiscal 2007 to 2008 and 228% from fiscal 2006 to 2007.

As a percentage of total revenue, our total cost of revenue decreased from 81% in fiscal 2007 to 75% in fiscal 2008. ***This decrease in total cost of revenue as a percentage of total revenue is reflective of decreased costs of polysilicon beginning in the second quarter of fiscal 2008 and improved manufacturing economies of scale associated with markedly higher production volume,*** partially offset by (i) a one-time asset impairment charge of $2.2 million in fiscal 2008 relating to the wind-down of our imaging detector product line; (ii) a more favorable mix of business in our Systems Segment that benefited gross margin by approximately five percentage points during fiscal 2007; and (iii) the $2.7 million settlement received from one of our suppliers in the Components Segment during fiscal 2007 in connection with defective materials sold to us during 2006 that was reflected as a reduction to total cost of revenue.

\* \* \*

**Systems Segment Gross Margin:** Gross margin was $167.1 million and $77.7 million for fiscal 2008 and 2007, respectively, or 20% and 17% of systems revenue, respectively. Gross margin increased due to a higher percentage of SunPower solar panels used in its projects as well as cost savings we realized from more efficient field implementation of our systems trackers.

\* \* \*

**Components Segment Gross Margin:** Gross margin was $196.6 million, $70.1 million and $50.5 million for fiscal 2008, 2007 and 2006, respectively, or 32%, 23% and 21%, respectively, of components revenue. ***Gross margin increased due to higher average solar cell conversion efficiency and better silicon utilization, continued reduction in silicon costs, higher volume, and slightly higher average selling prices***.

\* \* \*

**Other Cost of Revenue Factors:** Additionally, within our own solar panel assembly facility in the Philippines we incur personnel-related costs, depreciation, utilities and other occupancy costs. ***To date, demand for our solar power products has been robust and our production output has increased allowing us to spread a significant amount of our fixed costs over relatively high production volume, thereby reducing our per unit fixed c o s t*** . . . .

170. The Company's 2008 Form 10-K also contained false and misleading statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part, the following:

> Based on their evaluation as of the end of the period covered by this Annual Report on Form 10-K and subject to the foregoing, ***our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective***.

171. The 2008 Form 10-K also stated that the Company had implemented a new system to enhance its internal controls over financial reporting, which "improve[d] and enhance[d the Company's] system of internal controls over financial reporting":

> In the third quarter of fiscal 2008, we implemented a new enterprise resource planning ("ERP") system in our subsidiaries around the world, which resulted in a material update to our system of internal control over financial reporting. Issues encountered subsequent to implementation caused us to further revise our internal control process and procedures in order to correct and supplement our processing capabilities within the new system in that quarter. Throughout the ERP system stabilization period ***we will continue to improve and enhance our system of internal control over financial reporting***.

172. Additionally, in connection with the 2008 Form 10-K, both Werner and Arriola executed and filed SOX Certifications where they certified the financial results and the Company's internal controls, using language identical to that above in ¶143, *supra*.

173. The statements contained in SunPower's January 29, 2009 press release and made during the January 29, 2009 conference call, and the statements contained in the Company's 2008 Form 10-K, referenced above, were each materially false and misleading when made for the following reasons:

(a) SunPower has admitted that its financial results and statements for 4Q08 and fiscal year 2008, ended December 28, 2008 (¶¶165-172, *supra),* included the following misstatements:

| 4Q08 SunPower Financial Information as Reported and as Corrected by SunPower | | | | |
|---|---|---|---|---|
| | Three Months Ended December 28, 2008 | | | |
| $ in millions, rounded, except per share amounts | Reported Amount | Corrected Amount | Amount Overstated | Percent Overstated |
| Gross margin ($) | $ 111.3 | $ 111.7 | ($ 0.4) | 0% |
| Pre-tax income | $ 34.0 | $ 33.4 | $ 0.6 | 2% |
| Earnings per share | $0.37 | $0.33 | $0.03 | 10% |
| Inventory - Work-in-process | $ 15.5 | $ 25.8 | ($ 10.3) | (40%) |
| Components gross margin rate (%) | 34% | 34% | (0%) | (1%) |

| Fiscal 2008 SunPower Financial Information as Reported and as Corrected by SunPower | | | | |
|---|---|---|---|---|
| | Twelve Months Ended December 28, 2008 | | | |
| $ in millions, rounded, except per share amounts | Reported Amount | Corrected Amount | Amount Overstated | Percent Overstated |
| Gross margin ($) | $ 362.7 | $ 349.6 | $ 13.1 | 4% |
| Pre-tax income | $ 129.1 | $ 116.1 | $ 13.0 | 11% |
| Earnings per share | $1.16 | $1.05 | $0.11 | 11% |
| Inventory - Work-in-process | $ 15.5 | $ 25.8 | ($ 10.3) | (40%) |
| Components gross margin rate (%) | 32% | 30% | 1.7% | 5% |

(b)     Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold, by failing to make proper, timely adjustments to the Company's stated reports.  As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made . . . in order to report results for manufacturing operations that would be consistent with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c)     Contrary to Werner's and Hernandez's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a

1   result, statements concerning SunPower's financial results were inaccurate, unreliable and/or

2   subject to manipulation; and

3            (d)    The statements in ¶¶165-172 were materially false and misleading because

4   they created a false impression that the Company's gross margin in 4Q08 and fiscal year 2008

5   was based on higher solar cell conversion efficiency and better silicon utilization, cost reductions

6   and increased volume when in fact it was in substantial part the direct result of SunPower and the

7   Insider Defendants' intentional scheme to improperly understate cost of revenue, overstate

8   inventory and distort gross margins in both the Company's systems and components segments in

9   order to meet Wall Street expectations, and inflate and maintain the Company's stock price.

10            **5.**    **First Quarter 2009**

11       174.   On April 23, 2009, SunPower published a press release announcing results for

12   1Q09 and reiterating guidance for the remainder of 2009.  The press release was titled *SunPower*

13   *Reports First-Quarter 2009 Results* and stated, in part, the following:

14           Revenue for the 2009 first quarter was $214 million and compares to revenues of
$401 million in the fourth quarter of 2008 and $274 million in the first quarter of

15           last year.  The Components and Systems segments each accounted for 50% of
first-quarter 2009 revenue.

16                             *   *   *

17           On a GAAP basis for the 2009 first quarter, SunPower reported gross margin of

18           22.3%, an operating loss of $2.5 million and a net loss per share of ($0.6) . . .

19           On a non-GAAP basis, adjusted to exclude non-cash charges for amortization of
intangible assets of $4.1 million, stock-based compensation of $9.5 million and

20           non-cash interest expense of $5.0 million, SunPower reported total gross margin
of 24.3%, operating income of $11.5 million and net income per diluted share of

21           $0.05. This compares with fourth-quarter 2008 non-GAAP gross margin of
29.9%, operating income of $77.5 million and $0.69 net income per diluted share.

22           For the 2009 first quarter, Components segment gross margin was 29.5% and
Systems segment gross margin was 19.0%.

23

24       175.   In addition to the foregoing, the Company's April 23, 2009, press release quoted

25   Werner, in part, as follows:

26           [o]ur quarterly performance was impacted by seasonality, the continuing effects
of the credit crisis and difficult economic conditions. ***Despite these headwinds we***

27           ***were able to deliver strong gross margins in our Components business and positive***
***non-GAAP net income***.  We have responded to current market conditions by

28

1   moving to a demand-driven manufacturing model and reducing our planned
operating expenses to align with our adjusted revenue outlook.  Looking forward,
2   we see positive trends emerging in a number of market segments, including the
rooftop, distributed power plant and utility markets that give us confidence that
3   we are well positioned for growth in the second half of 2009, 2010 and beyond.

4   176.    That same day, the Company participated in a conference call with analysts

5   following their earnings announcements for 1Q09.   While acknowledging that 1Q09 was

6   "challenging," SunPower still reported strong gross margins and positive net income and that

7   SunPower "*responded to a challenging Q1 by taking the steps necessary to control our costs given*

8   *current market conditions* . . . ."  SunPower also claimed on the call that the Company remained

9   competitive in the challenging market due to its reduced costs and that "our cost structure on the

10  components segment, which specifically is modules is quite good."   Specifically, Werner

11  repeated:

12      [O]ur first quarter was impacted by seasonality, and continuing effects of the
credit crisis, and difficult economic conditions.  *Despite these headwinds, we were*
13      *able to deliver strong gross margins, and positive non-GAAP net income* . . . .

14  177.    Arriola further stated:

15      In regards to our operating expenses, we took a systematic approach to *reducing*
*costs* throughout the Company.  We analyzed which of our expenses could be
16      shifted from a fixed nature to variable based and reprioritized costs that could be
eliminated or delayed until the business climate and overall demand improves.
17      As a result, *we have identified and reduced more than $50 million in costs from*
*our internal 2009 operating expense line*.
18

19  178.    On the same call, Werner answered a question about inventory and falsely assured

20  the public that the Company would not have to write down any inventory during the next two

21  quarters:

22      **Timothy Arcuri** - Citigroup - Analyst:

23      . . . looking at the inventory number and looking at the premium that your
components are getting out there relative to the peers.  It is at its highest level that
24      it has ever been.  *As you look at that big inventory number, how do you assess the*
*risk of having to write that down over the next two quarters,* as pricing has to come
25      down to close that gap?

26      **Tom Werner** - SunPower Corporation - CEO:

27      [] So in terms of the inventory and risk of write-down, we mentioned that we have
implemented a demand-driven supply chain.  And what that means is that we will
28

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                           -69-
Case No. CV 09-5473-RS

regulate or size the amount of manufacturing that we do based on the amount of inventory that we have between us and installation. So by definition, *we are able to manage that inventory level down by managing how much we produce. And so we fully expect to absorb that inventory pretty rapidly in the first part of Q2*. The other thing that I said that is really relevant to this is that the first part of Q2 has started out substantially better than the first part of Q1. And so the rate of installation is substantially higher than the rate of installation in Q1. So you can't use the Q1 usage rates to calculate when that inventory will go away. So very good question. *I can assure you we are on top of this*. And we are moderating production build, based on the amount of inventory as we install it. In terms of the specific numbers of production, I think our guys are ready.

179.    Later in the call, Werner was again pressed about SunPower's inventory position:

**Al Kaschalk** - Wedbush Morgan - Analyst:

Tom, I am trying to balance the outlook, the guidance, and the manufacturing production starting in Q2 here. And maybe you could just shed a little bit of color? I am not necessarily asking you to call a bottom. But are you comfortable as you roll out Q2 that you can remain pretty steady state on the manufacturing side, and not necessarily building inventory further? *Or do you need a few more things to open up in the visibility channel to make that statement?*

**Tom Werner** - SunPower Corporation - CEO:

*No, we are comfortable that we can lower inventory consistent with our manufacturing plan, yes*.

**Al Kaschalk** - Wedbush Morgan - Analyst:

Does that mean production could be at least 20% above what you produced in Q1 of 93 to 94 megawatts?

**Tom Werner** - SunPower Corporation - CEO:

Yes, *let me be clear. We have already adjusted our manufacturing to lower the amount of inventory that we carried from Q1, and satisfy what we expect our business to be in Q2*. And what we will do is moderate the amount of manufacturing we do based on inventory levels, which is driven by demand. So hopefully that is helpful. *The answer is yes, we will lower inventory levels consistent with our expected build plan*.

180.    On or about May 8, 2009, SunPower filed with the SEC the Company's 1Q09 Form 10-Q, signed by Arriola and certified by Werner and Arriola. The 1Q09 Form 10-Q repeated the financial results previously issued in the April 23, 2009 press release. The 1Q09 Form 10-Q reported the Company's purported cost of revenue (as a percentage of revenue and the year-over-year change) for its two segments, as follows:

**Total Cost of Revenue:** During the three months ended March 29, 2009 and March 30, 2008, our total cost of revenue was $166.0 million and $220.5 million,

respectively, which represents a decrease of 25%.  The decrease in total cost of revenue corresponds with the decrease of 22% in total revenue during the three months ended March 29, 2009 compared to the same period in 2008.  As a percentage of total revenue, our total cost of revenue decreased to 78% in the three months ended March 29, 2009 compared to 81% in the three months ended March 30, 2008.  ***This decrease in total cost of revenue as a percentage of total revenue*** is reflective of (i) decreased costs of polysilicon beginning in the second quarter of fiscal 2008; (ii) improved manufacturing economies of scale associated with markedly higher production volume; (iii) reduced expenses associated with the amortization of intangible assets and stock-based compensation; and (iv) one-time asset impairment charges of $5.5 million in the first quarter of fiscal 2008 relating to the wind down of our imaging detector product line and for the write-down of certain solar product manufacturing equipment which became obsolete due to new processes (the costs associated with the $3.3 million write-down of certain solar product manufacturing equipment was recovered from the vendor in the third quarter of fiscal 2008).

\*   \*   \*

**Systems Segment Gross Margin:** Gross margin was $17.7 million and $35.6 million for the three months ended March 29, 2009 and March 30, 2008, respectively, or 17% and 20%, respectively, of systems revenue.  Gross margin decreased due to lower average selling prices for our solar power systems and system group department overhead costs incurred that are fixed in nature when systems revenue decreased 41% in the three months ended March 29, 2009 as compared to the same period in 2008.

\*   \*   \*

**Components Segment Gross Margin:** Gross margin was $30.0 million and $17.6 million for the three months ended March 29, 2009 and March 30, 2008, respectively, or 28% and 19%, respectively, of components revenue. ***Gross margin increased due to higher average solar cell conversion efficiency and better silicon utilization, continued reduction in silicon costs and higher volume, partially offset by lower average selling prices for our solar power products***.

181.   The Company's 1Q09 Form 10-Q also contained statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part, the following:

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, ***our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective***.

182.   In connection with the 1Q09 Form 10-Q, both Werner and Arriola executed and filed SOX Certifications where they certified the financial results and the Company's internal controls, using language identical to ¶143, *supra*.

183. The statements contained in SunPower's April 23, 2009 press release and made during the April 23, 2009 conference call, and the statements contained in the Company's 1Q09 Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

(a) SunPower has admitted that its financial results and statements for 1Q09, ended March 29, 2009 (¶¶174-182), included the following misstatements:

| 1Q09 SunPower Financial Information as Reported and as Corrected by SunPower | | | | |
|---|---|---|---|---|
| | Three Months Ended March 29, 2009 | | | |
| $ in millions, rounded, except per share amounts | Reported Amount | Corrected Amount | Amount Overstated | Percent Overstated |
| Gross margin ($) | $ 47.7 | $ 32.2 | $ 15.5 | 48% |
| Pre-tax loss | ($ 14.6) | ($ 30.1) | ($ 15.5) | (52%) |
| Loss per share | ($0.06) | ($0.12) | ($0.06) | (51%) |
| Inventory – work-in-process | $ 12.9 | $ 47.2 | ($ 34.3) | (73%) |
| Systems gross margin rate (%) | 16.7% | 8.3% | 8.4% | 101% |
| Components gross margin rate (%) | 28% | 22% | 6% | 27% |
| Combined gross margin rate (%) | 22% | 15% | 7% | 47% |

(b) Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold, by failing to make proper, timely adjustments to the Company's stated reports. As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made . . . in order to report results for manufacturing operations that would be consistent with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c) Contrary to Werner's and Arriola's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a

result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

(d)     The statements in ¶¶174-182 were materially false and misleading because they created a false impression that the Company's increase in gross margin in 1Q09 was based on higher solar cell conversion efficiency and better silicon utilization, cost reductions and increased volume when in fact it was in substantial part the direct result of SunPower and the Insider Defendants' intentional scheme to: (i) improperly understate cost of revenue (ii) overstate inventory and distort gross margins in both the Company's systems and components segments in order to meet Wall Street expectations; (iii) inflate and maintain the Company's stock price; and (iv) complete the April 2009 Offerings while SunPower's securities were trading at artificially-inflated prices.

### 6.     Second Quarter 2009

184.    On July 23, 2009, SunPower issued a press release announcing results for 2Q09 and reiterated guidance for the remainder of 2009.  The press release was titled *SunPower Reports Second-Quarter 2009 Results* and stated, in part, the following:

> Revenue for the 2009 second quarter was $298 million which compares to revenues of $214 million in the first quarter of 2009 and $383 million in the second quarter of 2008.  The company's Components and Systems segments accounted for 63% and 37% of second-quarter 2009 revenue, respectively.
>
> *          *          *
>
> On a [GAAP basis . . .], SunPower reported gross margin of 19.6%, operating income of $9.9 million and net income per share of $0.26.  GAAP net income per diluted share for the second quarter of 2009 includes a $21.2 million, or $0.21 per diluted share, non-taxable gain related to the company's recent securities offering and a $5.9 million, or $0.04 per diluted share for noncash interest charges associated with the adoption of the new FSP APB 14-1 accounting rule, which impacts how companies account for interest expense on convertible bonds.
>
> On a non-GAAP basis, adjusted to exclude non-cash charges for amortization of intangible assets of $4.1 million, stock-based compensation of $11.6 million and non-cash interest expense of $5.9 million, SunPower reported total gross margin of 22.6%. Gross margin for the second quarter was negatively impacted by approximately $12 million from lower factory utilization due to the company's planned transition to a demand driven manufacturing strategy, which successfully focused on reducing inventory levels.  Operating income for the quarter was $26.8 million and net income per diluted share was $0.24. This compares with first quarter 2009 non- GAAP gross margin of 24.3%, operating income of $11.5

million and $0.05 net income per diluted share.  For the 2009 second quarter, the Components segment non-GAAP gross margin was 24.6% and Systems segment gross margin was 18.9%.

185.    The Company's July 23, 2009 press release quoted Werner, in relevant part, as follows:

> Our second-quarter results reflect the continued success of our diversified segment and market strategy as we benefited from the further growth in our dealer network and executed on our large scale project commitments. [] ***Additionally, our operational focus during the quarter enabled us to show progress in reducing inventory levels and in controlling variable expenses***.  Our long-term strategy to build our brand based on superior experience, technology and return is paying off.  As a result, we have successfully adjusted pricing to maintain market share and our price premium.
>
> Overall, we recorded solid second-quarter results in a demand driven market, consistent with our operating plan.  In all of our markets, we are encouraged by the improving industry trends we are seeing in both end demand and financing and we are well positioned for further growth in the second half of the year and 2010.  ***Our manufacturing costs are competitive today and we are ahead of plan to achieve our cost reduction goals***.  Customers continue to choose SunPower due to our superior roof top and power plant experience, industry leading performance of our solar panels and tracking technology, and our ability to drive attractive project returns for our customers.

186.    On July 23, 2009, defendants participated in a conference call with analysts following their earnings announcements for the 2Q09.  Defendants reported that the 2Q09 was "characterized by strong execution as we [] ***beat our stated goals for the quarter***."  Defendants claimed that revenue in the 2Q09 was $298 million, a ***39% increase*** from 1Q09. Arriola stated:

> ***As we expected, we experienced a strong turnaround in the second quarter*** revenue from our components business. . . .  Revenue in this category was $189 million in the second quarter, up over 75% compared to the first quarter of 2009, and up over 68% compared to the second quarter of 2008.

187.    On the July 23, 2009 call, Werner emphasized the "value of SunPower's vertical integration and diversified market and channel strategy," noting that SunPower "beat our goals" in 2Q09 by being a "***cost leader***."  Werner claimed that SunPower has been "aggressive[] on cost reductions" and has "reduced costs by more than 50% since 2007."  Werner further stated that:

> Our product continues to command a premium average selling price. This is a result of our experience, technology, and return on investment we offer our customers.  Our channel strategy was designed for a demand-driven environment,

and gives us the ability to manage our pricing as a result of market conditions and long-term strategy.

\* \* \*

As far as ASPs, our revenue range is modeled to incorporate decreases of up to 15% in the second half of the year. *We expect to maintain or potentially improve our gross margins in the second half of the year*, as we increase the capacity utilization in our fabs . . .

188.    On or about August 3, 2009, SunPower filed with the SEC the Company's 2Q09 Form 10-Q, signed by Arriola and certified by Werner and Arriola.  The Company's 2Q09 Form 10-Q repeated the financial results previously issued in the July 23, 2009 press release and also stated, in part, the following:

In the three months ended June 28, 2009, the Company identified certain adjustments related to fiscal 2008, *primarily due to systems costs and inventory* that resulted in recording additional out of period costs of approximately $2.1 million. *The effect of these items is not material to estimated pre-tax or net income for the current year*.

In the opinion of management, the accompanying condensed consolidated interim financial statements contain all adjustments, consisting only of normal recurring adjustments, which the Company believes are necessary for a fair statement of the Company's financial position as of June 28, 2009 and its results of operations for the three and six months ended June 28, 2009 and June 29, 2008 and its cash flows for the six months ended June 28, 2009 and June 29, 2008. These condensed consolidated interim financial statements are not necessarily indicative of the results to be expected for the entire year.

189.    The 2Q09 Form 10-Q also reported the Company's purported Cost of Revenue (as a percentage of revenue and the year-over-year change) for its two segments, as follows:

**Total Cost of Revenue:** During the three and six months ended June 28, 2009, our two solar cell manufacturing facilities operated at approximately 49% and 61% capacity, respectively, producing only 63.6 megawatts and 157.3 megawatts, respectively, as compared to the three and six months ended June 29, 2008 when our facilities operated at approximately 74% and 71% capacity, respectively, producing 49.8 megawatts and 88.3 megawatts, respectively. *During the three and six months ended June 28, 2009, our total cost of revenue was $239.2 million and $405.2 million, respectively, which represented decreases of 17% and 21%, respectively, compared to the total cost of revenue reported in the comparable periods of 2008.* As a percentage of total revenue, our total cost of revenue increased to 80% and 79% in the three and six months ended June 28, 2009, respectively, compared to 76% and 78% in the three and six months ended June 29, 2008, respectively.  This increase in total cost of revenue as a percentage of total revenue is reflective of: (i) lower factory utilization due to our planned transition to a demand driven manufacturing strategy to reduce inventory levels and (ii) higher amortization of capitalized non-cash interest expense associated

with the adoption of Financial Accounting Standards Board, or FASB, Staff Position, or FSP, Accounting Principles Board, or APB, 14-1, "Accounting for Convertible Debt Instruments That May Be Settled in Cash upon Conversion (Including Partial Cash Settlement)," or FSP APB 14-1. This increase in total cost of revenue as a percentage of total revenue was partially offset by: (i) decreased costs of polysilicon beginning in the second quarter of fiscal 2008; (ii) reduced expenses associated with the amortization of other intangible assets and stock-based compensation; and (iii) one-time asset impairment charges of $5.5 million in the first quarter of fiscal 2008 relating to the wind down of our imaging detector product line and for the write-down of certain solar product manufacturing equipment which became obsolete due to new processes (the costs associated with the $3.3 million write-down of certain solar product manufacturing equipment was recovered from the vendor in the third quarter of fiscal 2008).

**Systems Segment Cost of Revenue:** Our cost of systems revenue consists primarily of solar panels, mounting systems, inverters and subcontractor costs. The cost of solar panels is the single largest cost element in our cost of systems revenue. Our Systems Segment sourced virtually all of its solar panel installations with SunPower solar panels in the three and six months ended June 28, 2009, as compared to 61% and 52% for the three and six months ended June 29, 2008, respectively. Our Systems Segment generally experiences *higher gross margin* on construction projects that utilize SunPower solar panels compared to construction projects that utilize solar panels purchased from third-parties.

**Systems Segment Gross Margin:** *Gross margin was $16.9 million and $34.7 million for the three and six months ended June 28, 2009, respectively, or 16% of systems revenue. Gross margin was $61.4 million and $97. 0 million for the three and six months ended June 29, 2008, respectively, or 23% and 22%, respectively*, of systems revenue. Gross margin decreased due to lower average selling prices for our solar power systems and system group department overhead costs incurred that are fixed in nature when systems revenue decreased 60% and 52% in the three and six months ended June 28, 2009, respectively, as compared to the same periods in 2008.

190.    The Company's 2Q09 Form 10-Q also contained statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part, the following:

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, *our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective*.

191.    In connection with the 2Q09 Form 10-Q, both Werner and Arriola executed and filed SOX Certifications where they certified the financial results and the Company's internal controls, employing language identical to ¶143, *supra*.

192.    The statements contained in SunPower's July 23, 2009 press release and made during the July 23, 2009 conference call, and the statements contained in the Company's 2Q09 Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

(a)    SunPower has admitted that its financial results and statements for 2Q09 (¶¶184-191, *supra),* included the following misstatements:

| 2Q09 SunPower Financial Information as Reported and as Corrected by SunPower | | | | |
|---|---|---|---|---|
| | Three Months Ended June 28, 2009 | | | |
| $ in millions, rounded, except per share amounts | Reported Amount | Corrected Amount | Amount Overstated | Percent Overstated |
| Gross margin ($) | $ 58.5 | $ 40.7 | $ 17.8 | 44% |
| Pre-tax income | $ 25.1 | $ 6.2 | $ 18.9 | 305% |
| Earnings per share | $0.25 | $0.16 | $0.09 | 56% |
| Inventory – work-in-process | $ 5.9 | $ 36.1 | $ 30.2 | 84% |
| Systems gross margin rate (%) | 16% | 13% | 2.5% | 20% |
| Components gross margin rate (%) | 28% | 22% | 8.1% | 58% |
| Combined gross margin rate (%) | 20% | 14% | 6% | 45% |

(b)    Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold, by failing to make proper, timely adjustments to the Company's stated reports. As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made in order to report results for manufacturing operations that would be consistent with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c)    Contrary to Werner's and Arriola's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a

result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

(d)     The statements in ¶¶184-191 were materially false and misleading because they created a false impression that the Company's gross margin in 2Q09 was based on higher solar cell conversion efficiency and better silicon utilization, cost reductions and increased volume when in fact it was in substantial part the direct result of SunPower and the Insider Defendants' intentional scheme to improperly understate cost of revenue, overstate inventory and distort gross margins in both the Company's systems and components segments in order to meet Wall Street expectations, and inflate and maintain the Company's stock price.

## 7.     Third Quarter 2009

193.     On October 22, 2009, SunPower issued a press release announcing results for 3Q09, and reiterating guidance for the remainder of 2009.  The press release was titled *SunPower Reports Third-Quarter 2009 Results* and stated, in part, the following:

> Revenue for the 2009 third quarter was $466 million which compares to $298 million in the second quarter of 2009 and $378 million in the third quarter of 2008.  The company's Components and Systems segments accounted for 64% and 36% of third-quarter 2009 revenue, respectively.

194.     That same day, defendants participated in a conference call with analysts following their earnings announcements for 3Q09.  Werner claimed that their "vertically integrated strategy" provided for "another strong quarter with record revenue and production." Arriola stated that "the consolidated gross margins was 20.7% versus 22.6% in the second quarter."

195.     During the October 22, 2009 conference call, in response to an analyst's question about margin improvement, Arriola stated:

> ***But we're continuing to bring costs down***.  Capacity utilization is continuing to improve.  Which means we're having (inaudible) unabsorbed costs.  One time items will go away.  ***So, look for on gross margins, similar to second quarter to slightly stronger***.

196.    On the 3Q09 conference call, Arriola also revealed that SunPower had recorded $8.5 million in charges to expense during 3Q09 for inventory losses, directly contradicting Werner's repeated assurances during SunPower's 1Q09 earnings conference call that there would be no inventory write-offs during the next two quarters:

> Gross margins were also impacted by our decision to sell and reposition some older third party inventory at competitive market prices.  As a result of these actions, ***we incurred a one time expense of $8.5 million in the third quarter with $5.2 million of the expense allocated to our componented [sic] segment and $3.3 million allocated to our systems business***.

197.    On or about November 2, 2009, SunPower filed with the SEC the Company's 3Q09 Form 10-Q, signed by Arriola and certified by Werner and Arriola.  The Company's 3Q09 Form 10-Q repeated the financial results previously reported in the October 22, 2009 press release.

198.    The 3Q09 Form 10-Q also reported the Company's purported cost of revenue (as a percentage of revenue and the year-over-year change) for its two segments, as follows:

> **Total Cost of Revenue:** During the three and nine months ended September 27, 2009, our total cost of revenue was $377.0 million and $782.2 million, respectively, which represented an increase of 39% and zero, respectively, compared to the total cost of revenue reported in the comparable periods of 2008.  As a percentage of total revenue, our total cost of revenue increased to 81% and 80% in the three and nine months ended September 27, 2009, respectively, compared to 72% and 76% in the three and nine months ended September 28, 2008, respectively.  This increase in total cost of revenue as a percentage of total revenue is reflective of: (i) the sale and write-down of inventory to its estimated market value in the third quarter of fiscal 2009 based upon our assumptions about future demand and market conditions; and (ii) higher amortization of capitalized non-cash interest expense in the three and nine months ended September 27, 2009 as compared to the same periods in 2008.  This increase in total cost of revenue as a percentage of total revenue was partially offset by: (i) decreased costs of polysilicon; (ii) reduced expenses associated with the amortization of other intangible assets and stock-based compensation; and (iii) an asset impairment charge of $2.2 million in the nine months ended September 28, 2008 relating to the wind down of our imaging detector product line (the costs associated with the $3.3 million write-down of certain solar product manufacturing equipment taken in the first quarter of fiscal 2008 was recovered from the vendor in the third quarter of fiscal 2008).

> *            *            *

> **Systems Segment Gross Margin:** Gross margin was $23.6 million and $58.2 million for the three and nine months ended September 27, 2009, respectively, or 14% and 15%, respectively, of systems revenue. Gross margin was $34.5 million and $131.5 million for the three and nine months ended September 28, 2008,

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                   -79-
Case No. CV 09-5473-RS

respectively, or 18% and 20%, respectively, of systems revenue. Gross margin decreased due to: (i) lower average selling prices for our solar power systems; (ii) the sale and write-down of aged third-party solar panels to its estimated market value in the third quarter of fiscal 2009 based upon our assumptions about future demand and market conditions; and (iii) our inability to reduce system group department overhead costs incurred that are fixed in nature when systems revenue decreased 13% and 40% in the three and nine months ended September 27, 2009, respectively, as compared to the same periods in 2008.

\* \* \*

**Components Segment Gross Margin:** Gross margin was $65.7 million and $137.3 million for the three and nine months ended September 27, 2009, respectively, or 22% and 23%, respectively, of components revenue. Gross margin was $70.8 million and $119.9 million for the three and nine months ended September 28, 2008, respectively, or 38% and 31%, respectively, of components revenue. Gross margin decreased due to: (i) lower average selling prices for our solar power products; and (ii) the sale and write-down of inventory to its estimated market value in the third quarter of fiscal 2009 based upon our assumptions about future demand and market conditions. This decrease in gross margin was partially offset by continued reduction in silicon costs. Over the next several years, we expect average selling prices for our solar power products to decline as the market becomes more competitive, as financial incentives for solar power decline as typically planned by local, state, and national policy programs designed to accelerate solar power adoption, as certain products mature and as manufacturers are able to lower their manufacturing costs and pass on some of the savings to their customers.

199. The Company's 3Q09 Form 10-Q also contained statements regarding the sufficiency and adequacy of the Company's internal controls that stated, in part, the following:

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q and subject to the foregoing, *our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective*.

200. In connection with the 3Q09 Form 10-Q, both Werner and Arriola executed and filed SOX Certifications where they certified the financial results and the Company's internal controls, employing language identical to ¶143 *supra*.

201. The statements contained in SunPower's October 22, 2009 press release and made during the October 22, 2009 conference call, and the statements contained in the Company's 3Q09 Form 10-Q, referenced above, were each materially false and misleading when made for the following reasons:

---

(a)     SunPower has admitted that its financial results and statements for its first three quarters of 2009, ended September 27, 2009 (¶¶193-200, *supra),* included the following misstatements:

| 3Q09 SunPower Financial Information as Reported and as Corrected by SunPower | | | | |
|---|---|---|---|---|
| | Three Months Ended September 27, 2009 | | | |
| $ in millions, rounded, except per share amounts | Reported Amount | Corrected Amount | Amount Overstated | Percent Overstated |
| Gross margin ($) | $ 195.5 | $ 172.7 | $ 22.8 | 13% |
| Pre-tax income | $ 35.8 | $ 13.0 | $ 22.8 | 174% |
| Earnings per share | $0.35 | $0.27 | $0.08 | 31% |
| Inventory – work-in-process | $ 38.8 | $ 37.2 | ($ 1.6) | (4%) |
| Systems gross margin rate (%) | 15% | 13% | 2.5% | 20% |
| Components gross margin rate (%) | 23% | 21% | 2.2% | 10% |
| Combined gross margin rate (%) | 20% | 18% | 2.3% | 13% |

(b)     Unbeknownst to investors, SunPower had materially overstated the Company's profitability by under-reporting SunPower's rising revenue costs and cost of goods sold, by failing to make proper, timely adjustments to the Company's stated reports.  As admitted by the Company in the Restatement, these "unsubstantiated accounting entries were made . . . in order to report results for manufacturing operations that would be consistent with internal expense projections" and resulted in an understatement of the Company's cost of goods sold throughout the Class Period;

(c)     Contrary to Werner's and Arriola's SOX Certifications and other representations that internal controls were in place, at all times during the Class Period, the Company's internal controls and procedures suffered from material weaknesses and that, as a result, statements concerning SunPower's financial results were inaccurate, unreliable and/or subject to manipulation; and

(d)     The statements in ¶¶193-200 were materially false and misleading because they created a false impression that the Company's gross margin in 3Q09 and first nine

months of 2009 was based on higher solar cell conversion efficiency and better silicon utilization, cost reductions and increased volume when in fact it was in substantial part the direct result of SunPower and the Insider Defendants' intentional scheme to improperly understate cost of revenue, overstate inventory and distort gross margins in both the Company's systems and components segments in order to meet Wall Street expectations, and inflate and maintain the Company's stock price.

### C.   Violations Of GAAP And SEC Reporting Rules

202.   During the Class Period, SunPower and the Insider Defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make the Insider Defendants' statements, as set forth herein, not false and misleading.  *See*, *e.g.,* SEC Accounting and Auditing Enforcement Release No. 197, July 20, 1988.  The statements and omissions were materially false and misleading because they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition, in violation of the federal securities laws and GAAP.

### 1.   Management's GAAP Responsibilities

203.   GAAP are the authoritative standards, interpretations, rules and underlying concepts that govern proper financial accounting and reporting practices in the United States. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, regardless of accompanying disclosures. *See* 17 CFR § 210.4-01(a)(1) and § 210.10-01(a).  The SEC recognizes the financial accounting and reporting standards of the Financial Accounting Standards Board ("FASB") as GAAP.  SEC

Release Nos. 33-8221; IC-26028; 34-47743; FR-70.[12]   SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

204.   Management is **solely** responsible for preparing financial statements that comply with GAAP. PCAOB Auditing Standard No. 1, AU § 110.03, *Distinction between Responsibilities of Auditor and Management; see also* Sarbanes-Oxley Act of 2002, Title III § 302 and Title IV § 404.   Werner, Hernandez and Arriola signed and filed with the SEC SOX Certifications acknowledging these responsibilities and representing that, in all material respects, SunPower's financial information and financial statements, *inter alia:* (i) did not contain any untrue statements; (ii) did not omit any statements that would cause statements made to be misleading; and (iii) were presented in a fair manner *(i.e.,* in accordance with GAAP).  *Id.*

205.   The Insider Defendants' Class Period SOX Certifications were false when filed with the SEC. SunPower's financial information and financial statements were not presented in a fair manner, violated GAAP and SEC rules and contained numerous material misstatements and omissions.  In fact, as a result of the conduct detailed *infra,* SunPower was forced to restate **all** of the financial statements that the Insider Defendants caused it to file during the Class Period. Contrary to their signed SOX Certifications, Werner, Hernandez and Arriola either: (i) failed to evaluate, in good faith, SunPower's disclosure controls and procedures as claimed; or (ii) knowingly provided false public assurances regarding SunPower's disclosure controls and procedures.

206.   Months after the Class Period ended, SunPower announced that:

. . . we are restating (a) our consolidated financial statements as of and for the year ended December 28, 2008 and consolidated financial data for each of the quarterly periods for the year then ended as well as for the first three quarterly periods in the year ended January 3, 2010 (the "Restated Periods"), and (b) the *Selected Financial Data* in Item 6 as of and for the year ended December 28, 2008. ***These restatements correct misstatements identified through an independent***

---

[12] Effective in 3Q09, FASB codified existing GAAP as Accounting Standards Codification ("ASC"). Accordingly, the SEC now recognizes ASC as GAAP. 17 C.F.R. § § 211, 231 and 241; Release Nos. 33-9062A; 34-60519A; FR-80A.

---

*investigation into certain unsubstantiated accounting entries on the books of our Company's Philippines operations, as well as other errors identified by the Audit Committee's investigation and by management and out-of-period adjustments*.

207.    By restating, SunPower and the Insider Defendants have admitted that the Company's prior financial statements were materially false and misleading, that they contained material misstatements and omissions when they were originally issued and that SunPower had contemporaneous access to information that demonstrated the falsity of those statements. SunPower and the Insider Defendants have further admitted that they improperly accounted for the Company's operating income, pre-tax income, net income, EPS, cost of revenue, inventory and the gross margins of systems and components segments, among many other errors and omissions.   Had SunPower complied with GAAP, its reported Class Period financial results would have been materially worse than represented during the Class Period.

## 2.    SunPower's False Financial Information

208.    During and after the Class Period, SunPower reported and then corrected its reports as follows:

| 2009 SunPower Financial Information as Reported and as Corrected by SunPower | | | | |
|---|---|---|---|---|
| $ in millions, rounded | Three Months Ended | | 6 Mos Ended | 9 Mos Ended |
| | March 29, 2009 | June 28, 2009 | June 28, 2009 | Sept. 27, 2009 |
| Gross margin | | | | |
| Gross margin, reported | $ 47.7 | $ 58.5 | $106.2 | $195.5 |
| Less: Amount overstated | 15.5 | 17.8 | 33.3 | 22.8 |
| Gross margin, actual | $ 32.2 | $ 40.7 | $ 72.9 | $172.7 |
| Gross Margin: % overstated | 48% | 44% | 46% | 13% |
| Pre-tax income (loss) | | | | |
| Pre-tax income (loss), reported | ($ 14.6) | $ 25.1 | $ 10.5 | $ 35.8 |
| Less: Amount overstated | 15.5 | 18.9 | 34.4 | 22.8 |
| Pre-tax income (loss), actual | ($ 30.1) | $   6.2 | ($ 23.9) | $ 13.0 |
| Pre-tax income: % overstated or Pre-tax loss: % understated | 52% | 305% | n/m | 174% |

| Earnings (Loss) Per Share | | | | |
|---|---|---|---|---|
| EPS (loss per share), reported | ($0.06) | $0.25 | $0.22 | $0.35 |
| Less: Amount overstated | 0.06 | 0.09 | 0.16 | 0.08 |
| EPS (loss per share), actual | ($0.12) | $0.16 | $0.05 | $0.27 |
| EPS: % overstated | 50% | 56% | 299% | 31% |

| Gross margin rate – Systems % | | | | |
|---|---|---|---|---|
| Gross margin rate, reported | 17% | 16% | 16% | 15% |
| Less: Gross margin rate overstated | 8% | 3% | 5.4% | 2.5% |
| Gross margin rate, actual | 8% | 13% | 11% | 13% |
| Systems GM rate: % overstated | 101% | 20% | 50% | 20% |

| Gross margin rate – Components % | | | | |
|---|---|---|---|---|
| Gross margin rate, reported. | 28% | 22% | 24% | 23% |
| Less: gross margin rate overstated | 6% | 8% | 7% | 2% |
| Gross margin rate, actual | 22% | 14% | 17% | 21% |
| Components GM rate: % overstated | 27% | 58% | 43% | 10% |

**2008 SunPower Financial Information - As Reported and As Corrected by SunPower[13]**

| | Three Months Ended | | | | 12 Months Ended |
|---|---|---|---|---|---|
| $ in millions, rounded | March 30, 2008 | June 29, 2008 | Sept. 28, 2008 | Dec. 28, 2008 | Dec. 28, 2008 |
| Gross margin | | | | | |
| Gross margin, reported | $ 53.2 | $ 92.8 | $ 105.3 | $ 111.3 | $ 362.7 |
| Less: Amount overstated | $ 1.7 | $ 8.6 | $ 3.1 | ($ 0.4) | $ 13.1 |
| Gross margin, actual | $ 51.5 | $ 84.2 | $ 102.2 | $ 111.7 | $ 349.6 |
| Gross Margin: % overstated | 3% | 10% | 3% | 0% | 4% |
| Pre-tax income | | | | | |
| Pre-tax income, reported | $ 13.2 | $ 37.4 | $ 44.4 | $ 34.0 | $ 129.1 |
| Less: Amount overstated | $ 1.4 | $ 8.3 | $ 2.7 | $ 0.6 | $ 13.0 |
| Pre-tax income, actual | $ 11.8 | $ 29.1 | $ 41.7 | $ 33.4 | $ 116.1 |
| Pre-tax income: % overstated | 12% | 29% | 6% | 2% | 11% |
| Earnings Per Share | | | | | |
| EPS, reported | $0.14 | $0.37 | $0.29 | $0.37 | $1.16 |
| Less: Amount overstated | $0.01 | $0.05 | $0.02 | $0.03 | $0.11 |
| EPS, actual | $0.13 | $0.32 | $0.28 | $0.33 | $1.05 |
| EPS: % overstated | 8% | 16% | 7% | 10% | 11% |

---

[13] Overstatement amounts and percentages are based on SunPower's retrospectively adjusted financial results.

### 3.      Accounting For Inventory And Cost of Sales

209.    Under Accounting Research Bulletin No. 43, Chapter 4, *Inventory Pricing*[14] ("ARB 43") and Statement of Financial Accounting Standards No. 151, *Inventory Costs*[15] ("SFAS 151"), inventories are stated at the lower of cost or market (SunPower's manufacturing cost was lower than market):

> Inventories are presumed to be stated at cost . . . . For example, variable production overheads are allocated to each unit of production on the basis of the actual use of the production facilities. However, the allocation of fixed production overheads to the costs of conversion is based on the normal capacity of the production facilities . . . . The amount of fixed overhead allocated to each unit of production is not increased as a consequence of abnormally low production or idle plant.  Unallocated overheads are recognized as an expense in the period in which they are incurred . . . .

> SFAS 151, ¶¶5-5A.

210.    In manufacturing environments, cost is based on the standard production cost *per unit* ("standard cost") of each product manufactured at each facility, under normal conditions. Under SFAS 151 ¶¶5-5A, standard cost acts as a ceiling for manufactured inventory.  If actual costs are higher than standard costs, these excess or "abnormal" costs are included in cost of goods sold, and not added to inventory.

211.    Improperly accounting for the value of inventory distorts income by failing to properly match costs to related revenues.  ARB 43 states:

> A major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues.

> ARB 43, Chapter 4, f3, Statement 2.  *See also* FASB Current Text, Section I78, *Inventory.*

212.    Based on ARB 43, improperly accounting for the value of inventory distorts income by failing to properly match costs to related revenues.  SunPower violated ARB 43 by overstating its inventory, which artificially reduced its cost of revenue and inflated its profit.

---

[14]  In 3Q09, ARB 43 was replaced by ASC § 330.10.XX, *Inventory.*

[15]  In 3Q09, SFAS 151 was replaced by ASC § 330.10.XX, *Inventory.*

213.   During the Class Period, SunPower repeatedly violated SFAS No. 151 and ARB 43 by using so-called "unsubstantiated accounting entries" to remove excess manufacturing costs from its income statement, where it was properly reflected as cost of revenue, and improperly add these costs to inventory.  This caused cost of sales to be understated and inventory to be overstated by the same or nearly the same amount.

214.   These inventory accounting rules are based on an underlying GAAP concept often called the "matching principle." GAAP and accrual accounting require that costs of sales, *inter alia,* be recorded in the same period as the associated revenues.  Otherwise, profits are misstated. According to FASB Concepts Statement No. 6 ("Concepts 6"), *Elements of Financial Statements: Recognition, Matching and Allocation*

* * *

. . . recognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities—including matching of costs and revenues, allocation, and amortization—is the essence of using accrual accounting to measure performance of entities.

* * *

Matching of costs and revenues is simultaneous or combined recognition of the revenues and expenses that result directly and jointly from the same transactions or other events. In most entities, some transactions or events result simultaneously in both a revenue and one or more expenses. The revenue and expense(s) are directly related to each other and require recognition at the same time. In present practice, for example, a sale of product or merchandise involves both revenue (sales revenue) for receipt of cash or a receivable and expense (cost of goods sold) for sacrifice of the product or merchandise sold to customers.

Concepts 6, ¶145 and ¶146, respectively.  *See also* Statement of Financial Accounting Standards No. 16, *Prior Period Adjustments* and FASB Current Text, Section I78, *Inventory.*

### 4.   SunPower's False And Misleading Disclosures Under SEC Regulations

215.   To help conceal their financial statement fraud, defendants violated numerous SEC and GAAP requirements by making false and misleading disclosures, and omitting to make

required disclosures in its financial statements.[16]   According to SEC rules and GAAP, such disclosures are necessary to prevent SunPower's financial statements from being misleading.[17]

216.   Regulation S-K, Item 303, *Management's Discussion and Analysis of Financial Condition and Results of Operations,* required SunPower to disclose any unusual or infrequent transactions that materially affected its income from continuing operations.

217.   Accordingly, unless they were ordinary and frequent transactions, SunPower was required to disclose each of the "unsubstantiated accounting entries" and their impact on SunPower's financial statements.   SunPower and the Insider Defendants failed to properly account for SunPower's cost of revenue, inventory, sales margins, operating income, pre-tax income, net income and EPS.   SunPower and the Insider Defendants (i) failed to design and adhere to appropriate procedures to account for manufacturing variances, which is an inherent element of production; and (ii) failed to implement proper (or any) controls over approving, entering and reviewing multi-million dollar journal entries, general ledger access, record-keeping and segregation of duties.   SunPower and the Insider Defendants also failed to comply with SEC or GAAP requirements for financial reporting and disclosure and their record-keeping failures were not isolated or unique instances − records were improperly maintained for at least seven consecutive reporting periods, from at least 1Q08 through at least 3Q09.

218.   In addition, SunPower and the Insider Defendants failed to implement procedures reasonably designed to prevent accounting errors or irregularities.   Defendants failed to ensure that review and checks were in place to ensure that it was properly recording, accounting for and reporting its cost of revenue, sales margins, inventory balances and expense variances.

219.   SunPower and the Insider Defendants also failed to disclose in the Company's financial statements the existence of the material facts described herein and to appropriately

---

[16]   "The term 'financial statements' as used in this regulation shall be deemed to include all notes to the statements and all related schedules."  SEC Regulation S-X, Article 1, Rule 1-01(b), *Application of Regulation S-X.*

[17]   *See, e.g.,* SEC Regulation S-K, Item 303 and Accounting Principles Bulletin Opinion No. 22, *Disclosure of Accounting Policies.*

1   recognize and report assets, liabilities, revenues, and expenses in conformity with GAAP.

2   SunPower failed to make such disclosures and to account for and to report its financial

3   statements in conformity with GAAP.  The Insider Defendants knew, or were deliberately

4   reckless in not knowing, the facts which indicated that all of the Company's interim financial

5   statements, press releases, public statements, and financial filings with the SEC, which were

6   disseminated to the investing public during the Class Period, were materially false and

7   misleading for the reasons set forth herein.  Had the true financial position and results of

8   operations of the Company been disclosed during the Class Period, the Company's securities

9   would have traded at prices well below what they did during the Class Period.

10      220.    In addition to SunPower's failure to make the required disclosures in its financial

11   statements and in its SEC filings, defendants also shirked their duty to make such disclosures in

12   its conference calls, its press releases and its annual reports.  As a result of these improprieties,

13   many of defendants' key statements throughout the Class Period about SunPower's financial

14   results were materially false and misleading because all of SunPower's Class Period financial

15   statements and the results therein violated the basic fundamental principles and concepts

16   underlying the fairness of GAAP, including:

17      (a)     The principle that financial reporting should provide information that is

18   useful to present and potential investors and creditors and other users in making rational

19   investment, credit and similar decisions (FASB Statement of Concepts No. 1);

20      (b)     The principle that financial reporting should provide information about

21   an enterprise's financial performance during a period.  Although investment and credit

22   decisions reflect investors' and creditors' expectations about future enterprise performance,

23   those expectations are based partly on evaluations of past enterprise performance (FASB

24   Statement of Concepts No. 1);

25      (c)     The principle that financial reporting should provide information about

26   the economic resources of an enterprise, the claims to those resources, and the effects of

27

28

transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders. To the extent that management offers public securities, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1);

(e)     The principle that financial reporting should be reliable, relevant and timely to be useful.  Reliable means that the information represents what it purports to represent (FASB Statement of Concepts No. 2);

(f)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2);

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2); and

(h)     The principle of comparability, that an enterprise's financial information gains greatly in usefulness if it can be compared with similar information about other enterprises and with similar information about the same enterprise for some other period (FASB Statement of Concepts No. 2).

D.     **Additional Scienter Allegations**

221.     As explained below, SunPower's and the Insider Defendants' violations of GAAP and SEC reporting rules were pervasive, extensive and deliberate.  The same facts that explain why the statements are false and misleading also demonstrate scienter for SunPower and the Insider Defendants.

1    **1.    Defendants' Pervasive, Extensive And Deliberate GAAP Violations**

2        222.    SunPower and the Insider Defendants' GAAP violations were: (i) extensive in

3    duration, misstating almost two years of financial results; (ii) significant in the financial impact,

4    causing SunPower's quarterly reported earnings to be overstated more than 10% on average;

5    (iii) crucial to the Company's ability to meet Wall Street expectations in each quarter during the

6    Class Period; and (iv) the second time, in one year, that the Company admitted to inadequate

7    internal controls over financial reporting, despite previously assuring investors that SunPower

8    had "identified and corrected" previous problems.    Moreover, the accounting violations

9    concerned a key business unit, accounting for the majority of the Company's personnel and

10   physical assets, that laid at the heart of SunPower's operations and profitability.

11       223.    In substance, the Restatement restored the accounts to their balances before the

12   entries − the recorded amounts for inventory and cost of sales were substantially *correct* until the

13   unsubstantiated entries were made.    In other words, SunPower expenses were correctly recorded

14   throughout each quarter in the Class Period but then manually adjusted at the end of each quarter

15   to conform to budgeted forecasts.    Projections and budgets are prepared for and approved by

16   management, and by definition, are prepared before actual results are known.    Because the

17   *variances* from these budgets were so large − more than $15 million in 1Q09 and 2Q09 − they

18   could not have been created at or near the end of the periods, or for financial reporting purposes.

19       224.    Budgets, including, for example, internal expense projections, are subject to

20   internal controls.    The largest budgets must be approved by senior management.    Therefore,

21   access to these budgets is restricted.    The size of the variances that led to the unsubstantiated

22   accounting entries suggests that these were extremely large budgets.    This creates a strong

23   inference that senior management approved SunPower's internal expense projections throughout

24   the reporting periods in question.    Similarly, senior management monitored SunPower's

25   performance against the internal expense projections, including any variances between the

26   budget and actual results.    During each reporting period, the variances generally increased week

27

28

1  over week. Then, at the end of each reporting period – because of the unsubstantiated

2  accounting entries – the variances would suddenly be reduced to near-zero.

3  225. Accounts of former SunPower employees confirm that SunPower and the Insider

4  Defendants were intensely focused on budgets and monitoring the Company's performance to

5  forecasts. *See supra,* ¶¶81-98; 128-130. SunPower's executives either saw and ignored the

6  changes in the variances and/or the suspiciously low final variances, or recklessly failed to

7  perform their executive duties. The SEC says that manipulating inventory to inflate income is "***a***

8  ***perversion of the reporting process***." SEC ASR 293, Codified as FRR.T.205.02.

9  226. During the Class Period, SunPower intentionally issued financial statements with

10  misstatements that were determined to be material. SunPower also made undisclosed,

11  purportedly "immaterial" errors in its financial statements, which SunPower failed to correct

12  until after the Class Period. The total amount of such errors was $4.8 million in 2008 and $2.9

13  million in the first three quarters of 2009. These errors, which SunPower had identified at the

14  time but failed to make any necessary corrections, were material because SunPower corrected

15  them in the Restatement, which is not permitted for immaterial items. After the Class Period,

16  defendants made the admission that SunPower had knowingly issued financial statements with

17  uncorrected errors during the Class Period:

18      ***Out-Of-Period Adjustments:***

19      As noted above, the Company also recorded out-of-period adjustments during the

20      restatement periods that were previously considered to be immaterial. These
    adjustments related to Systems revenue, inventories, accounts payable and

21      accruals and stock-based compensation.

22  227. As the top executive officers at SunPower, the Insider Defendants were

23  knowledgeable about the Company's core operations. As the Company explained in its April

24  2009 Prospectus: "We rely heavily on the services of our key executive officers," including

25  Werner, Hernandez and Arriola. The Company advised prospective shareholders that "the

26  success of our business depends on the continuing contributions of our key personnel" and the

27  loss of Werner or Hernandez, in particular, could adversely impact its operations. Werner − as

28

CEO and a Director — was responsible for the overall operations of the Company.  Werner had unrestricted access to all information pertinent to SunPower's operations.   Werner was knowledgeable about the same accounting rules that defendants circumvented with "unsubstantiated accounting entries."

228.   For example, Werner stated in response to an analyst's question about reduced factory utilization and the potential negative impact on margins:

> *In terms of under absorption bookings, I am not a big fan of taking [such] cost hits* . . . .[So we have really, Marty's team has really managed absorption very effectively.] *So the fact that we are producing less volume than planned, of course, makes it difficult to absorb the fixed costs.*
>
> *All of the numbers we report will absorb the fixed costs in our reporting* . . . [We don't expect to have a separate under absorption number. Although, if it is beneficial at the end of the quarter, we could compare what it would have been had it been 100% loaded.] *But the way we report, we will absorb everything.*

229.   Hernandez and Arriola — SunPower's CFOs — were responsible for the accuracy of SunPower's reported financial results.  Both Hernandez and Arriola are experienced CFOs and have substantial GAAP experience and SEC reporting experience.  As trained CPAs, both were thoroughly familiar with the nature of the accounting violations since before the Class Period.  Both had experienced running large, public company accounting organizations and were familiar with the requirements and importance of their responsibilities as CFO with respect to internal controls and financial reporting.  Similarly, Rodman is a trained CPA, licensed since 1991, with professional public accountancy experience, while Trinidad is a licensed CPA and attorney in the Philippines.

230.   As SunPower's top officers, the Insider Defendants were informed about important developments in SunPower's core business; specifically, inventory, raw materials and manufacturing costs, margins, and cost of goods sold.

231.   SunPower's margins and cost of goods sold were key performance metrics for both management and investors throughout the Class Period.  As SunPower's top officers, the Insider Defendants were also aware of important developments at the Company and monitored its quarterly performance regarding these metrics.  Rodman – SunPower's corporate controller –

1    was responsible for overseeing all accounting and financial reporting for the Company, while

2    Trinidad – effectively SunPower's Phlippines CFO – devised the Company's 5-year cost

3    reduction program and was responsible for cost accounting and ensuring that SunPower's

4    Philippines manufacturing center met the aggressive cost-cutting targets.  Indeed, throughout the

5    Class Period, the Werner, Hernandez, and Arriola made numerous statements and responded to

6    inquiries from securities analysts regarding SunPower's manufacturing costs, product costs, cost

7    of goods sold, margins and revenues – the same financial data that they later admitted was

8    misstated.  *See supra,* ¶¶136-201.

9    232.   The Insider Defendants' scienter also can be inferred from the fact that

10   SunPower's Philippines facilities represented the Company's single most important components

11   manufacturing operation and its largest source of revenue.   SunPower's components are

12   principally manufactured at SunPower's Philippines facilities.  Moreover, the vast majority of

13   SunPower's personnel (approximately 85%) and physical assets (approximately 88%) are located

14   in the Philippines.

15   233.   For example, according to SunPower's Annual Report on Form 10-K for 2008, as

16   of December 28, 2008, the Company had approximately 5,400 employees worldwide, including

17   approximately 4,710 employees located in the Philippines, 540 located in the United States, and

18   150 located in other countries.   Of these employees, approximately 4,460 were engaged in

19   manufacturing. The 2008 Annual Report states that SunPower manufactured its solar cells at two

20   facilities in the Philippines, and assembled almost all of its solar panels at a third (newly built)

21   facility located in the Philippines.  The Annual Report further states that by geography, nearly

22   95% of Sunpower's property, plant, and equipment was located in the Philippines as of the end

23   of 2007.

24   234.   On December 14, 2009, the Company quietly filed a trademark application for a

25   low-cost line of solar products called "Serengeti."  SunPower neither issued a press release nor

26   did it make any special public announcement of this new business line.  Instead, the closest

27   SunPower has come to publicly acknowledging its foray into the low-cost solar power market

28

was an ambiguous statement by Werner on a 4Q09 earnings call that the Company would "leverage [its] third-party panel strategy." As an analyst described the Serengeti launch:

> SunPower [] **has silently** launched a product line of low-efficiency multicrystalline modules . . . . We believe this is a measured reaction to the loss of market share due to increased competition from both Chinese and Japanese module manufacturers. In addition, **we believe the use of multi-crystalline modules weakens SunPower's competitive argument that the company's high-efficiency mono-crystalline modules can compete effectively versus the lower-priced Asian modules**. We continue to rate the shares of SPWRA with a Sell rating and find the stock is meaningfully overvalued given the use of non-GAAP results.
>
> \*   \*   \*
>
> **In our view, this new offering** tells us that SunPower management has capitulated on its belief that its high-performance mono-crystalline module can effectively compete for every solar application.

235.    With the secretive launch of Serengeti, perhaps SunPower is now finally willing to acknowledge with acts what it was unwilling to concede with true statements during the Class Period – namely, that its highly-touted "brand" and "differentiated" business model were unsustainable in a commodities-driven market.

### 2.    Following The November 2008 "Blunder," SunPower Claimed It Was Focused On Investigating And Correcting Any Internal Control Issues

236.    On November 4, 2008, SunPower suddenly withdrew its 4Q08 guidance, citing "foreign exchange rate volatility." The announcement came just three weeks after announcing earnings and updating its guidance on October 16, 2008. Analyst Paul Clegg of Jeffries & Co. called the news a "surprising gaffe" and "blunder" for the Company. Indeed, less than one month earlier during the October 16, 2008, earnings conference call discussing the Company's reported 3Q08 results, management had been asked specifically whether its 4Q08 guidance accounted for fluctuations in the foreign currency exchange rate, and Hernandez replied that the Company was "conservative."

237.    Other analysts were even more suspicious. Analyst Michael Carboy wrote that the announcement "rattles our confidence" in SunPower's financial and risk management practices. Another analyst noted that the impact "is weighted significantly to the Components

---

business" – meaning, the production and sale of solar components from SunPower's Philippines manufacturing facilities.   Wedbush Morgan Securities analyst Al Kaschalk wrote that the "reduced confidence by the Street in the management team as it lowers outlook three weeks after earnings report . . . .   Management will have to work to regain some of its tarnished image after lowering guidance a mere three weeks after reporting Q3:08 earnings."

238.   At a subsequent investor conference hosted by SunPower in Las Vegas, Nevada on November 11, 2008, defendants reassured investors that the Company had "identified and corrected" the financial control issues leading to its bungled 4Q08 guidance.

239.   In addition to purportedly addressing the specific financial controls deficiencies that led to the withdrawal of its 4Q08 guidance, SunPower claimed in its Form 10-Q for the third quarter of 2008 filed with the SEC on November 7, 2008, that, the Company was "implement[ing] and improve[ing] additional and existing administrative, financial and operations systems, procedures and controls, including the need to update and integrate our financial internal control systems in SP systems and in our Philippines facility with those of our San Jose, California headquarters."   While prompted by the Company's failure to account for currency exchange rates, SunPower explicitly assured investors that it was making improvements to financial controls that were *not* limited to currency exchange but purportedly were Company-wide:

> In the third quarter of fiscal 2008, we implemented a new enterprise resource planning ("ERP") system in our subsidiaries around the world, which resulted in a material update to our system of internal control over financial reporting. ***Issues encountered subsequent to implementation caused us to further revise our internal control process and procedures in order to correct and supplement our processing capabilities within the new system in that quarter***. Throughout the ERP system stabilization period, which we expect to last for the remainder of the year, ***we will continue to improve and enhance our system of internal control over financial reporting***.

240.   In its Form 10-K for 2008, SunPower again emphasized that the Company had implemented its new ***Company-wide system*** to "improve and enhance the company's system of internal controls over financial reporting."

241.    Following the November 2008 admission of faulty internal controls, Defendants Werner, Hernandez, and Arriola further continued to reassure investors in SOX certifications that they had properly designed implemented and supervised internal controls over financial reporting at SunPower and that they had disclosed any material weaknesses in such controls.

242.    The fact that SunPower admitted material weaknesses in its financial reporting and internal controls in connection with its Components business **twice within one year** strongly evinces scienter for Werner, Hernandez, and Arriola.

243.    Analyst commentary following SunPower's November 2009 announcement of accounting misstatements corroborates the relatedness of SunPower's continued deficiencies in internal controls following the November 2008 disclosure despite management's repeated assurances that it was correcting and improving internal control deficiencies.  As one analyst commented, "We believe the accounting errors call the company's credibility more into question than the business model.  Although the nuances are different, *we note the announcement of accounting errors is reminiscent of inadequate hedging disclosed by the company soon after it announced 3Q08 results*. . . ."  *See* ¶119 *supra*.    Another analyst accused SunPower's management of using "**accounting chicanery to smooth out results in tough times**."  *See* ¶118 *supra*.

### 3.    SunPower's Restatement Demonstrates The Insider Defendants' Intentional Or Reckless Conduct

244.    SunPower's GAAP violations and other misstatements further establish scienter based on the results and accounts affected and their specific significance to SunPower's business. The Restatement is an admission that: (i) the Company's Class Period financial statements and the Insider Defendants' public statements regarding those results were **materially** false and misleading; and (ii) the financial statements reported during the Class Period were incorrect **based on information available to the defendants at the time the results were originally reported**. SunPower's Restatement contains at least the following indicators of defendants' scienter:

(a)     ***The type of restatement (misuse of the facts)*** − The restated items at issue were not due to any mathematical error, or honest misapplication of a complex accounting standard.  Rather, as set forth in ¶¶121-125, the Restatement resulted primarily from huge accounting adjustments which manually removed unfavorable operating expense variances from cost of revenue to inventory and improperly inflated gross margins, operating income, pre-tax income, net income and EPS.

(b)     ***The duration over which the improper accounting was perpetrated*** − As detailed herein, the Restatement does not hinge on an honest mistake or oversight during a single quarter or even a single year that was later corrected on a good faith basis.  Here, SunPower was forced to restate its financial statements covering fiscal 2008, each quarterly period during 2008, and the first three quarters of 2009 to correct its accounting improprieties that could no longer be concealed.

(c)     ***The types of accounting gimmicks employed*** − As detailed herein, the improper accounting corrected by this Restatement did not occur as a result of good faith differences in accounting judgments, or interpretations of complicated, vague or arcane accounting rules, and the Company does not claim otherwise.  Rather, SunPower's accounting improprieties violated clear and well-established basic expense recognition and inventory valuation standards.

(d)     ***The income statement effect of the misstatements*** − Most or all of the purported "errors" had the effect of improving, not worsening, operating results, including but not limited to gross margins, operating income, pre-tax income, net income and EPS.

245.   In addition to the Insider Defendants' knowledge of the Company's violations of basic accounting principles based on their accounting backgrounds, defendants' SOX Certifications attached to SunPower's Forms 10-Q and Forms 10-K also establish scienter.  As set forth in ¶¶142-143, 152-153, 161-163, 170-172, 181-182, 190-191, 199-200, Werner, Hernandez and Arriola certified that they had personally reviewed SunPower's financial statements, designed and evaluated SunPower's disclosure controls and evaluated SunPower's

internal controls over financial reporting.  Such reviews and evaluations, if performed as represented, would have alerted the Insider Defendants to SunPower's glaring accounting misstatements and material weaknesses in internal and disclosure controls that were subsequently admitted.

246.    These, defendants either knew of the material misstatements in the financial statements, the ineffectiveness of the disclosure controls, and the material weaknesses in internal controls, *or* defendants knowingly failed to perform the required review of the financial statements, evaluation of internal controls and evaluation of disclosure controls and falsely represented that they had.  In either case, defendants knew or recklessly disregarded that the SOX Certifications Werner, Hernandez and Arriola signed were false and misleading.

### E.    Loss Causation/Economic Loss

247.    On November 16, 2009, after the close of trading, SunPower issued a press release announcing that the Company had identified "unsubstantiated accounting entries," and that, as a result, the Company may have to restate its financial results for 2008 and the first three quarters of 2009.  The following day, on November 17, 2009, shares of the Company immediately collapsed as trading in SunPower shares resumed, falling approximately 20% during that single trading day and closing at just over $22 per share, compared to the prior day's close of about $27.00.

248.    Over a period of approximately eighteen months, SunPower improperly inflated the Company's financial results.  When SunPower and the Insider Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to investors, the price of SunPower securities declined precipitously − as the prior artificial inflation in the price of SunPower's securities was eliminated.  As a result of their purchases of SunPower securities, during the Class Period, Lead Plaintiffs and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

249.    By improperly characterizing the Company's financial results and misrepresenting its prospects, SunPower presented a misleading image of its business and future growth

prospects.   During the Class Period, defendants repeatedly emphasized the ability of the Company to monitor and control its operations and expenses, and consistently reported results within the range of guidance sponsored or endorsed by the Company.  These claims caused and maintained the artificial inflation in SunPower's securities prices throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

250.   The decline in SunPower's securities prices following the November 16, 2009 disclosure was a direct result of defendants' fraud being revealed.  The timing and magnitude of SunPower's securities price decline negates any inference that the losses suffered by Plaintiffs and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to defendants' fraudulent conduct. During the same period in which SunPower's securities prices fell, the Standard & Poor's 500 securities index was relatively unchanged.

251.   On March 18, 2010, after the close of trading, SunPower issued a press release announcing the results of its internal investigation and including restated financial information. The announcement revealed new, previously unknown details about the extent and pervasiveness of the accounting misstatements at SunPower during the Class Period. For example, the Company revealed that, in addition to the unsubstantiated accounting entries previously disclosed, the Company had engaged in unspecified "various accounting errors" and that the Audit Committee had recommended "various remedial measures to address certain [unidentified] personnel, organization and internal control matters."

252.   Additionally, the Company revealed that the adjustments to SunPower's prior financial results would be more significant than previously disclosed.  *See supra* ¶¶121-125; 131-132.  Immediately following the issuance of the press release, the market price for SunPower Class A common stock fell from its opening price of $22.02 on March 18, 2010, to a low of $18.62 on March 19, 2010 − a decline of approximately 14%.  SunPower Class B shares fell from a March 18, 2010, opening price of $19.73 to a low of $16.61 on March 19, 2010 − a decline of almost 14%.  Class members who held SunPower securities through the March 18,

1   2010 disclosure suffered damages as a direct result of new, material information about the scope

2   of defendants' accounting misstatements being revealed to the market.

3       253.    The economic loss, *i.e.*, damages suffered by Lead Plaintiffs and other members

4   of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price

5   of SunPower's securities and the subsequent significant decline in the value of the Company's

6   securities when defendants' prior misstatements and other fraudulent conduct was revealed.

7       254.    At all relevant times, the material misrepresentations and omissions alleged in this

8   Complaint directly or proximately caused or were a substantial contributing cause of the

9   damages sustained by Lead Plaintiffs and other members of the Class.  As described herein,

10  during the Class Period, the Insider Defendants made or caused to be made a series of materially

11  false or misleading statements about SunPower's business, prospects, and operations.  These

12  material misstatements and omissions had the cause and effect of creating in the market an

13  unrealistically positive assessment of SunPower and its business, prospects, and operations, thus

14  causing the Company's securities to be overvalued and artificially inflated at all relevant times.

15  Defendants' materially false and misleading statements during the Class Period caused Lead

16  Plaintiffs and other members of the Class to purchase the Company's securities at artificially

17  inflated prices, thus causing the damages complained of herein.

18      F.    **Applicability Of Presumption Of
            Reliance: Fraud On The Market Doctrine**

19

20      255.    At all relevant times, the market for SunPower's common stock was an efficient

21  market for the following reasons, among others:

22          (a)     SunPower common stock met the requirements for listing, and was listed

23  and actively traded on the NASDAQ, a highly efficient and automated market;

24          (b)     As a regulated issuer, SunPower filed periodic reports with the SEC and

25  the NASDAQ;

26          (c)     SunPower regularly communicated with public investors via established

27  market communication mechanisms, including through regular disseminations of press releases

28

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) SunPower was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

256. As a result of the foregoing, the market for SunPower's securities promptly digested current information regarding SunPower from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of SunPower's securities during the Class Period suffered similar injury through their purchase of SunPower's securities at artificially inflated prices, and a presumption of reliance applies.

257. At all relevant times, the market for SunPower's debentures was an efficient market for the following reasons, among others:

(a) A convertible debenture is a hybrid security comprised of common stock and debt, which bears many of the same characteristics as the issuer's common stock;

(b) SunPower's debentures were offered concurrently with an offering of 9 million shares of Class A common stock and were convertible at the holder's option into shares of SunPower Class A common stock, which were listed and traded on the NASDAQ. Accordingly, the market price for SunPower's debentures changed in tandem with SunPower's Class A common stock, which traded in a highly efficient market. For example, on November 17, 2009, the day after SunPower disclosed unsubstantiated accounting entries, the price for the debentures declined approximately 14% from the prior day's closing price while the price for Class A common stock declined approximately 19% over the same period;

(c) SunPower debentures were actively traded throughout the Class Period and transactions were required to be reported on FINRA's Trade Reporting and Compliance Engine ("TRACE");

(d)     As a regulated issuer, SunPower filed periodic reports with the SEC and the NASDAQ;

(c)     SunPower regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     SunPower was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

258.     As a result of the foregoing, the market for SunPower's debentures promptly digested current information regarding SunPower from all publicly available sources and reflected such information in the prices of the debentures.  Under these circumstances, all purchasers of SunPower's debentures during the Class Period suffered similar injury through their purchase of SunPower's debentures at artificially inflated prices, and a presumption of reliance applies.

**G.     No Safe Harbor**

259.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as and were not "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Insider Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular

1   speaker knew that the particular forward-looking statement was false, and/or the forward-looking
2   statement was authorized and/or approved by an executive officer of SunPower who knew that
3   those statements were false when made.

4   **VI.    CLASS ACTION ALLEGATIONS**

5          260.   Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the
6   Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired
7   SunPower publicly traded securities during the Class Period or pursuant to or traceable to the
8   Class B Shares Offering and/or the April 2009 Offerings, and were damaged by the conduct
9   asserted herein. Defendants are excluded from the Class.

10         261.   The members of the Class are so numerous that joinder of all members is
11  impracticable.  The disposition of their claims in a class action will provide substantial benefits
12  to the parties and the Court.  SunPower has over 25 million shares of stock outstanding, owned
13  by hundreds if not thousands of persons.

14         262.   There is a well-defined community of interest in the questions of law and fact
15  involved in this case.  Questions of law and fact common to the members of the Class which
16  predominate over questions which may affect individual Class members include:

17                 (a)     whether defendants violated the federal securities laws;

18                 (b)     whether defendants omitted and/or misrepresented material facts;

19                 (c)     whether defendants' statements omitted material facts necessary to make
20  the statements made, in light of the circumstances under which they were made, not misleading;

21                 (d)     whether defendants knew or deliberately disregarded that their statements
22  were false and misleading;

23                 (e)     whether the prices of SunPower publicly traded securities were artificially
24  inflated; and

25                 (f)     the extent of damage sustained by Class members and the appropriate
26  measure of damages.

27

28

---

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                              -104-
Case No. CV 09-5473-RS

263.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from defendants' wrongful conduct.

264.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

265.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII.    CLAIMS FOR RELIEF

### COUNT I

**For Violations Of § 10(b) Of The Exchange Act And Rule 10b-5(b)**
**Against SunPower And The Insider Defendants**

266.    Lead Plaintiffs incorporate ¶¶1-265 by reference.

267.    During the Class Period, SunPower and the Insider Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

268.    SunPower and the Insider Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

269.    SunPower and the Insider Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of SunPower as specified herein.

270. SunPower and the Insider Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing SunPower's true financial condition from the investing public and supporting the artificially inflated price of SunPower's securities.

271. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SunPower publicly traded securities. Lead Plaintiffs and the Class would not have purchased SunPower publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for SunPower's securities had been artificially inflated by SunPower and the Insider Defendants' materially false and misleading statements.

## COUNT II

### For Violations Of § 10(b) Of The Exchange Act And
### Rule 10b-5(a) & (c) Against SunPower And The Insider Defendants

272. Lead Plaintiffs incorporate ¶¶1-265 by reference.

273. During the Class Period, SunPower and the Insider Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

274. SunPower and the Insider Defendants violated § 10(b) of the Exchange Act and Rule 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of SunPower publicly traded securities during the Class Period.

275.    SunPower and the Insider Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of SunPower as specified herein.

276.    SunPower and the Insider Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of SunPower securities during the Class Period.

277.    SunPower and the Insider Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing SunPower's true financial condition from the investing public and supporting the artificially inflated price of SunPower's securities.

278.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SunPower publicly traded securities.  Lead Plaintiffs and the Class would not have purchased SunPower publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for SunPower's securities had been artificially inflated by SunPower and the Insider Defendants' materially false and misleading statements.

## COUNT III

### For Violations Of § 20(a) Of The Exchange Act Against The Insider Defendants

279.    Lead Plaintiffs incorporate ¶¶1-265 by reference.

280.    During the Class Period, the Insider Defendants acted as controlling persons of SunPower within the meaning of § 20(a) of the Exchange Act.  By reason of their high-level positions with the Company, participation in and/or awareness of the Company's operations,

1    direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of

2    the Company's actual performance, the Insider Defendants had the power to influence and

3    control and did influence and control, directly or indirectly, the decision-making of the Company,

4    including the content and dissemination of the materially false and misleading statements alleged

5    herein.

6         281.   By reason of such conduct, Insider Defendants are liable pursuant to § 20(a) of

7    the Exchange Act.

**COUNT IV**

**For Violation Of § 11 Of The Securities Act In Connection With
The April 2009 Offerings Against SunPower, Werner, Hernandez,
Rodgers, Albrecht, Atkins, Wood, And The Underwriter Defendants**

11        282.   This Count is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on

12   behalf of all persons who received or otherwise acquired SunPower securities pursuant to or

13   traceable to the April 2009 Offerings against SunPower, Werner, Hernandez, Rodgers, Albrecht,

14   Atkins, Wood and the Underwriter Defendants.

15        283.   This Count does not sound in fraud.  All of the preceding allegations of fraud or

16   fraudulent conduct or motive are specifically excluded from this Count.  Lead Plaintiffs do not

17   allege for purposes of this Count that SunPower, Werner, Hernandez, Rodgers, Albrecht, Atkins,

18   Wood and the Underwriter Defendants had scienter or fraudulent intent, which are not elements

19   of a § 11 claim.

20        284.   The April 2009 Prospectuses were inaccurate and misleading, contained untrue

21   statements of material facts, omitted to state other facts necessary to make the statements not

22   misleading, and omitted to state material facts required to be stated therein.

23        285.   The April 2009 Prospectuses incorporated by reference SunPower's materially

24   false and misleading 2008 Form 10-K.  As set forth above in ¶¶64, 173, SunPower has admitted

25   that its financial results and statements for its fiscal year 2008 contained in the Form 10-K

26   included misstatements.  SunPower, Werner, Hernandez, Rodgers, Albrecht, Atkins, Wood and

27   the Underwriter Defendants were responsible for the contents and dissemination of the April

28

2009 Prospectuses.  SunPower was the registrant for the securities issued in the Class B Shares Offering and the April 2009 Offerings, and as the issuer is strictly liable to Lead Plaintiffs and the Class for the material misstatements and omissions.

286.   Werner, Hernandez, Rodgers, Albrecht, Atkins and Wood signed the April 2009 Prospectuses.  Each of them was either an executive officer or director for the Company at the time the April 2009 Prospectuses became effective.   These defendants are therefore liable pursuant to §§ 11(a)(1) and 11(a)(2), 15 U.S.C. § 77k (a)(1) and (2).

287.   The Underwriter Defendants issued, caused to be issued, and participated in the issuance of the materially false and misleading April 2009 Prospectuses.  The Underwriter Defendants acted as "underwriters" for the April 2009 Offerings and are liable pursuant to 15 U.S.C. § 77k(a)(5). This claim against the Underwriter Defendants is based only on theories of strict liability and negligence.  It is not predicated on any allegation that they engaged in fraudulent conduct.

288.   None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the April 2009 Prospectuses were true and without omissions of any material facts and were not misleading.

289.   Lead Plaintiffs and the Class acquired SunPower securities pursuant to or traceable to the false and misleading April 2009 Prospectuses.

290.   At the times they purchased or otherwise acquired SunPower securities pursuant or traceable to the April 2009 Offerings, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to November 16, 2009.  Less than one year elapsed from the time Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Lead Plaintiffs filed the Consolidated Complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiffs filed *Plichta v. SunPower Corp., et al,* Case No. CV-09-5473-RS (N.D. Cal. Nov. 18, 2009).

**COUNT V**

**For Violation Of § 15 Of The Securities Act Against Werner, Hernandez, And Arriola**

291.   This Count is brought pursuant to § 15 of the Securities Act against Defendants Werner, Hernandez, and Arriola.   This Count does not sound in fraud.   All of the preceding allegations of fraud or fraudulent conduct or motive are specifically excluded from this Count. Lead Plaintiffs do not allege for purposes of this Count that Defendants Werner, Hernandez, and Arriola had scienter or fraudulent intent, which are not elements of a § 15 claim.

292.   At all relevant times, each of the Defendants Werner, Hernandez, and Arriola was a control person of SunPower within the meaning of § 15 of the Securities Act by virtue of their positions as a director and/or senior officer of SunPower, and their power to control SunPower's corporate actions and the transactions, and public statements alleged herein.

293.   Defendants Werner, Hernandez, and Arriola, at all relevant times, participated in the operation and management of the Company and conducted and participated, directly and indirectly, in the conduct of SunPower's business affairs.   As officers and/or directors of a publicly owned company, Defendants Werner, Hernandez, and Arriola had a duty to disseminate accurate and truthful information with respect to SunPower's financial conduct and results of operations.   Because of their positions of control and authority as officers and/or directors of SunPower, Defendants Werner, Hernandez, and Arriola were able to, and did, control the contents of the Registration Statements and April 2009 Prospectuses, which contained materially false and misleading financial information.

294.   Each of the Defendants Werner, Hernandez, and Arriola was a participant in the violation of § 11 of the Securities Act alleged in Count III above, based on having signed the Registration Statements and having otherwise participated in the process which allowed the April 2009 Offerings to be successfully completed.

# COUNT VI

### For Violation Of § 11 Of The Securities Act In
### Connection With The Class B Shares Offering Against
### <u>SunPower, Werner, Hernandez, And The Director Defendants</u>

295.   This Count is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who received or otherwise acquired SunPower Class B common stock pursuant to or traceable to the Class B Shares Offering against SunPower, Werner, Hernandez, and the Director Defendants.

296.   This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct or motive are specifically excluded from this Count.  Lead Plaintiffs do not allege for purposes of this Count that SunPower, Werner, Hernandez, or the Director Defendants had scienter or fraudulent intent, which are not elements of a § 11 claim.

297.   The September 2008 Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

298.   The September 2008 Registration Statement incorporated by reference SunPower's 1Q08 Form 10-Q and 2Q08 Form 10-Q.  As set forth above, in ¶144 and ¶154, SunPower has admitted that its financial results contained in the 1Q08 Form 10-Q and 2Q08 Form 10-Q included misstatements.

299.   SunPower's 1Q08 Form 10-Q and 2Q08 Form 10-Q also falsely reported that defendants "prepare [SunPower's] financial statements to conform with GAAP."  In fact, however, these financial statements were not prepared in accordance with GAAP as reflected by SunPower's Restatement by material amounts of gross margin, pre-tax income, EPS and components gross margin rate reflected in ¶144 and ¶154.

300.   The defendants named in this Count were responsible for the contents and dissemination of the September 2008 Registration Statement.

301.   SunPower was the registrant for the securities issued pursuant to the September 2008 Registration Statement and as issuer of the SunPower shares issued pursuant to that

registration statement, is strictly liable to Lead Plaintiffs and the Class for the material misstatements and omissions.

302. Werner, Hernandez and the Director Defendants signed the September 2008 Registration Statement. Each of them was either an executive officer or director for the Company at the time the September 2008 Registration Statement became effective. The individual defendants named herein are therefore liable pursuant to §§ 11(a)(1) and 11(a)(2), 15 U.S.C. §77k (a)(1) and (2).

303. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the September 2008 Registration Statement were true and without omissions of any material facts and were not misleading. Lead Plaintiffs and the Class acquired SunPower shares pursuant to or traceable to the materially false and misleading September 2008 Registration Statement.

304. At the times they purchased or otherwise acquired shares of SunPower Class B common stock pursuant or traceable to the September 2008 Registration Statement, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to November 16, 2009. Less than one year elapsed from the time Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiffs filed the Consolidated Complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed *Plichta v. SunPower Corp.,* Case No. CV-09- 5473 (N.D. Cal. Nov. 18, 2009).

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding Lead Plaintiffs and the members of the Class damages, including interest;

C. Awarding Lead Plaintiffs reasonable costs and attorneys' fees; and

1      D.    Awarding such equitable/injunctive or other relief as the Court may deem just

2  and proper.

3  **JURY DEMAND**

4      Lead Plaintiffs demand a trial by jury.

5

6  Dated:  April 18, 2011                  Respectfully submitted,

7                                   BERNSTEIN LITOWITZ BERGER

8                                      &GROSSMANN LLP

9                             */s/ David R. Stickney*

10                               DAVID R. STICKNEY

11                            DAVID R. STICKNEY
                          BENJAMIN GALDSTON

12                            DAVID R. KAPLAN
                          12481 High Bluff Drive, Suite 300

13                            San Diego, CA 92130
                          Tel:    (858) 793-0070

14                            Fax:    (858) 793-0323

15                                    BARROWAY TOPAZ KESSLER

16                                   MELTZER & CHECK LLP

17                             */s/ Ramzi Abadou*
                             RAMZI ABADOU

18                            RAMZI ABADOU
                          STACEY KAPLAN

19                            ERIK D. PETERSON
                          580 California Street, Suite 1750

20                            San Francisco, CA 94104
                          Tel:    (415) 400-3000

21                            Fax:    (415) 400-3001

22                                    -AND-

23                            KAPLAN FOX & KILSHEIMER LLP

24                           */s/ Laurence D. King*
                           LAURENCE D. KING

25

26                            LAURENCE D. KING
                          MARIO M. CHOI

27                            350 Sansome Street, Suite 400
                          San Francisco, CA 94104
                          Tel:    (415) 772-4700

28

Fax:     (415) 772-4707

FREDERIC S. FOX (*pro hac vice*)
JOEL B. STRAUSS (*pro hac vice*)
DONALD R. HALL (*pro hac vice*)
850 Third Avenue, 14th Floor
New York, NY 10022
Tel:     (212) 687-1980
Fax:     (212) 687-7714
ffox@kaplanfox.com
jstrauss@kaplanfox.com
dhall@kaplanfox.com

*Attorneys for Lead Plaintiffs Arkansas Teacher
Retirement System, Första-AP Fonden and
Danske Invest Management A/S*

## CERTIFICATION UNDER GENERAL ORDER NO. 45

I, David R. Stickney, am the ECF User whose ID and password are being used to file this First Amended Consolidated Class Action Complaint For Violations Of The Federal Securities Laws.  In compliance with General Order No. 45, X.B., I attest that Ramzi Abadou and Laurence D. King have concurred in this filing.

  */s/ David R. Stickney*
  DAVID R. STICKNEY