BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
DAVID R. STICKNEY   (Bar No. 188574)
NIKI L. MENDOZA   (Bar No. 214646)
BENJAMIN GALDSTON  (Bar No. 211114)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:     (858) 793-0070
Fax:     (858) 793-0323
davids@blbglaw.com
nikim@blbglaw.com
beng@blbglaw.com

KAPLAN FOX & KILSHEIMER LLP
LAURENCE D. KING  (Bar No. 206423)
MARIO M. CHOI  (Bar No. 24309)
350 Sansome Street, Suite 400
San Francisco, CA 94104
Tel:    (415) 772-4700
Fax:    (415) 772-4707
lking@kaplanfox.com
mchoi@kaplanfox.com

*Attorneys for Lead Plaintiffs Arkansas Teacher
Retirement System, Första AP-fonden and
Danske Invest Management A/S*

KESSLER TOPAZ MELTZER
   & CHECK, LLP
RAMZI ABADOU   (Bar No. 222567)
ELI R. GREENSTEIN (Bar No. 217945)
STACEY KAPLAN   (Bar No. 241989)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:     (415) 400-3000
Fax:     (415) 400-3001
rabadou@ktmc.com
egreenstein@ktmc.com
skaplan@ktmc.com

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SUNPOWER SECURITIES LITIGATION | Case No. CV 09-5473-RS (JSC) **(Consolidated)** <br><br> <u>**CLASS ACTION**</u> <br><br> **LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Judge:     Hon. Richard Seeborg <br> Courtroom: 3, 17th Floor <br> Date:      July 3, 2013 <br> Judge:     3:00 p.m. |

1

## <u>NOTICE OF MOTION AND MOTION</u>

2      PLEASE TAKE NOTICE that, pursuant to the Court's Order Preliminarily Approving

3   Settlement, Providing For Notice, And Scheduling Settlement Hearing ("Preliminary Approval

4   Order," ECF No. 257), on July 3, 2013, at 3:00 p.m., before the Honorable Richard Seeborg of

5   the United States District Court for the Northern District of California, San Francisco Division,

6   Lead Plaintiffs Arkansas Teacher Retirement System, Första AP-fonden and Danske Invest

7   Management A/S ("Lead Plaintiffs") will and hereby do move the Court for an order, pursuant to

8   Fed. R. Civ. P. 23(e), granting final approval of the Settlement in the above-captioned action on

9   the terms set forth in the Stipulation of Settlement dated as of February 1, 2013 (the

10  "Stipulation," ECF No. 248),[1] approving the proposed Plan of Allocation for distribution of the

11  Settlement proceeds, and granting final certification of the Settlement Class as preliminarily

12  certified in the Court's Preliminary Approval Order.[2]

13     This Motion is based on this Notice of Motion, the Memorandum of Points and

14  Authorities in Support Thereof, the Joint Declaration of Laurence D. King, David R. Stickney,

15  and Ramzi Abadou in Support of Motion for Final Approval of Settlement and Plan of

16  Allocation, and Motion for Approval of Attorneys' Fees and Reimbursement of Litigation

17  Expenses ("Lead Counsel Declaration" or "Lead Counsel Decl."), and exhibits thereto, all

18  pleadings and papers filed herein, arguments of counsel, and any other matters properly before

19  the Court.

20     The deadline for filing any objections to the Settlement or Plan of Allocation expires on

21  June 12, 2013.  Lead Counsel will address any objections that may be filed, if any, and also

22

23  _____

24  [1] All capitalized terms that are not defined herein are defined in the Stipulation.

25  [2]  On March 25, 2013, the Court preliminarily certified for settlement purposes only, pursuant to
26  Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, a Settlement Class.  [ECF No.
    257 at 2.]  Nothing has changed to alter the propriety of the Court's certification and, for all the
27  reasons stated in Lead Plaintiffs' motion for preliminary approval of the Settlement and
    memorandum of law in support thereof (ECF No. 247), incorporated herein by reference, Lead
28  Plaintiffs now request that the Court grant final certification of the Settlement Class for purposes
    of carrying out the Settlement.

_____

MOT. FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
Case No. CV 09-5473-RS (JSC)

1  submit proposed orders, in connection with their reply brief to be filed on or before
2  June 26, 2013.

3  **STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))**

4      1.      Whether the $19.7 million Settlement is fair, reasonable and adequate.

5      2.      Whether the proposed Plan of Allocation is fair and reasonable.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

I.      PROCEDURAL HISTORY ..................................................................... 2

    A.    Background ...................................................................................... 2

    B.    Lead Plaintiffs' Extensive Investigation, Preparation And Filing Of The Consolidated And Amended Complaints, And Oppositions To Defendants' Motions To Dismiss ............................................................... 3

    C.    The Extensive Discovery Process ............................................... 8

    D.    Lead Plaintiffs' Motion For Class Certification And Defendants' Motion For Partial Judgment On The Pleadings Were  Pending When The Settlement Was Reached ...................................................................................... 10

    E.    The Extensive Negotiations Leading To The Settlement ...................................................................................... 10

    F.    Overview Of The Notice Process ............................................... 12

II.    ARGUMENT ........................................................................................... 13

    A.    The Standards For Judicial Approval Of Class Action Settlements ...................................................................... 13

    B.    The Settlement Meets The Ninth Circuit's Standard For Approval ................................................................................... 15

        1.    Lead Plaintiffs' Case Is Strong, But Entails Risks ..................................... 15

        2.    The Expense, Complexity, And Likely Duration Of Further Litigation ...................................................... 16

        3.    The Amount Obtained In Settlement ............................ 17

        4.    The Extent Of Discovery Completed And The Stage Of The Proceedings ............................................. 18

        5.    The Experience And Views Of Lead Counsel And Lead Plaintiffs ................................................... 19

        6.    Reaction Of The Settlement Class Members To Date To The Proposed Settlement ............................ 20

    C.    The Plan Of Allocation Should Be Approved ........................... 21

III.   CONCLUSION ....................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anixter v. Home-Stake Prod. Co.*,
  77 F.3d 1215 (10th Cir. 1996) .......................................................................................13, 14

*In re Apple Computer Sec. Litig.*,
  1991 WL 238298 (N.D. Cal. Sept. 6, 1991) ...........................................................................16

*In re BankAtlantic Bancorp, Inc.*,
  2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) .........................................................................16

*Boyd v. Bechtel Corp.*,
  485 F. Supp. 610 (N.D. Cal. 1979) ........................................................................................19

*Class Plaintiffs v. Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ...............................................................................................23

*Ellis v. Naval Air Rework Facility*,
  87 F.R.D. 15 (N.D. Cal. 1980) ...............................................................................................19

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*,
  1992 WL 226321 (C.D. Cal. June 10, 1992) ..........................................................................19

*Glass v. UBS Fin. Servs., Inc.*,
  2007 WL 221862 (N.D. Cal. Jan. 26, 2007),
  *aff'd*, 331 Fed. Appx. 452 (9th Cir. 2009) ............................................................................19

*Hanlon v. Chrysler*,
  150 F.3d 1011 (9th Cir. 1998) ...............................................................................................15

*In re Heritage Bond Litig.*,
  2005 WL 1594403 (C.D. Cal. June 10, 2005) .................................................................17, 19

*In re Immune Response Sec. Litig.*,
  497 F. Supp. 2d 1166 (S.D. Cal. 2007) .................................................................................13

*Lundell v. Dell, Inc.*,
  2006 WL 3507938 (N.D. Cal. Dec. 5, 2006) .........................................................................20

*Maley v. Del Global Tech. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) ...................................................................................17

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ...........................................................................................14, 18

*Nat'l Rural Telecomms. Coop. v. DIRECTV*,
  221 F.R.D. 523 (C.D. Cal. 2004) ..........................................................................................20

*Officers for Justice v. Civil Serv. Comm'n*,
   688 F.2d 615 (9th Cir. 1982) ...................................................................14, 15, 17

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2007) ...............................................14, 19, 21, 23

*In re Pac. Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) .......................................................................19

*In re Portal Software, Inc. Sec. Litig.*,
   2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ...........................................21

*In re Rambus Inc. Deriv. Litig.*,
   2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ..............................14, 18, 19, 21

*Robbins v. Koger Props. Inc.*,
   116 F.3d 1441 (11th Cir. 1997) ...............................................................16

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ...................................................................13

*In re Sumitomo Cooper Litig.*,
   189 F.R.D. 274 (S.D.N.Y. 1999) ..............................................................17

*In re Top Tankers, Inc. Sec. Litig.*,
   2008 WL 2944620 (S.D.N.Y. July 31, 2008) ..............................................17

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) .....................................................................15

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   720 F. Supp. 1379 (D. Ariz. 1989) ...........................................................14

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982)........................................................................15

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005).........................................................23

STATUTES, RULES & REGULATIONS, AND SECONDARY AUTHORITIES

Federal Rules of Civil Procedure
   Rule 23(e)...............................................................................................14

H.R. Conf. Rep. 104-369 (1995).......................................................................19

## MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiffs and Lead Counsel have succeeded in reaching a Settlement for $19.7 million after more than three years of extensive litigation, document and deposition discovery, and arm's-length settlement negotiations overseen by an experienced and respected mediator, Jed D. Melnick, Esq. (the "Mediator"). The $19.7 million was deposited into an escrow account on or about April 5, 2013, and has been earning interest for the benefit of the Settlement Class.

Lead Plaintiffs, along with Lead Counsel – based upon their evaluation of the facts and applicable law, and their recognition of the risk and expense of continued litigation of this securities class action – submit that the proposed Settlement is in the best interests of the Settlement Class, providing a meaningful recovery for the Settlement Class now. *See* Joint Declaration of Lead Plaintiffs in Support of Final Approval of Settlement and Lead Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Lead Plaintiffs' Decl."), attached to the Lead Counsel Decl. as Exhibit A, at ¶8.

As set forth in the Lead Counsel Declaration, the Settlement was reached only after an extended mediation process and careful consideration of complex factual and legal issues. Prior to reaching the Settlement, Lead Counsel and Lead Plaintiffs were well informed of the strengths and weaknesses of the claims and defenses, as well as the practical realities of recovering substantial sums from Defendants. Lead Counsel reviewed and analyzed over 2.5 million pages of documents produced by Defendants and third-parties and took the deposition of SunPower Corporation ("SunPower" or the "Company"). *See* Lead Counsel Decl. at ¶¶44-46. Moreover, Lead Plaintiffs were aware that Defendants would argue that the accounting misconduct occurred entirely within SunPower's Philippines manufacturing subsidiary, by Philippine accountants at the direction of Philippine personnel, and was unknown to SunPower's top management located in the United States. In addition, based on representations by Defendants' Counsel, Lead Counsel understood that there would be no insurance available to fund an eventual judgment. And, based on Lead Counsel's analysis of SunPower's publicly filed financial statements with the U.S. Securities and Exchange Commission ("SEC"), and retention of

1   an investment banker as a valuation expert, it was Lead Plaintiffs' assessment that the Company's

2   cash position was diminishing, resulting in at least a serious question whether SunPower might be

3   able to satisfy a judgment that would meaningfully compensate Settlement Class Members. *See*

4   Lead Counsel Decl. at ¶7.

5        Pursuant to the Court's Preliminary Approval Order, beginning on April 8, 2013, the

6   Court-approved Notice was disseminated to over 89,000 potential Settlement Class Members and

7   their nominees. *See* Declaration of Stephanie A. Thurin re Notice Dissemination and Publication

8   ("Thurin Decl."), attached to the Lead Counsel Decl. as Exhibit B, at ¶¶3-12. Pursuant to the

9   Preliminary Approval Order, the deadline for Settlement Class Members to file objections to the

10   Settlement, or to seek exclusion from the Settlement Class, will expire on June 12, 2013. To date,

11   no objections or exclusions have been received.[3]

12   **I.**     **PROCEDURAL HISTORY**

13        A detailed description of the procedural history of the litigation, the claims asserted, the

14   investigation and discovery undertaken, the negotiation and substance of the Settlement, and the

15   substantial risks and uncertainties of the litigation is contained in the accompanying Lead Counsel

16   Declaration. A summary description is provided below.

17       **A.**    **Background**

18        The fundamental allegations in this case are that Defendants reported seven consecutive

19   quarters of false financial results of SunPower, which, in general, overstated SunPower's earnings

20   and margins and understated the Company's expenses. Specifically, Lead Plaintiffs allege that

21   Defendants made false and misleading statements concerning the Company's financial condition,

22   cost reduction efforts, and the adequacy of SunPower's internal controls in press releases, investor

23

24

25

26   [3] In the event any exclusion requests or objections are received, Lead Plaintiffs will address them

27   in their reply brief to be filed on or before June 26, 2013. A list of those seeking exclusion will be included in Exhibit 1 attached to the proposed Final Judgment and Order of Dismissal with

28   Prejudice that will also be submitted to the Court following expiration of the June 12, 2013 deadline for seeking exclusion.

conference calls, and in SEC filings.[4]  In each quarter of 2008, and the first three quarters of 2009, SunPower materially overstated the Company's profitability by under-reporting SunPower's rising cost of goods sold, and by failing to make proper, timely adjustments to the Company's published reports.  SunPower's accounting misstatements overstated income, gross margins, earnings per share ("EPS"), and other important metrics in key quarters that analysts and the broader market viewed as critical to the Company's success.  ¶¶8-20, 99-135.

Lead Plaintiffs further allege that, as a result of SunPower's false financial statements and Defendants' additional misstatements concerning the Company's financial condition, the price of SunPower's Securities was artificially inflated during the Settlement Class Period.  ¶¶6, 136-220. Members of the proposed Settlement Class, including Lead Plaintiffs, allegedly suffered damages when the artificial inflation was removed from the Securities prices and the truth began to be revealed when, after market close on November 16, 2009, SunPower disclosed that "based upon an internal review of its Philippines manufacturing operations," the Company discovered "unsubstantiated accounting entries" and that investors should no longer rely on SunPower's prior financial statements for 2008, and the first three quarters of 2009.  ¶¶7, 115-35, 247, 252, 257. Following the announcement, the price of SunPower's Securities dropped between 14-20%.  ¶¶7, 247-54, 257.

On March 19, 2010, SunPower filed its restatement with the SEC which revealed that the Company's previously reported financial results had been misstated for fiscal year ended December 28, 2008, each quarterly period in 2008, and the first three quarters in fiscal year 2009, ended January 3, 2010 (the "Restatement").  ¶¶7, 202-46, 251.

**B.    Lead Plaintiffs' Extensive Investigation, Preparation And Filing Of The Consolidated And Amended Complaints, And Oppositions To Defendants' Motions To Dismiss**

Lead Counsel undertook an extensive investigation to prepare the consolidated and then Amended Complaint, including, but not limited to, reviewing and analyzing all relevant SEC

---

[4] ¶¶8-15, 136-220.  All "¶" cites refer to Lead Plaintiffs' First Amended Consolidated Class Action Complaint For Violations Of The Federal Securities Laws (the "Amended Complaint" or the "Complaint").  [ECF No. 153.]

filings, analyst reports, and news reports.  In addition, Lead Counsel devoted extensive efforts to locate and interview former SunPower employees and other potential witnesses.  The investigation was global in nature, including Lead Counsel's direct participation in the interviews, and the retention of private investigators in the Philippines to locate former SunPower employees residing abroad with first-hand knowledge of the accounting fraud.  Certain of the witness accounts served as a basis of many of the allegations in the consolidated complaint and the Amended Complaint, which the Court credited in sustaining the Amended Complaint.  *See* Order Granting in Part and Denying in Part Motion to Dismiss [ECF No. 178].

Lead Plaintiffs also retained and consulted with experts throughout the litigation, including in preparing the complaints and analyzing Defendants' anticipated affirmative defenses, and later in crafting discovery requests, preparing for depositions, analyzing documents, moving for class certification, preparing mediation briefs, analyzing estimated damages, and preparing the proposed Plan of Allocation.  For example, it was necessary for Lead Plaintiffs to consult with an accounting expert to analyze SunPower's Restatement of nearly two years of financial results.  Such consultation was important to understand – and detail in the Complaint – the relevant accounting standards and requirements, as well as the particular manner in which SunPower's journal entries were manipulated that led to the Restatement.

On May 28, 2010, Lead Plaintiffs filed their consolidated complaint asserting claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act"), against SunPower, the Individual Defendants, and certain other individual and underwriter defendants.  [ECF No. 92.]  Thereafter, motions to dismiss were filed on behalf of all named defendants.  [ECF Nos. 112-28.]  For example, the SunPower defendants argued, among other things, that the consolidated complaint failed to plead facts giving rise to a strong inference of scienter because: (1) the Confidential Witness ("CW") statements did not support scienter; (2) the Sarbanes-Oxley ("SOX") certifications did not support scienter; and (3) the results of the Audit Committee's investigation undermined, rather than supported, an inference of scienter. [ECF No. 122.]  The SunPower defendants also argued for dismissal of the § 11 claims based on a purported lack of tracing to the

April 2009 offerings.   The underwriter defendants argued that the § 11 claims should be dismissed for failure to adequately trace the shares at issue to the applicable offerings, and for lack of subject matter jurisdiction. The underwriter defendants also argued that the § 11 claim based on the debt offering should fail because Lead Plaintiffs could not allege compensable damages.  [ECF No. 112.]

On September 22, 2010, Lead Plaintiffs filed an omnibus opposition to all defendants' motions to dismiss. [ECF No. 136.]   Lead Plaintiffs argued, among other things, that the consolidated complaint raised a strong inference of scienter as evidenced by the following: (1) the magnitude, duration, manner and simplicity of the accounting fraud; (2) the fact that SunPower's top officers knew about critical facts related to SunPower's core operations; (3) the accounting fraud enabled SunPower to raise $450 million in April 2009; and (4) the insider defendants' false SOX certifications contributed to a strong inference of scienter.   Lead Plaintiffs also argued that they had adequately alleged § 11 claims for the April 2009 offerings and that the underwriter defendants were statutorily liable under § 11 in connection with the offerings.   Finally, Lead Plaintiffs argued that § 11 claims arising from the September 2008 Class B offering were adequately alleged. [ECF No. 136.]

Following full briefing and the hearing on November 4, 2010, on March 1, 2011, the Court issued an Order dismissing with prejudice the claims pursuant to §§ 11 and 15 of the Securities Act, and dismissing with leave to replead the § 10(b) claims on the basis that Lead Plaintiffs' allegations did not give rise to a strong inference of scienter.

In response to the Court's Order, Lead Plaintiffs filed the Amended Complaint on April 18, 2011.  [ECF No. 153.]  The Amended Complaint again asserted claims under §§ 10(b) and 20(a) of the Exchange Act and §§ 11 and 15 of the Securities Act.[5]  The Amended Complaint added new claims for scheme liability under SEC Rule 10b-5(a) and (c), and added as named defendants SunPower's former controller, John B. Rodman ("Rodman"), and its former

---

[5] In light of the Court's dismissal of the Securities Act claims with prejudice, Lead Plaintiffs did not amend the Securities Act claims but included them in the Amended Complaint solely and exclusively to preserve their appellate rights.  *See* note 2 to Amended Complaint.

Philippines finance director, Mariano M. Trinidad ("Trinidad"), both of whom Lead Plaintiffs alleged were directly involved in the falsification of SunPower's financial results, reported to the Individual Defendants Werner, Hernandez and Arriola, and were fired because of their involvement in the fraud.

Based on Lead Counsel's extensive investigation and additional CW interviews, the Amended Complaint also added new detailed allegations that the Defendants themselves set aggressive expense reduction forecasts and closely monitored the Company's performance toward projections – including conducting frequent and regular meetings with finance personnel and department heads.  The Amended Complaint identified by name SunPower's various formal budget planning sessions conducted by the Defendants throughout the year (¶¶85-88); the specific budgets set by the Defendants and the names of documents containing such forecasts (*id*.); the frequency and participants of meetings held by Defendants to monitor SunPower's performance to expense budgets (¶¶89-90); and the names of reports regarding performance to budget that were received by Defendants and allegedly showed "red flags" alerting the Defendants that SunPower was not meeting its targets (¶¶91-92).  The Amended Complaint also explained that the alleged insider defendants and other high-level management employees had "SuperUser" access to SunPower's computerized accounting system.  ¶¶96-98.  Accordingly, the insider defendants allegedly made (or were deliberately reckless about) the quarter-end manual accounting adjustments that SunPower has admitted were necessary to report expenses in line with forecasts.  The Amended Complaint also alleged that defendants Rodman and Trinidad were at the center of the fraud.

On May 23, 2011, Defendants filed motions to dismiss the Amended Complaint.  [ECF Nos. 155-59, 162, 169-70.]  The SunPower defendants argued that:  (i) the Exchange Act claims should be dismissed for failure to plead particularized facts giving rise to a strong inference that the SunPower defendants acted with scienter; (ii) the § 10(b) claims arising out of forward-looking statements should be dismissed for the independent reason that those statements were protected by the Private Securities Litigation Reform Act of 1995 ("PSLRA") Safe Harbor provisions and/or the bespeaks caution doctrine; and (iii) the Securities Act claims should be

1    dismissed for the reasons set forth in the Court's prior dismissal order.  Defendants Rodman and

2    Trinidad argued that the § 10(b) claims against them should be dismissed for failure to allege

3    sufficient facts showing they substantially participated in making false statements to investors.

4    The underwriter defendants joined in the SunPower defendants' motion to dismiss the § 11 claims

5    against them. [ECF No. 158.]

6         On June 22, 2011, Lead Plaintiffs filed an omnibus opposition to the two motions to

7    dismiss.  [ECF No. 162.]  Lead Plaintiffs responded that the Amended Complaint alleged facts

8    that, taken together and viewed holistically, gave rise to a strong inference of scienter as to each

9    Defendant – an inference that was at least as compelling if not more so than the opposing

10   "innocent" inference offered by Defendants.   Lead Plaintiffs argued that throughout the

11   Settlement Class Period, SunPower's margins were under intense pressure due to increased

12   competition and high-cost supply contracts.  ¶¶5, 11, 74, 77-78.  Analysts saw "management's

13   ability to drive costs as the greatest intermediate term factor to determine [SunPower's] success."

14   ¶¶71-72, 80.  Thus, expenses and gross margins – the very metrics that Defendants falsified –

15   were SunPower's most important and scrutinized metrics.   ¶¶11, 244. Further, Lead Plaintiffs

16   argued that because Defendants were aware of the same pattern – that SunPower was not

17   performing to budget, but then watched it suddenly and inexplicably meet its budget at the end of

18   seven consecutive quarters – the accounting manipulations were "patently obvious" and

19   Defendants' knowledge of these facts and any purported "failure to question" or willful disregard

20   constitutes, at a minimum, deliberate recklessness.   Further, Lead Plaintiffs argued that the

21   terminations of Trinidad and Rodman, and Hernandez's resignation were additional indicia of

22   scienter. Moreover, Defendants' statements of present fact and current business conditions –

23   including statements attributing SunPower's financial success to "cost reduction efforts" – did not

24   constitute forward-looking statements or puffery.

25        Following full briefing and a hearing on August 11, 2011, the Court granted in part and

26   denied in part Defendants' motions to dismiss on December 19, 2011.   [ECF No. 178.]

27   Specifically, the Court's Order dismissed all claims asserted against Rodman, Trinidad, T.J.

28   Rodgers, W. Steve Albrecht, Betsy S. Atkins, Patrick Wood, III, Uwe-Ernst Bufe, and the

1 underwriter defendants with prejudice, but sustained the remaining Exchange Act claims against

2 the SunPower defendants.

3       The two rounds of motions to dismiss required substantial briefing.  In all, Lead Plaintiffs'

4 responses to these arguments were included in two briefs, which combined for over 60 pages.

5 Each of the motions to dismiss raised complex legal issues.

6       Defendants answered the Amended Complaint on January 27, 2012.  [ECF No. 182.]

7 **C.**    **The Extensive Discovery Process**

8       The Court's December 19, 2011 Order sustaining in part the Amended Complaint lifted

9 the mandatory discovery stay imposed by the PSLRA, and Lead Plaintiffs immediately

10 commenced formal discovery.  As detailed in the Lead Counsel Declaration, Lead Plaintiffs'

11 discovery efforts included, among other things: (1) serving and responding to multiple document

12 requests, interrogatories and requests for admissions; (2) issuing document subpoenas to

13 numerous third-parties, including SunPower's outside auditors PricewaterhouseCoopers LLP

14 ("PWC"); (3) negotiating a Stipulated Protective Order Governing Confidentiality [ECF No.

15 197]; (4) engaging in multiple in-person and telephonic meet and confer conferences with

16 Defendants and third-parties over a 10-month time period; (5) preparing a request for the issuance

17 of Letters Rogatory for deposition testimony and document discovery from relevant witnesses in

18 the Republic of the Philippines, including SunPower's own former accounting personnel and

19 former Philippines Finance Director Trinidad; (6) reviewing and analyzing documents received

20 from SunPower and non-parties; and (7) preparing for and taking the Rule 30(b)(6) deposition of

21 SunPower on a variety of topics relevant to the allegations of the Amended Complaint.

22       In response to Lead Plaintiffs' extensive discovery efforts, Lead Plaintiffs received a

23 substantial volume of documents from Defendants and third-parties.  In total, Lead Counsel

24 obtained, and devoted thousands of hours to reviewing, over 2.5 million pages of documents.  In

25 addition, on September 21, 2012, Lead Plaintiffs took a near full-day Rule 30(b)(6) deposition of

26 SunPower's corporate designee, Vidul Prakesh, on a host of issues including: (1) SunPower's

27 corporate organization and reporting structure; (2) SunPower's periodic reports and meetings; (3)

28 SunPower's financial reporting and accounting processes; (4) SunPower's public statements; (5)

1    SunPower's Restatement and Audit Committee investigation into the Restatement; (6)

2    SunPower's Philippines operations and certain Philippines personnel; and (7) document

3    preservation, production, and electronically-stored information ("ESI").

4        Lead Plaintiffs were also forced to file two motions to compel.  The first was necessitated

5    by Defendants' attempt to limit entire categories of relevant discovery to a few individuals at

6    SunPower.  Rather than conducting a reasonable search of the files of all relevant custodians and

7    personnel who worked in SunPower's key accounting, finance, internal audit and Philippine

8    accounting divisions, where the fraudulent financial reporting purportedly occurred, Defendants

9    attempted to narrow discovery for certain discovery requests to either a small group of 5-7

10   individuals (including the 3 Individual Defendants) or an undefined group of SunPower

11   "executives."   Lead Plaintiffs argued that Defendants' attempt to limit entire categories of

12   relevant discovery to only a handful of individuals – while ignoring countless key accounting and

13   finance custodians – was fundamentally inconsistent with well-settled principles underlying Fed.

14   R. Civ. P. 26.[6]  Following full briefing, the Magistrate Judge issued an order directing the parties

15   to continue to meet and confer on the outstanding issues, which resulted in the parties reaching

16   certain additional agreements on the scope of discovery.  Lead Counsel Decl. ¶¶51-53.

17       Lead Plaintiffs' second motion to compel resulted from the fact that Lead Plaintiffs

18   believed that SunPower's designated Rule 30(b)(6) deponent was not adequately prepared to

19   testify during the deposition despite the reasonably particular notice of deposition and the parties'

20   extensive discussions about the subjects required for testimony.  Following full briefing and oral

21   argument on Lead Plaintiffs' motion to compel, the Magistrate Judge directed Defendants to

22   produce certain documents and information that were the subject of Lead Plaintiffs' Rule 30(b)(6)

23   deposition notice but otherwise declined to reopen the SunPower deposition.  Lead Counsel Decl.

24   ¶¶60-61.

---

[6] In the motion to compel, Lead Plaintiffs also sought limited pre-class period discovery relating to 2007, a year in which certain SunPower transactions had been restated and for which certain budgeting and other financial planning documents would be relevant.  [ECF No. 207.]

### D. Lead Plaintiffs' Motion For Class Certification And Defendants' Motion For Partial Judgment On The Pleadings Were Pending When The Settlement Was Reached

Following substantial discovery as detailed in the Lead Counsel Declaration, on September 14, 2012, Defendants filed a motion for partial judgment on the pleadings, arguing that certain purported forward-looking statements were protected by the PSLRA's Safe Harbor provisions, that Lead Plaintiffs failed to plead the forward-looking statements were false, and that the statements were merely "statements of corporate optimism" and not actionable as a matter of law. [ECF Nos. 217-220.] On October 19, 2012, Lead Plaintiffs filed an opposition to the motion, arguing that the statements were not forward-looking but were historical statements of fact; that Defendants could not satisfy the required stringent showing that any cautionary language was meaningful; that at the time the statements were made Defendants had no reasonable basis for, and were aware of facts seriously undermining, their statements; and Defendants' statements regarding SunPower's key financial metrics were not immaterial puffery. [ECF No. 230.] The motion was pending when the Settlement was reached.

Also, following substantial discovery, on September 28, 2012, Lead Plaintiffs filed a motion for class certification. In support of their motion, Lead Plaintiffs filed the expert declaration of Jane Nettesheim of Stanford Consulting Group, Inc., which included a thorough analysis of the efficiency of the market for SunPower Securities. Defendants served wide-ranging discovery demands on Lead Plaintiffs purportedly related to class certification, to which Lead Plaintiffs responded. Lead Counsel Decl. at ¶76. Lead Plaintiffs' class certification motion was pending when the Settlement was reached.

### E. The Extensive Negotiations Leading To The Settlement

Beginning in May 2012, the parties engaged in arm's-length settlement discussions that were facilitated by Jed D. Melnick, Esq., a well-regarded private mediator with JAMS, with considerable knowledge and expertise in the field of federal securities law.[7]

---

[7] Mr. Melnick works with JAMS, a private mediation practice. According to the JAMS website, Mr. Melnick has been involved in the mediation and successful resolution of hundreds of complex

As detailed in the Lead Counsel Declaration, mediation discussions commenced on May 30, 2012, when counsel for Lead Plaintiffs and Defendants met with Mr. Melnick to lay out their initial factual and legal positions in the case and decide on the framework for future mediation sessions.  Prior to this mediation session, Lead Plaintiffs and SunPower exchanged lengthy mediation statements on the salient factual and legal issues expected to arise during the discussions.  During the full-day mediation session, the parties each made liability and damages presentations.  Although the first mediation session did not result in a settlement, it laid the groundwork for the parties to continue settlement discussions while litigating the case.

Between June 2012, and December 7, 2012, counsel for the parties participated in telephonic mediation updates facilitated by Mr. Melnick, as well as several face-to-face meetings without the Mediator's participation.  During these discussions, the parties discussed the challenges faced by Lead Plaintiffs in proving Defendants' scienter, damages, the lack of meaningful insurance coverage and the Company's ability to satisfy any judgment, among other things.

Following extensive negotiations, and after it became apparent that the parties had reached an impasse, the Mediator recommended a proposed settlement in the amount of $19.7 million. Lead Counsel understands that the recommendation was based on the Mediator's involvement in the negotiations, review and analysis of the parties' mediation submissions, and extensive communications with the parties.  Ultimately, after extensive discovery had taken place (including the production by Defendants and third-parties of over 2.5 million pages of documents and a deposition of SunPower), and after Defendants filed a motion for partial judgment on the

---

disputes with an aggregate value in the billions of dollars.  He has mediated over 750 disputes, published articles on mediation, founded a nationally ranked dispute resolution journal and taught young mediators.  Mr. Melnick is the managing partner for Weinstein Melnick LLC, working alongside the Hon. Daniel Weinstein (Ret.), one of the nation's preeminent mediators of complex civil disputes.  In 2010, 2011 and 2012, Mr. Melnick was selected as a *Pennsylvania Super Lawyers* "Rising Star," the only "Rising Star" in the Alternative Dispute Resolution category in Pennsylvania.  He was also selected to the 2010 list of Pennsylvania "Lawyers on the Fast Track," a recognition given to 30 Pennsylvania Lawyers under the age of 40 by *Legal Intelligencer* and the *Pennsylvania Law Weekly*.  http://www.jamsadr.com/melnick.

1  pleadings and Lead Plaintiffs filed their motion for class certification, on December 7, 2012, the

2  parties reached an agreement-in-principle to settle for that amount.

3       The entire process involved significant disputed issues, and even after an agreement-in-

4  principle had been reached, there were extensive continued negotiations about specific terms of

5  the settlement agreement.

6       **F.**    **Overview Of The Notice Process**

7       On February 1, 2013, Lead Plaintiffs filed an unopposed motion for preliminary approval

8  of the Settlement.  [ECF No. 247.]  Following a hearing on the motion on March 14, 2013, on

9  March 25, 2013, the Court granted preliminary approval, preliminarily certified the Settlement

10 Class for settlement purposes, and set a schedule for the motion for final approval of the

11 Settlement.  [ECF No. 257.]

12      Pursuant to the Court's Preliminary Approval Order, copies of the Notice were mailed to

13 over 89,000 potential Settlement Class Members and nominees beginning on April 8, 2013.  *See*

14 Thurin Decl. at ¶¶9-12.  In addition, the Court-approved Summary Notice was published in the

15 national edition of *Investor's Business Daily* and transmitted over the *PR Newswire* on

16 April 18, 2012. *Id.* at ¶13.  Information regarding the Settlement, including downloadable copies

17 of the Notice and Claim Form, was posted on the website established by the Claims Administrator

18 specifically for this Settlement, www.sunpowersecuritieslitigation.com, as well as on Lead

19 Counsel's websites, www.blbglaw.com, www.kaplanfox.com and www.ktmc.com.  *Id.* at ¶20;

20 Lead Counsel Decl. at ¶108.

21      As set forth in the Notice, the Court-ordered deadline for Settlement Class Members to file

22 objections to the Settlement, the Plan of Allocation, and/or the fee and expense application, or to

23 request exclusion from the Settlement Class, is June 12, 2013.  To date, no objections have been

24 received and not a single Settlement Class Member has requested to be excluded from the

25 Settlement Class.[8]

26 ———————————————

27 [8] As the deadline for filing objections and submitting requests for exclusion has not passed, Lead
   Counsel will address any objections and/or requests for exclusion received after the date of this
28 submission in their reply papers to be filed with the Court on or before June 26, 2013.

This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1).

The Notice advises Settlement Class Members of the essential terms of the Settlement, sets forth the procedures for objecting to the Settlement, requesting exclusion from the Settlement Class, and submitting a Claim Form in order to be potentially eligible to receive a distribution from the Net Settlement Fund, and provides specifics on the date, time and place of the Final Approval Hearing. The Notice also contains information regarding Lead Counsel's fee and expense application and the proposed plan for allocating the settlement proceeds among Settlement Class Members. Thus, the Notice provides the necessary information for Settlement Class Members to make an informed decision regarding the proposed Settlement.

The Notice fairly apprises Settlement Class Members of their rights with respect to the Settlement and, therefore, is the best notice practicable under the circumstances and complies with the Court's March 25, 2013 Preliminary Approval Order, Federal Rule of Civil Procedure 23, and due process.[9]

## II.   ARGUMENT

### A.    The Standards For Judicial Approval Of Class Action Settlements

It is well established in the Ninth Circuit that "voluntary conciliation and settlement are the preferred means of dispute resolution," especially in class actions.[10] Under Rule 23(e) of the Federal Rules of Civil Procedure, a class action may be settled upon notice of the proposed settlement to class members, and a court finding, after a hearing, that it is fair, reasonable and

---

[9] *See In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *1 (N.D. Cal. Nov. 26, 2007) (approving similar notice regimen); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1170 (S.D. Cal. 2007); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'") (citations omitted).

[10] *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *see also In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) ("[T]he court must also be mindful of the Ninth Circuit's policy favoring settlement, particularly in class action law suits.").

---

adequate.  On a motion for final approval of a class action settlement, "the Court must determine whether the interests of the [class] will be better served by resolution of the litigation than by continuation of it."  *See In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1387 (D. Ariz. 1989).

A court's role in settlement approval is essentially twofold, determining whether the settlement: (i) is tainted by fraud or collusion; and (ii) is fair, reasonable and adequate.  *See Officers for Justice*, 688 F.2d at 625.  In exercising its discretion to approve the settlement of a class action, a court should consider the following factors:  (1) "the strength of the plaintiffs' case"; (2) "the risk, expense, complexity, and likely duration of further litigation"; (3) "the risk of maintaining a class action throughout the trial"; (4) "the amount offered in settlement"; (5) "the extent of discovery completed and the stage of the proceedings"; (6) "the experience and views of counsel"; and (7) "the reaction of the class members to the proposed settlement."  *In re Rambus Inc. Derivative Litig.*, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009) (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)).  "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case."  *Officers for Justice*, 688 F.2d at 625.

In exercising its sound discretion, a district court should not adjudicate the merits of the case.  As the Ninth Circuit has noted:

> [T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits.  Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.  The proposed settlement is not to be judged against a hypothetical or speculative measure of what ***might*** have been achieved by the negotiators.[11]

Indeed, this Court recognized in approving a class action settlement involving an alleged manufacturing defect that "the Ninth Circuit has instructed:  'Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or

---

[11] *Officers for Justice*, 688 F.2d at 625 (emphasis added); *see also Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) ("in order to avoid a trial, the judge must [not] in effect conduct one").

snazzier, but whether it is fair, adequate and free from collusion.'" *Milligan v. Toyota Motor Sales U.S.A. Inc.,* No. C 09-05418 RS (N.D. Cal. Jan. 6, 2012), ECF No. 80 at p. 12 (quoting *Hanlon v. Chrysler,* 150 F.3d 1011, 1027 (9th Cir. 1998)).  Here, the Settlement is the product of extensive arm's-length negotiations presided over by an experienced mediator.   It is the considered judgment of the Lead Counsel, and the three sophisticated Lead Plaintiffs, that the Settlement represents a fair, reasonable, and adequate resolution of the litigation and warrants this Court's approval.  *See* Lead Counsel Decl. at ¶93, 142; Lead Plaintiffs' Decl. at ¶8.

### B.    The Settlement Meets The Ninth Circuit's Standard For Approval

#### 1.    Lead Plaintiffs' Case Is Strong, But Entails Risks

Courts evaluating proposed class action settlements consider the risks faced by plaintiffs in further litigation.   *See, e.g., Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  While Lead Plaintiffs believe that all of the claims asserted against Defendants have merit, they also recognize that there were risks of lesser or no recovery.  For example, Lead Plaintiffs would have the burden to establish, among other things, that the alleged statements were actionable and false and misleading, and that they were made with scienter.   Even if Lead Plaintiffs fully defeated Defendants' motion for partial judgment on the pleadings that was pending when the Settlement was reached, Lead Plaintiffs were aware that Defendants would argue that the accounting misconduct that led to SunPower's Restatement occurred entirely within SunPower's Philippines manufacturing subsidiary, by Philippine accountants at the direction of Philippine personnel, and was unknown to SunPower's top management located in the United States.  Defendants would continue to argue that when the Company first became aware of the "unsubstantiated" journal entries at its Philippines subsidiary, SunPower's Audit Committee commissioned an independent investigation involving outside law firms and forensic investigators at an expense of more than $8 million, which resulted in the Audit Committee concluding that SunPower's senior management neither directed nor were aware of the accounting misconduct. Lead Counsel Decl. at ¶¶5, 139.

Lead Plaintiffs were also aware that Defendants argued on the motions to dismiss, and would continue to argue during summary judgment and trial, that the Audit Committee's

conclusions were further verified and accepted by SunPower's outside auditing firm, which audited and certified SunPower's restated financial statements, and by the SEC, which, according to the Company's public disclosures, formally closed its investigation into the matter and "did not intend to recommend any enforcement action by the Commission." *Id.* at ¶¶6, 139. Accordingly, Lead Plaintiffs faced the real risk that liability, and particularly the element of scienter, would be difficult to establish.

Lead Plaintiffs further considered that certain contested issues would have been decided by a jury in the event of a trial, including whether the alleged misrepresentations were false and material to investors and made with scienter, whether all of the Settlement Class Members' losses were caused by the alleged misrepresentations, and the amount of damages. Even a meritorious case can be lost at trial, or later on appeal.[12]

Moreover, Lead Plaintiffs were aware of the practical reality that, even if Lead Plaintiffs were fully successful through motion practice, at trial, and on appeal, there were at least serious questions as to SunPower's ability to satisfy a judgment. Specifically, based on review of SunPower's publicly filed financial statements, and retention of a valuation expert, it was Lead Plaintiffs' assessment that SunPower's cash position was diminishing. Furthermore, Defendants represented during mediation that there was no insurance available to fund an eventual judgment or a settlement. Lead Counsel Decl. at ¶¶7, 139. Thus, Lead Plaintiffs knew that, even if they were entirely successful, even after trial and appeals, they may actually recover substantially less than the amount obtained in this Settlement for the benefit of the Settlement Class, or nothing at all.

### 2. The Expense, Complexity, And Likely Duration Of Further Litigation

---

[12] *See In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' judgment as a matter of law following plaintiff verdict); *In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (after the jury rendered a verdict for plaintiffs after an extended trial, the court overturned the verdict); *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning securities class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988).

The certainty of an immediate recovery for Settlement Class Members strongly weighs in favor of settlement given the costs, delays, risks of losing entirely and the uncertain possibility of achieving a larger recovery at some point far in the future. *See, e.g., Officers for Justice,* 688 F.2d at 626. The established policy favoring settlement of disputed claims is even stronger for class actions due to the associated expense, complexity, and delays. *See In re Top Tankers, Inc. Sec. Litig.*, 2008 WL 2944620, at *3 (S.D.N.Y. July 31, 2008). Indeed, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *Id.* (citation omitted). Courts recognize that securities class actions are generally complex and expensive to prosecute. *See, e.g., In re Heritage Bond Litig.*, 2005 WL 1594403, at *6 (C.D. Cal. June 10, 2005) (citing *Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 364 (S.D.N.Y. 2002); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)).

There is no doubt that this securities class action involves complex factual and legal issues. If the Settlement here had not been achieved, the action would likely have continued for years, and discovery would have spanned the globe under foreign procedures. Indeed, at the time the Settlement was reached, Lead Counsel had prepared requests for Letters Rogatory to obtain discovery, including deposition and document discovery, of certain potential witnesses that Lead Plaintiffs had identified as located in the Philippines. Lead Counsel Decl. at ¶62. Instead of the lengthy, costly, and uncertain course of further litigation, including discovery in the Philippines, the Settlement provides an immediate and certain recovery for the Settlement Class.

### 3.    The Amount Obtained In Settlement

The determination of a "reasonable" settlement is not susceptible to a mathematical equation yielding a particularized sum. In fact, a settlement may be acceptable even if it amounts to only a fraction of the potential recovery that might be available at trial. *See Mego Fin.*, 213 F.3d at 458.

Here, the Settlement provides for the recovery of $19.7 million in cash, plus interest. The Settlement was reached as a result of lengthy negotiations, following a recommendation by the Mediator, and only after extensive discovery had taken place, Defendants filed their motion for

1   partial judgment on the pleadings, and Lead Plaintiffs filed their motion for class certification.

2   Defendants would be expected to argue that any losses were caused in whole or substantial part

3   by factors other than untrue statements, and that estimated recoverable damages were

4   substantially less than Lead Plaintiffs would argue, or zero.

5       In sum, the $19.7 million Settlement presents a reasonable resolution of this action and

6   eliminates the risk that the Settlement Class might recover far less, or nothing at all.

7           **4.      The Extent Of Discovery Completed
                      And The Stage Of The Proceedings**

8

9       The stage of the proceedings and the amount of information available to the parties to

10  assess the strengths and weaknesses of their case is another factor that courts consider in

11  determining the fairness, reasonableness, and adequacy of a settlement.  *See Mego Fin.*, 213 F.3d

12  at 459; *Rambus*, 2009 WL 166689, at *2.

13      As detailed in the Lead Counsel Declaration, the litigation continued for over three years

14  and involved substantial motion practice and extensive document and deposition discovery.  Lead

15  Plaintiffs' efforts included serving Defendants with multiple requests for documents, answers to

16  interrogatories, and requests for admissions; serving numerous third-parties with document

17  subpoenas; and seeking to obtain discovery, including deposition and document discovery, of

18  certain potential witnesses in the Philippines.  Lead Plaintiffs' efforts, and related motions to

19  compel, resulted in the production of more than 2.5 million pages of documents and a key

20  deposition of SunPower itself.

21      By the time the Settlement was reached, the parties had completed two rounds of motions

22  to dismiss, extensive document discovery, the deposition of SunPower and preparation for

23  additional depositions domestically and internationally, Lead Plaintiffs' motion for class

24  certification, and Defendants' motion for partial judgment on the pleadings.  In sum, Lead

25  Plaintiffs actively prosecuted this case for the benefit of the Settlement Class for over three years,

26  and reached an agreement to settle at a point when they were well informed as to the factual, legal

27  and practical risks involved in continuing the action.

28

1

      **5.**      **The Experience And Views Of**
                       <u>**Lead Counsel And Lead Plaintiffs**</u>

2

3

       Courts recognize that the opinion of experienced counsel supporting the settlement is

4

entitled to considerable weight.[13]  This makes sense, as counsel is "most closely acquainted with

5

the facts of the underlying litigation."[14]  "Parties represented by competent counsel are better

6

positioned than courts to produce a settlement that fairly reflects each party's expected outcome in

7

litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).  Thus, "the trial judge,

8

absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of

9

counsel." *Heritage Bond*, 2005 WL 1594403, at *9 (citation omitted).

10

       Here, Lead Counsel have many years of experience in litigating complex securities actions

11

throughout the country – including within this Circuit – and in assessing the relevant merits of

12

each side's case.[15]

13

14

_____

15

[13] *See, e.g.*, *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) ("the fact that

16

experienced counsel involved in the case approved the settlement after hard-fought negotiations
is entitled to considerable weight"); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal.

17

1979); *see also In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 1992 WL 226321, at
*2 (C.D. Cal. June 10, 1992) (finding belief of counsel that the proposed settlement represented

18

the most beneficial result for the class to be a compelling factor in approving settlement); *see
also Omnivision*, 559 F. Supp. 2d at 1043 ("The recommendations of plaintiffs' counsel should

19

be given a presumption of reasonableness.") (quoting *Boyd*, 485 F. Supp. at 622).

20

[14] *Heritage Bond*, 2005 WL 1594403, at *9 (citations omitted); *Rambus*, 2009 WL 166689, at
*3; *Glass v. UBS Fin. Servs., Inc.*, 2007 WL 221862, at *5 (N.D. Cal. Jan. 26, 2007), *aff'd*, 331

21

Fed. Appx. 452 (9th Cir. 2009) (unpubl.).

22

[15] *See, e.g., In re McKesson HBOC, Inc. Sec. Litig.*, 99-CV-20743 RMW (N.D. Cal.) (successful
recovery of over $1.04 billion); *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 08-00832-JW

23

(N.D. Cal.) ($173 million); *In re Connetics Sec. Litig.*, 07-02940 SI (N.D. Cal.) ($12.75 million);
*In re New Century*, 07-cv-00931 (FMOx) (C.D. Cal.) ($125 million); *In re Int'l Rectifier Corp.*

24

*Sec. Litig.*, 07-02544-JFW (C.D. Cal.) ($90 million); *In re Gemstar-TV Guide Int'l Inc. Sec.
Litig.*, 02-CV-2775-MRP (C.D. Cal.) ($92.5 million); *In re Wells Fargo Mortgage-Backed*

25

*Certificates Litig.,* 09-cv-01376-LHK (N.D. Cal.) ($125 million); *In re Tenet Healthcare Corp.
Sec. Litig.*, CV 02-8462-RSWL (C.D. Cal.) ($281.5 million); *In re Brocade Sec. Litig.,* 05-CV-

26

02042-CRB (N.D. Cal.) ($160 million); *In re Marvell Tech. Grp. Ltd. Sec. Litig.,* 06-cv-6286
RMW (N.D. Cal.) ($72 million); *In re 3Com Sec. Litig.*, 97-cv-21083 (N.D. Cal.) ($259 million);

27

*In re Informix Corp. Sec. Litig*., 97-cv-1289 (N.D. Cal.) ($136.5 million); *see also* Firm

28

Resumes, previously submitted as ECF Nos. 32-5, 32-6 and 32-7.

Additionally, throughout the litigation and settlement negotiations, the SunPower defendants have been represented by experienced counsel from a prominent law firm, Morrison & Foerster LLP.  As a result, the parties' negotiations were thorough.  The negotiations required extensive mediation efforts – conducted under the direction of Mr. Melnick – ultimately resulting in the parties accepting the Mediator's recommendation to settle for $19.7 million.  With this background, the Settlement was clearly reached without collusion and only after good-faith bargaining among the parties.  *See Lundell v. Dell, Inc.*, 2006 WL 3507938, at *3 (N.D. Cal. Dec. 5, 2006) (approving class action settlement that was "the result of intensive, arms'-length negotiations between experienced attorneys familiar with the legal and factual issues of this case").

Moreover, under the regime put in place with the enactment of the PSLRA, a lead plaintiff's approval of a settlement should be accorded "special weight because [the lead plaintiff] may have a better understanding of the case than most members of the class." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (quoting Manual for Complex Litigation (Third) § 30.44 (1995)).  Congress enacted the PSLRA in large part to encourage sophisticated institutional investors, like Lead Plaintiffs here, to take control of securities class actions and "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R. Conf. Rep. 104-369, at *32 (1995).  Here, the institutional investor Lead Plaintiffs participated throughout the prosecution and settlement of this case, including searching for and producing documents requested by Defendants and even attending in person a mediation session.  *See* Lead Plaintiffs' Decl. at ¶7.  Lead Plaintiffs' approval of the Settlement is further evidence that the Settlement is fair, reasonable and adequate.

### 6.    Reaction Of The Settlement Class Members To Date To The Proposed Settlement

The reaction of the Settlement Class is another factor relevant in determining the adequacy of the Settlement.  *See Rambus*, 2009 WL 166689, at *3 (citation omitted).  "[T]he absence of a

---

1   large number of objections to a proposed class action settlement raises a strong presumption that

2   the terms of a proposed class settlement action are favorable to the class members." *Omnivision*,

3   559 F. Supp. 2d at 1043 (citation omitted).  Here, pursuant to the Preliminary Approval Order, the

4   deadline for Settlement Class Members to object to the Settlement, the Plan of Allocation or Lead

5   Counsel's fee and expense request will expire on June 12, 2013.  To date, there have been no

6   objections.

7   **C.      The Plan Of Allocation Should Be Approved**

8          Lead Plaintiffs have proposed a plan to allocate the proceeds of the Settlement among

9   Settlement Class Members who submit valid Claim Forms.  The objective of the proposed Plan of

10   Allocation is to equitably distribute the Net Settlement Fund among Claimants based on their

11   respective alleged economic losses as a result of the alleged fraud, as opposed to losses caused by

12   market- or industry-wide factors, or company-specific factors unrelated to the alleged fraud.

13          As detailed in the Declaration of Jane D. Nettesheim in Support of Plan of Allocation

14   ("Nettesheim Decl."), attached as Exhibit D to the Lead Counsel Declaration, Lead Plaintiffs

15   engaged Jane Nettesheim and Faye Fort of the Stanford Consulting Group, Inc. to examine the

16   alleged misrepresentations involved in the Action and to propose a fair and reasonable method for

17   allocating the settlement proceeds among Claimants.  As set forth in the Nettesheim Declaration,

18   and fully explained in the Notice, a "Recognized Loss" will be calculated for each purchase or

19   acquisition of a SunPower Security by a Settlement Class Member during the Settlement Class

20   Period as set forth on valid Claim Forms, which calculation will depend on:  (1) when each

21   Security was purchased or otherwise acquired; (2) whether the Security was held until after the

22   end of the Settlement Class Period; (3) whether and when the Security was sold, redeemed or

23   otherwise disposed of; (4) the amount paid (or value of the consideration given) for each Security

24   purchased or otherwise acquired; (5) the amount received (or value of the consideration received)

25   for each Security sold or otherwise disposed of; and (6) the alleged artificial inflation in the price

26   of the Security at different times during the Settlement Class Period attributable to Defendants'

27   false statements as alleged in this case ("artificial inflation") as calculated by Lead Plaintiffs'

28

1    damages consultant.[16]  The Net Settlement Fund will be allocated on a *pro rata* basis based on the

2    amount of each Authorized Claimant's claim amount as calculated by the Claims Administrator

3    under the Plan of Allocation.

4          The structure of the proposed Plan of Allocation, which is appended in full to the Notice,

5    is comparable to plans of allocation that have been used in numerous securities class actions.

6    Lead Plaintiffs submit that the proposed Plan of Allocation is fair and reasonable and should be

7    approved together with the Settlement at the Final Approval Hearing.

8           In addition, in response to the dissemination of over 89,000 Notices, there have been no

9    objections to date to the proposed Plan of Allocation.

10         Assessment of the adequacy of a plan of allocation in a class action is governed by the

11   same standards of review applicable to the settlement as a whole – the plan needs to be fair,

12   reasonable and adequate.  *See Omnivision*, 559 F. Supp. 2d at 1045; *Class Plaintiffs v. Seattle*,

13   955 F.2d 1268, 1284-85 (9th Cir. 1992).  "An allocation formula need only have a reasonable,

14   rational basis, particularly if recommended by experienced and competent class counsel."  *In re*

15   *WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (citation omitted).  A plan

16   of allocation that allocates settlement funds to class members based on the extent of their injuries

17   or the strengths of their claims is reasonable.  *See Omnivision*, 559 F. Supp. 2d at 1045.

18         Here, the proposed Plan of Allocation in this case was prepared in consultation with Lead

19   Plaintiffs' damages consultant, tracks the theory of damages asserted by Lead Plaintiffs and is

20

21   [16] Here, the single alleged corrective disclosure occurred after the market closed on
     November 16, 2009.  Thus, if a Settlement Class Member purchased a SunPower Security during
22   the Settlement Class Period but sold it before the market closed on November 16, 2009, the
     Recognized Loss for that transaction is $0, regardless of when the Security was purchased, and
23   any loss suffered is not compensable under the federal securities laws under Lead Plaintiffs'
     theory of the case.  In addition, the 90-day "look back" provision of the PSLRA is incorporated
24   into the calculation of Recognized Loss.  The limitations on calculation of Recognized Loss
     imposed by the PSLRA are applied such that losses on Securities purchased during the Settlement
25   Class Period and held as of the close of the 90-day "look back" period cannot exceed the
     difference between the purchase price paid for the Security and the average price of the Security
26   during the 90-day "look back" period.  Losses on Securities purchased during the Settlement
     Class Period and sold during the 90-day "look back" period cannot exceed the difference between
27   the purchase price paid for the Security and the rolling average of the Security's price during the
     90-day "look back" period as of the date of the sale.
28

1   otherwise fair, reasonable and adequate to the Settlement Class as a whole.  *See* Nettesheim Decl.

2   at ¶4.

3   **III.   CONCLUSION**

4        For the foregoing reasons, Lead Plaintiffs respectfully request that the Court grant final

5   approval of the Settlement and Plan of Allocation.

6   Dated: May 15, 2013              Respectfully submitted,

7                             BERNSTEIN LITOWITZ BERGER
                              & GROSSMANN LLP

8

9                               */s/ David R. Stickney*
                              DAVID R. STICKNEY

10

11                            DAVID R. STICKNEY
                         NIKI L. MENDOZA

12                            BENJAMIN GALDSTON
                         12481 High Bluff Drive, Suite 300

13                            San Diego, CA 92130
                         Tel:   (858) 793-0070
                         Fax:   (858) 793-0323

14

15                            *Attorneys for Lead Plaintiffs Arkansas Teacher
                         Retirement System, Första AP-fonden and
                         Danske Invest Management A/S*

16

17                            KAPLAN FOX & KILSHEIMER LLP
                         LAURENCE D. KING

18                            MARIO M. CHOI
                         350 Sansome Street, Suite 400

19                            San Francisco, CA 94104
                         Tel:   (415) 772-4700

20                            Fax:   (415) 772-4707

21                                  -and-

22                            FREDERIC S. FOX (*pro hac vice*)
                         JOEL B. STRAUSS (*pro hac vice*)

23                            CHRISTINE M. FOX (*pro hac vice*)
                         850 Third Avenue, 14th Floor

24                            New York, NY 10022
                         Tel:   (212) 687-1980

25                            Fax:   (212) 687-7714
                         ffox@kaplanfox.com

26                            jstrauss@kaplanfox.com
                         cfox@kaplanfox.com

27

28                            *Attorneys for Lead Plaintiffs Arkansas Teacher
                         Retirement System, Första AP-fonden and
                         Danske Invest Management A/S*

KESSLER TOPAZ MELTZER
  & CHECK LLP
RAMZI ABADOU
ELI R. GREENSTEIN
STACEY KAPLAN
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:    (415) 400-3000
Fax:    (415) 400-3001

-and-

DARREN J. CHECK
JENNIFER L. ENCK
280 King of Prussia Road
Radnor, PA 19087
Tel:    (610) 667-7706
Fax:    (610) 667-7056
dcheck@ktmc.com
jenck@ktmc.com

*Attorneys for Lead Plaintiffs Arkansas Teacher
Retirement System, Första AP-fonden and
Danske Invest Management A/S, and additional
Plaintiff Bobby J. Reynolds*